# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BAYSTATE MEDICAL CENTER,            )
759 Chestnut Street,                )
Springfield, Massachusetts,         )
                                    )
        Plaintiff,            )     CASE NO.:
                                    )
    v.                            )
                                    )
MICHAEL O. LEAVITT, in his official capacity )
as Secretary, United States Department )
of Health and Human Services,       )
200 Independence Avenue, N.W.,      )
Washington, D.C. 20201,             )
                                    )
and                                 )
                                    )
JO ANNE B. BARNHART, in her official capacity )
as Commissioner, Social Security Administration, )
6401 Security Boulevard,            )
Baltimore, Maryland 21235,          )
                                    )
        Defendants.           )

## COMPLAINT FOR SUMS DUE OR FOR DECLARATORY AND INJUNCTIVE RELIEF CONCERNING MEDICARE PAYMENTS TO A DISPROPORTIONATE SHARE HOSPITAL

This is an action for judicial review of the final decision of the defendant, Secretary of

the Department of Health and Human Services (the "Secretary"), concerning the Secretary's

determinations of the Medicare "disproportionate share hospital" (or "DSH") payment due to

plaintiff hospital, Baystate Medical Center (the "Hospital"), for fiscal years 1993-1996.  In the

proceeding below, the Secretary's Provider Reimbursement Review Board (the "PRRB" or

"Board") issued a lengthy decision laying out the pertinent facts, set forth in the body of this

Complaint, that conclusively establish the Secretary's erroneous computation of the DSH

payments at issue.  PRRB Dec. No. 2006-D20, Mar. 17, 2006 ("PRRB Dec.").  That decision

was improperly reversed by the Administrator of the Secretary's agency, the Centers for Medicare and Medicaid Services ("CMS"), in a May 17, 2006 decision ("Adm'r Dec."), from which this appeal is taken.  The Administrator deems "acceptable" a series of errors and omissions in the agency's DSH payment calculations, concluding that each of these undisputed failings, viewed in isolation from each other, represents an "acceptable rate of error."  Adm'r Dec. at 25-26, 42-43.  But the undisputed evidence shows that the cumulative effect of these errors and omissions was to decrease the DSH payments – by hundreds of millions if not *billions* of dollars – to hospitals like Baystate that served a disproportionate share of low-income Americans during the four fiscal years at issue.  *See* ¶ 266, *infra*.  As Senator Dirksen famously once said:  "A billion here, a billion there, pretty soon it adds up to real money."

The record amassed before the agency is voluminous, and the resulting agency decisions are lengthy.  Of necessity, the factual detail is set forth in this Complaint.[1]  But, the essential fact of this matter is undisputed and simple:  The Secretary's calculations are wrong.  Systemic errors in both the method and execution of his calculations have resulted in an ongoing, systemic understatement of the Medicare DSH payments owed by the government to all hospitals, including the plaintiff Hospital.  Further, because the Secretary's agency, CMS, did not maintain documentation for its calculations or the systems used to perform those calculations, the

---

[1]    The Medicare payment and DSH calculation process, including the "SSI fraction" calculation at issue in this case, is addressed herein at paragraphs 22-54 (Parts I, II); the specific SSI fraction calculations for the Hospital's fiscal years at issue (1993-96) are addressed at paragraphs 55-89 (Part 3(A)); errors in the *match process* that CMS uses to calculate the *numerator* of the SSI fraction are addressed at paragraphs 103-204 (Part 3(D)); flaws in the *data* that CMS uses to calculate the numerator of the SSI fraction are addressed at paragraphs 205-62 (Part 3(E)); the potential economic impact of all of CMS's errors affecting the *numerator* of the SSI fraction is addressed at paragraphs 263-74 (Part 3(F)); errors in CMS' calculation of the *denominator* of the SSI fraction are addressed at paragraphs 275-302 (Part 3(E)); CMS's efforts to resist discovery relating to the economic impact of its errors in *both* parts of the SSI fraction are addressed at paragraphs 303-34 (Part 3(H)); and CMS' belated efforts to attack the credibility of the witnesses below are addressed at paragraphs 335-45 (Part 3(I)).

Secretary cannot verify what was counted in the agency's calculations for any of the Hospital fiscal years at issue, nor show how the numbers in his calculations were derived for those periods.

The relief sought in this case is also quite simple and direct:  The Hospital seeks a remand to the Secretary with instructions that he correct his errors and omissions, recompute the DSH payments due the Hospital for the years at issue as result of those corrections, and pay the Hospital the additional sums to which it is entitled.  Alternatively, the Hospital requests a remand accompanied by an order compelling the government to produce the records that it maintains in its sole possession, that the government withheld in the proceeding below, and that the Hospital would need to prove, on remand, the precise financial impact of the many undisputed errors and omissions in the Secretary's calculations of the DSH payment determinations at issue.

## <u>INTRODUCTION</u>

1.      The Medicare DSH payment is intended for hospitals that shoulder the financial burden of providing care for a high proportion, or "disproportionate share," of low-income patients.  Currently, these payments amount to more than $6 billion per year for all qualifying hospitals nationwide.

2.      The Medicare DSH payment, the plaintiff Hospital, and the Secretary's disdain for properly calculating the DSH adjustment as Congress intended have all been before this Court before.  Most recently, the Hospital was the first named plaintiff hospital in *Baystate Health System v. Thompson,* Civ. No. 02-0601 (PLF) ("*Baystate*"), the lead case on the "core issue" in the hundreds of Medicare DSH payment actions consolidated in this Court as *In Re Medicare Reimbursement Litigation*, Misc. No. 03-0090 (PLF).  In *Baystate*, this Court exercised its mandamus jurisdiction to order the Secretary to correct his erroneous and unlawful calculations of the 'Medicaid fraction' – one of the two fractions that determine a hospital's DSH

payment – and retrospectively recalculate the hospitals' DSH payments for past years, including the Hospital's fiscal year 1991. Among other things, the Court concluded that the public interest in the Secretary's following the rule of law eclipsed the Secretary's purported concerns over the administrative burden of correcting his past errors. *Baystate*, 309 F. Supp. 2d 89, 99 (D.D.C. 2004), *aff'd*, 414 F.3d 7 (D.C. Cir. 2005), *cert. denied*, 126 S.Ct. 1672 (2006).

3.     The Secretary's admittedly erroneous calculation of the Medicare DSH payment is also at issue in this case. Whereas the prior *Baystate* case concerned the Medicaid fraction, however, this case concerns the other fraction that is used to determine the Medicare DSH payment – referred to interchangeably as the "Medicare/SSI fraction" or the "SSI fraction."

4.     In 2000, the Hospital sued in this Court to compel the Secretary to comply with a PRRB subpoena requiring production of records reflecting the patients and patient days that were counted in his calculation of the Hospital's SSI fraction for fiscal year 1995, one of four fiscal years now before the Court in the instant action for judicial review of the final agency decision below. *Baystate Medical Center v. Thompson*, Civ. No. 00-02940 (PLF). After several extensions of time, the Secretary eventually moved to dismiss the earlier enforcement action for lack of subject matter jurisdiction. In support of that motion, the Secretary submitted the declaration of an agency employee (the "Thomas Declaration") who stated, under penalty of perjury, that the data files that the agency had used to calculate the Hospital's SSI fraction for 1995 did not exist. *See infra* ¶ 307. This Court dismissed the Hospital's case.

5.     Two years later, however, in a discovery hearing conducted by the PRRB in the Spring of 2003, the Hospital proved that the data files that the Secretary used to compute the SSI fraction for the Hospital's fiscal year 1995 did in fact exist. Through counsel, the Secretary responded to that revelation with an extraordinary warning to the appointed members of the

PRRB that they should "proceed very cautiously with respect to any further discovery orders in this case." *See infra* ¶ 313. Nevertheless, the Hospital uncovered still more evidence, including evidence of numerous long-standing, systemic errors and omissions in the Secretary's calculations of the SSI fraction, errors that had never before been disclosed by the Secretary or his agency to the Hospital or, upon information and belief, to any other Medicare-participating hospital. In the end, the Secretary's own Board found – and this is undisputed – that the Secretary's calculations of the SSI fraction for DSH have been and are wrong in several respects, almost all which result in a systematic understatement of the SSI fractions and, in turn, underpayment of the DSH payments properly owed to the predominantly non-profit hospitals, like the plaintiff here, that serve low-income patients.

6.     The record evidence shows that the Secretary's calculations of the SSI fraction were doomed to failure from the beginning. As prescribed by Congress' 1986 Medicare DSH statute, the Medicare/SSI fraction is supposed to accurately capture the number of a hospital's Medicare inpatient days for a given year (the denominator of the fraction) and the number of those days attributable to Medicare patients who during their hospital stay were also entitled to benefits under the supplemental security income ("SSI") program established under title XVI of the Social Security Act and administered by defendant Commissioner of the Social Security Administration ("SSA") (the numerator of the fraction). 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). In 1986, recognizing that the calculation of the SSI fractions would require a match of records of Medicare inpatient hospital stays against SSA's records of SSI recipients, which are not available to hospitals, the Secretary took upon himself the exclusive, fiduciary obligation to calculate the SSI fraction annually for the benefit of every hospital in the nation. 51 Fed. Reg. 31454, 31459-60 (Sep. 3, 1986) (final rule).

7.    The evidence shows, however, that the Secretary's agency did not provide SSA with appropriate specifications or requirements for the SSI data needed to calculate the SSI fractions; nor did it undertake any meaningful (or fruitful) efforts to test or validate the data files and programs that it used to compute the SSI fractions; nor did it maintain systems documentation for those programs.  *See infra* ¶¶ 90-92.    Consequently, the Secretary cannot now say, and does not now have records to show, specifically which patient days were counted in his calculation of the SSI fraction for two of the Hospital's four fiscal years at issue (1993 and 1994).    *See infra* ¶ 166.    Additionally, the data that the Secretary claims to have used to calculate the fractions for the other two years at issue (1995 and 1996) does not agree with the SSI fractions that were actually applied to determine the Hospital's DSH payments for those years, and the Secretary's agency has admitted that it cannot explain the differences.  *See infra* ¶¶ 80-81, 88-89.    What is more, the Secretary's own staff have admitted in testimony below that the agency at this point cannot say how its match programs ran at the time when the agency computed the SSI fractions for the fiscal years at issue here.  *See infra* ¶¶ 141, 166, 188.

8.    This haphazard, back-of-the-envelope approach to the calculations of the SSI fractions for the current $6 billion per year DSH program virtually guaranteed the many errors and omissions that occurred over the years, and that still persist.  Moreover, at this point, there remains no genuine dispute that there were, and are, several identifiable systemic problems with the Secretary's calculations.  Indeed, as the Secretary's Board found, the agency knew of at least one major problem with the SSI data as early as 1993, *before* the Secretary used that incorrect SSI data to calculate the SSI fractions at issue.  *See infra* ¶¶ 206-29.    What was described by one former government employee as a "quick and dirty" fix of that particular problem was implemented only later, along with attempts to correct other problems, but only prospectively

and without disclosure to hospitals of the existence of problems that had contaminated the Secretary's calculations for prior years. *See infra* ¶ 220. The record evidence establishes that the agency not only failed to disclose to hospitals the existence of known errors in its calculations, but that it affirmatively covered its tracks. *See infra* ¶¶ 216-17. Over the years since the DSH payment was enacted in 1986, the agency has disseminated false and misleading statements in the Thomas Declaration mentioned above, in various *Federal Register* notices regarding the SSI calculations and the data used to determine the SSI days in the numerator of the fraction, in published rulings by the agency, in the agency's federal court briefs regarding the count of Medicare days in the denominator of the fraction, and in sworn deposition testimony given by the agency's designated witnesses. And, above all, the agency consistently resisted efforts by hospitals and the Board, in this case and others, to discover evidence in the government's sole possession that would shed light on the totality and financial impact of the pervasive errors and omissions in the Secretary's calculations. *See infra* ¶¶ 303-34.

9. Despite the agency's long-standing efforts to conceal the problems with its calculations of the SSI fractions, the PRRB has now uncovered, in a unanimous decision, many systemic problems that plague the Secretary's calculation of the SSI fraction and that almost always deflate the resulting SSI ratios and thus decreased the DSH payments to the Hospital for the 1993-1996 years at issue. As set out in greater detail below, the Board found that the SSI data files that were used to compute the *numerator* of the Hospital's SSI fractions for the periods at issue were inaccurate and incomplete in at least four respects relating to the quality and completeness of the SSI data used in the match of records that occurs in the process of calculating the SSI fraction (*see* ¶¶ 205-62, *infra*). The Board also found a number of discrepancies in the count of Medicare inpatient days that were included in the *denominator* of

the SSI fractions (*see* ¶¶ 275-302, *infra*), which the Secretary is able to explain.  In addition, the Board found compelling evidence that the process employed by the Secretary to match his agency's Medicare inpatient hospital stay records with the SSI data files produces inaccurate results, systematically yielding false negatives in the match process, thus reducing the numerator of the SSI fraction and the DSH payment to the Hospital's detriment.  *See* ¶¶ 103-204, *infra*. The Board's detailed findings on the problems with the Secretary's calculations are meticulously laid out in a 43-page, single-spaced decision supported by 238 footnotes and numerous additional citations to the record evidence.

10.     The Secretary, in his final decision below, *does not dispute* the Board's findings on the many systemic problems with the Secretary's calculations of the SSI fractions.   Instead, the Administrator of the Secretary's agency, CMS, rests his decision to reverse the Board on a legal argument, that hospitals may appeal, but for reasons of administrative "finality" are not entitled to relief from errors in the agency's calculation of the SSI fractions.  In other words, the Administrator asserts that one variable term of the DSH calculation (the SSI fraction) is perpetually fixed (even if wrong), while the DSH payment itself, and the other variable terms in the payment formula (the Medicaid fraction) may be updated and revised for many years after the end of the hospital fiscal year.  Alternatively, the Administrator asserts that the Hospital is not entitled to relief in this case because, the Administrator alleges, the Hospital did not prove the precise financial impact of the Secretary's errors on the Hospital's DSH payments for the years at issue.  Neither ruling withstands scrutiny.

11.     While the Administrator's no-relief policy for errors in the agency's calculation of the SSI fraction for DSH would certainly promote the agency's professed interest in "finality" (by locking in the Secretary's calculation perpetually, without regard to later or even corrected

data that was available to the Secretary when the calculation was performed), this brand of "finality" can be achieved only at the expense of the rule of law. Following the decisions of this Court and the Court of Appeals in the *In Re Medicare Reimbursement Litigation*, the Secretary has no legitimate basis to contest the fact that his erroneous calculations of the Medicare DSH payment are subject to review and retroactive correction. In that case, the Court of Appeals affirmed this Court's 2004 decision compelling the Secretary to revise erroneous and unlawful DSH payment determinations that were issued as early as 1994, for fiscal years that ended even earlier. If hospitals have a right to appeal the Secretary's DSH calculations (and that right is uncontested), they have a right to a remedy.

12.     The Administrator's alternative ruling is equally unsound and, frankly, a singularly unattractive position for a federal agency to take. When the Administrator alleges that the Hospital failed to carry a burden to show the financial impact of the undisputed errors and omissions in the Secretary's calculations of the SSI fractions at issue, he utterly ignores the Board's findings that the agency resisted all of the Hospital's and the Board's efforts to obtain from the government the records that would be needed to establish the financial impact with the precision the Secretary now demands. The Secretary cannot escape the consequences of his agency's own errors by withholding evidence and then blaming the Hospital for gaps in the evidentiary record. Given all the undisputed evidence of errors and omissions in CMS' calculations of the SSI fraction, the burden shifted to *the Secretary* "to produce countervailing evidence or a reason, *not based on the insufficiency of the [Hospital's] evidence*, that explains why [the Hospital's] allegations [should not be] accepted," and this burden cannot be avoided merely by asserting generalized scenarios that could affect the impact of CMS' errors and omissions and that "could only be eliminated with information unavailable to the [Hospital]."

*Atlanta Coll. of Med. & Dental Careers, Inc. v. Riley*, 987 F.2d 821, 830-31 (D.C. Cir. 1993) (emphasis added). Further, the adverse inference rule, which applies to administrative proceedings like the proceeding before the Board in this case, "provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him." *Int'l Union v. NLRB*, 459 F.2d 1329 (D.C. Cir. 1972).

13.    Accordingly, the Administrator's decision below should be reversed and this matter should be remanded with instructions to recalculate and revise the SSI fractions for the periods at issue and pay the Hospital the additional DSH payments due as result of those revisions. Alternatively, the Court should enter an order remanding this case for further proceedings and compelling the Commissioner of SSA to produce the SSI entitlement records for all of the Hospital's Medicare inpatients during the periods of their inpatient hospital stays in the periods at issue. These records – the records that would be required to measure the impact of errors and omissions in the Secretary's calculation of the SSI fraction – were sought by both the Board and the Hospital in this case and the Secretary resisted all efforts to obtain them, going so far as to proffer false testimony in this Court in order to conceal them. The government's refusals to produce that information in this case were unlawful, *see, e.g., Loma Linda Cmty. Hosp. v. Shalala*, [1996 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 44,030 (C.D. Cal. 1995), and the decision below, therefore, must be vacated.

## PARTIES

14.    The Plaintiff, Baystate Medical Center, is a non-profit organization that owns and operates an acute care hospital that participated in the Medicare program as a "provider of services," or "provider" during the periods at issue.

15.     Defendant Michael O. Leavitt (the "Secretary") is Secretary of the United States Department of Health and Human Services ("HHS"), the federal agency that administers the Medicare program and DSH payment adjustment at issue.  HHS' headquarters is located in the District of Columbia.  The Secretary is sued only in his official capacity.  References to him herein are meant to refer to him, his subordinate agencies and officials, and to his official predecessors or successors as the context requires.

16.     The Secretary is a trustee of the Federal Hospital Insurance Trust Fund established under title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* (referred hereinafter as the "Medicare Act").  42 U.S.C. § 1395i(b).  The Secretary is also responsible for the administration of the Medicare program established under title XVIII of the Act.

17.     CMS is a component of HHS, which was formerly known as the Health Care Financing Administration ("HCFA") during the periods at issue, and which was and is responsible for day-to-day operation and administration of the Medicare program.  For ease of reference, this Complaint generally refers to CMS without regard to the name the agency used before.

18.     Defendant Jo Anne B. Barnhart (the "Commissioner") is the Commissioner of the Social Security Administration ("SSA"), the federal agency that administers the Social Security retirement program established under title II of the Social Security Act and the Supplemental Security Income ("SSI") program established under title XVI of that Act.  SSA's headquarters is located in Baltimore, Maryland.  The Commissioner is sued only in her official capacity.  References to her herein are meant to refer to her, her subordinate agencies and officials, and to her official predecessors or successors as the context requires.

## JURISDICTION AND VENUE

19.    Jurisdiction is proper under 42 U.S.C. § 1395oo(f), 28 U.S.C. § 1331, and 28 U.S.C. § 1361.

20.    The cause of action arises under the title XVIIII of the Social Security Act, 42 U.S.C. § 1395 et seq., the Freedom of Information Act, 5 U.S.C. § 552, and the Administrative Procedure Act, 5 U.S.C. § 706.

21.    Venue is proper in this district under 42 U.S.C. § 1395oo(f) and 28 U.S.C. § 1391(e).

## FACTUAL ALLEGATIONS

## I. MEDICARE PAYMENT AND APPEALS PROCESS

22.    The Medicare program is a federal system of health insurance for the aged, disabled, and individuals afflicted with end-stage renal disease.  This case concerns Part A of the Medicare Act, 42 U.S.C. §§ 1395c-1395i-4, which provides for payments from the Federal Hospital Insurance Trust Fund, of which the Secretary is a trustee, for institutional health care services furnished to Medicare beneficiaries by participating "providers of services" like the Hospital.  *See* 42 U.S.C. § 1395d(a)(1).  Part A of the Act entitles a Medicare beneficiary to have payment made on the beneficiary's behalf for covered "inpatient hospital services" furnished by a participating hospital.  42 U.S.C. § 1395d(a)(1).

23.    Medicare pays for most acute care hospital inpatient services through a prospective payment system ("PPS") based on predetermined, nationally applicable rates, *see generally* 42 U.S.C. § 1395ww(d), that are subject to hospital-specific payment adjustments, like the DSH payment adjustment at issue.  Those adjustments have always been determined for each hospital retrospectively, after the end of the fiscal year, through the cost report settlement process described below.  42 U.S.C. § 1395ww(d)(5)(F); 42 C.F.R. § 412.106.

24.    Medicare payments to hospitals are determined by fiscal intermediaries, private firms (usually insurance companies) that contract with CMS under 42 U.S.C. § 1395(h).  About two or three years after a provider's fiscal year, the intermediary analyzes a cost report prepared by the provider and issues a Notice of Program Reimbursement, or "NPR," that informs the provider of the intermediary's final determination of the provider's Medicare reimbursement for the cost reporting period at issue.

25.    Generally, the final determination of the intermediary in an NPR for a given provider fiscal year (or Medicare cost reporting period) is not issued until two or three years after the end of that year.  PRRB Dec. at 32 & n.183.

26.    A provider, like the Hospital, is entitled to a hearing before the PRRB if it is dissatisfied with an intermediary's determination in an NPR as to the amount of Medicare payment due the provider for a cost reporting period.  42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835.    The Board may reverse, affirm or modify the final determination of the intermediary.  42 U.S.C. § 1395oo(d).

27.    The PRRB is an administrative tribunal appointed by the Secretary.  42 U.S.C. § 1395oo(h).  The Medicare Act prescribes that the appointed members of the PRRB must be "knowledgeable in the field of payment of providers of services."  *Id.*  Additionally, the Act mandates that the Secretary shall "make available to the Board such secretarial, clerical, and *other assistance as the Board may require to carry out its functions*."  *Id.* § 1395oo(i) (emphasis added).

28.    The final decision of the PRRB is subject to review by the Administrator of CMS pursuant to delegation of authority by the Secretary to the Administrator.  *See* 42 U.S.C. § 1395oo(f); 42 C.F.R. § 405.1875.    The Secretary's final decision, as set forth either in the

decision of the Board or of the Administrator, may be reviewed in a civil action before this Court.  42 U.S.C. § 1395oo(f).

29.    In addition to the direct appeals process described above, the Secretary's regulations also provide for reopening and retrospective revision of a Medicare reimbursement determination for a period of at least three years after the date of the determination of an Intermediary or decision of the Secretary.  42 C.F.R. § 405.1885.  In general, because it commonly takes two to three years for an intermediary to issue an NPR, reopening and retrospective revision of an intermediary's determination for a provider's fiscal year may occur either at the direction of the Secretary or on the intermediary's own initiative at any time for a period of at least five to six years after the end of that fiscal year.   In addition, reopening and revision must occur at any time when it is established that a determination was procured through fraud or similar fault.  *See* 42 C.F.R. § 405.1885.

## II.  MEDICARE DSH ADJUSTMENT

### A.    LEGISLATIVE HISTORY

30.    Until 1983, the Medicare program paid hospitals on a retrospective, "reasonable cost" basis for inpatient hospital services covered under Part A of the Medicare Act.  42 U.S.C. § 1395f(b).  Under the prospective payment system (or "PPS") that replaced the "reasonable cost" reimbursement model, most general acute care hospitals are paid standardized rates for discharges categorized into hundreds of diagnosis-related groups, subject to certain payment adjustments.  Social Security Amendments of 1983, Pub. L. No. 98-21, § 601(e); 42 U.S.C. § 1395ww(d).

31.    When Congress enacted the PPS in 1983, it authorized the Secretary to provide an adjustment to the standardized PPS payment rates per discharge for hospitals that serve a disproportionate share of low-income patients.  *See* Social Security Amendments of 1983, Pub.

L. No. 98-21, § 601(e), codified at 42 U.S.C. § 1395ww(d)(5)(C)(i) (1983). This is the

disproportionate share hospital, or "DSH" adjustment at issue in this case.

32.    Because the standardized PPS rates are not based on the costs actually incurred by

a hospital, Congress was concerned that the standardized rates would not yield adequate

reimbursements for hospitals that shoulder the additional financial burden of providing for the

care of low-income patients. As this Court put it in an earlier case:

> poor and unhealthy patients often need more medical assistance than
> patients drawn from a more affluent and healthier population. For
> example, [under PPS] if a patient were admitted for an appendectomy, but
> also required treatment for complications arising from malnutrition, the
> hospital would only be entitled to payment for the appendectomy.

*Samaritan Health Ctr. v. Heckler*, 636 F. Supp. 503, 508 (D.D.C. 1985) ("*Samaritan I*").

33.    In addition, Congress found that hospitals that treat a large proportion of low-

income patients tend to incur higher than average overhead costs per discharge:

> There are two categories of reasons for these increased costs: a) low-
> income Medicare patients are in poorer health within a given DRG (that is,
> they are more severely ill than average), tend to have more complications,
> secondary diagnoses and fewer alternatives for out of hospital
> convalescence than other patients; b) hospitals having a large share of
> low-income patients (Medicare and non-Medicare) have extra overhead
> costs and higher staffing ratios which reflect the special need for such
> personnel as medical social workers, translators, nutritional and health
> education workers.

H. Rep. No. 99-241, at 16, *reprinted in* 1986 U.S.C.C.A.N. 579, 594.

## B.    THE SECRETARY'S EARLY RESISTANCE TO THE DSH PAYMENT ADJUSTMENT

34.    When Congress first enacted the PPS in 1983 and authorized the Secretary to

establish a DSH adjustment, the Secretary declined to make the adjustment. 48 Fed. Reg. 39,783

(1983). In response, Congress directed the Secretary to publish criteria for DSH qualification

and to identify qualifying hospitals by December 31, 1984. Deficit Reduction Act of 1984, Pub.

L. No. 98-369, § 2315(h), codified at 42 U.S.C. § 1395ww note.  When the Secretary failed to implement Congress' directive by the statutory deadline, this Court exercised its mandamus jurisdiction and ordered the Secretary to do so.  *See Samaritan I*, 636 F. Supp. 503 (D.D.C. 1985).  The Secretary thereafter issued very narrow criteria for qualification as a DSH.  50 Fed. Reg. 53,398-53,400 (1985).  The Secretary's minimal effort at compliance with the Court's order in *Samaritan I* only narrowly missed triggering a citation for contempt, and even then "failed to do what the Act required."  *Samaritan Health Ctr. v. Bowen*, 646 F. Supp. 343, 345, 347 (D.D.C. 1986) ("*Samaritan Health II*").

35.     In 1986, Congress addressed the Secretary's recalcitrance by adopting its own precise definition of a disproportionate share hospital "without awaiting perfection of the Secretary's 'analysis,'" *Samaritan Health II*, 646 F. Supp. at 345, and amended the PPS statute to prescribe detailed statutory criteria for the DSH adjustment.  Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), Pub. L. No. 99-272, § 9105.  Congress also expressed its disapproval of the agency's failure to establish a DSH adjustment in 1984, the Secretary's "total lack of responsiveness" thereafter, and his failure to implement the DSH adjustment "in any meaningful way" prior to the 1986 amendments.  *See* H.R. Conf. Rep. No. 98-861, at 1356 (1984), *reprinted in* 1984 U.S.C.C.A.N. 1445, 2044; *see also* H.R. Rep. No. 99-241, at 16 (1986), *reprinted in* 1986 U.S.C.C.A.N. 579, 594.

## C.     CALCULATION OF THE MEDICARE DSH PAYMENT

### The Disproportionate Patient Percentage

36.     Under the statutory criteria in effect during the periods at issue here, a hospital that serves a disproportionate share of low-income patients – a DSH – is entitled to an upward percentage adjustment to the standard PPS rates.  *See* 42 U.S.C. § 1395ww(d)(5)(F); *see also* 42 C.F.R. § 412.106.  In nearly all cases, the DSH payment adjustment is based on a hospital's

"disproportionate patient percentage."  *See* 42 U.S.C. § 1395ww(d)(5)(F)(i)(I)  and (d)(5)(F)(v); 42 C.F.R. § 412.106(c)(1).

37.    The disproportionate patient percentage determines a hospital's qualification for any DSH payment at all as well as the amount of the DSH payment for most qualifying hospitals, depending on the hospital's size and location.  *See* 42 U.S.C. § 1395ww(d)(5)(F)(iv) and (vii)-(xiii); 42 C.F.R. § 412.106(d).

38.    The "disproportionate patient percentage" is defined in 42 U.S.C. § 1395ww(d)(5)(F)(vi) as the sum of two fractions expressed as percentages.  These two fractions are commonly called the "Medicaid fraction" and the "Medicare/SSI fraction" (sometimes referred to interchangeably as the "Medicare fraction" or the "SSI fraction").

<u>**The Medicaid Fraction**</u>

39.    The Medicaid fraction is based on a hospital's percentage of total inpatient days for a cost reporting period attributable to patients who were "eligible for medical assistance" under a State Medicaid plan during their inpatient hospital stays.  42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).  In general, the more Medicaid inpatient days, the larger the DSH payment.

40.    A hospital's Medicaid fraction for a given cost reporting period is determined retrospectively by the fiscal intermediary, 42 C.F.R. § 412.106(b)(4), in and through the Medicare cost report settlement process that is generally completed two to three years after the close of the cost reporting period.

41.    The Secretary does not allow a hospital to estimate the number of Medicaid patient days included in the Medicaid fraction for a hospital fiscal year.  PRRB Dec. at 8 & n.18 (citing testimony of the intermediary's representative, Gouger); *see also* 42 C.F.R. § 412.106(b)(4).

42.    Until 1997, the Secretary required that the numerator of the Medicaid fraction could include only those inpatient days that were actually *paid* by Medicaid, even though the statute required only that the patient be *eligible* for Medicaid. 51 Fed. Reg. 31454, 31460-61 (Sep. 3, 1986) (final rule).  There followed years of litigation, culminating in four consecutive appellate courts holding that the Secretary's interpretation of the Medicaid fraction to exclude Medicaid eligible-but-unpaid days contravened the plain meaning of the DSH statute.  *See Cabell Huntington Hosp. v. Shalala*, 101 F.3d 984 (4th Cir. 1996); *Legacy Emanuel Hosp. & Health Ctr. v. Shalala*, 97 F.3d 1261 (9th Cir. 1996); *Deaconness Health Serv. Corp. v. Shalala*, 83 F.3d 1041 (8th Cir. 1996); *Jewish Hosp. Inc. v. Secretary of Health and Human Servs.*, 19 F.3d 270 (6th Cir. 1996).  These and subsequent decisions reflect judicial recognition of the Secretary's historic resistance to the legislative will as expressed in the DSH statute.  *See Portland Adventist Med. Ctr. v. Thompson,* 399 F.3d 1091, 1099 (9th Cir. 2005) ("This appears to be the latest in a series of cases in which the Secretary has refused to implement the DSH provision in conformity with the intent behind the statute"); *Clark Reg'l Med. Ctr. United States Dep't of Health and Human Servs.,* 314 F.3d 241, 249 (6th Cir. 2002) ("the Department cannot simply interpret the [DSH] regulation so as to always disadvantage the subject hospital"); *Cabell Huntington Hosp. v. Shalala*, 101 F.3d 984, 990 (4th Cir. 1996) (characterizing the Secretary's interpretation as an attempt to "rewrite the will of Congress" by an agency that has been "hostile from the start to the very idea of making the payments at issue"); *Jewish Hosp., Inc. v. Secretary of Health & Human Servs.*, 19 F.3d 270, 276 (6th Cir. 1994) (finding "credible and compelling" evidence of the agency's "hostility to the concept of the disproportionate share adjustment"). This Court has held that the Secretary's decision to acquiescence in the four adverse appellate decisions, manifested in an administrative ruling issued in February 1997, was a "notice of

inconsistency with law" that triggered mandatory reopening of eligible NPRs under the Secretary's reopening regulations, 42 U.S.C. § 405.1885(b).  *In re Medicare Reimbursement Litig.*, 309 F. Supp. 2d 89 (D.D.C. 2004) (Friedman, J.), *aff'd*, 414 F.3d 7 (D.C. Cir. 2005), *cert. denied*, 126 S.Ct. 1672 (2006).

## The SSI Fraction

43.    The other fraction that makes up the disproportionate patient percentage – the SSI fraction – is the subject of the dispute in this case.  The DSH statute defines the SSI fraction as:

> the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such [cost reporting] period which were made up of patients who (for such days) were entitled to benefits under Part A of this title [Medicare] and were entitled to supplemental security income ["SSI"] benefits (excluding any State supplementation) under title XVI of this Act, and the denominator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under Part A of this title. . . .

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).

44.    The SSI program referred to in the DSH statute, quoted in the preceding paragraph, is a federal assistance program for low-income individuals who are aged, disabled or blind.  42 U.S.C. § 1381 *et seq*.

45.    The SSI program is administered by SSA.  *See* 42 U.S.C. § 1381a; 42 C.F.R. §§416.101, 416.105.  Until 1995, SSA was part of HHS (formerly called the Department of Health, Education and Welfare).  SSA was separated from HHS and became an independent agency effective March 31, 1995.  Social Security Independence and Program Improvement Act of 1994, Pub. L. No. 103-296, 108 Stat. 1464, §§ 101, 110(a).

46.    Since the inception of the DSH payment adjustment in 1986, CMS has computed the SSI fraction annually for every hospital, undertaking the sole and exclusive responsibility to perform the necessary calculation.  *See* 42 C.F.R. § 412.106(b)(2); 51 Fed. Reg. 16772, 16777

(May 6, 1986) (interim final rule); 51 Fed. Reg. 31454, 31459-60 (Sep. 3, 1986) (final rule); *see also* PRRB Dec. at 3.   The Secretary's preamble to the September 1986 final rule instituting DSH stated: "Recognizing the difficulty hospitals would have identifying their Medicare patients who are also SSI recipients, we have undertaken the task (and expense) of determining for each hospital the number of patient days of those dually entitled to Medicare Part A and SSI and have removed this burden from hospitals."   51 Fed. Reg. 31459.   Thus, the Secretary assumed the fiduciary duty to correctly perform the SSI calculation.

47.     The Medicare/SSI fraction is computed solely by CMS, based upon SSI data that CMS receives annually from SSA and CMS' match of that data against CMS' own inpatient hospital utilization records.   PRRB Dec. at 3.   As was stipulated before the Board in this case, apart from the transmission of claims data for Medicare inpatient hospital stays, hospitals and fiscal intermediaries have no input into, and are not parties to, the Secretary's calculation of the SSI fractions.  *See* 42 C.F.R. § 412.106(b)(2); 51 Fed. Reg. at 31459-60.

48.     When the Secretary assumed responsibility in 1986 for the calculation of the SSI factions, and imposed a regulatory scheme whereby hospitals were to play no role in that process but instead were required to rely upon the agency's calculation of the SSI fraction, the Secretary assumed a fiduciary obligation toward the hospitals with respect to the calculation of the SSI fraction that was his duty to perform.

49.     Since 1986, CMS has acknowledged that hospitals have the right to contest CMS' calculations of the SSI fractions through the usual administrative appeals process established under 42 U.S.C. § 1395oo (discussed in paragraphs 26-28, *supra*).  *See* 51 Fed. Reg. at 31458 (Sep. 3, 1986) ("all hospitals have the right to appeal … the denial of eligibility for the

disproportionate share adjustment or the amount of the adjustment they receive" after settlement of the hospital's cost report and receipt of an NPR for a fiscal year).

50.    In general, CMS' calculation of the SSI fraction comprises two basic data sources:  (i) inpatient hospital stay records reflecting Medicare patient days in each hospital in the country (which forms the denominator of the Medicare/SSI fraction); and (ii) SSI entitlement data provided to CMS by SSA.  PRRB Dec. at 3.  CMS attempts to "match" these two data sets annually in order to determine a hospital's number of patient days in a year attributable to individuals who were entitled to both Medicare Part A benefits and federal SSI benefits during their inpatient hospital stay.   The more Medicare patient days that are matched with the SSI eligibility records, the larger the numerator of the SSI fraction and the greater the DSH payment to the hospital.

51.    Since the inception of the DSH payment adjustment in 1986, the Secretary has computed the SSI fractions retrospectively for every Medicare-participating hospital based on discharges occurring in the Federal fiscal year ending September 30.  The SSI fraction computed by the Secretary for a *Federal* fiscal year applies to a *hospital* fiscal year (or cost reporting period) that begins in that Federal fiscal year, unless the hospital later requests a recalculation of the SSI fraction based on discharges occurring in the hospital's own fiscal year (if different than the Federal fiscal year, *e.g.*, a fiscal year ending June 30).  42 C.F.R. § 412.106(b)(2)-(3).

52.    For the periods at issue, the Secretary calculated the SSI fractions that were applied retrospectively to determine Medicare DSH payments based on a match of (i) SSI data that CMS received from SSA in the following month of March, about six months after the September 30 year-end for subject Federal fiscal year, against (ii) Medicare inpatient hospital stay records accumulated in a CMS file by the following month of June, about nine months after

the September 30 year-end for the subject Federal fiscal year. *See infra* ¶¶ 55-89. The CMS match for a given fiscal year thus occurs in June of the following year.

53.    Medicare fiscal intermediaries are required to apply the SSI fraction computed by CMS when they determine a hospital's DSH payment for a hospital fiscal year. 42 C.F.R. § 412.106(b)(2)-(3); *see also infra* ¶ 128.

54.    For each hospital fiscal year at issue in this case, CMS over a period of years performed a series of calculations of the SSI fraction, using updated and corrected data, between the time when CMS initially calculated the SSI fraction that was applied to determine the Hospital's Medicare DSH payment (nine months after the end of each fiscal year at issue) and the completion of the cost report settlement process for each  fiscal year (two to three years later). *See infra* ¶¶ 58, 67, 75, 84. A CMS witness, William Anthony (Tony) Dean, testified before the PRRB that all of the files reflecting the Secretary's calculations were supposed to be kept "permanently available." PRRB 2003 Evidentiary Hearing Tr. at 64-71. Moreover, according to another CMS witness, Daryl Rosenberg, it would have been "simple" for the Secretary to have distributed CMS' later calculations of the SSI fractions for each fiscal year to the Secretary's fiscal intermediaries and hospitals for use in the later determinations of the DSH payments due the Hospital for each year. PRRB 2004 Hearing Tr. at 2056, 2073-74. CMS' written discovery responses and the testimony of a CMS witness (Steve Phillips) in the proceeding below reflect the agency's concession that the latest data available for a year is the best, most accurate data for that year. CMS Responses to Provider Interrogatories 18, 19 & 20; PRRB Hearing Tr. at 1163-67. Nevertheless, the Secretary did not disclose CMS' later calculations for the fiscal years at issue to the Medicare intermediaries or hospitals, and its latest calculations for those years were not applied to determine the Hospital's DSH payments for the

periods at issue.  That is, even though the final DSH payment determination for each period at issue was issued after the Secretary had performed the latest calculation of the Hospital's SSI fraction for each year at issue in this case, the Hospital's NPR reflected the results of an SSI fraction calculation performed with much earlier, and concededly less accurate, data.  *See infra* ¶¶ 122-28.

### III.    FACTS SPECIFIC TO THIS CASE

### A.    SUMMARY OF PERTINENT FACTS REGARDING THE DSH PAYMENT DETERMINATIONS AT ISSUE

### DSH Payment Determination and SSI Fraction For Fiscal Year 1993

55.    The fiscal intermediary issued a DSH payment determination for the Hospital's fiscal year ending September 30, 1993 in an NPR dated March 25, 1996.  This NPR for the Hospital's fiscal year 1993 reflected an SSI fraction computed by CMS in June 1994.

56.    The Hospital and the Intermediary stipulated before the Board that the Secretary's determination of the SSI fraction for the Hospital's fiscal year 1993 included the following:

| SSI Days | Medicare Days | SSI Ratio |
|----------|---------------|-----------|
| 4746 | 65780 | 0.07215 |

57.    According to the undisputed testimony of a CMS employee, when the Secretary calculated the Hospital's SSI fraction for 1993 in June 1994, the agency knew that were was a problem with the SSI data it was using in its calculations of the SSI fractions.  *See infra* ¶ 214. That problem, involving the omission of all inactive or "stale" SSI records (*see infra* ¶¶ 207-29), was fixed in 1996, but CMS applied the fix only prospectively for fiscal years after 1994.   CMS did not disclose the existence of the "stale records" problem to the Hospital until the Hospital began uncovering evidence of it in connection with a discovery hearing conducted by the Board in the Spring of 2003 in the proceedings below.

58.     After the Secretary calculated the Hospital's SSI fraction for 1993 (in June 1994), and before the NPR issued for fiscal year 1993 (in 1996), CMS recomputed the Hospital's SSI fraction for fiscal year 1993 at the end of every quarter, through and including the quarter ended December 31, 1995, using updated and corrected data. *See infra* ¶¶ 122-28.  The subsequent recalculations performed after March 1995 were based on matches with updated SSI data for 1993 that CMS received from SSA by April 1, 1995.  *See infra* ¶¶ 107-12.

59.     The SSI data for 1993 that CMS received from SSA in 1995 reflected SSI entitlement determinations that were rendered by SSA after March 1994 and made effective retroactively to 1993, and those retroactive SSI determinations were reflected in the six subsequent recalculations and matches that CMS performed after March 1995 for fiscal year 1993.  Though all of the CMS files for its subsequent recalculations and matches for 1993 were supposed to be kept "permanently available," and even though it would have been "simple" for CMS to have distributed the results of the subsequent recalculations and matches to the Medicare fiscal intermediaries for use in their final DSH payment determinations in the cost report settlement process for 1993, none of CMS's six subsequent, revised calculations of the Hospital's SSI fraction was applied to determine the Hospital's DSH payment for 1993.  CMS conceded in written discovery responses below that that the agency has no recollection or documentation concerning any factor or factors ever considered by the agency in deciding to use the June 1994 calculation to determine the Hospital's DSH payment for 1993, *see* CMS Response to Provider Interrogatory 16, even though CMS also admitted that later data is better, *see supra* ¶ 54.

60.     The SSI data that CMS used to compute the Hospital's SSI fraction for 1993 also omitted the SSI entitlement records of SSI recipients for the periods of time when they received

manual payments of SSI cash benefits or when they received non-cash SSI benefits under the Federal statute governing the SSI program.  *See infra ¶¶* 230-40, 259-62.  These problems also contaminated CMS' calculations of the SSI fractions for the Hospital's fiscal years 1994, 1995, and 1996.

61.    In discovery below, CMS admitted that, in 1996, the agency changed the process it uses to match its inpatient hospital stay records with the SSI entitlement records it receives from SSA.  CMS further admitted that this change would have tended to increase the SSI fractions (and thus the DSH payments) for prior periods if the change in CMS' process had been applied to the calculations used to determine DSH payments for those prior periods, including the Hospital's fiscal year 1993.  *See infra* ¶¶ 171-76.   But, the 1996 change to the match process was not applied to the DSH payment determinations for fiscal years before 1995 or 1996, nor was it disclosed to the Hospital until CMS admitted to the problem in its discovery responses in this case. *See infra* ¶¶ 175.

62.    In addition, the match process that CMS used to compute the SSI fraction for the Hospital's fiscal year 1993 also produced "unreliable" and inaccurate results that tend to deflate the DSH payment because CMS has never used individuals' own Social Security numbers for this match process, even though (i) the agency uses those numbers for other data matches, (ii) the Secretary said in 1986 that matching on individuals' own unique Social Security numbers is the "most feasible approach" for this match process, and (iii) witnesses for both parties testified below that the Social Security number would produce the most accurate match results.  *See infra* ¶¶ 129-70.   This problem also contaminated CMS' calculations of the Hospital's SSI fractions for fiscal years 1994, 1995 and 1996.

63.     In the Board proceeding, the Hospital obtained a Board subpoena requiring CMS to produce the records reflecting the patient-level detail for the patients and patient days that were counted in the number of SSI days as well as the detail for patients and days counted in the number of Medicare days reflected in the SSI fraction computed by CMS in June 1994 for the Hospital's fiscal year 1993.   The Secretary did not produce such records and alleges that CMS does not have them.

### DSH Payment Determination and SSI Fraction For Fiscal Year 1994

64.     The fiscal intermediary issued a DSH payment determination for the Hospital's fiscal year ending September 30, 1994 in an NPR dated March 11, 1997.  This NPR for the Hospital's fiscal year 1994 reflected an SSI fraction computed by CMS in June 1995.

65.     The Hospital and the Intermediary stipulated before the Board that the Secretary's determination of the SSI fraction for the Hospital's fiscal year 1994 included the following:

| SSI Days | Medicare Days | SSI Ratio |
|----------|---------------|-----------|
| 5274     | 64251         | 0.08208   |

66.     When the Secretary calculated the Hospital's SSI fraction for 1994 in June 1995, the agency knew that were was a problem with the SSI data it was using in its calculations of the SSI fractions.  *See* ¶ 57, *supra*.

67.     After the Secretary calculated the Hospital's SSI fraction for 1994 (in June 1995), and before the NPR issued for fiscal year 1994 (in 1997), CMS recomputed the Hospital's SSI fraction for fiscal year 1994 at the end of every quarter, through and including the quarter ended December 31, 1996, using updated and corrected data.   The subsequent recalculations performed after March 1996 were based on matches with updated SSI data for 1994 that CMS received from SSA by April 1, 1996 (when the stale records problem was fixed).

68.     The SSI data for 1994 that CMS received from SSA in 1996 included the inactive or "stale" SSI entitlement records that had been omitted from the SSI records that SSA had previously furnished to CMS for 1994.   In addition, the SSI data for 1994 that CMS received from SSA in 1996 also reflected SSI entitlement determinations that were rendered by SSA after March 1995 and made effective retroactively to 1994.   Consequently, the six subsequent recalculations and matches that CMS performed after March 1996 for fiscal year 1994 would have included and reflected the 'stale' SSI records that were previously omitted and the retroactive SSI determinations or reinstatements of benefits for 1994 that occurred during the period from April 1995 through March 1996.   Though all of the CMS files for its subsequent recalculations and matches for 1994 were supposed to be kept "permanently available," and even though it would have been "simple" for CMS to have distributed the results of the subsequent recalculations and matches to the Medicare fiscal intermediaries for use in their final DSH payment determinations in the cost report settlement process for 1994, none of CMS's six subsequent, revised calculations of the Hospital's SSI fraction was applied to determine the Hospital's DSH payment for 1994.   CMS conceded in written discovery responses below that that the agency has no recollection or documentation concerning any factor or factors ever considered by the agency in deciding to use the June 1995 calculation to determine the Hospital's DSH payment for 1994, even though CMS also admitted that later data is better.  *See supra* ¶ 54.

69.     As noted in paragraph 60 above regarding fiscal year 1993, the SSI data that CMS used to compute the Hospital's SSI fraction for 1994 also omitted the SSI entitlement records of SSI recipients for the periods of time when they received manual payments of SSI cash benefits

or when they received non-cash SSI benefits under the Federal statute governing the SSI program.

70.     As noted in paragraph 61 above, CMS admitted that, in 1996, the agency changed its match process and that this change would have tended to increase the SSI fractions (and thus the DSH payments) for those prior periods, but the 1996 change was not applied to the DSH payment determinations for fiscal year 1994.

71.     In addition, as noted in paragraph 62 above, the match process that CMS used to compute the SSI fraction for the Hospital's fiscal year 1994 produced unreliable, inaccurate results that tend to deflate the DSH payment because CMS has never used individuals' own Social Security numbers for this match process.

72.     In the Board proceeding, the Hospital requested a Board subpoena requiring CMS to produce records reflecting the patient-level detail for the patients and patient days that were counted in the number of SSI days as well as the detail for the patients and days counted in the number of Medicare days reflected in the SSI fraction computed by CMS in June 1995 for the Hospital's fiscal year 1994.  The Secretary did not produce such records, and alleges that CMS does not have them.

**DSH Payment Determination and SSI Fraction For Fiscal Year 1995**

73.     The fiscal intermediary issued a DSH payment determination for the Hospital's fiscal year ending September 30, 1995 in an NPR dated March 23, 1998.  This NPR for the Hospital's fiscal year 1995 reflected an SSI fraction computed by CMS in June 1996.

74.     The Hospital and the Intermediary stipulated before the Board that the Secretary's determination of the SSI fraction for the Hospital's fiscal year 1995 included the following:

| SSI Days | Medicare Days | SSI Ratio |
|----------|---------------|-----------|
| 5569 | 63024 | 0.08836 |

75.    After the Secretary calculated the Hospital's SSI fraction for 1995 (in June 1996), and before the NPR issued for fiscal year 1995 (in 1998), CMS recomputed the Hospital's SSI fraction for fiscal year 1994 at the end of every quarter, through and including the quarter ended December 31, 1997, using updated and corrected data.  The subsequent recalculations performed after March 1997 were based on matches with updated SSI data for 1995 that CMS received from SSA by April 1, 1997.

76.    The SSI data for 1995 that CMS received from SSA in 1997 reflected SSI entitlement determinations that were rendered by SSA after March 1996 and made effective retroactively to 1995, and those retroactive SSI determinations were reflected in the six subsequent recalculations and matches that CMS performed after March 1997 for fiscal year 1995.  Though all of the CMS files for its subsequent recalculations and matches for 1995 were supposed to be kept "permanently available," and even though it would have been "simple" for CMS to have distributed the results of the subsequent recalculations and matches to the Medicare fiscal intermediaries for use in their final DSH payment determinations in the cost report settlement process for 1995, none of CMS's six subsequent, revised calculations of the Hospital's SSI fraction was applied to determine the Hospital's DSH payment for 1995.  CMS conceded in written discovery responses below that that the agency has no recollection or documentation concerning any factor or factors ever considered by the agency in deciding to use June 1996 calculation to determine the Hospital's DSH payment for 1995, even though CMS also admitted that later data is better.  *See supra* ¶ 54.

77.    As noted in paragraph 60 above, the SSI data CMS used to compute the Hospital's SSI fraction for 1995 also omitted the SSI entitlement records of SSI recipients for the

periods of time when they received manual payments of SSI cash benefits or when they received

non-cash SSI benefits under the Federal statute governing the SSI program.

78.    As noted in paragraph 61 above, CMS admitted that, in 1996, the agency changed

its match process and the 1996 change would have tended to increase the SSI fractions (and thus

the DSH payments) for those prior periods, but it is unclear whether the 1996 change was

applied to the DSH payment determinations for fiscal year 1995.

79.    In addition, as noted in paragraph 62 above, the match process that CMS used to

compute the SSI fraction for the Hospital's fiscal year 1995 produced unreliable, inaccurate

results that tend to deflate the DSH payment because CMS has never used individuals' own

Social Security numbers for this match process.

80.    In connection with a discovery hearing conducted by the Board in 2003, two years

after the agency submitted a declaration to this Court stating, under penalty of perjury, that

certain records do not exist, the Hospital proved that those records do exist and the Secretary

then produced them.  Specifically, the Secretary produced a CMS file purporting to reflect the

patient-level detail for the patients and patient days that were counted in the number of SSI days

and the detail for the patients and patients days counted in number of Medicare days reflected in

the SSI fraction computed by CMS in June 1996 for the Hospital's fiscal year 1995.  However,

the sums of the SSI days and the Medicare days reflected in the file produced to the Hospital in

2003 do not square with the numbers of days included in the Secretary's determination of the SSI

fraction for fiscal year 1995 as set forth in paragraph 74 above.

81.    In the Board proceeding, CMS admitted in discovery that it cannot explain why

the numbers of SSI days and Medicare days reflected in the file produced to the Hospital in 2003

for the fiscal year 1995 calculation do not match the numbers of days used in the Secretary's June 1996 determination of the SSI fraction for that same fiscal year, 1995.

### DSH Payment Determination and SSI Fraction For Fiscal Year 1996

82.    The fiscal intermediary issued a DSH payment determination for the Hospital's fiscal year ending September 30, 1996 in an NPR dated and March 18, 1999.  This NPR for the Hospital's fiscal year 1996 reflected an SSI fraction computed by CMS in June 1997.

83.    The Hospital and the Intermediary stipulated before the Board that the Secretary's determination of the SSI fraction for the Hospital's fiscal year 1996 included the following:

| SSI Days | Medicare Days | SSI Ratio |
|----------|---------------|-----------|
| 5324 | 57439 | 0.09269 |

84.    After the Secretary calculated the Hospital's SSI fraction for 1996 (in June 1997), and before the NPR issued for fiscal year 1996 (in 1999), CMS recomputed the SSI fraction for fiscal year 1996 at the end of every quarter, through and including the quarter ended December 31, 1998, using updated and corrected data.  The subsequent recalculations performed after March 1998 were based on matches with updated SSI data for 1996 that CMS received from SSA by April 1, 1998.

85.    The SSI data for 1996 that CMS received from SSA in 1998 reflected SSI entitlement determinations that were rendered by SSA after March 1997 and made effective retroactively to 1996, and those retroactive SSI determinations were reflected in the six subsequent recalculations and matches that CMS performed after March 1998 for fiscal year 1996.  Though all of the CMS files for its subsequent recalculations and matches for 1996 were supposed to be kept "permanently available," and even though it would have been "simple" for CMS to have distributed the results of the subsequent recalculations and matches to the Medicare fiscal intermediaries for use in their final DSH payment determinations in the cost report

settlement process for 1996, none of CMS's six subsequent, revised calculations of the Hospital's SSI fraction was applied to determine the Hospital's DSH payment for 1996. CMS conceded in written discovery responses below that that the agency has no recollection or documentation concerning any factor or factors ever considered by the agency in deciding to use June 1997 calculation to determine the Hospital's DSH payment for 1996, even though CMS also admitted that later data is better. *See supra* ¶ 54.

86.     As noted in paragraph 60 above regarding fiscal year 1993, the SSI data CMS used to compute the Hospital's SSI fraction for 1996 also omitted the SSI entitlement records of SSI recipients for the periods of time when they received manual payments of SSI cash benefits or when they received non-cash SSI benefits under the Federal statute governing the SSI program.

87.     As noted in paragraph 62 above, the match process that CMS used to compute the SSI fraction for the Hospital's fiscal year 1996 produced unreliable, inaccurate results that tend to deflate the DSH payment because CMS has never used individuals' own Social Security numbers for this match process.

88.     In the Board proceeding, the Secretary produced a file purporting to reflect the patient-level detail for the patients and patient days that were counted in the number of SSI days and the number of Medicare days reflected in the SSI fraction computed by CMS in June 1997 for the Hospital's fiscal year 1996. However, the sums of the SSI days and the Medicare days reflected in that file do not square with the numbers of days included in the Secretary's determination of the SSI fraction for fiscal year 1996 as set forth in paragraph 83 above.

89.     In the Board proceeding, CMS admitted in discovery that it cannot explain why the numbers of SSI days and Medicare days reflected in the file produced to the Hospital do not

match the numbers of days used in the Secretary's June 1997 determination of the SSI fraction for that same fiscal year, 1996.

## CMS' Failure To Comply With Federal Information Processing Standards For All Years

90.    In the Board proceeding, the Hospital obtained a Board subpoena requiring CMS to produce systems documentation for the programs and files that were used to produce the SSI fractions computed by CMS for the fiscal years at issue. The Secretary claimed that CMS did not maintain such documentation.

91.    In the proceeding below, the Board ordered CMS to produce documentary evidence reflecting any data specifications or systems requirements it gave to SSA regarding the files prepared by SSA for CMS in connection with CMS' calculations of the SSI fractions for the years at issue and any efforts by CMS to test and validate the files and programs that were used to calculate those SSI fractions. The Secretary produced no documentation of any meaningful specifications or requirements given to SSA or of any meaningful efforts to test and validate the files and programs that CMS used to calculate the SSI fractions. Pat Cribbs, a former long-time SSA employee who prepared the SSI data tapes used in CMS' calculations, testified in this case that CMS gave SSA only "general" and "vague" instructions concerning the SSI data that CMS needed. PRRB 2003 Evidentiary Hearing Tr. at 264, 269, 350-51. Essentially, she said, the SSI data tapes used in CMS' calculations were prepared "on the fly." PRRB 2004 Hearing Tr. at 111-12, 117, 239-40. A CMS employee who was involved in the calculations of the SSI fractions for the fiscal years at issue, Rosenberg, testified in September 2004 that she "eyeballs" the SSI fractions calculated by CMS for each fiscal year, but even she acknowledged the insufficiency of this effort, noting the "old saying" that, as with any computer program, "garbage in" will produce "garbage out." PRRB Hearing Tr. at 2104-06, 2146-27.

92.     Despite the size and importance of the DSH payment adjustment – a multi-billion dollar program annually – the PRRB found (Dec. at 30-32) that the Secretary did not comply with the basic federal data management directives and guidelines applicable to all federal agencies, including requirements for validation, verification, and testing of software applications. *See* Federal Information Resources Management Regulations, 41 C.F.R. §§ 201.100, *et seq.*; OMB Circular No. A-130 (FIPS), 58 Fed. Reg. 36068, 59 Fed. Reg. 37906, 37910-11. *See generally,* PRRB Dec. at 30-32 ("[I]t is disingenuous for CMS to take a position that the Provider must demonstrate what financial impact the flaws in the process caused while knowing that its own record retention failures make such a showing impossible."); OMB Circular, Transmittal Memorandum No. 2 at 7.h, 50 Fed. Reg. 37906, 37910 (July 25, 1994) ("Systematic attention to the management of government records is an essential component of sound public resources management which ensures public accountability.  Together with records preservation, it protects the government's historical record and guards the legal and financial rights of the government and the public.").

### CMS' Refusal To Produce Records Showing the Impact of Its Errors

93.     In the Board proceeding, the Hospital obtained Board subpoenas compelling SSA to produce the SSI entitlement records for all of the Hospital's Medicare inpatients during each of the fiscal years at issue.  *See infra* ¶¶ 317, 319.   Those records would have allowed the Hospital to determine the exact number of its Medicare patient days attributable to individuals who were also entitled to Federal SSI benefits during their inpatient stays at the Hospital during the years at issue, and to precisely measure and quantify the financial impact of errors and omissions in CMS' calculations of the Hospital's SSI fractions for those years.  But, even after the Hospital offered an alternative proposal that would have produced the same information to the Hospital, at its expense, and even after SSA agreed in writing to the alternative proposal, the

Administrator of CMS quashed the Board's subpoenas to SSA and CMS refused to participate in the alternative proposal. *See infra* ¶¶ 321-33.

**B.    SUMMARY OF DECISIONS BELOW**

94.    Following protracted discovery disputes, including a three-day discovery hearing in the Spring of 2003 during which the Secretary's counsel warned the Secretary's appointed Board members that they had better "proceed very cautiously with respect to any further discovery orders in this case," the Board, disregarding CMS counsel's threat, completed that discovery hearing and later conducted a six-day hearing on the merits in this case in September 2004. *See infra* ¶¶ 303-34. On the whole, the record before the Board includes testimony from 14 witnesses (including 10 current or former government employees) and several volumes of documentary exhibits.

95.    On March 17, 2006, the Board issued a 43-page, single-spaced decision on the merits. The Board found that the Secretary's calculations of the SSI fractions are systemically flawed in several respects, that nearly all of the flaws result in systemic understatement of the SSI fractions and underpayment of the DSH adjustments that hospitals are entitled to receive, that estimates of the SSI fraction are not permissible, that CMS knew when it performed the calculations at issue there were problems with the SSI data it was using in those calculations, that CMS did not use the best data available to compute the SSI fractions that were applied to determine the Hospital's DSH payments for the years at issue, and that there would be no significant administrative burden on CMS in requiring it to use more accurate data in its calculations of the SSI fractions. Based on those findings (discussed further below), the Board reversed the intermediary's DSH determination in the NPRs at issue and remanded for recalculation of the Hospital's SSI fraction and DSH payment for each year at issue.

96.    The CMS Administrator reversed the Board's decision in a decision that was signed by the Administrator on May 11, 2006, sent to the Hospital's counsel on May 17, 2006 and received by the Hospital's counsel on May 18, 2006.  The Administrator asserted that, as a matter of policy, the calculations of the SSI fractions that were applied to determine the Hospital's DSH payments can never be recalculated to reflect "updated or corrected" data. Alternatively, the Administrator ruled that the Hospital "is not entitled to a recalculation of its Medicare fraction for the cost years involved in this case" because it allegedly failed to show the precise financial impact of the various undisputed errors and omissions in CMS's calculations of the Hospital's SSI fractions, lacking necessary records that only the government has and that CMS refused to produce or allow to be produced to the Hospital.  Adm'r Dec. at 54.

C.    **THE HOSPITAL'S RIGHT TO RELIEF FROM CMS' PROVEN MISCALCULATION OF THE SSI FRACTION**

97.    In its decision below, the Secretary's Board concluded that the statutory and regulatory provisions for hospital appeals from Medicare payment DSH payment determinations provide the  Hospital a right to relief from errors and omissions in CMS' calculations of the SSI fractions for DSH.  PRRB Dec. at 6-7.  Among other things, the Board found nothing in the DSH statute or regulations that prohibits recalculations of the SSI fraction to correct errors.

98.    The Board also held that "an estimate, rather than an accurate determination [of the SSI fraction], is not permissible."  PRRB Dec. at 8.  The Board found that the DSH statute directs the Secretary to determine "the number" of a hospital's Medicare/SSI days for a fiscal year.  *Id*.  In addition, the Board found that the legislative history of the statute reflects that Congress anticipated that an estimate would have to be used to make interim DSH payments for the first fiscal year to which this payment adjustment applied, but Congress intended that "'the Secretary would be required to develop <u>accurate data</u> by October 1, 1986 on Medicare patients

who are enrolled in SSI.'"  *Id.* (quoting S. Rep. No. 99-146 at 291, *reprinted in* 1986 U.S.C.C.A.N. at 258) (emphasis added by Board).

99.     Finally, the Board concluded that, "[e]ven if the statute permitted an approximation based on the best available data . . . CMS did not use the best available data" because its calculations were flawed in several respects and CMS knew about at least some of those problems (but did not address them) at the time it calculated the fractions.  PRRB Dec. at 9.

100.    The Administrator responded to the Board's findings by ruling that providers are not entitled to require CMS to recalculate the SSI fraction "based upon later, or corrected, data." Adm'r Dec. at 17.  The Administrator asserted that it would be too burdensome to calculate the Medicare [SSI] fraction with "timely, accurate data[.]"  Adm'r Dec. at 18.

101.    The Administrator further asserted that the Secretary has a policy against revising the SSI fraction to reflect corrected or later data for payment purposes and that this alleged policy is consistent with the Medicare prospective payment system because the Secretary never set any "specific procedures or timeframes" for performing any such correction.  Adm'r Dec. at 20.  The Administrator also concluded that the Secretary's alleged policy against recalculating the SSI fraction to reflect correct or later data "promotes administrative finality."  Adm'r Dec. at 21.

102.    The purported administrative policy against CMS recalculation of erroneous SSI fraction calculations does not exist.  No such policy is published anywhere.  For every Medicare-participating hospital in the nation and for every Federal fiscal year, the Secretary calculates the SSI fractions at least 10 times, based on continually updated and corrected data, in the years between the close of affected hospital cost reporting periods and the issuance of NPRs for those

periods. *See infra* ¶ 122. Nonetheless, CMS only applies one of the earliest of these calculations for purposes of hospitals' DSH payments.

## D.    CMS' USE OF A SYSTEMICALLY FLAWED MATCH PROCESS

103.    In its decision below, the Secretary's Board found that CMS' match process is flawed in ways that understate the *numerator* of the resulting SSI fractions, that additional or alternative match criteria, such as patients' own unique Social Security numbers, must be used to correct the flaws in CMS' process, and that using such additional criteria would impose no significant administrative burden on the agency. PRRB Dec. at 10-21. The Board's specific factual findings, none of them controverted, are set forth more fully below in paragraphs 107-204. These paragraphs relate to problems with the match process itself; distinct problems with the underlying data used in the match are addressed in paragraphs 205-62.

104.    As discussed below, the Administrator's decision reversing the Board does not dispute the Board's finding that CMS' match process failed to identify some Medicare inpatients of the Hospital as federal SSI recipients for the periods at issue and continues to do so.

105.    The Administrator's decision asserts instead that the Hospital failed to quantify the financial impact of the flaws in CMS' match process. It is undisputed, however, that any such quantification would require access to records that only CMS and SSA possesses, and that CMS resisted all efforts by the Hospital and the Board in this case to obtain access to the information contained in those records.

106.    Though the Administrator faults the Hospital for allegedly having failed to quantify the impact of the flaws in CMS' match process, the Administrator nevertheless concludes that CMS achieved an "acceptable rate of error" in calculations of the Hospital's SSI fractions for the years at issue. Adm'r Dec. at 25-26, 42-43. The Administrator's decision, however, does not address what "rate of error," if any, is "acceptable" for Medicare payment

purposes generally or for DSH payment purposes in particular or what error rate the Administrator believes that CMS achieved in its calculations of the Hospital's SSI fractions for the years at issue.

### SSA's Annual SSI Data Tapes

107.    The Board made detailed findings of fact concerning the data elements included in the SSI data tapes that the Secretary uses to compute the SSI fractions for DSH.  PRRB Dec. at 10-11.

108.    The Board's findings concerning the data elements in SSA's annual SSI tape are based in part on the testimony of Pat Cribbs.  PRRB Dec. at 10-12.  Cribbs worked for SSA for 40 years, including 24 years in the SSI department.  PRRB Dec. at 10.  She was an SSA team leader for SSI database analysis and, in 1988 or 1989, took over responsibility for preparing the annual SSI tapes that CMS uses to calculate the SSI fractions for DSH.  PRRB Dec. at 10.  CMS did not controvert Ms. Cribbs' testimony before the Board.  The Administrator did not controvert her testimony in his decision.

109.    The Board made the following specific findings regarding the SSI eligibility data:

(a)    "SSA makes SSI eligibility determinations and maintains the SSI eligibility files."  PRRB Dec. at 10.

(b)    "Before April of each year, generally in March, SSA prepares and sends CMS a cartridge or tape containing SSI eligibility information covering a 42-month period."  PRRB Dec. at 10.

(c)    "The 42-month period covers the 36 months in the three prior calendar years and the first six months of the calendar year in which the tape is prepared.  Thus, the data included in the tape projects forward three months through the end of June in the calendar year in which the tape is created."  PRRB Dec. at 10.

(d)    "The SSA file contains select information prepared solely for CMS' use; SSA does not use the data file for any purpose."  PRRB Dec. at 10.

110.    Regarding the data elements on the special-purpose SSI tapes furnished to CMS by SSA, the Board found that the tapes for the periods at issue include the following data for each SSI recipient who was included on each tape:

(a)    truncated last name and first initial;

(b)    Social Security number, which is referred to as the personal account number, or "PAN;"

(c)    date of birth;

(d)    gender;

(e)    the Social Security or railroad retirement program identification number (called a "Title II number" or "CAN"), if the SSI recipient received monthly social security or railroad retirement benefits; and,

(f)    42 monthly indicators (ones and zeros) denoting the payment or non-payment of Federal SSI cash benefits during the period covered by the SSA tape.

PRRB Dec. at 10-11.

111.    During the September 2004 hearing before the Board, Cribbs testified that she spent about one hour per year on the annual SSI tapes for CMS, which were produced through computer runs performed in about two hours over a weekend.    PRRB Hearing Tr. at 125-26 ("Since it never changes, all you do is just plunk the program in when the time comes.  You change dates.  That's it."); *see also* PRRB Hearing Tr. at 175-76.  Considering the little time required for SSA to produce the special-purpose SSI tapes, it would not have been burdensome for SSA to run and furnish CMS with updated SSI tapes at least once every quarter instead of just once a year.

112.    The CMS Administrator's decision does not controvert any of the Board's findings, or Cribbs' testimony, as set forth in paragraphs 107-11 above.  *See, e.g.,* Adm'r Dec. at 15.

**CMS' Inpatient Hospital Stay Records (MEDPAR File)**

113.    The Board also made detailed findings of fact concerning the data elements included in the CMS files containing the inpatient hospital stay records for Medicare beneficiaries that CMS uses to compute the SSI fractions for DSH, known as "MEDPAR" files. PRRB Dec. at 11-12.

114.    The Board's findings of fact concerning inpatient hospital stay records are based on stipulations entered into below and uncontroverted record evidence, including the testimony of CMS' witness, William Anthony Dean, who "had been CMS' principal MEDPAR programmer since 1995 and was responsible for producing the MEDPAR and maintaining the database." PRRB Dec. at 11.

115.    The Board found that "All Medicare Part A and Part B claims are processed through a [Common Working File ("CWF")] file prior to claims payment," that "[s]ince 1995, the MEDPAR files have been drawn from the National Claims History (NCH) database," and that the NCH database, which is also maintained by CMS, "is a national repository of all Medicare claims processed by fiscal intermediaries." PRRB Dec. at 11. However, Dean's testimony before the Board does not reveal that he had any familiarity with the CWF that was apparently the source for the MEDPAR records until 1995, PRRB Dec. at 11, and the Intermediary's own representative testified that "[t]he Intermediary does not know from which CWF field MEDPAR pulls the data, or whether the MEDPAR even looks to utilized days at all." PRRB Dec. at 36.

116.    Based on the stipulations of the parties below, the Board also found that CMS' MEDPAR files contain the following data fields for each inpatient hospital stay that is included:

        (a)    the hospital's Medicare provider number;

(b)    the patient's health insurance claim account number ("HIC" or "HICAN");

(c)    the dates of admission to, and discharge from, the hospital;

(d)    the total length of the inpatient hospital stay;

(e)    the number of days in the stay that were covered under Medicare Part A; and

(f)    the number of days in the stay for which the patient was determined, through the match process described below, to be entitled to Federal SSI benefits.

PRRB Dec. at 11-12.

117.    Regarding the HIC numbers (or HICANs) that appear in CMS' MEDPAR files, the Board found: "The HIC number assigned to each Medicare beneficiary is either a Social Security number or railroad retirement number (but not necessarily the individual's own number) followed by an alpha-numeric beneficiary identification code."  PRRB Dec. at 12 n.39.

118.    The CMS Administrator's decision does not controvert any of the Board's findings as set forth in paragraphs 113-17 above.  *See* Adm'r Dec. at 16.

119.    Although the Administrator's decision does not controvert any of the Board's findings in paragraphs 113-17 above, the Administrator's decision alleges one fact concerning the MEDPAR file that is not found in the Board's decision and is not supported by the record evidence.  Specifically, after noting that a single "stay record" in a MEDPAR file may be the compilation of multiple hospital  claims for payment, the Administrator alleges, without citation to any record evidence, that  "[a]pproximately 95 percent of inpatient stays involve a single claim."  Adm'r Dec. at 16.

## CMS' Record Match Processes

120.    The Board also made detailed findings of fact concerning the processes that CMS and SSA use to match records, not only for purposes of CMS' calculations of the SSI fractions

for DSH but also for purposes of a more sophisticated and accurate process employed to perform a different data match for purposes of SSA's administration and payment of SSI cash assistance. PRRB Dec. 12-13.

121.    The Board's findings concerning the match processes are based on uncontroverted record evidence, principally the testimony of Cribbs, the long-time SSA employee who prepared SSA's annual SSI tapes for CMS, and of two CMS witnesses:  Dean, the MEDPAR programmer, and Daryl Rosenberg, another CMS employee who also was involved in CMS' calculations of the SSI fractions for DSH.  PRRB Dec. at 12-13.

### *CMS' Use of the Earliest and Least Accurate of Its Ten Data Matches*

122.    Based on Dean's testimony, the Board found that CMS creates multiple MEDPAR files for every federal fiscal year and calendar year:  "Each quarter, CMS creates several separate MEDPAR files that collectively cover multiple calendar and fiscal years." PRRB Dec. at 12.  In fact, as the Board further found, CMS creates multiple MEDPAR files for every Federal fiscal year over the course of a two and one-quarter year period after the end of the subject Federal fiscal year:

> Over [a period of] two and a quarter years, CMS performs 10 MEDPAR runs and creates 10 MEDPAR files for each Federal fiscal year, the latest of which is run in the third December after the end of the subject fiscal year.  For example, the 10th and last MEDPAR file for Federal fiscal year ended September 30, 1994 was produced in a  December 1996 MEDPAR run.

PRRB Dec. at 12.

123.    The Board also found, again based on Dean's uncontroverted testimony, that: "CMS matches its inpatient hospital stay records against the most recent annual SSA tape every time it creates one of these quarterly MEDPAR runs."  PRRB Dec. at 12.

124.    The Board found that, (i) although CMS creates 10 separate MEDPAR files for every Federal fiscal year and matches the inpatient hospital stay records in each file to the latest SSI data that CMS has received from SSA, (ii) although the latest of these MEDPAR files for a given Federal fiscal year is created more than two years after the end of the Federal fiscal year, *see* paragraph 54 above, and (iii) although final DSH payment determinations typically are not made until 2-3 years after the end of a hospital fiscal year, CMS nonetheless uses one of the *earliest* of the 10 MEDPAR files to compute the SSI fractions that are applied to determine hospitals' DSH payment:

> Despite having MEDPAR runs that are updated to the time of the final cost report settlement [which is usually 2-3 years after the end of hospital's fiscal year], it is undisputed that CMS used the MEDPAR file based on the month of June following the end of the Federal fiscal year to compute the SSI fractions at issue for each year under appeal.  For example, CMS used the June 1996 MEDPAR run to calculate the SSI fraction for Federal fiscal year ended September 30, 1995.

PRRB Dec. at 32.

125.    The Board further found, based on uncontroverted evidence, that the SSI fractions that CMS applies to determine hospitals' DSH payments for a given year do not reflect SSI benefits that may be granted or reinstated after March of a given calendar year, retroactively for a period within the preceding Federal fiscal year.   PRRB Dec. at 32.  This has the effect of reducing the number of Medicare/SSI patient days counted in the numerator of the SSI fractions, thereby understating the SSI fraction and the resulting DSH adjustment for that period.

126.    Additionally, regarding CMS' use of June MEDPAR files, the Board found that CMS' own policy staff was not aware of what exactly the agency was doing, noting that CMS' own witness, "Ms. [Anne] Tayloe [formerly Anne Rudolph], the individual responsible for [CMS'] DSH policy during the periods in issue, apparently believed that the latest available data was being used to compute the Medicare fraction."  PRRB Dec. at 33.  Ms. Tayloe was incorrect.

127.    Concerning CMS' publication of SSI fractions it computes for each Federal fiscal year, based on SSI data furnished to CMS in the following month of March and a MEDPAR file created in the following month of June, the Board found: "Following its computation of the SSI fractions for a particular Federal fiscal year, generally in July or August, CMS transmits the results of the computations for each hospital (i.e., the hospital's total number of Medicare Part A covered days, its total number of Medicare/SSI days, and the resulting percentage) to the Medicare fiscal intermediaries."  PRRB Dec. at 12.

128.    The Board further found that the Secretary's audit and payment agents, the fiscal intermediaries, are bound to apply CMS' calculation of the SSI fraction for a hospital:  "Each intermediary is required by regulation to apply the SSI fraction computed by CMS in determining a hospital's entitlement to the DSH payment."  42 C.F.R. §§ 412.106(b)(2) and (b)(5).  See also 51 Fed. Reg. 16772, 16777 (May 6, 1986) (interim final rule); 51 Fed. Reg. 31454, 31457-61 (Sept. 3, 1986) (final rule).  PRRB Dec. at 12.

### CMS' Broken Commitment to Use Social Security Numbers in Its Match Process

129.    Regarding the mechanics of the records match process that CMS uses to compute the SSI fractions for DSH, the Board found:  "The fundamental requirement in determining how many SSI recipients are among a hospital's inpatient population is that the patient identifier in the SSA file must match the patient identifier in the MEDPAR file."  PRRB Dec. at 12.

130.    The Board further found that "CMS said in the preamble to the 1986 rule [implementing the DSH statute] that it would use the Social Security number in the match[,] . . . stating 'we believe that matching Social Security numbers on a Federal fiscal year basis is the most feasible approach.'"  PRRB Dec. at 12 (quoting from the preamble to CMS' initial rulemaking implementing the DSH statute, 51 Fed. Reg. 16772, 16777 (May 6, 1986)).  CMS had access to Social Security numbers both for the SSA's annual tapes and its own Medicare

beneficiary records. *Id*. Before the Board, the parties did not dispute that "the Social Security number is the best unique identifier." PRRB Dec. at 12.

131.    The Board found, however, that "despite CMS' stated intent to use Social Security numbers as the patient match criteria, the evidence showed that CMS has never matched Social Security numbers on the SSI data tape with Social Security numbers on the MEDPAR in the calculation of the SSI ratios." PRRB Dec. at 13.

132.    The Board further found that the Secretary's decision not to fulfill his commitment to use patients' own Social Security numbers in the SSI fraction match process is at odds with the methodology employed by SSA and the Secretary for other purposes where failure to properly match records would not result in less Medicare program payments to hospitals, as in this case, but would result in greater program payments by SSA to SSI recipients:

> In a similar program, SSA and CMS use Social Security numbers (or PANs), as well as alternative identifiers (name and gender), to match SSA records with CMS' data in connection with SSA's monitoring of SSI recipients' residence in nursing homes. When SSA set up the nursing home match process with CMS, SSA and CMS worked to identify the functional requirements for the match, and the agencies tested and validated the match program. In contrast, the only criteria established for the matching process of SSI data files with MEDPAR data for hospitals were memorialized in two letters. Cribbs' understanding was that a programmer called her predecessor, who no longer works for SSA, and they decided over the phone what criteria to use. The program was already written when Cribbs took over and nothing had changed.

PRRB Dec. at 13. Significantly, a failure to properly match records in connection with the nursing home match process would produce greater government SSI payments to individuals than they are entitled to receive when residing in an institution for care that is paid by Medicaid, whereas in the DSH context, a failure to match would produce a lower SSI fraction and thus a lower DSH payment to hospitals.

133.    The CMS Administrator's decision does not controvert any of the Board's findings regarding the match processes employed by CMS as set forth in paragraphs 120-32 above.  *See, e.g.,* Adm'r Dec. at 15-17.

### SSA's Identification Numbers

134.    The Board made detailed findings of fact concerning the different types of identification numbers that are used by SSA in the administration of the Social Security retirement program (established under Title II of the Social Security Act) and in its administration of the SSI program (established under Title XVI of the Act) as well as the identification number that is used by CMS in its administration of the Medicare program (established under Title XVIII of the Act).  PRRB Dec. at  13-15.  The Board also made detailed findings of fact concerning the identification numbers that the Secretary used, or now alleges to have used, in calculating the SSI fractions for DSH.  PRRB Dec. at 13-15, 16-20.

135.    The Board's findings concerning the various identification numbers mentioned above are based principally on the testimony of Cribbs, the long-time SSA employee who ran the programs that produced SSA's special-purpose SSI tapes for CMS; Alan Shafer, another former, 34-year SSA employee who has appeared numerous times on behalf of SSA as an expert on management of information systems and data and who served as Associate Commissioner and management representative to the SSI systems work group that set up the SSI system (*see* PRRB Dec. at 10); and CMS' own MEDPAR programmer, Dean.

### SSA's Title II Claim Account Numbers ("CANs")

136.    The Board found:  "SSA uses claim account numbers, called Title II numbers or CANs, to track individuals' benefits under the Social Security Retirement program established under Title II of the Social Security Act."  PRRB Dec. at 13.

137.    The Board found that SSA's Title II number "consists of two elements:  the Social Security number of the Title II record holder (the person whose work history qualifies for benefits) and an alpha-numeric suffix, called a beneficiary identification code or 'BIC,' that denotes the relationship between the beneficiary and the Title II record holder."  PRRB Dec. at 13.  To illustrate the relationship between a Title II number and an individual's Social Security number, the Board wrote:

> [A]n individual, 'A,' may receive Title II benefits only through his or her spouse, 'B,' who has sufficient work history to be entitled to benefits on his or her own account.  In this circumstance, 'A' would be assigned a Title II number that includes 'B's nine-digit Social Security number with an alpha-numeric beneficiary identification code (such as B2) at the end.

PRRB Dec. at 13.

138.    Contrasting SSA's Title II number with an individual's own unique Social Security number, the Board found, based on the uncontroverted record evidence, that the Title II CAN is not an individual-unique identification number:

> Unlike the Social Security number, a Title II number (or CAN) is not an individual unique identifier.  An individual may have more than one Title II number at the same time because, as CMS acknowledges, an individual may receive Title II benefits simultaneously under or on account of more than one Title II number holder's account.  In addition, an individual's Title II number may change over time, for example, with marriage, divorce, death of a spouse or changes in work status.

PRRB Dec. at 13.

139.    Based on the uncontroverted testimony of Cribbs, who prepared SSA's special-purpose SSI tapes for many years, including the years at issue, and the testimony of CMS' own witness, Dean, the Board found:  "SSA's annual tapes do not include a Title II number for every individual who was entitled to SSI benefits."  PRRB Dec. at 13.  "An individual who receives SSI but does not receive Title II Social Security benefits, for example, may not have a Title II

number displayed on his or her SSI record, and a Title II number for that individual would not appear on SSA's annual tape." PRRB Dec. at 13-14.

140.    The Administrator's decision does not controvert any of the Board's findings regarding SSA's Title II numbers, or CANs, as set forth in paragraphs 134-39 above. *See, e.g.,* Adm'r Dec. at 15-17.

141.    However, the Administrator's decision alleges that Dean runs a program at CMS that generates assumed Title II numbers based on the Social Security numbers reflected in SSA's annual SSI tapes for purposes of calculating the SSI fractions for DSH. Adm'r Dec. at 42. That assertion is based solely on Dean's testimony before the Board in the 2004 hearing in this case, and, as the Board observed, was squarely contradicted by his earlier testimony in a 2003 evidentiary hearing conducted by the Board in this same case. *See* PRRB Dec. at 16-18. *See generally* ¶¶ 155-67 below. Dean also testified, however, that it is impossible for him or CMS at this point to know how CMS' programs worked before 1995, when Dean assumed his current position, because CMS kept no records documenting how its programs worked. *See* PRRB Dec. at 16-18. *See also* ¶ 166 below.  Dean's admission that it impossible for CMS to know now how its programs ran before 1995 is not acknowledged in the Administrator's decision, and its squarely contradicts the Administrator's assertion that CMS ran a program to generate assumed Title II numbers for purposes of calculating the Hospital's SSI fractions for the years at issue.

### The Title II Number On SSA's Annual SSI Tapes

142.    Regarding the Title II numbers that SSA includes on the special-purpose SSI tapes it furnishes to CMS, the Board found that "SSA's annual tape includes a field for only one Title II number."  PRRB Dec. at 14.  Based on the uncontroverted testimony of Cribbs and another SSA employee, Cliff Walsh, who was called by the Secretary's counsel as a witness for the Intermediary in this case, the Board further found:  "SSA's annual tapes never include more

than one Title II number for individuals who receive Title II Social Security benefits under more

than one Title II number, or for individuals whose Title II number changes over the course of the

42-month date range covered by an annual tape."  PRRB Dec. at 14.

143.    With respect to the SSA program that is used to identify the Title II number that is

included on an individual's SSI record in SSA's special-purpose SSI tapes, the Board credited

Cribbs' uncontroverted testimony that "in preparing SSA's annual tape, SSA's program takes the

Title II number from the 'unearned income' or 'UMI' field on the SSI master record."  PRRB

Dec. at 14.  The Board further found, again based on Cribbs' uncontroverted testimony:  "The

SSA program takes the first Title II number that appears within the unearned income field within

the 42-month date range covered by the tape, and it is 'more than likely' that there will be more

than one Title II number appearing in the unearned income field within the 42-month date

range."  PRRB Dec. at 14.  The Board also found that "because the Title II numbers are usually

sorted from oldest to newest in the unearned income field, the first number to appear in that field,

and the number that would be put on SSA's annual tape, ordinarily would be the oldest Title II

number within the 42-month date range."  PRRB Dec. at 14.

144.    Quoting Cribbs' uncontroverted testimony, the Board further found:

> [O]n the [SSI record] they have what they call unearned income as they
> get Title II Social Security benefits and that's where I have to look – I
> look at a certain part and I have to select to see if they happen to have a
> type "A" [Social Security benefits] within the 42-month period and
> whatever their CAN [i.e., Title II number] is I just pick it up because they
> only have room for one so *the first one wins*.

PRRB Dec. at 14 (emphasis added).

145.    The Administrator's decision does not controvert any of the Board's findings

regarding the Title II numbers that appear on SSA's special-purpose SSI tapes or the process by

which SSA selects the Title II numbers that appear on those tapes, as set forth in paragraphs 142-44 above.  *See, e.g.,* Adm'r Dec. at 15-17.

### CMS' Health Insurance Claim Account Number ("HICAN")

146.    The Board found that the Health Insurance Claim Account Number, sometimes referred to as a "HIC number" or "HICAN,"  for each Medicare beneficiary "is a Social Security number or railroad retirement number (but, in either case, not necessarily the individual's own number) followed by an alpha-numeric beneficiary identification code."  PRRB Dec. at 14.

147.    Regarding the relationship and differences between CMS' HIC numbers and SSA's Title II numbers, the Board found:  "Often, an individual's HIC number is the same as his or her Title II number or CAN, but while an individual can have more than one Title II number simultaneously, an individual cannot receive Medicare Part A benefits under more than one HIC number at one time."  PRRB Dec. at 14.

148.    The Board further found that "because the beneficiary identification codes are 'equated' in CMS' match process, the equated HIC number that is used in that process is not an individual unique identifier."  PRRB Dec. at 14-15.  In other words, after the HIC numbers are "equated" by the programs CMS employs in its match process, two or more different Medicare beneficiaries could be shown as having the same HIC number.

149.    Regarding the components of CMS' HIC number, the Board found:  "The first part of a HIC number, the Social Security or railroad retirement number, may or may not be the Medicare beneficiary's own Social Security or railroad retirement number."  PRRB Dec. at 15.

150.    To illustrate the function and use of an individual's Social Security number in the HICAN, the Board gave the following example:

> [A] married woman ("W") who is over the age of 65 may receive
> Medicare Part A benefits on the account of her husband ("H") if H has
> sufficient quarters of work to qualify for Social Security benefits.  In this

example, W's HIC number would include H's nine-digit Social Security
number followed by an alpha-numeric beneficiary identification
code indicating W's spousal relationship with H, on whose account W may
receive Social Security benefits (if any) under Title II of the Act.

PRRB Dec. at 15.

151.    Except as noted in paragraphs 152 and 154 below, the Administrator's decision

does not controvert any of the Board's  findings regarding CMS' HIC numbers that are used in

the match process CMS employs to calculate the SSI fractions for DSH, as set forth in

paragraphs 146-50 above.  *See, e.g.,* Adm'r Dec. at 42-43.

152.    Quoting from his own notice published in the *Federal Register* in 2005, after the

Board conducted its hearing in this case, the Administrator's decision contradicts the Board's

findings by claiming that SSA's "social security numbers are used on a 'wage earner' basis that

is not necessarily specific to an individual Medicare beneficiary (or hospital patient)."  Adm'r

Dec. at 42.

153.    Nothing in the Administrator's decision in this case, nothing in the 2005 *Federal*

*Register* notice that is quoted in his decision, and nothing in the record evidence in this case

explains what is meant by the Administrator's use of the term "'wage earner' basis."  Nor does

the Administrator's decision in this case, the 2005 *Federal Register* notice, or the record

evidence in this case explain or identify any factual basis for the allegation that SSA's Social

Security numbers are "not necessarily specific to an individual."

154.    Again quoting from his own notice published in the *Federal Register* in 2005, the

Administrator's decision contradicts the Board's findings by claiming that "HICAN are [*sic*]

unique to each beneficiary."  Adm'r Dec. at 42-43 (quoting the preamble to CMS rulemaking in

70 Fed. Reg. 47440-41 (Aug. 12, 2005)).  Nothing in the Administrator's decision, in the 2005

*Federal Register* notice, or record evidence before the Board in this case explains or identifies any factual basis for that allegation.

### *Internally Inconsistent and Contradictory Testimony of CMS' Witness, Dean, Regarding the Identification Numbers CMS Uses in the Match Process*

155.    The Board found that CMS' principal MEDPAR programmer, Dean, "became involved in the MEDPAR process in 1995 when he inherited the programs used to produce the MEDPAR.  He knew little about his predecessors' work on the program."  PRRB Dec. at 16.

156.    The Board found that "Dean testified at the 2003 Evidentiary Hearing that CMS runs a program, called SSISORT, that reformats the SSI data received from SSA, drops all SSI records that do not include a Title II number, a term that he used 'loosely' to refer to entitlement to Medicare, and he puts the remaining SSI records in a new output file."  PRRB Dec. at 16.  The Board further found that "[a]t the 2003 Evidentiary Hearing, Dean testified that CMS' programs have used just one identifier to match the inpatient hospital stay records in the MEDPAR file with the SSI entitlement information derived from tapes obtained from SSA."  PRRB Dec. at 16.

157.    Regarding Dean's 2003 testimony concerning the use of just one identifier in the match process CMS used to calculate the SSI fractions for DSH, the Board quoted the following testimony of Dean at the 2003 hearing:

> Q.    What are the criteria or identifiers on which the match is run?
>
> A.    The health insurance claim account number.  The match program will read a stay record and look at the HICAN, health insurance claim account number, and then will go to the – my version of the SSI file and search for the HICAN.  And when there is a match, that is when the SSI calculation is performed.

PRRB Dec. at 16.  Dean further explained at the 2003 hearing "that the Title II number taken from the SSA file is also called a HICAN in the new file [Dean] creates after the SSISORT program is run."  PRRB Dec. at 16.

158.    Dean also testified in 2003 that the SSI fraction match program that he runs for CMS will drop any SSI records that do not display a Title II number from SSA, stating that "if '. . . there is no Title II number, which is all we are, you know, on our end, that is all we are really concerned about . . . this process would not write that record out.  So I wouldn't keep that record.'"  PRRB Dec. at 16.

159.    Dean was clear in 2003 that the Social Security number is not used at all in CMS' match process even though that number appears on SSA's annual SSI tapes for every individual record included on those SSI data tapes.  PRRB Dec. at 16.  According to Dean in 2003, "It is strictly HICAN" that CMS relies on for the match.  Dean testified that "all other data elements on SSA's annual tapes, including the Social Security numbers, or PANs, are 'useless.'"  *Id.*  The Board noted that, "[i]n response to a question about whether Social Security numbers are included in the data fields on the MEDPAR, [Dean] responded [in his 2003 testimony] that '[i]t is a field we would never use.'"  *Id.*

160.    After the 2003 evidentiary hearing in this case, but prior to the hearing the Board conducted in September 2004, the Hospital submitted a pre-hearing brief (entitled "Provider's Position Paper") that detailed several systemic flaws in CMS' match process, including problems stemming from CMS' failure to match against SSI records that do not display a Title II number on SSA's annual SSI tape and are dropped from the file before it is matched against CMS' MEDPAR file.  The Provider's Position Paper also highlighted problems stemming from CMS' failure to match records based on individuals' own unique Social Security numbers or any other secondary match criteria.

161.    Contradicting his sworn testimony in 2003, Dean testified at the September 2004 hearing "that CMS runs matches against two numbers, the Title II CAN plus a HIC-like number

that the CMS program creates from the Social Security number [that appears on SSA's tape]." PRRB Dec. at 17.  As the Board noted, Dean stated at the 2004 hearing "that CMS uses two numbers for matching because 'our process doesn't want to take any chances,' and '[w]e want to make sure we're matching everybody that they [SSA] send us.'"  PRRB Dec. at 17.  The Board further found that "[w]hen confronted with what appeared to be inconsistencies between the 2003 Evidentiary Hearing the September 2004 Hearing, Dean asserted that the number CMS creates from the Social Security number **is** a HICAN, and that when he testified in 2003, he was using the term Title II number 'in a generic sense to mean eligibility for Medicare.'"  PRRB Dec. at 17 (bold, underscored text emphasized in italics in PRRB decision).

162.    Regarding additional inconsistencies in Dean's testimony, the Board also found:

> In further contrast to his prior [2003] testimony, Dean stated [at the 2004 hearing] that the SSISORT program does not discard all records in SSA's annual tape that do not contain a Title II number.  On the contrary, he said [in 2004] that ". . . we create a record from every record Social Security sends us by generating a HIC off of the Social Security number" and ". . . we'll match against numbers that are provided in the Title 2 field and we'll match against numbers provided in the Social Security field because we generate a high CAN [sic] from that."  Dean elaborated that his program runs the SSA data file through the SSISORT program and ". . . we come out with a version of the SSA tape, and this version is then applied against the claims data . . . but we're not dropping claims if they're not matched and keeping claims if they are matched.  It's our entire version of the SSA tape."

PRRB Dec. at 17.

163.    The Board further noted that Dean's testimony in 2004 was inconsistent with deposition testimony that he gave under oath in 1995, when he admitted that "he did not know how the match program worked at that time . . . ;  that he had not been given written guidelines or instructions concerning the match program . . . ; that he did not understand the reference in the match program to Title II numbers . . . ; and that he did not know what the match program did with duplicate records from SSA."  PRRB Dec. at 17 n.79.

164.    The Board additionally found that Dean's 2004 testimony is inconsistent with a written discovery response that CMS furnished to the Hospital in this case, before the Hospital submitted its pre-hearing Position Paper detailing several specific flaws in CMS' match process. PRRB Dec. at 19.

165.    Regarding the inconsistency between Dean's 2004 testimony and CMS' written discovery response referred to in the preceding paragraph, the Board found:

> With regard to Dean's testimony in 2004 that CMS matches on two numbers – the HICAN as well as a HIC-like number derived from the Social Security number - CMS' discovery response did not indicate that CMS ever matches against a number derived from the Social Security numbers included in SSA's annual tapes.  CMS stated that the agency ' . . . has no recollection, and no documentation concerning, whether CMS ever saw a need . . . to employ secondary or alternative matching criteria' in addition to, or in lieu of, the HICAN.

PRRB Dec. at 19.

166.    The Board explained its decision not to credit Dean's inconsistent testimony in 2004 in part as follows:  "Dean admitted that CMS cannot explain how the match ran, or what criteria were used in the match program that was run for the calculations of the SSI fractions for fiscal years 1993 and 1994, nor can CMS prove how the match program ran, or what criteria were used in the match program that was run, for the calculations of the SSI fractions for fiscal years 1995 and 1996, because CMS did not have an archiving mechanism for the output."  PRRB Dec. at 18.

167.    Additionally, the Board found that "[a]t the 2004 hearing, Dean confirmed that he was still the person primarily responsible for the matching process and for maintaining the program, but no one [from CMS] had yet asked him to look at the data and see if there appeared to be a problem."  PRRB Dec. at 18.

168.    The Administrator's decision does not controvert any of the Board's findings regarding the internal inconsistencies and contradictions in Dean's testimony, as set forth in paragraphs 155-67 above. *See, e.g.,* Adm'r Dec. at 15-17, 42.

169.    The Administrator, unlike the Board, credits most of Dean's testimony at the 2004 hearing – the testimony he gave after the Hospital had filed a pre-hearing Position Paper detailing several systemic flaws in CMS' match process – without addressing or even acknowledging the Board's findings, set forth above, regarding the inconsistencies between Dean's 2004 testimony and the sworn testimony that Dean gave in the 2003 hearing in this case and in his 1995 deposition testimony.  Adm'r Dec. at 15-17, 42.

170.    Further, the Administrator's decision fully credits Dean's 2004 testimony regarding CMS' alleged use of a secondary match identifier generated from the Social Security number appearing in SSA's annual SSI tapes without addressing CMS' admissions in discovery that CMS had no documentation reflecting that the agency ever even saw a need to use secondary or alternative  matching criteria. *See* PRRB Dec. at 19.

### CMS' Admission of A Systemic Flaw In the Match Process That Was Used To Calculate the SSI Fractions For DSH Until 1996

171.    As the Board found, CMS admitted in discovery that, in 1996, a CMS employee, Joseph Del Pilar, changed the match program that CMS ran, called the SSISORT program, "so that the program would write out separate records in cases where an individual had Medicare entitlement on one HIC number and later became entitled to Medicare on another HIC number (the 'Del Pilar change')."  PRRB Dec. at 18 (citing CMS Discovery Response to Provider Interrogatory 36, Provider Exhibit 152, pp. 2979-81).  The Board further found that, in CMS' discovery response regarding the Del Pilar change, CMS admitted the following:

> Had such change to the SSISORT program been in effect to 1996, such
> change would have tended to increase the numerator of the hospital's

> Medicare [SSI] fraction for such period if an individual had a qualifying
> inpatient stay at such hospital, and was entitled to SSI during the month in
> which the discharge from such stay occurred, and appeared as entitled to
> SSI for such month on the tape sent by SSA to CMS for purposes of
> calculating the Medicare fraction for such fiscal year, and was entitled to
> title II on more than one account number, and if SSA did not furnish all
> such title II numbers to CMS.

PRRB Dec. at 19.

172.    Del Pilar and Dean were the sources CMS identified for the discovery response

quoted in paragraph 171 above.  PRRB Dec. at 18.

173.    When Del Pilar testified in the 2004 hearing, however, he stated "that he merely

filled in at that time [in 1996] for Mr. Dean and had no knowledge or understanding of the

substantive changes he [had been] asked to make by [another CMS employee,] Ms. O'Leary, nor

did he recollect anything about the changes."  PRRB Dec. at 18.  Janet O'Leary "had worked for

CMS or its predecessor since 1977.   In the mid 90's she was in the National Claims History

Branch and in 1996 was its Branch Chief.  Tony Dean and Joseph Del Pilar, both programmers,

worked for her."  *Id.*   Regarding O'Leary's testimony concerning the 1996 change to CMS'

match process, the Board found:

> When Ms. O'Leary was questioned about the alleged changes [made in
> 1996], she also recalled very little about the Del Pilar changes.  She did
> recall, though, in some detail the 'stale records' issue [discussed *infra*
> ¶¶ 207-29] that was eventually corrected.  She identified Provider Exhibit
> 64 at page 1550 as her own notes from February, 1996.  The notes reflect
> that, at that time, there was a question whether a person could have more
> than one SSI record in a year and O'Leary stated that they questioned
> whether SSA was sending all those records.  But Ms. O'Leary testified at
> the hearing in 2004 that 'Again, we have no answer to that question that I
> know of.'

PRRB Dec. at 18-19.

174.    In fact, the Board found that O'Leary had little or no understanding of the programs her immediate subordinates had been running in connection with CMS' computations of the SSI fractions:

> O'Leary believed that the SSA tape had the health insurance claim [HIC] number on it, stating 'there would be no other way for us to identify' [the beneficiary ] individually.  She understood the HIC number and the Title II number to be the same.  She acknowledged that the SSN would also be on the SSA tape but that it would not identify an individual for Medicare because Medicare uses the HIC number 'which may or may not be the individual Social Security number  . . . included in our claim number.[']  She believed that CMS would also have the SSN in the enrollment database in most instances, but possibly not all.

PRRB Dec. at 19.

175.     The Board further found that "CMS does not allege that it ever corrected the SSI fractions that were computed prior to the 1996 change allegedly made by Del Pilar."  PRRB Dec. at 19.

176.    The Administrator's decision does not address or acknowledge the Board's findings, or CMS' own admissions, as described in paragraphs 171-75 above, regarding the 1996 Del Pilar change to the match program.  Nor does the Administrator disclaim CMS' admission before the Board that Del Pilar's change, if implemented, "would have tended to increase the numerator of the hospital's Medicare [SSI] fraction" for DSH.  *See ¶ 171, supra.*

### Additional Flaws in the Match Process

177.    The Board found that, regardless of whether CMS' match process worked in the manner described by Dean in his 2003 testimony or whether it worked in the manner that Dean now says he thinks it might have worked, the process is systemically flawed in multiple respects that produce unreliable numbers and tend to substantially deflate the resulting SSI fractions. PRRB Dec. at 20-22.

178.    The Board found:

If the evidence is correct that CMS only matches the HICAN in the MEDPAR files and the single Title II number on SSA's annual tapes, as [Dean's] 2003 testimony and CMS' discovery responses indicate, it would follow that CMS' inpatient hospital stay records would not have matched with the SSI records on SSA's annual tape for some individuals who were entitled to SSI, because SSA's annual tape never includes more than one Title II number, or CAN, for individuals who received Title II benefits under more than one Title II number.

PRRB Dec. at 20.

179.    The Board further found:

If the SSISORT program reformats the SSI data received from SSA to drop all SSI records that do not include a Title II number, as Dean testified in 2003, this creates a significant potential for error because, according to Shafer [the long-time SSA official], roughly half of the records on SSA's annual tapes would not have a Title II number.

PRRB Dec. at 20.

180.    Additionally, the Board found:

The match process described in Dean's testimony at the 2003 Evidentiary Hearing is also prone to error due to changes in Medicare beneficiaries' HIC numbers over the course of a year and CMS' failure to use the only individual unique identifier, the Social Security number, in the match process.

PRRB Dec. at 20.

181.    Regarding Dean's inconsistent testimony at the 2004 hearing, the Board found: "Even if the SSI match program has always been run against both the Title II numbers and the HIC-like numbers derived from the Social Security numbers in SSA's annual tapes, as Dean now hypothesizes, the evidence shows that CMS' match process would likely still produce false negatives."  PRRB Dec. at 20.

182.    In the first of two situations noted by the Board in which CMS' match process would produce false negatives even if the match program always ran in the manner that Dean hypothesized in his 2004 testimony, the Board found as follows:

> One example of a situation in which the SSI match program would fail to match is when an individual, "Jane," initially receives Title II and Medicare on her own account using her own Social Security number and an "A" beneficiary identification code (e.g., 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A). "Jane" subsequently qualifies for Title II and Medicare on her spouse's account, using her spouse's Social Security number followed by a "B" beneficiary identification code (i.e., 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B). After the change in the HICAN number, Jane is hospitalized. The HICAN for the period of the hospitalization would be Jane's later Title II number (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B), which would not match the first, oldest, Title II number that SSA's program would pick up from the unearned income field on the SSI master record. That number, in this example, would be 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A.

PRRB Dec. at 20. The Board found that, in his testimony at the 2004 hearing, "Dean initially agreed there would be no match in this first example, even assuming the SSI match program does what he now thinks it does." *Id.* The Board noted, however, that Dean "later recanted his answer, based on the premise that SSA's annual tape would have the spouse's Social Security number and a "B" beneficiary identification code (i.e., 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B) in the Title II field." *Id.* In rejecting Dean's new conjecture about how the match process might have worked properly, the Board found that "Dean's assumption is contradicted by Cribbs' testimony as to how her program actually works and how that program scans the unearned income field to pick up only the first and (oldest) Title II number. Further, Dean admits that he had never attempted to verify with SSA his supposition as to how SSA's program works." *Id.*

183.    The Board's second example of a situation in which CMS' match process would produce false negatives again (even if it always worked in the manner Dean hypothesized in his revised testimony on this point in 2004), is as follows:

> A second example of a situation in which the SSI match program would fail to match is when an individual, "Jane," whose Social Security number

is 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, initially receives Title II and Medicare under a deceased spouse's account using the decedent's Social Security number followed by a "B6" beneficiary identification code (i.e., 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B6).  Jane subsequently remarries and receives Title II and Medicare on her second spouse's account, using the second spouse's Social Security number and a "B1" beneficiary identification code  (i.e., 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B1).  If Jane is hospitalized after the change in her HICAN number, then the HICAN for the period of the hospitalization would be the second number (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B1), which would not match either the first, oldest, Title II number that SSA's program would pick up and include on its annual tape (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B6) or her own Social Security number with an "A" beneficiary identification code tagged on at the end (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A).  See Hearing Tr. at 1375-76.  *Dean admitted that there is no way that CMS' SSI match program would produce a match in this example, even if it actually worked the way he now thinks it might have worked.*

PRRB Dec. at 21 (emphasis in italics added).

184.    In view of the foregoing findings and citing uncontroverted evidence in the record, the Board concluded that CMS match process is systemically flawed:  "Regardless of how the match process may have worked, there is compelling evidence that it did not, in fact, produce accurate results."  PRRB Dec. at 21.

185.    The Board further found that "CMS' witness from SSA, Cliff Walsh, confirmed that "the limited SSI records that the Provider was able to obtain from SSA show several examples of SSI stays that would have been on the SSA data file and yet inexplicably were not counted as SSI days in CMS' MEDPAR data."  PRRB Dec. at 21.  Walsh "is Branch Chief of the Master Records Support Section of SSI System within the Social Security Administration.  He has been Branch Chief for six years, but has worked in that division since 1986 as the team leader of the Master Records Support Section.  His branch maintains the SSI master file and its associated database."  PRRB Dec. at 10.

186.    In response to questions from CMS' own counsel, who purported to represent the Intermediary in this case, Walsh confirmed before the Board in 2004 that the Hospital had identified five patient stays attributable to Medicare beneficiaries whose inpatient days were not

counted by CMS as Medicare/SSI patient days for purposes of the DSH calculation, but who

were in the Hospital during the period at issue, who were receiving SSI benefits during that time,

and whose SSI benefits certainly would have been reflected and included on the SSI tapes that

SSA furnished to CMS for purposes of CMS' calculations of the SSI fractions for the periods at

issue. *See* PRRB Dec. at 21. The Board found: "The omission of these stays from the SSI days

in the numerator of CMS' calculation proves there are flaws in CMS' match process." PRRB

Dec. at 21.

187. The Board therefore concluded that "the numbers used to calculate the DSH

Medicare fraction are unreliable, regardless of the ultimate process that CMS developed." PRRB

Dec. at 21. According to the Board:

> [T]he evidence is convincing that there is a great likelihood that some
> matches will not be picked up because of the failure to match on a unique
> identifier and/or multiple criteria. Even if Mr. Dean's most recent
> testimony is accepted, some SSI beneficiaries who qualify under another
> person's SSN or HIC number would not be identified. *Dean admits that
> unless SSA gives CMS all an individual's Title II numbers, CMS will never
> get its match right under the match process that CMS now says it uses.* A
> more accurate match would be undertaken using beneficiaries' Social
> Security numbers and alternative identifiers (name and gender) when
> comparing the information on the SSA data tapes, which is what occurs
> when SSA monitors SSI recipients' residence in nursing homes.

PRRB Dec. at 21 (emphasis in italics added).

188. Additionally, concerning the credibility of the witnesses who testified regarding

the match process and the identifiers used in that process, the Board found that "the SSA

witnesses were credible. All had over 20 years of experience with SSA and were extremely

knowledgeable about SSI programs and SSA's operations, including recordkeeping." PRRB

Dec. 21. "In contrast," the Board found, "CMS' employees charged with the responsibility for

implementing DSH demonstrated a lack of comprehensive knowledge of the match process, i.e.,

what data was included in or excluded from the SSA tapes, as well as how, when, why and to

what extent the shortcoming of that data might lead to a failure to match CMS' MEDPAR file." PRRB Dec. at 21-22.

189.    Having concluded that CMS' match process is flawed for the reasons set forth above, the Board found that other match criteria must be used to calculate the SSI fractions for DSH and that doing so would impose no significant administrative burden on CMS.  PRRB Dec. at 22-23.  In particular, the Board found that individual's own unique Social Security numbers should be used to match SSI records on SSA's annual tapes with CMS' inpatient hospital stay records in MEDPAR because "CMS stated in the [1986] Federal Register when the DSH legislation was first implemented that using the Social Security number was the best identifier, and it uses the Social Security number, among other matching criteria such as a name and gender, for matching in a virtually identical program for skilled nursing providers."  PRRB Dec. at 22.

190.    CMS' "Dean agreed with the Provider's counsel that if [CMS] had the Social Security numbers of each hospital inpatient, then matching a SSN against an SSN would 'of course' be a better match 'in an ideal world.'"  PRRB Dec. at 22.  Citing a sworn statement previously submitted to *this Court* by Robyn Thomas, the Division Director for CMS' Division of Information Distribution, the Board further found that "CMS' Medicare Enrollment Data Base (like SSA's annual tape) contains Medicare beneficiaries' own Social Security numbers, their names and dates of birth." *Id.*  The Board also found that "[i]n 2001, CMS, or its contractor, used a 'HIC finder' program to pull Social Security numbers from the enrollment database and add them to MEDPAR files that were produced to the Provider for fiscal years 1993, 1994 and 1995 in response to the subpoenas issued by the Board in 2000 (which required Social Security numbers)." *Id.*

64

191.    In view of the foregoing facts, the Board also found that "[t]here is no evidence of a significant administrative burden to create a far more accurate SSI calculation" by using Social Security numbers as an additional match criteria.  PRRB Dec. at 22.  More specifically, the Board found that:

> [T]he overwhelming weight of the evidence, much of it from CMS' own employees, indicates that to change the program to capture more accurate data would be *routine, simple and not time consuming*.  It would not require access to old data, as an accurate calculation could be made using current data files.  *The facts that CMS has developed a similar program to match SSI information for Medicare beneficiaries in nursing homes and has for years run multiple matches for the same period at different times, including a time that would coincide more closely with the settlement of the cost report, illustrate that a more reliable program is administratively and financially feasible*.

PRRB Dec. at 22-23 (emphasis added).

192.    Except as previously mentioned above, the Administrator's decision does not controvert the Board's findings or CMS' admissions concerning the effect of the flaws in CMS' match process, the necessity of using individuals' own Social Security numbers as additional match criterion and a later match of the MEDPAR file and SSI tapes match in order to achieve more accurate results, or the lack of any administrative burden on CMS in making these changes, as set forth in paragraphs 177-91 above.  *See* Adm'r Dec. at 43.

193.    Although the Administrator's decision does not genuinely address or controvert any of the Board's findings regarding the flaws in CMS' match process, the Administrator's decision concludes that, "to the extent that the Provider may have identified a scenario for which the Medicare beneficiaries' SSI days would not be credited (e.g., remarried widow on second husband's account) the Provider only identified one instance in the sample drawn to exaggerate any such errors, [*sic*] where this occurred, a percentage of .15 percent, significant [*sic*] less than

one percent." Adm'r Dec. at 43. "Therefore, [the Administrator concluded] the Secretary's policy determination not to use alternative identifiers is supported by the record in this case." *Id.*

### *Substantial Adverse Effect of Flaws in the Match Process*

194.    There is no record evidence to support the Administrator's claim that the Hospital identified just one case in which a Medicare beneficiary's SSI days were not credited in the numerator of the SSI fractions that CMS computed for the fiscal years at issue. As set forth in paragraph 186 above, CMS' own witness from SSA, Walsh, testified on examination by the Secretary's counsel that based only on the limited SSI records that the Hospital has been able to obtain in this case, the Hospital had identified at least *five* separate patient stays attributable to Medicare beneficiaries who were in fact receiving Federal SSI benefits during their inpatient stays but which were not identified by CMS as SSI beneficiaries due to flaws in its match process.

195.    Nor is there any evidence supporting the Administrator's claim that the Provider somehow drew "a sample . . . to exaggerate any such errors" in CMS' match process. Adm'r Dec. at 43. On the contrary, as set forth in paragraphs 303-34 below, it is uncontroverted the Hospital and the Board sought, and CMS consistently resisted the Hospital and Board efforts to obtain, the SSI records for *all* of the Hospital's Medicare patients during the periods at issue.

196.    Additionally, the Administrator's attempt to isolate one of the system's flaws in CMS' match process from all of the other undisputed errors and omissions in CMS' calculations is arbitrary, capricious and not based upon substantial evidence.

197.    There is no substantial evidence in the record supporting the suggestion in the Administrator's decision that flaws in CMS' match process produce an error rate of only .15 percent, as set forth in paragraph 193 above. In fact, while there are likely many more that have been concealed by CMS' recalcitrance in discovery, even the current administrative record

confirms that at least five patient stays, not one patient stay, were omitted from the SSI days in CMS' calculations of the SSI fractions due to errors in CMS' match process. *See* ¶ 186 above. That adjustment alone raises the minimum error rate to .75 percent (.15% x 5 = .75%). Importantly, moreover, this error rate encompasses only one of the several systemic errors identified by the Board, namely, CMS' failure to employ Social Security numbers in its match process as it announced it would do in 1986.

198.    The SSI fractions that CMS computed for the four Hospital fiscal years at issue included a total of 20,913 Medicare/SSI days and 250,494 total Medicare days, leaving 229,581 Medicare days that were not counted as SSI days by CMS. The application of a .75 percent error rate to the 229,581 Medicare patient days that CMS failed to identify as SSI recipient patient days would result in the addition of 1,722 Medicare/SSI days to the numerators of the Hospital's SSI fractions for the fiscal years at issue.

199.    For the four fiscal years at issue, the effect of adding SSI days to the numerator of the Hospital's SSI fraction is an increase in the DSH payment by an average of $830 per day. *See* Provider Exhibit 115, at 2301. The result, therefore, of adding 1,722 SSI days to the numerators of  the Hospital's SSI fractions for 1993-1996 is an increase in the Hospital's DSH payment of approximately $1.4 million (1,722 days x $830 per day) for all four years combined. If the same financial impact were projected to the approximately 2,000 hospitals that received DSH payments for the four years at issue, the overall financial impact of the flaws in CMS' match process would be approximately $2.8 billion ($1.4 million x 2,000) for those four years combined, and $700 million for each year.

200.    The average of the SSI fractions computed by CMS for the Hospital fiscal years at issue is .08334, which is computed by dividing 20,913 Medicare/SSI days for all four years

divided by 250,944 Medicare days for all four years. Adding 1,722 Medicare/SSI days to the numerators of the SSI fractions that CMS computed for these years would increase the Hospital's average SSI ratio by 8.2 percent, from .08334 to .09020.

201. The aggregate dollar impact of an 8.2 percent (.09020 ÷ .08334 – 1) increase to the SSI ratios for all disproportionate share hospitals nationwide would be approximately $400 million per year for the years at issue, extrapolating from the Board's calculation of $200 million impact associated with a 4.03% increase in the national average SSI ratio for 1993 alone (8.2/4.03 x $200 million = $400 million). *See* PRRB Dec. at 24; *see infra* ¶ 210.

202. Whether the impact of the flaws in CMS' match produced underpayments in the amount of $700 million or $400 million per year, and even if it was only $100 million per year, CMS' 2005 "policy determination not to use alternative identifiers" in the match process, Adm'r Dec. at 43, was arbitrary and capricious, and the Administrator's assertion that CMS achieved an "acceptable rate of error," *id*. at 25-26, finds no support in the uncontroverted record evidence.

203. Flaws in the match process resulting in DSH underpayments nationwide on the order of $400-$700 million, or even only $100 million, per year are significant.

204. Flaws in the match process resulting in DSH underpayments nationwide on the order of $400-$700 million, or even only $100 million, per year do not reflect an acceptable rate of error in CMS' calculations of the DSH payments for all hospitals.

E.   **CMS' USE OF INCOMPLETE AND INACCURATE SSI DATA**

205. The Board found that the SSI data that CMS used to calculate the *numerator* of Hospital's SSI fractions for the periods at issue omitted:

(a)     all inactive or 'stale' SSI records for all years prior to 1995;

(b)     SSI records relating to forced or manual payments of SSI benefits for all years;

(c)     SSI entitlement records relating to individuals whose SSI benefits were temporarily on hold or in suspense for all years;

(d)     SSI entitlement records for individuals whose SSI benefits were granted or reinstated retroactively for all years; and

(e)     SSI records relating to individuals who received special non-cash SSI benefits under Title XVI of the Social Security Act.

PRRB Dec. at 23-35.

206.    As set forth more fully below, the Board also found that:

(a)     CMS knew at least by 1993 that "there were significant inaccuracies with the data used for the DSH calculation and that those inaccuracies may have diminished the DSH payment to providers" but CMS did not correct any of the problems it knew about until 1996 and even then the fix was only partial and implemented only prospectively and without notice or disclosure to affected hospitals (PRRB Dec. at 23-26, 35);

(b)     Even once CMS purportedly fixed one of the problems in 1996 (for years 1995 forward only), CMS never corrected the calculations it had previously performed with incomplete data that were, in CMS' word, "contaminated" by the omission of 'stale' SSI records for all prior periods, including periods at issue in this case, nor did it undertake any effort to investigate other possible problems with the SSI data (PRRB Dec. at 34);

(c)     CMS did not disclose the problems it knew about to affected hospitals, but instead disseminated false statements and misinformation concerning the accuracy of the data used in its calculations of the SSI fractions for DSH (PRRB Dec. at 34); and

(d)     The various systemic flaws in the SSI data that CMS has used in its calculations of the SSI fractions could be easily fixed without imposing administrative burden on the agency.   PRRB Dec. at 26.

**Error One:  Omission of Inactive SSI Records**

207.    The Board found:  "It is undisputed that, until approximately February 1996, SSA's annual tapes omitted all SSI records that had been terminated and were inactive prior to the time when SSA transmitted the tape to CMS (the 'stale records problem')."  PRRB Dec. at 23.  The Board further found that "the omission of 'stale records' is a systemic error that would

69

tend to deflate the Medicare [SSI] ratio." PRRB Dec. at 26.   According to Cribbs, the former long-time SSA employee who ran the special purpose SSI tapes for the years at issue and was involved in the stale records problem, the omission of all inactive SSI records was a "major problem." PRRB Hearing Tr. at 202-03.

208.   Regarding the cause of the "stale records problem," the Board found that "an 'accounting page' of an individual's [SSI] record could be terminated [by SSA], even though the individual [may be still living and] remained entitled to SSI benefits, and that record [i.e., the accounting page] would become inactive immediately." PRRB Dec. at 23.  An accounting page of an individual's SSI record could be terminated and would become inactive immediately, "either due to space limitations or in forced pay cases." PRRB Dec. at 23.  In addition, the Board found that "the records of deceased individuals and individuals in terminated status would usually be moved into inactive files after 12 months.  Records may have been moved to inactive status sooner in earlier years because of space limitation." PRRB Dec. at 23-24.  As a result, a Medicare patient who was entitled to SSI during his hospital stay might nonetheless not be counted in the numerator of the hospital's SSI fraction solely because an accounting page of his SSI record may have been terminated due to his death or some other intervening event occurring between the time of his stay and the time when SSA generated the SSI records used by CMS to perform its match process for calculating the hospital's SSI fraction for that year.

209.   Based upon the uncontroverted testimony of CMS' own witness, Rosenberg, and other undisputed evidence in the record, the Board found that "it is undisputed that CMS had SSA prepare new tapes beginning with the 1995 fiscal year that corrected the problem by including the stale records; that is, the records that had previously been omitted because they had become inactive were included on the data file prepared for CMS beginning with fiscal year

1995." PRRB Dec. at 24 & n.120. Citing the uncontroverted testimony of another CMS witness, O'Leary, and other undisputed documentary evidence in the record, the Board found that "[a]fter it obtained corrected SSI records from SSA in 1996, . . . CMS created special MEDPAR files that included both the original ('old') and corrected ('new') SSI days for inpatient hospital stays in prior years." PRRB Dec. at 24. Based on O'Leary's undisputed testimony, the Board found that the "intent of this 'special MEDPAR project was to determine whether the differences were material and, if so, to recalculate prior SSI ratios." *Id.*

210. The Board found: "[A]s reflected on CMS' summary of its special MEDPAR files, the ratio of new SSI additions to old SSI deletions was greater than 17:1 for most years," though the omission of inactive SSI records was probably a larger problem in earlier years in the period from 1986-1994. PRRB Dec. at 24 & n.124. The Board further found that "the aggregate impact of the SSI additions (i.e., all PPS hospitals nationwide), net of SSI deletions, to be approximately $4 billion for years 1989 through 1996, assuming a 7-day average length of stay (ALOS) and an average value of $500 per SSI day." PRRB Dec. at 24. The Board found that the aggregate impact of the omission of inactive SSI records for fiscal year 1993 alone "would be approximately $202 million, . . . [e]ven though the new SSI data would have increased the national average SSI ratio for 1993 by only 4.03%, from .083746 to .087779[.]" PRRB Dec. at 24. Thus, the Board found that "this seemingly minor change to the SSI ratios would have a major impact on hospitals that treat a large indigent population." PRRB Dec. at 24.

211. The Board further found:

> While the financial impact may be relatively small when averaged over all PPS hospitals, it can have a significant impact on those PPS hospitals that serve a large low-income population. Hospitals must meet a certain threshold percentage of low-income patients before they qualify for the DSH adjustment. Even a fraction of a point under that threshold means they receive no DSH payment whatsoever. Once the threshold is met,

however, the volume of low-income patients directly correlates to the amount of the DSH payment.

PRRB Dec. at 25-26.

212.    The Board further found that the stale records problem is illustrated by comparison of two of CMS' calculations of the SSI fraction for the Hospital's fiscal year 1994, one calculation performed before CMS fixed the stale records problem and one performed by CMS after it fixed the stale records problem.  In particular, the Board compared the numbers included in CMS' June 1995 calculation of the Hospital's SSI fraction for the 1994 (which was calculated by CMS before it fixed the problem concerning inactive SSI records in 1996 but was nevertheless applied to determine the Hospital's DSH payment for 1994) with the numbers included in CMS' December 1996 calculation of the Hospital's SSI fraction for 1994 (which was calculated by CMS after it fixed the stale records problem but was not applied to determine the Hospital's DSH payment for 1994).   The Board found that this comparison  "showed that the Provider had 400 more SSI days while only 2600 more [Medicare] covered days which could be due to retroactive SSI eligibility determinations and/or restored [SSI] records."  PRRB Dec. at 25.  In other words, while the total number of Medicare days counted in the denominator of CMS' December 1996 calculation was 4.03% greater than the number of Medicare days counted in CMS's June 1995 calculation, the total number of Medicare/SSI days that were counted in numerator of the SSI fraction numerator grew by an even greater percentage, 7.5%.  Thus, the Board found that the "discrepancy between the earlier calculation and the 1996 run [for the Hospital's 1994 fiscal year] alone illustrates that the original data was inaccurate."  PRRB Dec. at 25.

213.    Though it found that even a seemingly small percentage change in the SSI ratios can have a major impact on hospitals that serve a large proportion of low-income patients, the

Board also found, based on the testimony of CMS witness, Rosenburg (who had served as CMS'
computer system analyst for over thirty years), that "the only way to know what the impact
would be of including the inactive records that were omitted from original calculations for fiscal
years 1993 and 1994 would be to rerun the actual calculations." PRRB Dec. at 25. CMS,
however, has refused to rerun the actual calculations for the Hospital's fiscal years 1993 and
1994.

214.    The Board also found that, because the "uncontroverted evidence shows that CMS
knew, at least by 1993, that there was a problem with the SSI data that CMS had been receiving
from SSA[,] . . . it is clear that CMS did not use the best data available when it calculated the SSI
fractions at issue for fiscal years 1993-1996. This was due, in part, to the omission of 'stale
records' from the SSI data tape prepared for CMS." PRRB Dec. at 25.

215.    Citing evidence from the discovery hearing it conducted in 2003 regarding
discovery requests that CMS had not responded to, the Board found: "It is disingenuous for the
Intermediary to claim that the omission of SSI days has no significant impact or that the Provider
must quantify the financial impact to prevail while CMS resisted efforts to obtain the information
critical to making such proof." PRRB Dec. at 25 & n.135. That information was and is
available to the agency. The Board found that CMS' own witness, O'Leary, had "confirmed that
the special MEDPAR files would have shown the impact of the omission of stale records (as well
as other updated SSI records) by year, by hospital, and by stay." PRRB Dec. at 25. The Board
further cited undisputed evidence in the record showing that, sometime after 1996, CMS claims
to have "lost or destroyed" the records referred to by O'Leary, which would have shown the
impact of the omission of stale SSI records by year, by hospital and by stay. PRRB Dec. at 34.
The Board concluded, therefore, that "it is disingenuous for CMS to take a position that the

Provider must demonstrate what financial impact the flaws in the process caused while knowing that its own record retention failures make such a showing impossible." PRRB Dec. at 32.

216.   Additionally, the Board made several findings that established for the first time that CMS actively and willfully concealed its omission of inactive SSI records from the calculations of the SSI fractions for periods prior to 1995:

(a)   "In June 1995, at just about the same time that CMS was settling with [a hospital in Rhode Island that had noted discrepancies in CMS' SSI fraction calculations], [CMS representative Ann] Tayloe testified in a deposition [in a contested DSH matter before the Board involving Saint Louis University Hospital] that the SSI data used in the calculation of the SSI fraction were verified and correct," even though Tayloe had been directly and personally involved in responding to and settling the other hospital's complaints on behalf of CMS. PRRB Dec. at 33.

(b)   "CMS did not produce any supporting documents, and Tayloe did not indicate in her testimony that there were any documents relating to the potential for error in CMS' calculation of the SSI fraction, even though the Board subpoena in that case [involving the Saint Louis University Hospital] required production of such documents in connection with the deposition." PRRB Dec. at 33.

(c)   "Also in June 1995, CMS published [a] proposed rule to change the process for recalculation of the SSI ratio based on a hospital's cost reporting period. CMS indicated both in the proposed and final rule that the recalculations invariably resulted in lower SSI ratios due to problems with the requesting <u>hospital's</u> data. It also represented that SSA, not CMS, computes the SSI fractions, and that SSA does not release the underlying SSI data to CMS." PRRB Dec. at 33-34. <u>These representations were false</u>.

(d)   "Just five months after publishing the final 1995 rule, CMS requested corrected SSI records from SSA because its MEDPAR records for prior years were 'contaminated' [CMS' own words] by the omission of 'stale' SSI records." PRRB Dec. at 34 (citing Provider Exhibit 64, p. 1546 (Memorandum from HCFA (Tayloe) to SSA stating: "It has come to our attention that (SSI) files that we receive periodically from (SSA) do not contain stale records, that is, a record of any beneficiary that has died since the receipt of a check in an earlier entitlement period.")).

(e)   "It is undisputed, however, that CMS has no documentation concerning whether, prior to 2003, CMS notified hospitals that SSA did not include all 'stale records' on the SSI tapes that it sent CMS prior to 1996 and that

CMS has no record of making any adjustment to hospitals' Medicare fractions or making any payment adjustments as a result of CMS' discovery in 1996 that SSA did not include all 'stale records' on the tapes it sent to CMS prior to 1996." PRRB Dec. at 34.

(f)    "CMS witnesses were not able to explain why the agency did not correct its prior calculations of the SSI fractions that omitted 'stale' SSA records. Every CMS witness involved in the process, except Tayloe, said that 'Policy' would have made a decision as to the need to correct prior calculations, and that 'Policy' included Tayloe; but Tayloe alleges that she remembers nothing about the matter. PRRB Dec. at 34-35.

217.    During the 2003 discovery hearing conducted by the Board in this case, CMS' counsel led the agency's principal policy official on DSH matters for the periods at issue, Ann Tayloe, to testify that, "although she considers herself to be 'a detail-oriented person,' a DSH payment issue involving 'a few hundred million dollars' would '[n]ot necessarily' have left a lasting impression on her, 'given the amount of money involved.'" PRRB Dec. at 35 (quoting PRRB 2003 Hearing Tr. at 142-43). All told, in the course of her later testimony before the Board in the 2004 hearing in this case, Tayloe stated that she "did not recall," or words to that effect, more than 50 times over the course of testimony before the PRRB on September 22, 2004. Assessing Ms. Tayloe's credibility and finding it wanting, the Board stated:

At the [September] 2004 Hearing, Tayloe also testified that she did not recall providing the responses to written interrogatories, between May 1 and August 15, 2004, which stated that CMS did not recall the answers to several Provider interrogatories. Tayloe, Hearing Tr. at 1934-75. *The witness was then admonished by a Board member for being 'a bit disingenuous' in her testimony.* Tayloe, Hearing Tr. at 1961. Tayloe did answer some detailed questions as to the composition of the 'denominator' of the SSI fraction when she testified on direct examination by the Office of the General Counsel at the 2004 Hearing. But, on cross-examination [by the Hospital's counsel], Tayloe professed to be unable to say what types of days are included in the denominator of the fraction. Tayloe, Hearing Tr. at 2007-15. *In the end, Tayloe testified that she did not recall what 'denominator' she was referring to when she testified on direct examination by [the Secretary's counsel].* Tayloe, Hearing Tr. at 2015-16.

PRRB Dec. at 35 n.210 (emphasis added).

218.    Responding to the claim by the Intermediary and CMS "that it would be too burdensome to revise the program to include the omitted records and recalculate the ratio based on the corrected data," the Board found that "the evidence does not bear out the complaint.  On the contrary, the evidence, even from CMS' own witnesses, overwhelmingly supports the simplicity of correcting the problem."  PRRB Dec. at 26.

219.    The Administrator's decision does not controvert the Board's findings or CMS' admissions concerning CMS' omission of inactive SSI records, as set forth in paragraphs 207-18 above, except that the Administrator disputes the Board's findings regarding the possible financial impact of CMS' omission of inactive SSI records from its calculations of the SSI fractions for fiscal years before 1995 and the lack of administrative burden in requiring CMS to revise its calculations to include the omitted records.  *See* Adm'r Dec. at 43-47.

220.    Most significantly, the Administrator does not dispute that CMS omitted the inactive SSI records from its calculations of the SSI fractions for years prior to 1995, that CMS recomputed the SSI fractions for prior years using corrected SSI records in 1996, but did not use those recalculations to revise DSH payments for the prior years, that the Medicare/SSI days associated with the omitted records were not counted in the SSI fractions that were calculated before this problem was corrected, that CMS did not disclose the stale records problem to hospitals whose DSH payments for prior years were adversely affected, that (as CMS' own witnesses admitted) the only way to know the precise financial impact of this error is to perform new calculations with all the SSI records included, that the government has sole and exclusion possession of the SSI records needed to perform such a recalculation, that the Hospital and the Board sought to obtain such records through the Board's subpoenas and the Hospital's FOIA

requests, or that, as the Board put it, CMS "resisted efforts" by the Board and the Hospital to obtain those records.

221.    Moreover, the Administrator's attempt to isolate CMS' omission of all inactive SSI records (for years prior to 1995) from the many other undisputed errors and omissions in CMS' calculations of the SSI fractions, is arbitrary, capricious and not based upon substantial evidence.

222.    Employing a series of assumptions and extrapolations from other data, the Administrator hypothesizes that CMS' omission of "stale records" may have resulted in the omission of an average of three to four stays per hospital, per year, for fiscal years 1993 and 1994, a discrepancy the agency advances as too insignificant to merit correction.  CMS' own summary reports of its investigation in 1996 into the stale records issue reflect that, while only 48,616 stays for Medicare/SSI patients were omitted from the SSI days in CMS' calculations for 1993 and 1994, many more stays were omitted for earlier years.  For example, CMS' summary report indicates that more than 320,000 stays were omitted for 1990 alone, an omission on the order of 13 times greater for 1990 than the omissions the agency uncovered for 1993 or 1994.

223.    Even if an average of only 3.5 patient stays were omitted from the SSI days included in the numerator of the SSI fractions for each of fiscal years 1993 and 1994, as the Administrator now alleges in his decision below, the financial impact of that error is significant.  In the 1993 and 1994, the national average length of stay for Medicare inpatients was 7 days per stay.  The result, therefore, of the omission of 3.5 patient stays from the numerator of the Hospital's SSI fractions for fiscal years 1993 and 1994 would be approximately $20,335 per year (3.5 stays x 7 days per stay x $830 per day), and $40,670 for the two years combined.  If the same financial impact were projected to the approximately 2,000 hospitals that received DSH

payments for the two affected years at issue, the overall financial impact of CMS' stale records problem would be approximately $81.3 million for the two years combined, and $40.6 million for each year.

224.    Measured another way, the addition of an average of even 3.5 stays for Medicare/SSI patients improperly omitted from CMS' calculation for 1993 and 1994, with a 7-day average length of stay during this period, would add 49 Medicare/SSI patient days (*i.e.,* 3.5 stays per year, times 2 years, times 7 days per stay) to the number of Medicare/SSI days (10,020) that were included in the numerators of the fractions that CMS computed for those Hospital fiscal years.  Those 49 additional days would increase the Hospital's average SSI ratio for those years by approximately .5% percent, from .07706 to .07744 (*i.e.*, 10,020 SSI days per CMS' calculations plus 49 additional SSI days associated with an average of 3.5 omitted stays, divided by 250,944 Medicare days equals an SSI ratio of .07744).   Extrapolating from the Board's calculation of a $200 million impact associated with 4.03% increase in the national average SSI ratio for 1993 alone equates to $25 million impact that would be associated with .5% increase in the SSI fractions (.5/4.03 x $200 million = $25 million).  *See* PRRB Dec. at 24.

225.    In any event, the Administrator's post-hearing assessment of the dollar impact of the stale records issue his agency discovered long ago is irrelevant post-hoc conjecture.  The Administrator's decision nowhere says that the calculation of financial impact described therein, or any other calculation, served as the basis for CMS' decision in 1996 not to recalculate the SSI fractions it had previously computed in error for years prior to 1995.  *See* Adm'r Dec. at 25-26, 42-47.  In fact, at the hearing before the PRRB, none of CMS' witnesses was able to state why CMS did not correct its error for the years prior to 1995.  PRRB Dec. at 34-35.

226.    The Administrator's decision proclaims in effect, and incorrectly, that an underpayment to all DSH hospitals on the order of approximately $50-$80 million for fiscal years 1993 and 1994 is an "acceptable rate of error," at least when the error is CMS' error, and when the error runs in favor of CMS and against hospitals.

227.    The Secretary has expended substantial audit and enforcement resources identifying, correcting, and recovering DSH overpayments to hospitals resulting from errors in hospitals' favor of a much smaller magnitude than $25 million.

228.    An error involving the omission of 'stale' SSI records and resulting in DSH underpayments nationwide on the order of $25 million per year is significant.

229.    An error involving the omission of 'stale' SSI records and resulting in DSH underpayments nationwide on the order of $25 million per year is not an acceptable rate of error in CMS' DSH payment determinations.

### Error Two:  Omission of Forced or Manual SSI Payment Records

230.    The Board found that CMS' calculations of the SSI fractions for DSH are also flawed, and understated, because CMS' calculations of the numerator have always omitted some SSI days attributable to Medicare beneficiaries who were receiving a forced or manual payment of SSI benefits during their inpatient hospital stay.  PRRB Dec. at 26-27.  The Board identified this error as a "systemic," "common" and "recurring error" that has the effect of reducing the SSI ratios computed by CMS.  PRRB Dec. at 26-27.

231.    The Board found that, while "SSA's system is designed to generate automated SSI payments,"  sometimes "[an SSA] field office needs to make a forced or manual payment on a temporary basis."  PRRB Dec. at 26.  In that case, "SSA will terminate the recipient's existing record, start a new record that includes $0 due in the Federal amount field (in order to stop the system from making a duplicate payment), then terminate the second record and start a third to

resume system payments prospectively after the manual payment action is resolved."  PRRB Dec. at 26.  The Board further found:  "In these cases [involving forced or manual payment], the earlier records, which would reflect a <u>C01 or M01</u> in the CMPH field and some amount due in the FAM field, will always be terminated, and thus would never have been included in the annual tapes that SSA sent to CMS before 1996.  The later records, which Cribbs' program did access for the data file, would show $0 due in the FAM field for periods in which a forced payment was made by a field office."  *Id.*  "As a result," the Board found, "individuals who received a forced payment during the periods of their inpatient hospital stays were not shown as having been entitled to SSI for such periods on SSA annual tapes."  *Id.*  The Board found that this systemic problem with manual or forced pay situations "was not fixed in 1996 when SSA began including all active and inactive records on the annual SSI tapes.  As [CMS witness] Dean testified, CMS' matching program eliminates duplicate records on SSA's annual tapes.  Thus, even after SSA started sending all active and inactive records, beginning in 1996, two of the three records generated in a forced pay situation would be eliminated by CMS, *leaving only about a one-in-three chance of a valid match with the correct SSI record*."  PRRB Dec. at 26-27 (emphasis added).

232.    In rejecting CMS' allegation that it would be administratively difficult to correct this problem, the Board found:  "[T]his problem could easily be fixed."  PRRB Dec. at 27.  Specifically, based in part on the uncontroverted testimony of longtime SSA employee Shafer, the Board found that "the signal for a forced pay situation is a C01 or M01 code in the CMPH field and $0 due in the FAM and State amount ('SAM') fields.  This situation only occurs when an individual is receiving a forced payment or non-cash benefits under section 1619(b) of the Social Security Act (these latter benefits are discussed further below).  SSA's computer program,

therefore, could easily be written to create a 'loop' to go back and check an individual's earlier records whenever it comes across a C01 or M01 in the CMPH field and no amount due in the FAM and SAM fields." PRRB Dec. at 27.

233. Responding to the argument by CMS and the Intermediary that CMS' omission of forced or manual payment cases "is too small to warrant retroactive correction," the Board found that "Shafer's testimony is credible that forced pay situations are common and concludes that omission of forced pay records is a systemic error that would likely deflate the DSH Medicare percentage. For the same reasons as discussed in the section on stale records, the Intermediary's arguments regarding minimal impact and administrative burden are without merit." PRRB Dec. at 27.

234. The Administrator's decision does not controvert the Board's findings that CMS' calculations of the SSI fractions for DSH have not counted SSI days attributable to Medicare patients who received manual or forced payments of SSI benefits or its findings concerning the lack of administrative burden in fixing this problem, as set forth in paragraphs 230-33 above. *See* Adm'r Dec. at 41. Significantly, the Administrator's decision does not dispute that CMS omitted the SSI records relating to forced or manual SSI payments from its calculations of the SSI fractions for all years at issue, that the Medicare/SSI days associated with the omitted records were not counted in the SSI fractions, that the only way to know the precise financial impact of this error is to perform new calculations with the all SSI records included, that CMS and SSA have sole and exclusion possession of the records needed to perform such a recalculation, that the Hospital and the Board sought to obtain such records through the Board's subpoenas and the Hospital's FOIA requests, or that, as the Board put it, CMS "resisted efforts" by the Board and the Hospital to obtain those records.

235.    Without proffering evidence of his own, the Administrator asserts that "the Provider has failed to demonstrate that the data used by CMS for the calculation of the Medicare fraction adversely impacted the Provider's reimbursement due to the omission of SSI days because of manual or forced payments to [*sic*] that the CMS calculation was improper."  Adm'r Dec. at 41.

236.    Extrapolating from the one stay relating to forced payment case that the Hospital determined had been omitted from CMS calculations for periods at issue, based on the Hospital's review of the limited SSI records it was able to obtain in this case despite CMS' resistance, the Administrator determined an error rate of ".15 percent," and concluded, without more, that this represented an "acceptable rate of error."  Adm'r Dec. at 25-26, 41.

237.    The Administrator's attempt to isolate CMS' omission of manual or forced payment cases from all of the other undisputed systemic errors and omissions in CMS' calculations of the SSI fractions is arbitrary, capricious and not based upon substantial evidence.

238.    In any event, insofar as the financial impact of a .75 percent error rate with respect to errors in CMS' match process would equate to an underpayment to disproportionate share hospitals of approximately $400-$700 million per year, as set forth in paragraphs 199-201 above, a .15 percent error rate stemming from CMS' omission of manual or forced payment cases produces a further underpayment of at least $80-$140 million per year (or one-fifth of the impact of .75 error rate) for all DSH hospitals nationwide.

239.    An error involving the omission of SSI records of individuals who received manual payments of SSI benefits and resulting in DSH underpayments nationwide on the order of $80-$140 million per year is significant.

240.    An error involving the omission of SSI records of individuals who received manual payments of SSI benefits and resulting in DSH underpayments nationwide on the order of $80-$140 million per year is not an acceptable rate of error in CMS' DSH payment determinations.

**Error Three:  Omission of Retroactive Determinations and Hold and Suspense Cases**

241.    The Board found that CMS' calculations of the SSI fractions for DSH are also systemically flawed, and understated, because CMS' calculations have always omitted from the numerator some days attributable to Medicare beneficiaries whose SSI benefits were either granted or restored retroactively after CMS calculated the SSI fraction for a given Federal fiscal year or were temporarily on hold or suspense when CMS calculated the SSI fraction for a given Federal fiscal year but were subsequently reinstated retroactively, back to the period of the patients' inpatient hospital stays.  PRRB Dec. at 27-29, 32-33.  The Board further concluded that there is no administrative burden imposed upon CMS in requiring CMS to fix this additional problem with its calculations.  PRRB Dec. at 28-29, 32-33.

242.    Concerning hold and suspense cases, the Board found that the "omission of hold and suspense records is a systemic error that would likely deflate the DSH Medicare percentage" and that the arguments by CMS and the Intermediary about the administrative burden of fixing this issue are "without merit."  PRRB Dec. at 28.  Regarding the cause of this systemic problem in CMS' calculation of the SSI fractions, the Board found, based on uncontroverted record evidence:

> As discussed above, if there is a positive amount due in the FAM field, but any code other than C01 or M01, such as a hold or suspense code, appears in the CMPH field, then SSA's program will assign a zero to that month in the annual tape.  In other words, the program would assign a zero to a month if an individual's SSI benefits are temporarily on hold or in suspense when SSA prepares its annual tape.  Of the limited records the Provider was able to obtain, Master ID number 13111 shows days omitted

from the SSI count because payments were in suspense when the tape was prepared, but those benefits were awarded retroactive to several months prior to the patients' hospital stays.

PRRB Dec. at 27.

243. The Board further found that "SSA's list of payment status codes, Provider Exhibit 155, includes several temporary hold or suspense codes." PRRB Dec. at 28. The Board gave the following examples of just some of several hold and suspense codes utilized by SSA:

> Shafer testified that one common example is suspense code S08, used when SSA is looking for a representative payee who is able and willing to accept checks on behalf of an SSI recipient. Other common examples are suspense codes S21 and H80. Code S21 is used when an individual is presumptively disabled and has received benefits on that basis for six months. After that initial six-month period, benefits are suspended until all necessary state determinations and paperwork are completed. In virtually all of these cases, benefits that are temporarily in suspense after the sixth month are eventually granted retroactively for the full period. Hold code H80 is used during the period in which an application for SSI benefits is pending a state eligibility determination.

PRRB Dec. at 28.

244. The Board concluded that CMS' "exclusion of SSI days associated with individuals whose benefits were temporarily on hold or in suspense can be easily fixed by using the updated SSI data in later versions that SSA provides annually for rolling 42-month periods." PRRB Dec. at 28.

245. The Board also found that CMS' "omission of retroactive awards is a systemic error." PRRB Dec. at 28-29. Regarding CMS' omission of SSI days attributable to Medicare patients whose SSI benefits were granted or reinstated retroactively to include the periods of their inpatient hospital stays, the Board found that "a significant portion of all SSI benefit awards are paid on appeal." PRRB Dec. at 28. "Generally," the Board added, "appeals are pending for an average of about one year. Consequently, a Medicare hospital inpatient whose SSI benefits are awarded on appeal are not picked up in CMS' calculation of the SSI fraction unless an appeal

happens to be resolved before SSA prepares its annual tape in March following the end of the fiscal year." PRRB Dec. at 28.

246. The Board rejected the argument by the Intermediary and CMS that the "effect of the omission of retroactive actions is . . . likely to be a wash" when measured against possible retroactive SSI benefits *terminations*, because "terminations of disability benefits are seldom made retroactively and most other denials are not made retroactively. In addition, CMS' 1996 summary report [regarding its omission of 'stale' SSI records] shows that the ratio of the number of stays with new SSI days added (which would have included stays by individuals whose SSI benefits were granted or reinstated retroactively) to the number of stays with old SSI days deleted (which would have included stays of individuals whose SSI benefits were denied retroactively) was greater than 17:1 for most years." PRRB Dec. at 28.

247. Regarding the lack of burden to correct this problem concerning omission of patients whose SSI benefits were determined retroactively, the Board found: "The problem with CMS' omission of retroactive awards is similar to the omission of hold and suspense cases, and the same solution applies in each case – for CMS to use the updated SSI data that SSA provides annually for a rolling 42-month period." PRRB Dec. at 29.

248. Elaborating, the Board made several specific findings regarding CMS' unexplained failure to use the best available, most current data for its match process:

(a) "The Medicare fraction is calculated relatively early in the cost report settlement process, which generally is not completed until two or three years after the end of a hospital's fiscal year." PRRB Dec. at 32.

(b) During the 2-3 year cost report settlement process, "the provider is, among other things, collecting information from the state concerning data for the other component of its DSH calculation, the Medicaid fraction. Billing for services rendered during the year continues – up to 30 months after the end of the provider's cost report year – and that patient data from the billing and payment process is captured in the MEDPAR file used to determine the denominator of the Medicare fraction. At the same time, the

determination of Medicare patients' eligibility for SSI may still be in process and not be reflected on the SSA tape until much later."  PRRB Dec. at 32.

(c)    "Over two and a quarter years [after the end of Federal fiscal year], CMS performs 10 MEDPAR runs and creates 10 MEDPAR files for each Federal fiscal year, the latest of which is run in the third December after the end of the subject fiscal year (e.g., the 10th and last MEDPAR file for Federal fiscal year ended September 30, 1994 was produced in a December 1996 MEDPAR run)."  PRRB Dec. at 32.

(d)    "CMS matches its inpatient hospital stay records against the most recent annual SSA tape every time it creates one of these quarterly MEDPAR runs."  PRRB Dec. at 32 (citing Dean's undisputed testimony).

(e)    "Despite having MEDPAR runs that are updated to the time of the final cost report settlement," two–three year after the end of fiscal year,  "it is undisputed that CMS used the MEDPAR file based on the month of June following the end of the Federal fiscal year to compute the SSI fractions at issue for each year under appeal.  For example, CMS used the June 1996 MEDPAR run to calculate the SSI fraction for Federal fiscal year ended September 30, 1995."  PRRB Dec. at 32 (citing CMS' written discovery response).   Therefore, the calculations performed for fiscal year 1995 in September 1996, December 1996, and March, June, September and December of 1997 were not used to determine the DSH payment made for fiscal year 1995, even though the NPR for 1995 was issued later.  PRRB Dec. at 32.

(f)    "Even though MEDPAR is run quarterly, the SSA tape is run only once annually, and CMS always uses the annual run from the time following the end of the federal fiscal year.  *It is also undisputed that, because CMS always receives the annual SSA tape before April 1st, CMS' inpatient hospital stay records are never matched with SSI records relating to individuals whose SSI benefits are granted or restored after April 1 retroactively to a period within the prior Federal fiscal year.*"    PRRB Dec. at 32 (emphasis added).

249.    For the foregoing reasons, the Board concluded:  "Given the process actually used which fixes the Medicare fraction in June following the end of the FFY despite there being ongoing processes that affect the numerator and the denominator,  it is inevitable that the data used to calculate the Medicare fraction is incomplete and not the 'best available data.'"  PRRB Dec. at 33.

250.    The Administrator's decision does not controvert the Board's findings concerning CMS' omission of hold and suspense cases and retroactive determinations, as set forth in paragraphs 241-50 above.  *See* Adm'r Dec. at 37-41.  Significantly, the Administrator does not dispute that CMS' calculations of the SSI fractions have always omitted hold and suspense cases and retroactive determinations, that the Medicare/SSI days associated with the omitted records were not counted in the SSI fractions, that the only way to know the precise financial impact of these errors is to perform new calculations with the all SSI records included, that CMS and SSA have sole and exclusion possession of the records needed to perform such a recalculation, that the Hospital and the Board sought to obtain such records through the Board's subpoenas and the Hospital's FOIA requests, or that, as the Board put it, CMS "resisted efforts" by the Board and the Hospital to obtain those records.

251.    The Administrator's decision asserts:  "CMS' policy recognizes that not all retroactive determinations made on SSI entitlement (whether granting or denying) would be included in the SSI record forwarded to CMS.  However, CMS has determined that such actions would have a minimal impact on a provider's Medicare DSH fraction which combined with the need for finality in the process, makes the use of later data impractical and no more accurate."  Adm'r Dec. at 37.

252.    Though the Administrator's decision implies an established "policy" not to account for "retroactive determinations" in CMS' calculations of the SSI fractions for DSH, as set forth in the preceding paragraph, the Administrator's decision is conspicuously silent as to who established this alleged policy, when it allegedly was determined, what information allegedly was considered in reaching this determination, or, most fundamentally, what evidence in the record reflects this alleged "policy" determination.  Rather, the Administrator's decision

on this point rests exclusively on statements published by CMS in the 2005 *Federal Register*, several months after the Board heard this case and several years after the periods at issue. Adm'r Dec. at 38-39 (quoting from 70 Fed. Reg. 47278, 47439-40).

253. In addition to the fact that the alleged policy determination relied upon in the Administrator's decision is one that was not made until 2005, the statements in the 2005 *Federal Register* notice that Administrator's decision relies upon (at 38-39) are unsupported by the record evidence in this case, or are clearly incorrect, or both:

    i)    The Administrator's decision, in quoting from the 2005 notice, asserts that "there needs to be administrative finality to the calculation of a hospital's Medicare [SSI] fraction;" but, neither the Administrator's decision nor the 2005 notice acknowledge or address the Board's undisputed findings (*see* ¶¶ 122-28 *supra*) that CMS performs 10 MEDPAR/SSI file matches for every Federal fiscal year, including several that are performed more than *one and one-half years* after the calculation of the SSI fractions that are applied for DSH payment purposes.

    ii)    The Administrator's decision, in quoting from the 2005 notice, asserts that "CMS has previously stated that its goal is to obtain reasonably accurate but not perfect calculations (51 Fed. Reg. 16777)"; but, neither the Administrator's decision nor the 2005 notice that it relies upon acknowledges or address the fact that the 1986 *Federal Register* notice cited in this portion of the Administrator's decision concerned only CMS' determination to calculate the SSI fractions on a Federal fiscal year basis and made no mention whatsoever of a policy determination of any sort having to do with retroactive determinations of SSI benefits.

    iii)    The Administrator's decision, in quoting from the 2005 notice, asserts that "our data have shown that 98 to 99 percent of SSI eligibility determinations are made and remain unchanged 6 months after the end of the Federal fiscal year"; but, neither the Administrator's decision nor the 2005 notice that it relies upon cites to any supporting evidence and, on information and belief, the Provider alleges that no such evidence exists.

    iv)    The Administrator's decision, in quoting from the 2005 notice, asserts that "[t]here will be a minimum of 6 months between the end of the hospital's cost reporting period and April 1 date [*sic*] that we have receive [*sic*] SSI eligibility information." Six months, however, is the maximum, not the minimum, time lag between the end of a hospital cost reporting period and CMS' early, April 1 cut-off date for its calculations of the SSI fractions. The Administrator's assertion that six months is the minimum time lag

stands on the unstated premise that the SSI fractions computed for a Federal fiscal year apply to hospital cost reporting periods *ending* within the federal fiscal year. But, that assumption is not true. The fractions computed by CMS for each Federal fiscal year apply to cost reporting periods *beginning* in, and not those ending in, the Federal fiscal year ending September 30. *See* 42 C.F.R. § 412.106(b)(2). Although CMS performs many additional matches after April 1st cut-off date, none of this more current data is used or reflected in CMS' calculation of SSI fractions applied to determine the DSH payments.

v)    The Administrator's decision, in quoting from the 2005 notice, asserts that "[t]he time lag between the close of a hospital's cost reporting period and the April 1 date that we receive eligibility information could actually be much longer for many hospitals," but, again, this allegation is false and misleading. For the reasons noted in the preceding sub-paragraph, six months is the maximum, not the minimum, time lag. Likewise, while the Administrator's decision and the 2005 notice state that "we will be using SSI eligibility from 17 months after a hospital's year ends with a November 1 to October 31 cost reporting period," that statement is also false and misleading. For example, it implies that the SSI fraction that would be applied to a cost reporting period beginning on November 1, 1993 is the fraction computed by CMS for the Federal fiscal year ended on the prior September 30, 1993. But, in truth, the fraction that would be applied to a cost reporting period beginning November 1, 1993 and ending October 31, 1994 is the fraction computed by CMS for the Federal fiscal year that began on prior October 1, 1993 and ended on September 30, 1994. *See* 42 C.F.R. § 412.106(b)(2). CMS calculated the SSI fraction for that year in June 1995 and published this calculation on August 15, 1995.

vi)    The Administrator's decision, in quoting from the 2005 notice, asserts: "Given the time between the end of hospital's [*sic*] cost reporting periods and when we are furnished with SSI eligibility information for that period [*sic*], we believe it is highly unlikely that a subsequent data run will produce data that is significantly different than one completed 6 months after the end of the Federal fiscal year[]." This allegation is pure conjecture, premised on the false assumptions described in the preceding sub-paragraphs.

254.    Although the Administrator's decision does not controvert the Board's findings concerning CMS' omission of hold and suspense cases and retroactive determinations, the Administrator's decision also alleges that "the Provider has failed to demonstrate by a preponderance of the evidence that such omissions have had any impact on its DSH reimbursement." Adm'r Dec. at 39-41. Extrapolating from the one stay relating to retroactive

SSI determination that the Hospital determined was omitted from CMS calculations of the Hospital's SSI fractions for periods at issue, based on the Hospital's review of the limited SSI records that it was able to obtain in this case despite CMS' resistance, the Administrator determined an error rate of "1/6 of one percent" (or .1667%) and again concluded, without more, that this represented an "acceptable rate of error." Adm'r Dec. at 25-26, 39.

255.    The Administrator's attempt to disaggregate CMS' omission of hold and suspense cases and retroactive determinations from all of the other undisputed errors and omissions in CMS' calculations of the SSI fractions is arbitrary, capricious and not based upon substantial evidence.

256.    In any event, as illustrated in paragraph 238 *supra*, a .1667 percent error rate stemming from CMS' omission of hold and suspense cases and retroactive determinations would produce a further underpayment to disproportionate share hospitals nationally of approximately $89-$156 million per year.

257.    An error involving the systemic omission of retroactively granted or reinstated SSI benefits and resulting in DSH underpayments nationwide on the order of $89-$156 million per year is significant.

258.    An error involving the systemic omission of retroactively granted or reinstated SSI benefits and resulting in DSH underpayments nationwide on the order of $89-$156 million per year is not an acceptable rate of error in CMS' DSH payment determinations.

### Error Four:  Omission of SSI Non-Cash Benefits

259.    The Board found that CMS' calculations of the SSI fractions for DSH are also flawed, and understated, because CMS' calculations of the numerator have always omitted days attributable to Medicare beneficiaries who were receiving non-cash SSI benefits under title XVI of the Social Security Act during their inpatient hospital stays.  PRRB Dec. at 29-30.  The Board

specifically found that CMS' categorical omission of these patient days "is a systemic error." PRRB Dec. at 30. The Board reasoned that "Section 1619(b) of the Social Security Act, as amended, 42 U.S.C. §1382h(b), establishes a work incentive for disabled individuals entitled to SSI benefits by allowing for the continuation of Medicaid benefits even though the individual's income is too high to qualify for an SSI cash payment during periods of work." PRRB Dec. at 29. Specifically:

> [t]he special SSI eligibility status applies for the purposes of establishing or maintaining your eligibility for Medicaid. For these purposes, *we continue to consider you to be a blind or disabled individual receiving benefits* even though you are in fact no longer receiving regular SSI benefits or special SSI cash benefits. . . . *Special SSI eligibility status also applies for purposes of reacquiring status as eligible for regular SSI benefits or special SSI cash benefits*.

PRRB Dec. at 29 (quoting 20 C.F.R. § 416.264 (1995) (emphasis in italics added by the Board)). The Board found that, "[a]s stated in the regulation, certain qualifying disabled recipients are considered to be entitled to Federal SSI benefits even though no SSI cash payment is made, both for purposes of allowing the recipient to continue receiving Medicaid coverage and to resume receiving the SSI cash benefit when the individual is unable to work, without having to reapply." *Id.*

260.    The Board found that all days associated with individuals who received non-cash SSI benefits always have been categorically omitted from CMS' calculations of the SSI fractions for all years and that this problem can be fixed without imposing an administrative burden:

> SSA's program for the annual SSI tape would assign a zero to any month in which an individual was working and not receiving a cash payment, but was considered to be receiving SSI under the 1619(b) work incentive program. As in the case of a forced payment the signal for someone who is receiving non-cash benefits under section 1619(b) of the Social Security Act is the presence of a C01 payment status code in the CMPH field and $0 due in the FAM field on the SSI master record. Thus, this problem, like the forced pay problem, can be fixed by putting a loop in the SSA program to go back to earlier records and check for a 1619(b) indicator.

PRRB Dec. at 29-30.

261.    The Administrator's decision does not controvert the Board's findings regarding CMS' calculation of the SSI fractions for periods at issue categorically omitted all SSI patient days attributable to individuals who received non-cash SSI benefits under Title XVI of the Social Security Act, as set forth in paragraphs 259-60 above.  *See* Adm'r Dec. at 37-41.  Instead, the Administrator reversed the Board's ruling on grounds that "all of the regulations relied upon by the Board in this case expressly state that they are applicable only for purposes of Medicaid eligibility."  Adm'r Dec. at 49.  The Administrator's decision ignores the last sentence of the SSA regulation that the Board relied upon, as quoted in paragraph 259 above, and omits that sentence from the portion of the regulation quoted in his decision at page 48.  That sentence states that the "Special SSI eligibility status" afforded under Section 1619(b) of the Social Security Act applies not only for Medicaid purposes, as the Administrator's decision asserts, but "also applies for purposes of reacquiring status as eligible for regular SSI benefits or special SSI cash benefits" under the SSI program.

262.    Both types of non-cash benefits mentioned in the SSA regulation the Board relied upon, 20 C.F.R. § 416.264 (1995), are afforded to individuals under the provisions of Title XVI of the Act governing the SSI program.  *See* 42 U.S.C. § 1382h(b).  Thus, as the Board correctly concluded, individuals who receive these special non-cash benefits are in fact "entitled to supplemental security income benefits . . . under title XVI" as described in the pertinent provision of the Medicare DSH statute, 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).

## F.    CMS' ALLEGEDLY ACCEPTABLE RATE OF ERROR

263.    The Board found that, even if the Medicare DSH statute permitted an approximation of the SSI fraction based on the best data available to CMS when it performed its

calculations, CMS did not in fact use the best data available when it calculated the Hospital's SSI fractions for the periods at issue for all of the reasons set forth above. PRRB Dec. at 9.

264.    The Board also determined that, although it was unable to determine whether the errors and omissions in CMS' calculation of the SSI fractions could have been avoided if CMS had complied with federal information processing standards and related directives from the Office of Management of Budget ("OMB"), "it is disingenuous for CMS to take a position that the Provider must demonstrate what financial impact the flaws in the process caused while knowing that its own record retention failures make such a showing impossible." PRRB Dec. at 32.

265.    The Administrator's decision concludes that "despite the[] alleged problems, the policies and methods used by CMS resulting in an acceptable rate of error, to the extent of being an almost nonexistent rate of error." Adm'r Dec. at 26-27.

266.    As set forth above, the Administrator's "acceptable rate of error" amounts to underpayments to hospitals serving a disproportionate share of low-income Americans on the order of hundreds of millions per year for the periods at issue. To recap the financial impacts of CMS' errors and omissions in the calculation of the *numerator* of the SSI fraction alone, even assuming the Administrator's own assumptions and extrapolations, the system-wide underpayments per year with respect to the errors and omissions shown by the uncontroverted record evidence amount to the following:

| Error | FY 1993 | FY 1994 | FY 1995 | FY 1996 |
|---|---|---|---|---|
| Flaws in the Match | $400-$700 million | $400-$700 million | $400-$700 million | $400-$700 million |
| Omission of Stale Records | $25 million | $25 million | 0 | 0 |
| Omission of Manual Payments | $80-$140 million | $80-$140 million | $80-$140 million | $80-$140 million |
| Omission of Hold, Suspense and Retroactive Determinations | $89-$156 million | $89-$156 million | $89-$156 million | $89-$156 million |
| Omission of Non-Cash Benefits | Not Determined | Not Determined | Not Determined | Not Determined |
| Total Per Year (Not Counting Omitted Non-Cash Benefits) | $594 million-$1.036 billion | $594 million-$1.036 billion | $569-$996 million | $569-$996 million |
| **Total for Years 1993-1996:  $2.3-$4.1 billion** | | | | |

267.    With approximately 2,000 hospitals that qualified for DSH payments during the 1993-96 period at issue, the above-stated financial impacts of CMS' errors and omissions, even without accounting for the omission of days attributable to individuals who received non-cash SSI benefits, would amount to an average DSH underpayment, per hospital, of approximately $1.0-$2.0 million in the aggregate for all four years combined, and an average of $250,000 - $500,000 for each of the fiscal years, for each hospital that had already qualified as a DSH, based on CMS' computations of the SSI fraction.

268.    The economic impact of CMS' errors would be substantially greater if the foregoing assessment included the financial impact on hospitals that nearly missed qualifying for DSH based on CMS' calculations of the SSI fractions for the periods at issue, and that would

qualify if CMS' calculations of the SSI fractions were correct.  *See* PRRB Dec. at 25-26 ("Even a fraction of a point under [the] threshold [for qualification for a DSH payment] means they receive no DSH payment whatsoever.  Once the threshold is met, however, the volume of low-income patients directly correlates to the amount of the DSH payment.")

269.    The Administrator's decision pronounces that CMS achieved an "acceptable rate of error" in its calculations of the SSI fractions for the fiscal years at issue without elaborating on what, if any, rate of error is considered by the Secretary to be acceptable for Medicare payment purposes generally or for the Medicare DSH payment in particular.  *See* Adm'r Dec. at 25-26.

270.    The Administrator's pronouncement that CMS achieved an "acceptable rate of error" in its calculations of the SSI fractions is impossible to square with the uncontroverted record evidence in this case.   It also departs from agency policy concerning other aspects of the DSH calculation, particularly with respect to the Medicaid fraction, which the Secretary does not allow hospitals to compute by using estimates.

271.    CMS' witnesses in this case confirmed that CMS does not permit "estimates" for the numbers of days that are counted in the Medicaid fraction for DSH.  *See* PRRB Dec. at 8 (citing the testimony of Intermediary representative, Terry Gouger, and CMS employee, Steve Phillips).  CMS' witnesses also confirmed that CMS does not permit "estimates" for another proxy (the interns-and-residents-to-beds ratio) that is used to determine another prospective payment system add-on, the Indirect Medical Education adjustment.  Like the DSH payment, this additional payment is determined through the cost report settlement process long after the end of hospital's fiscal year.  *See* PRRB Dec. at 8.

272.    Likewise, the Secretary's Office of Inspector General (OIG) has concluded in at least three audit reports released in the last three years that DSH claims or payment

determinations should be recalculated and revised when the number of Medicaid days included in the Medicaid fraction was overstated, with respect to discrete errors, by as few as 7 days and with a financial impact of as little as $2,247, and when the SSI ratio was misstated in a hospital's favor by as little as 1.8%. OIG, *Review of Gwinnett Medical Center's Claim for Medicare Disproportionate Share Hospital Payments for Fiscal Year 1999* (2003); OIG, *Review of Medicare Disproportionate Share Hospital Payments for Methodist Hospital-Memphis for Fiscal Year 1999* (2003); OIG, *Review Of Medicare Disproportionate Share Hospital Payments Claimed By Saint Mary's Regional Medical Center for Fiscal Year Ending December 31, 2002* (2004).

273.    In any event, errors that have the cumulative effect of producing DSH underpayments nationwide on the order of $500 million per year, or more, are significant.

274.    Errors that have the cumulative effect of producing DSH underpayments nationwide of $500 million per year, or more, do not make up an acceptable rate of error in CMS' DSH payment determinations.

## G.    ERRORS IN CMS' COUNT OF MEDICARE DAYS IN MEDPAR

275.    As discussed further below, the PRRB found that the count of Medicare days in CMS' determination of the *denominator* of the SSI fraction is also unreliable. PRRB Dec. at 35-40. The Administrator reversed this finding based on his pronouncement that the MEDPAR count is close enough, even though there is no dispute that it is not correct and that CMS cannot explain the discrepancies. *See* Adm'r Dec. at 28-35.

276.    The Board also found that the denominator of the SSI fraction for DSH should include "covered and utilized" days as well as actual patient days when Medicare beneficiaries were enrolled in a Medicare health maintenance organization during their inpatient hospital stays ("Medicare HMO days"). PRRB Dec. at 37-40. The Administrator affirmed, without

considering or even acknowledging the undisputed evidence of CMS' inconsistent policies and practices or Congress' manifest intent that Medicare HMO days should not be regarded as Medicare days attributable to individuals entitled to payment under Medicare Part A.

### MEDPAR's Count of Medicare Days is Unreliable

277.    The Board found "compelling evidence" in the record showing that CMS' "count of total Medicare days for the denominator [of the SSI fraction] is unreliable." PRRB Dec. at 38. That evidence relates to a reconciliation of CMS' MEDPAR data and the data in the Intermediary's Part A Provider Statistical & Reimbursement Report ("PS&R"), which was performed in 2003 by agreement of the Hospital and the Intermediary for only two of the four fiscal years at issue – 1994 and 1995. PRRB Dec. at 35-38.

278.    The Board found that the PS&R report, which is generated by the Medicare fiscal intermediary, "contains the details of the days for which a provider is paid by Medicare." PRRB Dec. at 35. Providers, like the Hospital, "are required to reconcile their cost report submission to the paid claims data furnished in the PS&R." PRRB Dec. at 35. The Board further found that, "[i]n most instances MEDPAR data and PS&R data would be the same; i.e., both would show the days Medicare covered and paid for inpatient services for each Medicare beneficiary." PRRB Dec. at 35.

279.    The Board also found, however, that the "PS&R is unlike the MEDPAR in that the PS&R does not purport to contain days for which Medicare provided coverage and charged the beneficiary with 'utilization' of his/her available Medicare covered days but, for some technical reason, Medicare did not pay the hospital for the care. This can occur, for example, because the provider failed to timely bill Medicare for the services." PRRB Dec. at 35.

280.    The Board found that in 2003, the Hospital and the Intermediary agreed to reconcile the differences between the Intermediary's PS&R reports and CMS' available

MEDPAR files for two of the four fiscal years at issue, 1994 and 1995. PRRB Dec. at 36 & n.211. The Board further found that "[a] detailed summary of the data reflected on the PS&R, the MEDPAR, and the CWF documents produced by the Intermediary for each of the above stays [for 1994 and 1995] is set forth in paragraphs 12.1 - 13.15 and the accompanying tables in Appendices I and II in the Provider's Position Paper. There is no dispute as to accuracy of the information presented in the tables in Appendices I and II in the Provider's Position Paper." Reconciliation of the Intermediary's PS&R reports and CMS' available MEDPAR files for Hospital fiscal years 1994 and 1995 identified the following discrepancies:

- 61 inpatient hospital stays that had Medicare paid days on the PS&R that were not included in the MEDPAR data; and,

- 47 stays that had Medicare days in the MEDPAR that were not included as paid Medicare days on PS&R."

PRRB Dec. at 36.

281. With respect to the 61 patient stays that were reflected as Medicare-paid days on the Intermediary's PS&R reports but were not included in CMS' MEDPAR files for 1994 and 1995, the Board found:

(a) "57 [of the 61] stays had been paid before CMS ran the June MEDPAR files that were used to calculate the SSI fractions at issue for fiscal years 1994 and 1995";

(b) "46 of these 61 stays had utilized days charged on the CWF" ["Common Working File"];

(c) "CMS cannot explain why the Medicare paid days for these [46] stays are not included in the MEDPAR file";

(d) "As to the remaining 15 of these 61 stays, CMS' answers to interrogatories state that the days associated with these stays were properly excluded from the MEDPAR because 'utilized' days were not, *or should not have been* counted in the CWF from which the MEDPAR report is drawn" (emphasis added);

    (e)        But, "while most of the [15] stays had payments that were cancelled, the CWF continued to reflect 'utilized' days for some stays after payments were cancelled and some of the stays simply were not found on the CWF";

    (f)        And, "[t]he Intermediary does not know from which CWF field MEDPAR pulls the data, or whether the MEDPAR even looks to utilized days at all."

PRRB Dec. at 36.

282.    Based on the "discrepancies that the Intermediary was unable to explain," as described in the preceding paragraph, the Board concluded that "the MEDPAR count of total Medicare days for the denominator is unreliable."  PRRB Dec. at 38.

283.    In addition to unexplained discrepancies in the count of Medicare days in CMS' MEDPAR files, the Board also found that CMS contradicted itself even as to the question of what days even should be counted as Medicare days in MEDPAR.  For example, the Board noted that CMS reversed its position multiple times concerning its policy on whether the denominator of the SSI fraction should include days that are not paid by Medicare pursuant the Medicare secondary payer provisions of the Act:

> [while] 13 Medicare secondary payer ("MSP") stays . . . were counted as Medicare days in the MEDPAR to the extent that Medicare actually made payment[,] . . . [d]uring the course of this case, CMS reversed its answers to interrogatories asking whether MSP days should be counted in the denominator of the SSI fraction, and at the hearing, CMS' witness, Phillips, initially disagreed with CMS' revised interrogatory responses but then recanted his testimony.

PRRB Dec. at 39 & n.226 (citing Phillips' testimony and CMS' original and revised discovery responses).  CMS' failure to develop and document systems and policies for the calculation of the SSI fraction evince the cavalier indifference inherent in the agency's "back-of-the-envelope" approach to the calculations of a significant component of DSH payments currently amounting to more than $6 billion per year.

284.    The Board found that CMS' "[t]reatment of certain categories of days," like the Medicare secondary days, "sheds some light on MEDPAR's deficiencies."  PRRB Dec. at 38.

285.    The Administrator's decision does not controvert the Board's findings regarding the unexplained discrepancies between the Intermediary's PS&R report and CMS' MEDPAR file and CMS' own contradictory statements as to what days should be counted in the MEDPAR file, as set forth in paragraphs 277-84 above.  *See* Adm'r Dec. at 28-31.  Instead, the Administrator simply refused to accept "that the MEDPAR data used is 'inaccurate as revealed by [the] unexplained discrepancies,'"  Adm'r Dec. at 28, and announced that "the MEDPAR data used to construct the denominator was the best data available."  *Id.* at 31.  The Administrator further commented that "it is unclear from the Board's finding what was suppose[d] to be done with respect to the denominator when the SSI fraction was ordered to be recalculated by the Board."  Adm'r Dec. at 29.

286.    The Administrator's conclusion that the "MEDPAR data  . . . was the best data available" is based, in part, on the Administrator's allegation, unsubstantiated by citation to any evidence in the record, that "[t]here was no difference between the MEDPAR and the PS&R for FYEs 1993 and 1996."  Adm'r Dec. at 31.  As set forth above, the undisputed record evidence shows that the Intermediary and the Hospital agreed to reconcile only two of the four fiscal years at issue and that the files for 1993 and 1996, in contrast, were simply not reviewed for variances.  That is not to say that such variances do not exist.

287.    The Administrator's conclusion that the "MEDPAR data  . . . was the best data available" is also based, in part, on the Administrator's allegation that "[t]here were approximately 35,000 stays on the PS&R for all four years involved" including the two years that the Hospital and the Intermediary did not attempt to reconcile.  Adm'r Dec. at 31.

288.    The Administrator's conclusion that the "MEDPAR data . . . was the best data available" is also based, in part, on the Administrator's allegation, also unsupported by citation to record evidence, that "approximately 99.82 percent of the stays were accepted by both parties as accurately represented."   Again, the Administrator is incorrect in suggesting that the parties had reconciled the MEDPAR and PS&R files for 1993 and 1996, as well as 1994 and 1995, and found no variances for 1993 and 1996.  By agreement, the parties did not attempt to reconcile 1993 or 1996.  Further, with respect to the variances for 1994, the Administrator's decision is grossly misleading insofar as the only data available from CMS to be reconciled for that year was not the data that went into the SSI fraction that was actually applied to determine the Hospital's DSH payment for 1994 but was from a recalculation of the SSI fraction for 1994 that CMS performed later.  That later calculation for 1994 included more than 2,600 additional Medicare patient days, for a total of 66,887 Medicare days.   If a reconciliation had been performed between the PS&R and the number of Medicare days counted in the SSI fraction that was applied to determine the Hospital's DSH payment for 1994 (64,251 Medicare days), the error rate would be approximately 23 times greater than what the Administrator's decision suggests (66,887 − 64,251 = 2,636 / 64,251 = 4.10% error rate).   In short, the Administrator's decision attempts to use "corrected" data, which he did not use and which he refuses to use to determine the Hospital's DSH payment for 1994, to determine that his self-professed error rate is "acceptable."

### Types of Days That Should Be Counted in the Denominator of the SSI Fraction

289.    Regarding the types of patient days that should be included in the denominator of the SSI fraction for DSH, the Board ruled, and the Administrator affirmed, that it should include all "covered or utilized" days and Medicare HMO days.

290.    The Board ruled that the denominator of the SSI fraction should include all "covered or utilized" days regardless of whether the patient was entitled to have Medicare benefits paid on his or her behalf for such days, and despite the Board's finding that "CMS' past position" on this point is "confusing."  PRRB Dec. at 37.  The Board based this ruling principally on:  (i) its reading of the Medicare DSH statute and regulation; and (ii) its findings that the Secretary's initial 1986 rulemaking implementing the DSH statute said that the denominator of the SSI fraction would be derived from "data from the Medicare Part A Tape Bill (PATBILL) file" and subsequent notices published in the *Federal Register* after 1986 indicated that the PATBILL file is "the functional equivalent of the MEDPAR file."  PRRB Dec. at 38 (quoting the Secretary's May 6, 1986 notice at 51 Fed. Reg. 16772 and his September 1, 1987 notice at 52 Fed. Reg. 33143, 33144).

291.    After the Board issued its decision, the Hospital timely requested by letter dated April 3, 2006, that the Board reconsider and clarify that the denominator of the SSI fraction should include only Medicare paid days and should not include days occurring after an individual has exhausted Part A benefits for inpatient hospital services or days for which no Medicare payment is made pursuant to the Medicare Secondary Payer provisions of the statute and regulations.

292.    The Hospital's April 3, 2006 request for reconsideration pointed out that even if "covered or utilized days" were the correct standard, the denominator of the SSI fraction should not include days after a patient had exhausted Medicare Part A benefits or days not paid by Medicare under the law's Medicare Secondary Payer provisions because:

> (a)    The Board has consistently ruled that patient days attributable to an individual who had exhausted Medicare Part A benefits and was eligible for Medicaid should be counted in the numerator of the *Medicaid* fraction and not in the SSI fraction.  *See Jersey Shore Med. Ctr. v. Blue Cross &*

> *Blue Shield Ass'n/Blue Cross & Blue Shield of New Jersey*, MEDICARE & MEDICAID GUIDE (CCH) ¶ 80,083 (1998); *Edgewater Med. Ctr. v. Blue Cross & Blue Shield Ass'n/Blue Cross & Blue Shield of Illinois*, ; MEDICARE & MEDICAID GUIDE (CCH) ¶ 80,435 (2000); *Castle Med. Ctr. v. Blue Cross & Blue Shield Ass'n/United Government Services*, MEDICARE & MEDICAID GUIDE (CCH) ¶ 81,022 (2003);

    (b)    The reconciliation of the PS&R and MEDPAR for Hospital fiscal years 1994 and 1995 showed that inpatient days occurring after a patient had exhausted Medicare Part A benefits were not included in MEDPAR's count of Medicare days for the SSI fraction;

    (c)    CMS' discovery responses and testimony of CMS witnesses established that such Medicare Part A exhausted benefit days should not be included in the denominator of the SSI fraction;

    (d)    Medicare Part A exhausted benefit days and Medicare that are not paid by Medicare pursuant to the Medicare Secondary Payer provisions of the law are not, and have never been, counted as "utilized days" in the CWF, as stated in § 40 of the Medicare Claims Processing Manual and § 3685.B; and,

    (e)    CMS' prior policy clearly established that a patient is not entitled to Part A benefits after he or she exhausted benefits for inpatient hospital services, as stated by the Secretary in a 1990 *Federal Register* notice, 55 Fed. Reg. 35,990 35996 (Sept. 4, 1990) ("entitlement to payment under Part A ceases after the beneficiary has used 90 days in a benefit period and has either exhausted the lifetime reserve days, or elected not to use available lifetime reserve days").

293.    The Hospital's request for reconsideration also commented that the Board should reconsider its ruling that the denominator of the SSI fraction should include "covered or utilized days," as opposed to Medicare-paid days only, because:

    (a)    Despite whatever else CMS may have said in the 1980s, when CMS switched from using the PATBILL file to using the MEDPAR, without advance notice or opportunity for public comment, the PATBILL file included a field (not found in MEDPAR) consisting of "Cost report days," which were defined as consisting of "days credited to the provider's PS&R report as Medicare Days," as stated in § 3870 of the Medicare Intermediary Manual;

    (b)    When the Secretary first implemented the DSH statute in 1986, the agency did not say that the Medicare/SSI fraction would include "utilized" days. What the Secretary explicitly and repeatedly said, both in the 1986 rules

and in subsequent litigation before the federal courts, is that the Medicare/SSI fraction includes only "paid" days;

(c)    When the Secretary promulgated the original DSH regulation in 1986, he said that the Medicaid fraction would include only Medicaid-paid days and that the agency was construing the SSI fraction consistently to include only Medicare-paid days, 51 Fed. Reg. at 16777 (May 6, 1986); 51 Fed. Reg. 31454, 31460-61 (Sep. 3, 1986);

(d)    The Secretary's original interpretation of the DSH statute as including only Medicaid paid days in the Medicaid fraction and only Medicare paid days in the Medicare/SSI fraction was consistently advanced by the Secretary in at later federal court litigation concerning the application of this paid-days only policy with respect to the Medicaid fraction. *See, e.g., Legacy Emanuel Hosp. & Health Ctr.* v. *Shalala*, 97 F.3d 1261, 1265 (9th Cir. 1996) (expressly noting the Secretary's position that "the Medicare proxy only counts patient days paid by Medicare"); and

(e)    The DSH statute defines the SSI fraction as consisting of patient days attributable to individuals who were "entitled to benefits" under Medicare Part A, and the "benefit" provided under Medicare Part A is the right to have payment made on one's behalf for covered inpatient hospital services or other post-hospital skilled nursing facility or home health services. *See* 42 U.S.C. § 426(c)(I) ("entitlement of an individual to hospital insurance benefits . . . shall consist of entitlement to have payment made . . . for inpatient hospital services").

294.    After the Board denied the Hospital's request for reconsideration, which had also been copied to the Administrator, the Hospital incorporated the comments set forth in its request by reference in its written comments to the Administrator by letter dated April 24, 2006.  The Administrator's decision, however, does not address or even acknowledge any of the Hospital's comments as summarized in paragraphs 291-93 above.  *See* Adm'r Dec. at 28-34.

295.    The Administrator's decision instead affirmed the Board's ruling that the denominator of the SSI fraction should include "covered or utilized days" because the PATBILL file was mentioned in the Secretary's 1986 rulemaking, the PATBILL file was described by CMS as the functional equivalent of the MEDPAR file in a 1987 notice in the *Federal Register*,

and the MEDPAR file was mentioned as the source of the data for the denominator of the SSI fraction in notices published in the *Federal Register* in 1990, 1995, and 2006.  Adm'r Dec. at 29.

296.    Additionally, the Administrator's decision affirms the Board's ruling that the denominator of the SSI fraction should include "covered or utilized days" because the Secretary mentioned the word "covered" in:  (i) the DSH regulation's definition of the *numerator* – but not in its definition of the denominator – of the SSI fraction, 42 C.F.R. § 412.106(b)(2)(i); (ii) the preamble to the 1986 rule implementing the DSH statute; and (iii) the preamble to a 2004 rulemaking concerning the DSH payment.  Adm'r Dec. at 34.

## Medicare HMO Days

297.    The Board also ruled that the denominator of the SSI fraction for DSH should include Medicare HMO days.  PRRB Dec. at 39-40.

298.    The Board reached its conclusion that Medicare HMO days should be counted in the numerator of the SSI fraction even though:

> (a)    The 2003 reconciliation of the MEDPAR and PS&R files showed that the only Medicare HMO patient stays that were actually counted in CMS' MEDPAR file for 1994 and 1995 – the only two years that were included in the reconciliation –  were 22 Medicare HMO patient stays that had been billed in error to the Intermediary for payment under regular Medicare (non-HMO) fee-for-service program and were, therefore, denied for payment by the Intermediary under that program.  PRRB Dec. at 39-40; *see also* PRRB Dec. at 36 & n.211.

> (b)    The undisputed record evidence, including GAO reports, shows that as far back as 1987, and continuing thereafter, CMS knew that few HMO days were counted in the SSI fraction because hospitals and HMOs had little incentive and no contractual obligation to submit no-pay bills for HMO stays.  PRRB Dec. at 39 & n.229.

> (c)    The undisputed record evidence shows that CMS acknowledged as far back as 1990 that Medicare fiscal intermediaries "do not necessarily know what to do with 'no-pay' bills for HMO days even when they are submitted."  PRRB Dec. at 39 (quoting from CMS' notice in the 1990 *Federal Register* at 55 Fed. Reg. 35990, 35994 (September 4, 1990)).

(d)     The Board found that CMS' own witness, Dean, testified "that the field on MEDPAR for HMO days 'hasn't been used since the time that I started running the MEDPAR [in 1995].'"  PRRB Dec. at 40 (quoting Dean's undisputed testimony).  "Therefore," the Board found, "HMO days could not have been included in the SSI fraction in any case, even if a no-pay bill had been submitted."  PRRB Dec. at 40.

(e)     It is undisputed that, and the Board found:  "For periods [at issue] prior to 1998, HMO days were excluded from all aspects of the Medicare cost report [other than the SSI fraction for DSH] and were not counted as Medicare days in the calculation of the Medicare patient load for [graduate medical education ("GME")] payment purposes even though the statutory definitions of the two programs are very similar."  PRRB Dec. at 40 (discussing CMS' different treatment of virtually identical statutory language in the pertinent sections of the Medicare Act addressing the SSI fraction for DSH and the Medicare patient load fraction for GME).  And, as the Board noted:  "CMS has never explained the reason for this inconsistent treatment of Medicare HMO days, see 54 Fed. Reg. 40294-95; 55 Fed. Reg. 35990, 35994 (September 4, 1990)."  PRRB Dec. at 40.

299.    In its April 3, 2006 request for reconsideration, the Hospital asked the Board to reconsider its ruling regarding Medicare HMO days because:

(a)     CMS never actually followed a policy of counting HMO days as Medicare days in the Medicare/SSI fraction as evidenced by the undisputed facts of this case showing that only 22 Medicare HMO stays were counted in MEDPAR for Hospital fiscal years 1994 and 1995 and as admitted in the GAO and CMS statements referenced in paragraph 298 above;

(b)     Congress expressed and manifested its intent that Medicare HMO days should not be regarded as patients "with respect to whom payment may be made under part A,"  42 U.S.C. § 1395ww(h)(3)(A), in section 4625 of the Balanced Budget Act of 1997, Pub. Law No. 105-33,  which established a medical education payment with respect to Medicare HMO patient days separate and apart from the existing provision of the Medicare Act providing for a medical education payment based on a hospital's percentage of total patient days attributable to  "patients with respect whom payment may be made under part A"; and

(c)     Even if CMS ever had followed a policy of counting Medicare HMO days in the SSI fraction (and it did not), CMS has never provided a rational explanation as to why HMO days should be counted as Medicare Part A days only for purposes of the calculating the SSI fraction for DSH and as non-Medicare days for every other Medicare cost report or payment purpose, including the medical education payment.

300.    The Administrator's decision does not address or even acknowledge the above comments in paragraph 299.  *See* Adm'r Dec. at 34-35.

301.    The Administrator concludes that Medicare HMO days should be included in the SSI fraction for the fiscal years at issue because "HMOs are required to cover inpatient hospitalization services, and utilization is charged to the beneficiary for such days."  Adm'r Dec. at 34.

302.    The regulations and agency guidance cited by the Administrator as support for this assertion (in paragraph 301) do not state or establish that Medicare HMO patient days are charged against a beneficiary's utilization of Medicare Part A benefits.  Those sources instead make clear that a Medicare HMO must provide the benefits prescribed therein "at a minimum," and thus may provide more benefits or greater benefit periods for required benefits (such as inpatient hospital services) than are allowed under the Part A fee-for-service.  *See* 42 C.F.R. § 417.101(a)(2)(ii);  Medicare Health Maintenance Organization/Competitive Medical Plan Manual § 2102 (cited in Adm'r Dec. at 34 n.58).  If anything, then, the authorities cited in the Administrator's decision indicate that no utilization of Medicare Part A benefits is charged against a Medicare HMO enrollee for inpatient hospitals services because a Medicare HMO may provide for additional benefits beyond those allowed under the traditional Medicare Part A fee-for-service program.

**H.    CMS' RESISTANCE TO EFFORTS TO OBTAIN RELEVANT EVIDENCE IN THE GOVERNMENT'S SOLE POSSESSION BEARING ON THE FINANCIAL IMPACT OF ERRORS IN CMS' CALCULATIONS**

303.    As the Board found CMS "resisted efforts" by the Hospital and the Board to obtain relevant evidence that would precisely show the impact of the errors and omissions in CMS' calculations of SSI fractions for the Hospital fiscal years at issue.  PRRB Dec. at  25.

304.    In 2000, the Board issued administrative subpoenas at the Hospital's request compelling CMS to furnish patient-level detail data reflecting the patient days that CMS counted in both the numerator and the denominator of its calculations of the hospital's SSI fractions for a number of fiscal years, including fiscal year 1995.  When CMS did not respond to the Board's subpoena, the Hospital initiated a civil action in this Court (Civ. No. 00-02940 (PLF)) seeking an order compelling the Secretary to do so.

305.    The Secretary requested and received several extensions of time to respond to the Hospital's complaint in this Court.  During that period, CMS furnished the Hospital with three different data runs relating to the hospital's SSI fraction for fiscal years 1993 through 1995.  Each of those data runs was marked by significant errors, however, and none of them purported to reflect the original data required by the Board's subpoena.  *See* PRRB Dec. at 4.

306.    On June 6, 2001, one day after CMS furnished the Hospital with the third round of incorrect data for fiscal year 1995, the Secretary moved to dismiss the Hospital's civil action in this Court.  The Secretary's motion asserted that "the Secretary . . . has, in fact, complied with the PRRB's subpoena" and that the case should be dismissed for lack of subject matter jurisdiction.  Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss For Lack of Subject Matter Jurisdiction at 12, Civ. No. 00-02940 (PLF).

307.    In support of the motion to dismiss, the Secretary's counsel submitted a declaration of CMS employee Robyn Thomas, who stated under penalty of perjury that the data that CMS had used to calculate the Hospital's SSI percentage for fiscal year 1995 were no longer available:

> Baystate Medical Center requested data that was included in the calculation of the numerator and denominator of its Medicare SSI percentage for fiscal year ending September 30, 1995.  *The files that HCFA originally used to calculate that percentage are no longer*

> available. Therefore, HCFA requested from the Social Security
> Administration (SSA) a re-creation of SSA's 1995 SSI eligibility file, which
> is the basis for the SSI eligibility information contained in the HCFA
> MEDPAR file.

Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss For Lack

of Subject Matter Jurisdiction, Exh. A, Declaration of Robyn Thomas ¶ 6, Civ. No. 00-02940

(PLF) (emphasis added). The Thomas Declaration further attested that the Secretary "has

answered the PRRB's subpoena as completely and accurately as possible." *Id.* at 12.

308. In response to the Secretary's motion, the Hospital expressed skepticism that

CMS could not reproduce the data required by the Board's subpoena and suggested that it would

be appropriate for the Secretary to explain in reply why he could not reproduce the data that was

actually used to calculate the Hospital's SSI fraction for fiscal year 1995.

309. The Secretary's reply memorandum reasserted that "the Secretary has answered

the subpoena at issue as completely and as accurately as possible." Defendant's Reply to

Plaintiff's Response to Defendant's Motion to Dismiss at 1, 4-5, Civ. No. 00-02940 (PLF). The

Secretary further urged the court to disregard the Hospital's doubts about the veracity of the

Thomas' Declaration, claiming that CMS had conducted an exhaustive search for data that it had

used to calculate the Hospital's SSI fraction for fiscal year 1995:

> Indeed, an employee of the Secretary who is intimately familiar with the
> data has declared, under penalty of perjury, that the agency "has answered
> the PRRB subpoena as completely and accurately as possible." Thomas
> Declaration, ¶ 12. Plaintiff's refusal to accept that *the agency has
> conducted an exhaustive search of its data banks in order to respond to
> the subpoena* – a refusal based on nothing more than "skeptic[ism],"
> "suspicion," and "belief," – is a wholly insufficient basis upon which to
> look to recourse from this Court.

*Id.* at 4-5. (Emphasis added.)

310. The Court ultimately dismissed the earlier suit in December 2002 on the ground

that the Hospital must work through the Board to obtain judicial enforcement of its subpoena.

311.    Later, in the 2003 discovery hearing conducted by the Board, the Hospital proved that the representations that CMS had made to this Court in the Thomas Declaration and in the memorandum in support of the Secretary's motion to dismiss were false.  During that hearing, CMS' principal MEDPAR programmer, Dean (who reported directly to the declarant, Thomas), admitted upon examination before the Board that the SSI and Medicare days data that CMS had used to compute the SSI fraction for the Hospital's 1995 fiscal year were still in CMS' possession when Thomas's sworn statement to the contrary was submitted, under penalty of perjury, to this Court.  *See* PRRB Dec. at 18 ("Testimony at the evidentiary hearing revealed that, contrary to CMS' prior representations about the non-availability of computer files, the information contained in most of the SSA data files and MEDPAR for the years in issue was still available as the versions Dean created after he ran the SSISORT process."); PRRB Dec. at 25 n.135 ( "Even though SSA's original tapes were no longer available, Dean had the versions he made that contained all the same information as in the SSA original tape.")

312.    Deans' admission before the Board in the 2003 discovery hearing came shortly after the Secretary's counsel, Romano, sent Dean an April 23, 2004 email attaching a list of MEDPAR files and asked whether Thomas' sworn assertion that the agency's 1995 no longer existed was "*literally true (I hope)* in light of the files listed below."   (Emphasis added.) Romano ultimately produced that data to the Hospital under cover letter dated July 29, 2003 – the same data that CMS had used to compute the SSI fraction for the Hospital's 1995 fiscal year, and the very data that the agency had sworn not to exist in a declaration submitted to this Court in support of dismissing the Hospital's lawsuit.

313.    On May 1, 2003, the day after Dean had admitted to the existence of the 1995 data that CMS had used to calculate the Hospital's SSI fraction for 1995, CMS counsel, Romano,

issued a warning to the Board that it  "*should proceed very cautiously with respect to any further discovery orders in this case.*"   In response, the Chairman of the PRRB made the following remarks on the record:

> When I became Chairman in [2002] and started looking at some of the cases that we had, I saw that we had some very old cases that I couldn't figure out why they were still sitting here.   So I started asking some questions and I found out that this case and others, that were some apparently very intractable discovery disputes involved * * * And in digging into that a little bit more, I found that we had issued subpoenas and that there was at least a dispute over whether or not the responses had been complete.  * * * From what I've seen, we do indeed [have] a genuine discovery dispute.  * * *  And I will also note that during the course of this proceeding the Board had requested the General Counsel's office to enforce its subpoenas, which that office declined to do.  With regard to whether or not information has been submitted, * * * [m]y perception of the way that came out yesterday was it really didn't come out very easily, and it had to be clarified through pretty extensive questioning,  Now whether or not there was some intent to not be fully open with us or whether or not it some misunderstanding, I don't know, but I know that it wasn't – things didn't flow concerning that revelation easily from my perspective.  And it seems to me that just the fact of our having this evidentiary hearing seems to have produced some documents that otherwise had not been produced. . . . The Rudolph [Tayloe] memo [from February 1996] certainly appears to me to have been central to the issue that's been pending all these years.  * * *  And there's just one more.  As I say, I'm not trying to form an opinion on whether or not anything was done by the client, CMS, willfully keep information out of the hands of the [hospital] and the Board or whether it was purely a lack of understanding of who was doing what, but I do know that the government has been very keen in at least the last decade with regard to the Federal False Claims Act . . . .  And as I recall, one of the standards of culpability in the False Claims Act is willful ignorance.  And I think that's very reasonable and it should be imposed, but I also think that we to all of us that deal with federal health care funds should be held to the same standard.  None of us should be excluded from that standard, so in analyzing your client's [CMS'] caution that we tread very carefully here on other discovery orders from what I've seen it's very clear that we just need to get to the bottom of this and get the facts out. * * *

314.    A few moments later, the Board Chair added the following additional comments in a further exchange with CMS' counsel, Romano:

> I would just comment that just based upon the records availability yesterday that there did seem to be a semantics war going on there.  It was very – it became very clear after a lengthy examination that even though Mr. Dean didn't have the original physical tapes that SSA sent you had a problem.  *You had it all along.  It was right there.*  (Emphasis added).

315.   The Board's request for enforcement of subpoenas, alluded to in the Board Chairman's comments quoted above, related to subpoenas that the PRRB had issued in 2002 in this case.  One of those two subpoenas directed CMS to produce documents reflecting its policies and procedures for calculating the SSI fraction for DSH.  In view of the errors and omissions in the three rounds of SSI data that CMS had furnished to the Hospital in 2001, and CMS' purported inability to reproduce its original data, the Hospital had previously asked CMS to produce copies of any manuals, programs, or procedures employed by CMS in calculating the SSI fraction.  In response, CMS counsel produced only copies of transcripts of depositions of two CMS employees, Dean and Rosenberg, which had been taken in 1995 in another appeal on the same issue by St. Louis University Hospital.  *See* ¶ 216, *supra*.

316.   On February 7, 2002 the PRRB issued a subpoena compelling CMS to produce all documents and programs relating to the policies and procedures used to calculate the SSI fraction.  CMS timely produced just three sets of documents, which included:  (i) another copy of the transcript of Dean's 1995 deposition in the St. Louis case; (ii) another copy of the transcript of Rosenberg's 1995 deposition in the St. Louis case; and (iii) printouts of three computer programs that purportedly are used to perform the match of MEDPAR and SSI records.  The computer programs that CMS produced were not the programs that the agency had used to compute the SSI fraction for fiscal years 1995 and earlier, however, as evidenced by the programs' references to "Y2K."  CMS produced additional documents relating to CMS' policies and procedures for calculating the SSI fraction more than a year later, in connection with and as a follow up to the discovery hearing that the PRRB conducted in May 2003.  But, even after the

discovery hearing, CMS still did not produce any documented standards, procedures, or protocols for its calculation of the SSI fraction.

317.    The Board also issued a second subpoena on February 7, 2002.  That subpoena directed SSA to produce its SSI entitlement records for a small sample of Medicare beneficiaries who were treated by the Hospital during periods at issue in here.  SSA refused to produce those records on privacy grounds.  By letter dated June 21, 2002, the Board requested that the Secretary's counsel seek judicial enforcement of the subpoena "by the legal means addressed in the statute" at 42 U.S.C. § 205(e).  As noted in the comments of the PRRB Chairman, quoted above, the Secretary's  counsel refused to enforce that subpoena.

318.    Anticipating the government's reluctance to produce the SSI records required by the Board's subpoena, the Hospital pursued other avenues in 2002, in particular, efforts to obtain the SSI eligibility records for Medicare patients who were still living, whose whereabouts were still known to the hospital, and who consented in writing to SSA's release of their SSI records. This study undertaken by the Hospital indicated that some of these patients had been entitled to SSI during their inpatient hospital stays but most likely had not been counted as SSI patient days by CMS (as indicated in the data runs that CMS supplied to the Hospital in 2001) in its calculation of the SSI fraction.

319.    Based on the results of the limited consent study mentioned in the preceding paragraph, in the Spring of 2003, the Hospital submitted a request to SSA, under the Freedom of Information Act, by letter dated April 11, 2003, for the SSI records of *all Medicare patients* discharged from the hospital in fiscal years 1993 through 1996.  The Hospital also requested that the Board issue a subpoena to SSA for the SSI records of *all Medicare patients* discharged from the hospital in fiscal years 1993 through 1996.  On June 5, 2003, the PRRB issued a subpoena

directing SSA to produce those SSI records for all of the Hospital's Medicare patients during the years 1993 through 1996.

320.    In a partial response to the Hospital's 2003 FOIA request, SSA furnished the Hospital with SSI eligibility records only for deceased individuals who had been treated by the hospital in fiscal year 1994, contending that production of anything more would be too burdensome or prohibited by the Privacy Act.

321.    Meanwhile, having received no response from SSA concerning the Board's subpoena for the SSI records for all of the Hospital's Medicare inpatients during the years at issue, the Chairman of the PRRB proposed in a June 2003 pre-hearing conference that the parties attempt to work through the political appointees at SSA and  HHS for assistance in obtaining the SSI records required by the Board's subpoena.  The Hospital supported that proposal, but the Secretary's counsel, Romano, opposed it, apparently preferring instead for the Secretary's counsel to direct and control any discussions with SSA regarding its response to the PRRB's subpoena.

322.    In another pre-hearing conference held on July 28, 2003, faced with a continuing lack of progress, the Board restated its interest in pursuing through political channels the "fundamental data that's needed to get the answers in this case" and determined to wait two more weeks before initiating such efforts.

323.    Soon after the July 2003 pre-hearing conference, the Board received a letter from SSA, dated July 28, 2003, stating that SSA would not produce the SSI records to the extent that the Board's subpoena called for production of information regarding living individuals. Subsequently, by letter dated August 29, 2003, the Board requested the assistance of the Secretary in obtaining the subpoenaed SSI eligibility records from SSA.    This request was

consistent with the Medicare statute's mandate that the Secretary shall "make available to the Board such secretarial, clerical, and *other assistance as the Board may require to carry out its functions*." 42 U.S.C. § 1395oo(i) (emphasis added).

324.    As all of these efforts were underway, counsel for the Hospital and the Secretary's counsel, Romano, exchanged extensive correspondence regarding the Hospital's proposal to have SSA release SSI data to a third party contractor of CMS that would verify which of the hospital's Medicare patients were entitled to SSI benefits during the periods at issue and then disclose the SSI data on those patients to the Hospital.  Although the Hospital offered in writing to bear all the cost of this alternative data match, CMS refused to cooperate, alleging (falsely, as it later turned out) that SSA would not agree to release the SSI data to CMS in connection with this proposal.

325.    On April 30, 2004, the Hospital filed a petition asking the Board to grant "expedited judicial review" ("EJR") over the issues underlying the evidentiary impasse concerning the SSI entitlement records.  By letter dated May 28, 2004, the Board denied the Hospital's petition on the ground that the Board had not formally requested that the Secretary's counsel initiate legal action to enforce the Board's June 5, 2003 subpoena for the SSI records for all Medicare patients who were discharged from the Hospital in fiscal years 1993 through 1996.  The Board's May 28, 2004 letter noted that the Board would make a formal request to HHS counsel for enforcement of its subpoenas, which it later did, and advised the parties that it would either grant EJR or initiate other appropriate action if its request for enforcement was not timely acted upon by the Secretary's counsel.

326.    Shortly after the Board issued its decision on the EJR petition, by a letter dated June 2, 2004, the Secretary's counsel asked the Administrator of CMS to undertake an

interlocutory review and issue an order reversing the Board's determination to enforce its subpoena to SSA. Over the Hospital's written objections, and in defiance of the Board, the Administrator eventually issued a decision concluding that the Board's subpoenas to SSA should not be enforced.

327.    By letter dated June 10, 2004, the Board Chairman wrote to counsel for the Hospital and counsel for CMS and suggested that the parties try to mediate the evidentiary impasse concerning the SSI data, noting in reference to the Hospital's alternative data match proposal that "there does appear to be a workable solution on the table, provided that the details could be worked out."

328.    By letter dated June 21, 2004, the Hospital's counsel informed the Board and counsel for CMS that the Hospital was amenable to mediation of the evidentiary issue, but noting that the Hospital was being prejudiced by CMS' continuing failure to have provided answers to discovery requests.

329.    The Secretary's counsel wrote to the PRRB the same day, alleging that it was unclear to him whether SSA would agree to provide CMS with the SSI data needed to implement the Hospital's alternative data match proposal and he did not know whether CMS "would be willing under any circumstance to participate in the [hospital's] data proposal."

330.    On that same date, by letter dated June 21, 2004, the Board requested that the Secretary's counsel "seek enforcement of the June 5, 2003 subpoena issued to SSA [for the SSI records for all of the Hospital's Medicare patients for the years at issue] and reiter[ated] its request for enforcement of the February 7, 2002 subpoena." The Board's four-page letter to CMS counsel noted:

> There is no authority in the statute or regulations for the CMS Administrator to block evidence from being sought or presented that the

> Board has determined is essential to a matter in dispute.  These authorities, coupled with the inherent conflict of interest in OGC's representation of both CMS and the Board, we believe should weigh heavily in favor of honoring the Board's legitimate request.

331.    On July 9, 2004, SSA counsel sent a letter to the Secretary's counsel and the Hospital, with an additional copy sent under separate cover to the Attorney Advisor to the Administrator of CMS, concerning SSA's willingness to supply CMS with the SSI data that would be needed to facilitate the alternative data match that the Hospital had proposed as means of obtaining necessary SSI entitlement data for all of its Medicare patients during the fiscal years at issue.  As noted in SSA' transmittal letter to the CMS Administrator, SSA proposed its "business solution" as a means to "assist the Administrator in facilitating a resolution in [the PRRB] case."

332.    By letter dated July 12, 2004, the Hospital's counsel furnished the Board with copies of SSA's letters regarding its willingness to cooperate with the "business solution" to the evidentiary impasse in the pending PRRB appeals.  In that same communication, the Hospital's counsel also informed the PRRB that "[n]otwithstanding SSA's agreement to cooperate with this proposal, Mr. Romano [the Secretary's counsel], has notified us by e-mail 'that OIS [the CMS Office of Information Services – the Office headed by Robyn Thomas] . . . is not willing to participate in the [hospital's] proposed data match.'"

333.    On July 29, 2004, the Deputy Administrator of CMS signed an order concluding that the Board "does not have the authority to subpoena SSA under section 205 (d) and (e) of the Social Security Act.  Thus, the Administrator will not request that the OGC [Office of General Counsel] seek enforcement of the Board subpoenas in Federal district court."  The Deputy Administrator's order of July 29, 2004, was effected through an extraordinary interlocutory administrative appeal process that the Administrator had previously ruled (in other cases) to be

categorically unavailable in the Medicare administrative appeal process established under 42 U.S.C. § 1395oo.  *See Texas Disproportionate Share Group Appeal*, MEDICARE & MEDICAID GUIDE (CCH) ¶ 44,581 fn. 6 (July 22, 1996); *Cardinal Cushing Hospital*, MEDICARE & MEDICAID GUIDE (CCH) ¶ 80,975 fn. 4 (Jan. 29, 2003).

334.    Approximately six weeks later, beginning on September 15, 2004, the PRRB commenced its six-day hearing on the merits of the Hospital's appeals contesting CMS' calculations of the hospital's SSI fractions for fiscal years 1993-1996.

## I.    **CREDIBILITY OF WITNESSES**

335.    As noted *supra*, Board found that, while the present and former SSA employees who testified in this case (Shafer, Cribbs and Walsh) were "credible" and "extremely knowledgeable," the CMS employees "demonstrated a lack of comprehensive knowledge of the [CMS] match process."  PRRB Dec. at 21.  The Board had occasion to warn at least one key CMS witness that her answers on critical questions before the Board were "disingenuous." PRRB Dec. at 34-35 & n.210.

336.    The Administrator's decision does not address the Board's findings regarding the credibility of the CMS witnesses and the present and former SSA employees, but suggests that the Board should not have credited what the Administrator characterizes as "opinion testimony" of  two witness from the Hospital's DSH consulting firm, as well as the former long-time SSA employee, Shafer.   Adm'r Dec. at 50-53.   The Administrator's decision is arbitrary and capricious and not based on substantial evidence in so far as it credits the testimony of CMS witnesses that the Board discredited, and discredits (or ignores) the testimony of the present and former SSA employees, without squarely addressing the Board's findings regarding the credibility of witnesses and giving any reasons why the Administrator did not accept the Board's

findings.  *See, e.g., Morall v. Drug Enforcement Admin.*, 412 F.3d 165 (D.C. Cir. 2005), (*citing E. Tenn. Natural Gas Co. v. FERC*, 953 F.2d 675, 681 (D.C. Cir. 1992)).

337.    The Administrator's challenge to the credibility of the two witnesses from the Hospital's DSH consulting firm rests on the fact, fully disclosed in the Hospital's response to CMS' discovery requests in this case, that the Hospital pays its consulting firm on a contingency-fee basis, not for their testimony in this case, but for the DSH consulting services they have provided to the Hospital for many fiscal years (not just the years at issue) and with respect to all aspects of the DSH calculation (not just the SSI fraction).  There is no agreement by the Hospital or its counsel to pay the witnesses from the DSH consulting firm any fee whatsoever for their testimony in this case.

338.    The Administrator acknowledges that the Hospital "did not proffer either witness [from its consulting firm] as experts [*sic*]," Adm'r Dec. at 50, but nonetheless faults the Board for crediting a few pieces of testimony that he characterizes as "opinion" testimony.  The Secretary's counsel, however, did not object either before or during the Board hearing to the Hospital's disclosed intent to call these witnesses to testify.  The Secretary's counsel also did not object on this basis to any testimony they gave at the hearing.

339.    Nearly all of testimony given by the two witnesses from the DSH consulting firm concerned historical or observed facts that were corroborated by the testimony of CMS' own witnesses,  CMS' own documents, or both.  Little, if any, of the Board's findings in this case rested on testimony that could be reasonably objected to (even after the fact) as opinion testimony by either of the two witnesses from the consulting firm.

340.    Additionally, in faulting the Board's decision for crediting testimony given by the witnesses from the DSH consulting firm, the Administrator's decision misrepresents what the

Board actually found and the evidence it relied upon in reaching those decisions.  *See* Adm'r

Dec. at 50 n.93.  For example, the Administrator complains that the Board's "referr[ed] to Smith

testimony regarding additional 200 days as an unexplained discrepancy and something other than

'new or additional Medicare covered days coming in the denominator[,]'" and that "[t]he Board

than [*sic*] concluded that the 'discrepancies' [*sic*] between the earlier calculation and the 1996

run alone (i.e., the additional days beyond the expected 200 days testified to by Smith)

'illustrates that the original data was inaccurate with respect to the stale data.'"  Adm'r Dec. at

50 n.93 (citing PRRB Dec. at 25).  But, the Administrator's decision ignores and misrepresents

what the Board said in its decision when it agreed with *the Intermediary's opinion*, as expressed

by the Secretary's counsel in the Intermediary's post-hearing brief, on this same point:  "The

Intermediary believes that there is no way to know the source of the additional days, and the

Board agrees.  Even though the ratio suggests it is unlikely, it could simply be the result of the

addition of 2,600 more covered days, of which 400 were SSI days.  The discrepancy could also

be due to omissions in earlier SSI runs.  It could be both."  PRRB Dec. at 25.  Ultimately, what

the Board relied upon in reaching its findings concerning CMS' omission of the 'stale' SSI

records problem is change in *the ratio* itself, as reflected in CMS' own 1996 MEDPAR run for

1994, and the "uncontroverted evidence show[ing] that CMS knew, at least by 1993, that there

was a problem with the SSI data that CMS had been receiving from SSA.  Consequently, it is

clear that CMS did not use the best data available when it calculated the SSI fractions at issue for

fiscal years 1993-1996."  PRRB Dec. at 25.

     341.    The Administrator also complains that the Board's decision "referr[ed] to Pfiel's

[*sic*] testimony that changes in the Medicare fraction would have a major impact on hospitals

that treat a large indigent population" and that it "adopt[ed] Pfiel's [*sic*] opinion testimony with

respect to the use of multiple alternative identifiers." Adm'r Dec. at 50 n.93 (citing PRRB Dec. at 22, 24, 25). But, the Administrator's decision misrepresents the Board's actual decision on these points too. In reaching its decision that CMS' must use other match criteria, specifically individuals' own Social Security numbers, the Board relied principally on the representations and admissions by the Secretary and CMS employees that the Social Security number is "the best identifier," that matches on Social Security numbers "of course" would be better than matches the Secretary uses for DSH purposes, and that the Secretary uses the Social Security number and additional secondary match criteria (name, date of birth, and gender) "for matching in a virtually identical program for skilled nursing providers." PRRB Dec. at 22.

342.    Similarly, regarding the financial impact of what the Administrator tries to dismiss as minor changes in the SSI ratios, CMS' own witness, Rosenberg, agreed that a $202 million dollar impact of a mere 4.03% percentage change in the national average SSI ratio would be "extremely significant." PRRB Dec. at 24. Rosenberg further "agreed with the Board chair's suggestion that the only way to know what the impact would be of including the inactive [SSI] records that were omitted from original calculations for fiscal years 1993 and 1994 would be to rerun the actual calculations." PRRB Dec. at 25. This is what CMS did in 1996, but, according to the testimony of the CMS employees, the relevant files were allowed to expire, disappear, or be destroyed. Further, the Board found that while "the financial impact may be relatively small when averaged over all PPS hospitals, it can have a significant impact on those PPS hospitals that serve a large low-income population [because] [h]ospitals must meet a certain threshold percentage of low-income patients before they qualify for the DSH adjustment. Even a fraction of a point under that threshold means they receive no DSH payment whatsoever." PRRB Dec. at 25-26; *id.* at 2 (noting that the disproportionate patient percentage, which includes the SSI

fraction as one of two component parts, determines whether "a hospital qualifies for the DSH adjustment" under the statute).

343.    Similarly, the Administrator's decision indirectly attacks the integrity of a long-time veteran retiree of SSA, Shafer, alleging that "Alan Schafer [*sic*] was another consultant engaged by the Provider's representative" and that "[h]is compensation agreement was not discussed in testimony."  Adm'r Dec. at 51.  Those allegations are false.  The Secretary's own counsel examined Shafer about how much he was being compensated for his time, and he answered that he was being paid a fixed hourly rate.

344.    The Administrator's assault on the integrity of witnesses is a gratuitous smokescreen.  In fact, the record reflects that the Hospital's DSH consulting firm is the same consulting firm that the Department of Justice itself employed to testify on the Government's behalf in another Medicare case that culminated in a personal letter of commendation to the consulting firm from the then-Director of the FBI, Louis Freeh.

345.    While attacking the credibility and integrity of witnesses for the Hospital in this case, the Administrator's decision entirely ignores the seriously false and misleading statements that have been offered by CMS or its employees to this Court, to the public and to affected disproportionate share hospitals regarding the accuracy of CMS' calculations of the SSI fraction and the existence of data needed to assess the accuracy of, and correct, those calculations.

## COUNT I

## JUDICIAL REVIEW UNDER THE MEDICARE ACT

346.    The Hospital incorporates the allegations in paragraphs 1 through 345 as if fully set forth herein.  The bases of this Count I are as stated in those paragraphs and as restated or summarized in the succeeding paragraphs.

347.    The Medicare statute, 42 U.S.C. § 1395oo(f), provides that the final decision of the agency in this case shall be reviewed under the applicable provisions of the Administrative Procedure Act ("APA").

348.    The APA provides that the reviewing court shall set aside the agency's final decision in this case if it is contrary to law, arbitrary and capricious, or not based upon substantial evidence in the record.  5 U.S.C. § 706.

349.    The Administrator's decision in this case must be set aside and reversed and the matter should be remanded for recalculation of the SSI fractions for the periods at issue, because the Administrator's decision is contrary to law, arbitrary, capricious, and not based upon substantial evidence in the record.   Without limiting the generality of the foregoing, the Hospital contends that the Administrator's decision should be reversed, and the SSI fractions and DSH payment determinations at issue should be remanded for recalculation, for the reasons set forth in the following paragraphs 350-59.

350.    The Administrator's decision that the SSI fractions are fixed when calculated by CMS in the month of June following the end of a Federal fiscal year, and may not be recalculated to reflect later updated or corrected data, is inconsistent with the plain meaning and manifest intent of the DSH statute, 42 U.S.C. § 1395ww(d)(5)(F), the plain language of the DSH regulation, 42 C.F.R. § 412.106, *cf. Georgetown Univ. Hosp. v. Bowen*, 862 F.2d 323 (D.C. Cir. 1988), and the Secretary's stated intent at the time he adopted the initial DSH regulation in 1986, 51 Fed. Reg. 31454, 31458 (Sept. 3, 1986).

351.    Additionally, the Administrator's decision that the SSI fractions are fixed when calculated by CMS in the month of June following the end of a Federal fiscal year, and may not be recalculated to reflect later updated or corrected data, is inconsistent with the provision of the

Act providing for administrative and judicial review of the final determination of DSH payment due to a provider for a fiscal year, 42 U.S.C. § 1395oo, and violates the Hospital's constitutional due process rights.  *See, e.g., Loma Linda Cmty. Hosp. v. Shalala*, [1996 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 44,030 (C.D. Cal. 1995) (noting a hospital's right to appeal the calculation of the SSI fraction under section 1395oo(a) of the Medicare statute).  The Secretary cannot turn a blind eye to the undisputed facts of this case and presume, based upon the application of mere alleged "policy," that its calculation of the SSI fraction is correct, when in fact it indisputably is not.  *See United Scenic Artists v. Nat'l Labor Relations Bd.*, 762 F.2d 1027, 1034-35 (D.C. Cir. 1985) (overruling an agency finding "presumed as matter of law, whether or not this squares with the actual facts");  *Gutierrez-Rogue v. INS*, 954 F.2d 769, 773 (D.C. Cir. 1992) (the due process right to a meaningful hearing requires an agency to provide a party with the opportunity to rebut an officially noticed fact).  The Administrator's decision in this case "would sanction the creation of an unregulated back door through which unrebuttable, non-record evidence could be introduced against [the Hospital] outside of the statutorily-mandated hearing context."  *Kaczmarczyk v. INS*, 933 F.2d 588, 596 (7th Cir.), *cert. denied*, 112 S.Ct. 583 (1991).

352.    Additionally, the Administrator's assertion in this case that the SSI fractions are fixed when calculated in the month of June following the end of a Federal fiscal year, and may not be recalculated to reflect later updated or corrected data, is arbitrary and capricious, and is not based upon substantial evidence, because:

> (a)    It is inconsistent with the uncontroverted record evidence showing that CMS has calculated the SSI fractions at least 10 times for every fiscal year and it would have been "simple," according to the testimony of CMS' own witness, Rosenberg, to apply the later calculations in cost report settlements that occurred after CMS performed the latest calculation for each fiscal year.

(b)     CMS' written discovery responses below admit that the agency has no recollection or documentation of any factor ever considered in deciding to apply the SSI fractions calculated in the month of June following the end of a Federal fiscal year for DSH payment purposes. *See Motor Veh. Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (failure to consider an important aspect of the problem constitutes arbitrary and capricious agency action).

(c)     The Secretary did not provide hospitals with adequate advance notice or opportunity to comment on this policy as required by the notice and comment rulemaking requirements prescribed by the APA.

(d)     CMS' alleged policy is inconsistent with the agency's treatment of the other fraction – the Medicaid fraction – that is used to compute the DSH payment for a fiscal year, as well as the agency's policy and practice for the computation of the similar PPS payment adjustment for Indirect Medical Education costs, both of which are computed retrospectively based on accurate (not estimated data). Additionally, the Secretary has provided no rational explanation for this dissimilar treatment of similar situations. *See, e.g., Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) (arbitrary and capricious for an agency to treat similar situations differently without a rational explanation).

353.    The Administrator's allegation that CMS' calculations of the SSI fractions that were used to determine the Hospital's DSH payments for the fiscal years at issue were accurate is contrary to the plain meaning and legislative intent of the DSH statue and regulation, which require the Secretary to compute the number of Medicare patient days attributable to patients who were entitled to SSI benefits under title XVI of the Social Security Act and to compute that number based on an accurate data, and not based on estimates. *See* PRRB Dec. at 8 (citing legislative history of the DSH statute).

354.    The Administrator's allegation in this case that CMS used the best data available to compute the SSI fractions that were used to determine the Hospital's DSH payments for the fiscal years at issue is not based upon substantial evidence in the record because the uncontroverted evidence shows that CMS's calculations are systemically flawed in several

respects and CMS knew at least since 1993 that there were problems with at least some of the data used in its calculations.

355. The Administrator's allegation in this case that the Hospital failed to show that the undisputed errors and omissions in CMS' calculations of those fractions had significant adverse impact on the resulting DSH payment is unsupported by substantial evidence in the record because the uncontroverted record evidence shows that CMS' errors had a substantial adverse impact on hospitals that serve a disproportionate share of low-income patients.

356. The Administrator's allegation in this case that the Hospital failed to show that the undisputed errors and omissions in CMS' calculations of those fractions had significant adverse impact on the resulting DSH payment also is arbitrary and capricious, and is not supported by substantial evidence, because:

> (a)    the adverse inference rule "provides that when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him," *Int'l Union v. NLRB*, 459 F.2d 1329 (D.C. Cir. 1972); and,
>
> (b)    the undisputed evidence of errors and omissions in CMS' calculations of the SSI fraction shifts the burden to the Secretary "to produce countervailing evidence or a reason, not based on the insufficiency of the [Hospital's] evidence, that explains why [the Hospital's] allegations [should not be] accepted" and this burden cannot be avoided merely by asserting generalized scenarios that could affect the impact of CMS' errors and omissions and that "could only be eliminated with information unavailable to the [Hospital]." *Atlanta College of Med. & Dental Careers, Inc. v. Riley*, 987 F.2d 821, 830-31 (D.C. Cir. 1993).

357. The Administrator's decision regarding the count of Medicare days in the MEDPAR file is not based upon substantial evidence in the record, and is otherwise arbitrary and capricious, because the uncontroverted evidence shows discrepancies in the MEDPAR file that CMS cannot explain.

358.    The Administrator's decision that the denominator of the SSI fraction should include "covered or utilized days" for which the patient is not entitled to payment of benefits under Medicare Part A is contrary to law, is not based upon substantial evidence and is otherwise arbitrary and capricious, because:

(a)    The DSH statute defines the SSI fraction as consisting of patient days attributable to individuals who were "entitled to benefits" under Medicare Part A, and the "benefit" provided under Medicare Part A is the right to have payment made on one's behalf for covered inpatient hospital services or other post-hospital skilled nursing facility or home health services, *see* 42 U.S.C. § 426(c)(I) ("entitlement of an individual to hospital insurance benefits . . . shall consist of entitlement to have payment made. . .for inpatient hospital services");

(b)    The Secretary stated when he promulgated the original DSH regulation in 1986 that the Medicaid fraction would include only Medicaid-paid days and that the agency was construing the SSI fraction consistently to include only Medicare-paid days, 51 Fed. Reg. at 16777 (May 6, 1986); 51 Fed. Reg. 31454, 31460-61 (Sep. 3, 1986);

(c)    The Secretary stated when he promulgated the original DSH regulation in 1986 that the Medicare days in the denominator of the SSI fraction would derived from the PATBILL file, and the PATBILL file included a field (not found in MEDPAR) consisting of "Cost report days," consisting of "days credited to the provider's PS&R report as Medicare Days;"

(d)    The Secretary switched from using the PATBILL file to using the MEDPAR file without advance notice or an opportunity to comment by affected hospitals;

(e)    The Secretary's original interpretation of the DSH statute as including only Medicaid paid days in the Medicaid fraction and only Medicare paid days in the Medicare/SSI fraction was consistently advanced by the Secretary in later federal court litigation concerning the application of the paid-days only policy with respect to the Medicaid fraction. *See, e.g., Legacy Emanuel Hosp. & Health Ctr.* v. *Shalala*, 97 F.3d 1261, 1265 (9th Cir. 1996) (expressly noting the Secretary's position that "the Medicare proxy only counts patient days paid by Medicare");

(f)    The Secretary never invoked the notice and comment rulemaking requirements of the APA to amend the DSH regulation for the periods at issue to include patient days attributable to patients who were not entitled to payment of benefits under Medicare Part A in the denominator of the SSI fraction;

(g)     The reconciliation of the intermediary's PS&R files and CMS' MEDPAR files for Hospital fiscal years 1994 and 1995 showed that inpatient days occurring after a patient had exhausted Medicare Part A benefits were not included in MEDPAR's count of Medicare days for the SSI fraction;

(h)     When requesting a reconciliation of the SSI fraction for its own cost reporting period, a hospital was required until 1995 to submit a count of Medicare days reconciled with the Medicare paid days on its cost report and excluding all other Medicare beneficiary days (including HMO days);

(i)     CMS counsel admitted in the proceeding below that the count of Medicare patient days should include only covered days and should not include the full length of stay for all Medicare beneficiaries;

(j)     CMS' discovery responses and testimony of CMS witnesses established that such Medicare Part A exhausted benefit days should not be included in the denominator of the SSI fraction;

(k)     Medicare Part A exhausted benefit days and Medicare that are not paid by Medicare pursuant to the Medicare Secondary Payer provisions of the law are not, and have never been, counted as "utilized days" in the CWF, as stated in § 40 of the Medicare Claims Processing Manual and § 3685.B; and,

(l)     CMS' long-standing policy clearly establishes that a patient is not entitled to Part A benefits after he or she exhausted benefits for inpatient hospital services, as stated by the Secretary in a 1990 *Federal Register* notice, 55 Fed. Reg. 35,990 35996  (Sep. 4, 1990) ("entitlement to payment under Part A ceases after the beneficiary has used 90 days in a benefit period and has either exhausted the lifetime reserve days, or elected not to use available lifetime reserve days").

359.    The Administrator's decision that the denominator of the SSI fraction should include Medicare HMO days is contrary to law, is not based upon substantial evidence and is otherwise arbitrary and capricious, because:

(a)     The undisputed reconciliation of CMS' MEDPAR files and the intermediary's PS&R files shows that for Hospital fiscal years 1994 and 1995 the only Medicare HMO patient stays that were actually counted in CMS' MEDPAR file for 1994 and 1995 were 22 Medicare HMO patient stays that had been billed in error to the Intermediary for payment under regular Medicare (non-HMO) fee-for-service program and were, therefore, denied for payment by the Intermediary under that program;

(b)    The undisputed record evidence shows that as far back as 1987, and continuing thereafter, CMS knew that few, if any, Medicare HMO days could have been counted in the SSI fraction because hospitals and HMOs had little incentive and no contractual obligation to submit no-pay bills for HMO stays;

(c)    The undisputed record evidence shows that CMS acknowledged as far back as 1990 that Medicare fiscal intermediaries "do not necessarily know what to do with 'no-pay' bills for HMO days even when they are submitted" to fiscal intermediaries;

(d)    CMS' own witness, Dean, testified "that the field on MEDPAR for HMO days 'hasn't been used since the time that [he] started running the MEDPAR [in 1995];"

(e)    It is undisputed that for the periods at issue, Medicare HMO days were excluded from all aspects of the Medicare cost report and were not counted as Medicare days in the calculation of the Medicare patient load for GME payment purposes even though the Medicare statute uses virtually identical language to define the numerators of SSI fraction for DSH and the Medicare patient load fraction for GME;

(f)    CMS has never explained the reason for its inconsistent treatment of Medicare HMO days; and

(g)    Congress expressed and manifested its intent that Medicare HMO days should not be regarded as patients "with respect to whom payment may be made under part A," 42 U.S.C. § 1395ww(h)(3)(A), in section 4625 of the Balanced Budget Act of 1997, Pub. Law No. 105-33, which established a medical education payment with respect to Medicare HMO patient days separate and part from the existing provision of the Medicare Act providing for a medical education payment based on a hospital's percentage of total patient days attributable to "patients with respect whom payment may be made under part A."

360.   Wherefore, as to Count I, the Hospital requests an order:

(a)    Reversing the Administrator's decision in this case;

(b)    Remanding to the Secretary with instructions to:

    i)    to develop, test, validate and document appropriate data specifications and systems requirements for the production by SSA of the SSI entitlement records for all recipients of SSI benefits;

    ii)    to obtain correct and complete SSI data from SSA for the periods at issue;

iii)   to develop, test, validate and document appropriate programs for matching the Secretary's inpatient hospital stay records with the SSI data from SSA based on alternative identifiers, including individuals' own Social Security numbers as well as Title II numbers, name, date of birth and gender;

iv)   to develop, test, validate and document appropriate data specifications and systems requirements for populating the Secretary's existing inpatient hospital stay records with individuals' own Social Security numbers (in addition to name, date of birth and gender) and for counting the number of inpatient hospital stays for which Medicare Part A benefits were paid and excluding Medicare HMO days;

v)   to recalculate the Hospital's SSI fractions for the years at issue;

vi)   to provide the Hospital with the patient-level detail data, and the data specifications, systems requirements and programs used to compute the revised fractions for the years at issue so that the Hospital can validate the results; and

vii)   to pay the Hospital the additional DSH payments due as result of the recalculations of the SSI fractions for the years at issue, plus interest;

(c)   Directing the Secretary pay the legal fees of counsel for the Hospital, plus costs of suit; and

(d)   Awarding such other relief as the Court deems appropriate.

## COUNT II

### To Compel Production of SSI Records Sought By the PRRB

361.   Plaintiff incorporates the allegations in Paragraphs 1 through 360 as if fully set forth herein.

362.   If the Court denies the Hospital the relief sought in Court I, then the Hospital alternatively is entitled to an order reversing and vacating the Secretary's final decision in this case, compelling SSA to produce to the Hospital the SSI entitlement records for all of the Hospital's Medicare inpatients during the fiscal years at issue, as was required by the PRRB's June 5, 2003 subpoena to SSA, and remanding this matter to the PRRB for further proceedings.

363.    The Secretary's final decision in this case denying the Hospital relief from errors and omissions in the Secretary's calculations of the SSI fractions on the ground that the Hospital failed to carry a burden to show that the errors and omissions of the Secretary's calculations of the Hospital's SSI fractions adversely affected the Hospital's DSH payment is inconsistent with applicable provisions of 42 U.S.C. §§ 405 and 1395oo, constitutes an unlawful denial of the Hospital's constitutional due process rights, is otherwise contrary to law, and is arbitrary and capricious.  The Deputy Administrator's July 2004 interlocutory decision refusing to enforce the Board's June 5, 2003 subpoena to SSA, and CMS' refusal to cooperate with the alternative data match approach that was proposed by the Hospital and was acceptable to SSA, unlawfully and improperly denied the Hospital access to the SSI entitlement records needed to prove impact of the errors and omissions in the Secretary's calculations of the Hospital's SSI fractions for the fiscal years at issue.  As stated by the Secretary's own Board in its June 21, 2004, letter to the Secretary's counsel:

> There is no authority in the statute or regulations for the CMS Administrator to block evidence from being sought or presented that the Board has determined is essential to a matter in dispute.  These authorities, coupled with the inherent conflict of interest in OGC's representation of both CMS and the Board, we believe should weigh heavily in favor of honoring the Board's legitimate request [to enforce its subpoena to SSA].

364.    Wherefore, as to Count II, the Hospital alternatively requests an Order:

    i)    Compelling the Commissioner of SSA to produce, or otherwise arrange for the production, to the Hospital of the SSI entitlement records required by the Board's June 5, 2003 subpoena or such other SSI data as would be needed for the Hospital to accurately and fully identify all Medicare inpatients who were entitled to SSI benefits during their inpatient hospital stays at the Hospital during the periods at issue; and

    ii)    Reversing and vacating the Deputy Administrator's July 2004 interlocutory order denying enforcement of the PRRB's June 5, 2003 subpoena to SSA and the Administrator's 2006 final decision in this case; and

iii)   Remanding this matter to the PRRB for further proceedings upon the production to the Hospital of all the SSI records required by the preceding subparagraph i).

## COUNT III

### To Compel Production of SSI Records Under the Freedom of Information Act

365.   Plaintiff incorporates the allegations in Paragraphs 1 through 364 as if fully set forth herein.

366.   If the Court denies the Hospital the relief sought in Counts I and II, then the Hospital alternatively is entitled to an order from this Court reversing and vacating the Secretary's final decision in this case, compelling SSA to produce to the Hospital the SSI entitlement records for all of the Hospital's Medicare inpatients during the fiscal years at issue as requested by the Hospital in 2003 under the Freedom of Information Act ("FOIA"), and remanding this matter to the PRRB for further proceedings.

367.   SSA unlawfully and wrongfully denied the Hospital's FOIA request.

368.   Plaintiff timely and fully exhausted all available administrative remedies with respect to SSA's denial of the Hospital's FOIA request.

369.   This action to compel production of the SSI entitlement records requested by Plaintiff in its FOIA request is timely filed within the applicable statute of limitations.

370.   The Secretary's final decision in this case denying the Hospital relief from errors and omissions in the Secretary's calculations of the SSI fractions on the ground that the Hospital failed to carry a burden to show that the errors and omissions of the Secretary's calculations of the Hospital's SSI fractions adversely affected the Hospital's DSH payment is inconsistent with applicable provisions of 42 U.S.C. §§ 405 and 1395oo, constitutes an unlawful denial of the Hospital's constitutional due process rights, is otherwise contrary to law, and is arbitrary and capricious.   The Hospital requested and SSA unlawfully denied the Hospital's request under

FOIA for the SSI entitlement records needed to prove that the errors and omissions in the Secretary's calculations adversely impacted the Hospital's DSH payments for the fiscal years at issue.

371.    Wherefore, as to Count III, the Hospital alternatively requests an Order:

i)    Compelling the Commissioner of SSA to produce to the Hospital the SSI entitlement records requested in its 2003 FOIA request; and

ii)    Reversing and vacating the Administrator's 2006 final decision in this case; and

iii)    Remanding this matter to the PRRB for further proceedings upon SSA's production to the Hospital of all the SSI records requested by the Hospital in its 2004 FOIA request.

/s/ Christopher L. Keough
Christopher L. Keough
 DC Bar No. 436567
John M. Faust
 DC Bar No. 433553
Stephanie A. Webster
 DC Bar No. 479524
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

Dated: July 14, 2006