UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BAYSTATE MEDICAL CENTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 1:06-cv-01263 |
| | ) |
| MICHAEL O. LEAVITT, et al., | ) |
| | ) |
| Defendants. | ) |
| —————————————————— | ) |

## DEFENDANT LEAVITT'S MOTION FOR SUMMARY JUDGMENT

Defendant Leavitt, by his undersigned attorneys, hereby moves, pursuant to Rule 56, Federal Rules of Civil Procedure, for summary judgment. The grounds for this motion are that defendant Leavitt is entitled to judgment as a matter of law, that there are no genuine issues of material fact, and that the decision of the Administrator of the Centers for Medicare & Medicaid Services is supported by substantial evidence.

In support of this motion, the Court is respectfully referred to the 23 volume administrative record previously filed with the Court; to Defendant Leavitt's  Statement of Material as to which there is no genuine issue, filed herewith; and to Defendants' Memorandum of Points and Authorities in Support of Defendant Leavitt's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney

SHEILA M. LIEBER
Deputy Director

/s/ *Brian G. Kennedy*
BRIAN G. KENNEDY (D.C. Bar # 228726)
LISA A. OLSON (D.C. Bar #38266)
U.S. Department of Justice
20 Mass. Ave., N.W., Room 7300
Washington, D.C. 20530
Telephone: (202) 514-3357
Telefacsimile: (202) 514-3357
E-mail: brian.kennedy@usdoj.gov

Dated: April 11, 2007                           Counsel for Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BAYSTATE MEDICAL CENTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06-cv-01263 |
| | ) | |
| MICHAEL O. LEAVITT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANT LEAVITT'S MOTION FOR SUMMARY JUDGMENT AND
IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

JEFFREY A. TAYLOR
United States Attorney

SHEILA M. LIEBER
Deputy Director

BRIAN G. KENNEDY (D.C. Bar # 228726)
LISA A. OLSON (D.C. Bar #38266)
U.S. Department of Justice
20 Mass. Ave., N.W., Room 7300
Washington, D.C. 20530
Telephone: (202) 514-3357
Telefacsimile: (202) 514-3357
E-mail: brian.kennedy@usdoj.gov

Dated: April 11, 2007                     Counsel for Defendants

## TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

STATEMENT OF THE CASE ........................................................................................ 4

      1.      Statutory Background of Medicare Part A .......................................... 4

      2.      DSH Provisions ..................................................................................... 5

      3.      Matching SSA's Records On SSI Recipients With CMS's Hospital Claim
              Records ................................................................................................. 6

      4.      Baystate's Substantive Claims .............................................................. 9

      5.      Proceedings Below .............................................................................. 11

ARGUMENT ................................................................................................................ 13

I. The Secretary's Construction Of The Medicare Act Is Entitled To Deference ....................... 13

II.     The Standard Of This Court's Review Is Provided By The
        Administrative Procedure Act .......................................................... 14

III.    Individuals Whose Earned Income Disqualified Them From Receiving
        SSI Payments Were Properly Excluded From The Numerator Of The
        SSI Fraction ...................................................................................... 17

IV.    Defendant Properly Included "Covered" Days In The SSI Denominator
        And Excluded Exhausted And Secondary Payer Days As Not "Covered" ................... 21

V.     HMO Patients Entitled To Part A Medicare Benefits Were
        Properly Included In The Denominator Of The SSI Fraction ......................................... 25

VI.    Baystate Did Not Demonstrate That Any Errors Of Computer
        Programming Led To Understatement Of Its SSI Fraction By
        An Unacceptably Large Percentage ................................................. 29

VII.   Baystate's Contentions That Agency Employees Repeatedly
        Lied About The DSH Calculations Are Without Merit .................................................... 37

CONCLUSION ............................................................................................................. 44

# TABLE OF AUTHORITIES

## CASES                                                    Page(s)

AFGE v. Rumsfeld,
    321 F.3d 139 (D.C. Cir. 2003) ........................................................................ 16

Administrators of the Tulane Educ. Fund v. Shalala,
    987 F.2d 790 (D.C. Cir. 1993) ........................................................................ 27

Atlanta Coll. of Med. & Dental Careers v. Riley,
    987 F.2d 821 (D.C. Cir. 1993) ........................................................................ 17

Bowen v. Yuckert,
    482 U.S. 137 (1987) ........................................................................................ 36

*Chevron, U.S.A. v. Natural Resources Defense Council, Inc.,
    467 U.S. 837 (1984) ................................................................................. passim

Cobell v. Kempthorne,
    455 F.3d 301 (D.C. Cir. 2006) ........................................................................ 14

Cobell v. Norton,
    240 F.3d 1081 (D.C. Cir. 2001) ...................................................................... 15

Cobell v. Norton,
    428 F.3d 1070 (D.C. Cir. 2005) ................................................... 2, 14, 29, 32

Conn. Nat'l Bank v. Germain,
    503 U.S. 249 (1992) ........................................................................................ 28

County of Los Angeles v. Shalala,
    192 F.3d 1005 (D.C. Cir. 1999), cert. denied, 530 U.S. 1204 (2000) .......................... 4, 5

Crowe v. Bolduc,
    334 F.3d 124, 132 (1st Cir. 2003) .................................................................. 13

Jewish Hospital v. Secretary,
    19 F.3d 270 (6th Cir. 1996) ........................................................................... 23

Legacy Emanuel Hospital v. Shalala,
      97 F.3d 1261 (9th Cir. 1996) ........................................................ 23

Methodist Hospital v. Shalala,
      38 F.3d 1225 (D.C. Cir. 1994), ......................................... 13, 30, 37

Mt. Diablo Hospital v. Shalala,
      3 F.3d 1226 (9th Cir. 1993) ........................................................ 30

North Broward Hosp. Dist. v. Shalala,
      172 F.3d 90 (D.C. Cir.), cert. denied, 528 U.S. 1022 (1999) ......................................... 14

Palmore v. United States,
      411 U.S. 389 (1973) ........................................................ 27-28

Regions Hosp. v. Shalala,
      522 U.S. 448 (1998) ........................................................ 27

Shoshone-Bannock Tribes v. Reno,
      56 F.3d 1476 (D.C. Cir. 1995) ........................................................ 15

Sullivan v. Zebley,
      493 U.S. 521 (1990) ........................................................ 6, 36

United States v. Mead Corp.,
      533 U.S. 218 (2001) ........................................................ 13

## STATUTES AND REGULATIONS

42 U.S.C. § 1381 et seq ........................................................ 6, 18

42 U.S.C. § 1381a ........................................................ 20

42 U.S.C. § 1382 ........................................................ 6, 18, 20

42 U.S.C. § 1382c ........................................................ 6, 21

42 U.S.C. § 1382h(a) ........................................................ 21

*42 U.S.C. § 1382h(b) ........................................................ passim

42 U.S.C. § 1383(a)(2)(B)(viii) ........................................................ 35

42 U.S.C. § 1383(j) ........................................................ 18

*42 U.S.C. § 1395c ............................................................................ 4, 34-35, 36

42 U.S.C.§ 1395d ............................................................................ 27

42 U.S.C. § 1395d(a) ........................................................................ 24

42 U.S.C. § 1395d(a)(1) ..................................................................... 24

42 U.S.C. § 1395f(a)(1) ...................................................................... 22

42 U.S.C. § 1395g ............................................................................ 27

42 U.S.C. § 1395h ............................................................................ 4

42 U.S.C. § 1395*i* ............................................................................ 15

42 U.S.C. § 1395i-2 .......................................................................... 4

42 U.S.C. § 1395i-2a ......................................................................... 4

42 U.S.C. §§ 1395j-1395w-4 .............................................................. 26

42 U.S.C. § 1395mm(a)(1)(A)(i) ......................................................... 26

42 U.S.C. § 1395mm(a)(1)(D) ............................................................ 27

42 U.S.C. § 1395mm(a)(6) ................................................................. 27

42 U.S.C. § 1395mm(c)(2)(A)(I) ......................................................... 27

42 U.S.C. § 1395mm(c)(2)(A)(ii) ........................................................ 25

42 U.S.C. § 1395mm(d) ..................................................................... 25

42 U.S.C. § 1395*oo*(f) ...................................................................... 11, 14

42 U.S.C. § 1395ww(a)(4) .................................................................. 26

42 U.S.C. § 1395ww(b)( 3)(A) ............................................................ 5

42 U.S.C. § 1395ww(d) ..................................................................... 26

42 U.S.C. § 1395ww(d)(1)(A) ............................................................. 26

42 U.S.C. § 1395ww(d)(5)(B) ............................................................... 26

*42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) ................................................. passim

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) ...................................................... 6

42 U.S.C. 1395ww(h) .......................................................................... 26

42 U.S.C. § 1395ww(h)(3) .................................................................. 27

42 U.S.C. § 1395ww(h)(3) .................................................................. 27

42 U.S.C. § 1395ww(h)(3)(A) ............................................................. 27

42 U.S.C. § 1395ww(h)(3)(C) ............................................................. 28

42 U.S.C. §§ 1396 ............................................................................... 18

42 U.S.C. § 1396a(10)(A)(i)(II) ......................................................... 19

42 U.S.C. § 1396v ............................................................................... 18

20 C.F.R. § 416.110 ............................................................................. 6

20 C.F.R. § 416.264 ...................................................................... 19, 20

20 C.F.R. § 416.267 ............................................................................ 19

20 C.F.R. § 416.269 ............................................................................ 19

41 C.F.R. § 201-20.303(b)(2)(i) (1995) ............................................. 16

42 C.F.R. § 409.61(a) .......................................................................... 24

42 C.F.R. § 412.106 (1993-1996) ....................................................... 23

42 C.F.R. § 413.76(c) ..................................................................... 26, 28

*51 Fed. Reg. 16772 (May 6, 1986) .................................................. passim

* 51 Fed. Reg. 31454 (Sep. 3, 1986) .............................................. 7, 9, 23

55 Fed. Reg. 35994 (Sept. 4, 1990) .................................................... 28

59 Fed. Reg. 41400 (Aug. 12, 1994) ................................................... 21

60 Fed. Reg. 29202 (June 2, 1995) ........................................................... 42

60 Fed. Reg. 45778 (Sept. 1, 1995) .......................................................... 42

## LEGISLATIVE MATERIAL

H. Conf. Rep. 96-944, 1980 U.S.C.C.A.N. 1392 ........................................ 19

H.R. Rep. No. 99-241, 1986 U.S.C.CA.N. 579 .................................... 5, 31

S. Rep. 96-408, 1980 U.S.C.C.A.N. 1277 .................................... 18-19, 21

S. Rep. No. 99-146, 1986 U.S.C.C.A.N. 258 ........................................... 31

## OTHER

Medicare Prospective Payment Commission, *Hospital Inpatient and
  Outpatient Services,* Report to Congress, ch. 2A (March 7, 2007), available at
http://www.medpac.gov. .......................................................................... .....5, 31

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BAYSTATE MEDICAL CENTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06-cv-01263 |
| | ) | |
| MICHAEL O. LEAVITT, <u>et al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANT LEAVITT'S MOTION FOR SUMMARY JUDGMENT AND
<u>IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

<u>INTRODUCTION</u>

Plaintiff Baystate Medical Center ("Baystate") challenges final determinations by the Secretary of Health and Human Services ("Secretary") of one of two fractions, the "SSI fraction," used in determining the disproportionate share hospital" ("DSH") patient percentage that is used to calculate certain add-on payments to general acute-care hospitals under the Medicare Act. The combination of the Supplemental Security Income ("SSI") fraction and the Medicaid fraction (which is not relevant here) serve as a proxy for determining whether a given hospital serves a disproportionate share of low-income patients. The final agency decision of the Secretary's delegate, the Administrator of the Centers for Medicare & Medicaid Services, rejected those claims, and Baystate seeks judicial review.

Baystate makes two types of claims. First, three of Baystate's claims take issue with the Secretary's view of what patient days should be counted in either the numerator of the fraction or in both the numerator and denominator of the fraction. In reviewing those claims, if the court determines Congress has not directly addressed the precise matter at issue, "the question for the

court is whether the agency's answer is based on a permissible construction of the statute."

Chevron, U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984).

Baystate's other claims address whether the agency's methodology for calculating the SSI

fraction achieved an acceptable degree of accuracy.  Plaintiff's view seems to be that absolute

accuracy is required, as the statute requires calculation of "the number" and "not an estimate."

Pl. Brief at 22-23.   However, under Chevron, it is not plaintiffs but the agencies that "enjoy a

high degree of deference" to their "ideas on the trade-off between absolute accuracy and cost (in

terms of time and money)."  Cobell v. Norton, 428 F.3d 1070, 1074 (D.C. Cir. 2005).  Baystate's

demand for a process that can produce a count that, in the glare of second-guessing hindsight,

might produce an SSI fraction that can be shown to have been error-free strikes the wrong trade-

off between absolute accuracy and the costs in time and money of revisiting Baystate's DSH

payments for its fiscal years 1993 through 1996.  The Secretary's contrary interpretation

advances the interests of administrative finality, and is entitled to Chevron deference.

The first of Baystate's patient-days-that-should-be-counted claims relates to the SSI

fraction's numerator.  The numerator of the SSI fraction is the number of hospital days spent by

persons entitled to Medicare Part A benefits who were at the time of the stay entitled to SSI

benefits.  42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).  Baystate contends that, in addition to counting in

the numerator persons who were entitled to SSI benefits, the Secretary should also have counted

persons who are deemed to be receiving such benefits under 42 U.S.C. § 1382h(b).  However,

section 1382h(b) expressly provides that it is "for purposes of" the Medicaid Act that such non-

SSI recipients are deemed to be receiving SSI.  The Administrator properly rejected Baystate's

attempt to rewrite the statute to deem such persons eligible for SSI for Medicare purposes as well.

Second, the SSI fraction's denominator is the number of hospital days in a given year of patients who were entitled to Medicare Part A benefits. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). Here, Baystate argues that hospital days of persons who <u>were</u> entitled to benefits under Medicare Part A should nevertheless not be included in the denominator (nor, it would follow, in the numerator) if either their benefits were provided by a Medicare HMO or if the hospital for some reason was not entitled to payment even though Medicare provided the beneficiary with hospital coverage for the stay. The Administrator properly rejected both those arguments as inconsistent with the statute's focus on the <u>beneficiary's entitlement</u> to Part A benefits, which is present whether the hospital is paid by a Medicare HMO or not at all.

Finally, Baystate also argues that the computer programs the Secretary used to try to match massive Social Security and Medicare databases in order to arrive at a fraction missed some numerator days that hindsight and more precise programming would have captured. However, the statute does not specify with what degree of precision those calculations must be performed. The Administrator rejected Baystate's contention, permissibly construing the statute not to require a perfect "errorless" match process that would be inconsistent with the efficient administration of the Medicare program. 1 Administrative Record 55.

<u>STATEMENT OF THE CASE</u>

1.     <u>Statutory Background of Medicare Part A</u>

Part A of the Medicare Act provides for basic protection against the cost of hospital care to individuals over the age of 64 who are eligible for retirement benefits under title II of the Social Security Act or under the railroad retirement system, individuals under age 65 who have

been entitled to disability benefits under title II for not less than 24 months, and certain indiv-iduals with end-stage renal disease. 42 U.S.C. § 1395c.[1]  Other residents of the United States over age 64 may pay premiums (or have premiums paid on their behalf) to enroll in Part A.  42 U.S.C. § 1395i-2.  Persons under 65 who were found, and remain, disabled for title II purposes but are no longer entitled to such benefits because of excess income may also pay premiums to enroll in Part A.  42 U.S.C. § 1395i-2a.

Aspects of the Medicare Act are administered by the Secretary, who has delegated many functions to the Centers for Medicare & Medicaid Services ("CMS" or the agency), formerly known as the Health Care Financing Administration ("HCFA").  CMS, in turn, uses contractors known as "fiscal intermediaries" to process hospital claims.  42 U.S.C. § 1395h.

From the inception of Medicare until 1983, hospitals were paid based on the "reasonable costs" they incurred.  See, e.g., County of Los Angeles v. Shalala, 192 F.3d 1005, 1008 (D.C. Cir. 1999), cert. denied, 530 U.S. 1204 (2000).  "To stem the program's escalating costs and perceived inefficiency, Congress fundamentally overhauled the Medicare reimbursement methodology in 1983," and payments are now made under a Prospective Payment System ("PPS"), that pays qualifying hospitals at prospectively fixed rates.  Id.  Some calculations used in determining prospective payment amounts are made directly by Congress, most notably the determination of the "applicable standard increase."  42 U.S.C. § 1395ww(b)( 3)(A).  Other determinations, including the determination of the DSH fractions, are made by the Secretary pursuant to statutory direction.

---

[1] Persons who would be eligible for title II benefits if certain government employment were covered under title II are treated for these purposes as if they were eligible.  42 U.S.C. § 1395c.

2.    DSH Provisions

The DSH adjustment provides for increased PPS payments to hospitals that serve a "significantly disproportionate number of low-income patients." 42 U.S.C. § 1395ww(d)(5)(F)(i)(I). Congress concluded that hospitals that serve a disproportionate number of low-income patients may have greater than average expenses. The DSH adjustment does not attempt to calculate those extra expenses directly, nor does it attempt to identify all low-income individuals who are treated at a hospital. Rather, Congress intended the DSH fraction to be merely a "proxy measure for low income," H.R. REP. No. 99-241, reprinted in 1986 U.S.C.CA.N. 579, 595, that is, a rough measure of compensation for extra costs associated with serving a disproportionate number of low-income patients.[2]

Whether a hospital qualifies for the DSH adjustment and the amount of the adjustment it receives depend on the hospital's "disproportionate patient percentage." See 42 U.S.C. § 1395ww(d)(5)(F)(v). In turn, the disproportionate patient percentage is the sum of two fractions, the "Medicare and Medicaid fractions." 42 U.S.C. § 1395ww(d)(5)(F)(vi). This case involves the Medicare fraction, which is also referred to as the SSI fraction because it captures the percentage of Medicare patients who were also eligible for Supplemental Security Income ("SSI") benefits at the time of their hospital stays.

The numerator of the SSI fraction consists of:

the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of this sub-

_____

[2] For a recent discussion and analysis of the DSH program, see Medicare Prospective Payment Commission, *Hospital Inpatient and Outpatient Services,* Report to Congress, ch. 2A, at 70-87 (March 7, 2007), available at http://www.medpac.gov.

chapter and were entitled to supplemental security income benefits . . . under
subchapter XVI of this chapter . . . .

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).

The denominator of the SSI fraction consists of:

the number of such hospital's patient days for such fiscal year which were made
up of patients who (for such days) were entitled to benefits under part A of this
subchapter . . . .

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).[3]

The Supplemental Security Income program of Title XVI of the Social Security Act, 42

U.S.C. § 1381 et seq., provides a "guaranteed minimum income level" for financially needy

individuals who are aged, blind, or disabled.  Sullivan v. Zebley, 493 U.S. 521, 524 (1990); see

also 20 C.F.R. § 416.110.  In order to qualify for SSI payments, an individual must have income

and resources not in excess of statutorily specified amounts, 42 U.S.C. § 1382, and must be

"aged, blind, or disabled" as defined in 42 U.S.C. § 1382c.  The SSI program is administered by

the Social Security Administration ("SSA").

      3.       Matching SSA's Records On SSI Recipients With CMS's Hospital Claim
                Records

Calculation of the SSI fraction, then, requires some matching of records from two

different agencies' massive databases to find persons who were entitled to SSI benefits during

the same month they had a Medicare-covered stay at a hospital.  Even as early as 1986, the

necessary matching involved about 11 million Medicare hospital billing records per year, plus

---

     [3] The Medicaid fraction component of the disproportionate patient percentage, not at
issue in this case, accounts for Medicaid patients.  42 U.S.C.§ 1395ww(d)(5)(F)(vi)(II).

SSA's month-by-month records of SSI entitlement for over 5 million individuals.  51 FED. REG. 31454, 31459 (Sep. 3, 1986) (DSH final rule).

Although Congress required DSH payments for qualifying hospitals, and the statutory formula for doing so is relatively detailed, Congress left many implementation decisions to the discretion of the Secretary.  For example, while the statute refers to the number of "patient days" associated with patients who were entitled to both SSI and Medicare Part A, Congress did not describe precisely the method of determining such days.  Similarly, the statute is silent as to the level of precision that must be achieved, other than directing that the SSI fraction be expressed "as a percentage."  Furthermore, Congress provided no guidance in explaining what data should be used for this accounting or who should do the accounting.

The Secretary rejected a methodology that would have required hospitals to provide their own data for demonstrating the SSI eligibility of their Medicare inpatients, choosing instead to carry this burden for hospitals by conducting his own match of SSI eligibility data with Medicare inpatient discharge files of the thousands of subpart (d) hospitals.  *See* 51 FED. REG. at 31459.[4] The Secretary decided to determine the number of patient days in the SSI fraction numerator (i.e., patients who were entitled to both SSI and Medicare Part A), "by matching data from the Medicare Part A Tape Bill [PATBILL] file with the Social Security Administration's SSI file." 51 FED. REG. 16772, 16777 (May 6, 1986) (interim final rule with comment period).  The agency further explained that "this match will be done at least annually and will involve a match of the

---

[4] In response to a comment, HCFA stated: "Recognizing the difficulty hospitals would have identifying their Medicare patients who are also SSI recipients, we have undertaken the task (and expense) of determining for each hospital the number of patient days of those dually entitled to Medicare Part A and SSI and have removed this burden from hospitals."  51 FED. REG. at 1459.

individuals who are SSI recipients for each month during the Federal fiscal year in which the

hospital's cost reporting period begins with the Medicare Part A beneficiaries who received

inpatient hospital services during the same month." <u>Id.</u>  Also, consistent with the expectation of

the House Committee Report, the Secretary determined that DSH payments would be made on

an interim basis, subject to a final fiscal year-end settlement by the Medicare fiscal intermediary.

<u>Id.</u>  In other words, the Secretary would look in one Federal fiscal year ("FFY") to a provider's

experience during the prior FFY in order to both finally determine its DSH payments for the

earlier period, and to enable interim estimated DSH payments for the succeeding FFY.

        The Secretary specifically advised providers that the match of Medicare PATBILL files

with SSA's files for SSI recipients would be done on a Federal fiscal year basis, and not on a

hospital cost reporting period basis, even though the Medicare statute suggests the latter

approach.  <u>Id.</u>  A cost reporting period methodology would have required a monthly, rather than

a yearly, match of Medicare and SSI files.  According to the Secretary, "[a] monthly match . . .

would be administratively more cumbersome and costly and could not be accomplished in a

timely manner."  <u>Id.</u>  The Secretary determined that there should not be "significant fluctuations"

from one year to the next, and thus concluded that "the percentage for a hospital's own experi-

ence during the Federal fiscal year should be <u>reasonably close</u> to the percentage specific to the

hospital's cost reporting period."  <u>Id.</u> (emphasis added).  The agency also allowed providers to

request calculation of the SSI fraction on a cost reporting period basis, but the provider would

have to furnish its own data on its Medicare patients for its cost reporting period, and bear the

full cost of such calculation.  <u>Id.</u>

Although the Secretary received various comments on the original SSI fraction methodology, no commenter expressed concern regarding the source of data (SSA's SSI records and Medicare's PATBILL records) or the time when the data match would be performed. Other commenters did question, however, whether providers should have to bear the cost of recomputing their DSH calculations on a cost reporting basis since the statute suggested that the DSH percentages should be determined in this manner. 51 FED. REG. at 31459. In response, the Secretary stated that the administrative burden of conducting a data match on a monthly basis, rather than once prior to the beginning of each new Federal fiscal year, outweighed any slight gain in accuracy. 51 FED. REG. at 31459-60.

4.      Baystate's Substantive Claims

Baystate challenges the agency's determination of Baystate's SSI fraction for each of fiscal years 1993 through 1996 on a variety of grounds. Some of Baystate's claims raise legal questions about what types of days should be counted in either the numerator or denominator. First, Baystate contends that persons who are not eligible for SSI benefits but are by statute (42 U.S.C. § 1382h(b)) deemed SSI-eligible for purposes of the Medicaid Act should also be deemed SSI-eligible for the DSH-computing purpose of the Medicare Act. Pl. Brief at 32-34. Second, Baystate maintains that the denominator should not include days on which a beneficiary's hospital stay was "covered" by Medicare if, for some reason (i.e., a peer-review decision), the hospital did not also receive payment. Id. at 35-38.[5] Third, Baystate asserts that persons who are

-----

[5] Baystate also includes passages about Medicare secondary payer days, Pl. Brief at 39-40, but it is not clear, what, if any, disagreement there is on this point.

eligible for Part A benefits but receive benefits through a Medicare HMO should not be counted in the denominator.  Id. at 40-44.

Other Baystate claims relate to whether certain days were in fact counted by the computer programs used to match SSA and CMS records.  The first such claim relates to the computer tapes of SSI records that SSA sends to CMS six months after the close of a fiscal year for which the SSI fraction is being calculated.  Until 1996, SSA may have omitted from the computer tape records of persons who had had no active SSI claims any time in the preceding twelve months (but who might have had active claims in the first six months CMS was interested in matching).  On our view of the record, CMS found out about this misstep in early 1996, see 6 AR 2103-2114, took corrective action before calculating the SSI fraction for fiscal 1995 and fiscal 1996, but did not recalculate the SSI fraction for prior years.  Baystate contends that CMS discovered this error in the SSA records no later than 1993 (Pl. Brief at 29) and should have also corrected the SSI fractions for fiscal 1992 and 1993.

Second, where SSA needs to make a manual payment, it apparently zeroes out its automated record (to prevent automated payment that would duplicate the manual payment), creates a temporary record, and then later creates a new automated record.  Plaintiff contends that the SSA programmers did not assure that the data they sent to CMS would always reflect the actual status of SSI eligibility rather than a record zeroed out in this circumstance.

Third, for the most part Medicare eligibility is tied to eligibility for Social Security benefits and both SSA and CMS will have the same earnings record number for their eligibility rolls.  However, plaintiff contends that the programming was done in such a way that matches might have been missed for some people whose eligibility shifted from one earnings record to

another.  The program that performs that match does not appear to have been entered into the record; the original programmer is no longer with the agency and was not called as a witness; and attempts of the attorneys and a person who subsequently ran the program to talk about precisely what the program did seem confused, see, e.g.,14 AR 5383-89, so there is a possibility that some matches were missed in cases where beneficiaries' eligibility numbers changed.

Fourth, CMS used data sent over by SSA six months after the close of the fiscal year. Plaintiff contends that if CMS used later data, there is a likelihood that the lifting of SSI payment suspensions and retroactive findings of SSI eligibility or ineligibility that would be reflected in that later data would, on balance, increase the numerator.

5.    Proceedings Below

This case comes before the Court on judicial review of administrative action pursuant to 42 U.S.C. § 1395$oo$(f).  Baystate's claims were initially heard, in part sustained, and in part denied, by the Provider Reimbursement Review Board ("PRRB").  Volume 1 Administrative Record ("1 AR") 131 (PRRB Decision).  The final agency action subject to review is the Administrator's decision reversing in part (insofar as Baystate's claims had been sustained) the PRRB's decision.  1 AR 2.

The Administrator's 55-page decision addressed each of Baystate's arguments.  He found that the provisions of 42 U.S.C. § 1382h(b) deeming certain former SSI recipients still SSI-entitled for purposes of the Medicaid Act did not make them entitled to SSI within the meaning of the Medicare Act.  1 AR 49-50.  Second, he agreed with the PRRB's decision that the denominator should include days in which Medicare provided Part A hospitalization coverage to beneficiaries, not just days in which the hospital was paid for those covered days.  1 AR 35.

-11-

Third, the Administrator also agreed with the PRRB in rejecting plaintiff's claim that Medicare Part A days should be excluded from the SSI fraction if the Medicare coverage was provided through an HMO. 1 AR 35-36. Fourth, he rejected Baystate's claim and the PRRB's finding that "CMS must have complete accuracy in the counting of SSI days, allow[ing] the provider to challenge each and every day included or not included in the SSI calculation." 1 AR 27. In the Administrator's view, the PRRB "erroneously concluded that the use of the word 'number' in the DSH statute thus requires absolute precision in the [SSI] fraction when in fact the word in and of itself is not a synonym for precision." Id. The PRRB's standard, he continued, was not consistent with either "the efficient administration of the Medicare program" or "the reality of the" millions of claims every year that underlie the DSH payments. Id. While the PRRB had reasoned that performing recalculations for Baystate would not be unduly burdensome, the Administrator found that the more pertinent inquiry is the systemic burden of performing multiple recalculations for the many hospitals that have similar claims. 1 AR 55. The Administrator concluded that the agency had achieved an "acceptable rate of error" in the calculations. Id. at 27.

The Administrator's decision also specifically discounts the testimony of two of the principal witnesses presented by Baystate and relied upon by the PRRB. The Administrator found that those witnesses presented what amounts to expert testimony, 1 AR 51, despite having an agreement to receive up to 35% of any recovery, id. at 52. The Administrator found that such contingency-fee expert-witness arrangements are contrary to public policy, id. at 52-54, citing inter alia Crowe v. Bolduc, 334 F.3d 124, 132 (1st Cir. 2003), and that the existence of such an agreement should be taken into account in evaluating their testimony, id. at 52.

ARGUMENT

I.    The Secretary's Construction Of The Medicare Act Is Entitled To Deference

"When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions.  First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.  If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation.  Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  Chevron, U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984).[6]  Moreover, "the Supreme Court has made clear that courts must give heightened deference to the Secretary's interpretation of a 'complex and highly technical regulatory program' such as Medicare." Methodist Hospital v. Shalala, 38 F.3d 1225, 1229 (D.C. Cir. 1994), quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994).  In particular, agencies "enjoy a high degree of deference" under Chevron to their "ideas on the trade-off between absolute accuracy and cost (in terms of time and money)."  Cobell v. Norton, 428 F.3d 1070, 1074 (D.C. Cir. 2005).[7]

---

[6] Of course, Chevron deference does not apply to every stray comment an agency might make, but both the agency's regulations and the findings of the Administrator in adjudicatory proceedings before the agency are paradigmatic examples of the kinds of agency action that are entitled to such deference.  United States v. Mead Corp., 533 U.S. 218, 230-31 (2001).

[7] Plaintiff argues (Pl. Brief at 6, 7 & nn.3&4) that the Secretary has long been "hostile" to the concept of DSH payments.  "If Congress views HHS as 'unremittingly hostile' to dispropor-

II.    The Standard Of This Court's Review Is
       Provided By The Administrative Procedure Act

At times Baystate's brief seems to acknowledge that the relevant standard of review

under the Administrative Procedure Act (APA) is provided by the Act itself, namely, that an

agency action can be set aside only if it is arbitrary, capricious, an abuse of discretion, unsup-

ported by substantial evidence, or otherwise not in accordance with law.  Pl. Brief at 18, citing 5

U.S.C. § 706; see also 42 U.S.C. § 1395oo(f) (incorporating APA standards).

 However, at other points, Baystate tries to smuggle in a stricter standard of review,

calling the Secretary a "fiduciary" (Pl. Brief at 3, 9, 29), whose actions must be "[m]easured

against the duties and obligations of the Secretary as a fiduciary" (id. at 29).  No authority is

cited for this novel proposition.  The standards for review under the APA and the fiduciary law

of trusts can lead to different results depending on which is applicable.  Cobell v. Kempthorne,

455 F.3d 301, 307 (D.C. Cir. 2006).  Of course, as Cobell itself illustrates, there can be cases

where APA standards and fiduciary standards co-exist, with applicability depending on the

precise question.  Id.  But the imposition of a fiduciary duty on the government is necessarily

dependent "'on the substantive laws creating those obligations.'"  Cobell v. Norton, 240 F.3d

1081, 1098 (D.C. Cir. 2001) (emphasis supplied), quoting Shoshone-Bannock Tribes v. Reno, 56

F.3d 1476, 1482 (D.C. Cir. 1995).  Where Congress uses the familiar language of a trust, the

existence of a fiduciary obligation may be inferred.  Id.  In contrast to the long-established

_____

tionate share adjustments, it is free to decrease the agency's discretion in administering them or
remove them from the agency's purview entirely.  Absent such congressional intervention,
administration of the provision at issue is entrusted to HHS, and [the courts'] review is that
prescribed by Chevron."  North Broward Hosp. Dist. v. Shalala, 172 F.3d 90, 94 (D.C. Cir.),
cert. denied, 528 U.S. 1022 (1999).

fiduciary obligations of the federal government toward Indian tribes, the substantive law that controls here, the Medicare Act, imposes no fiduciary obligations on the Secretary vis-à-vis hospitals. And, while the Medicare Act does create a "Federal Hospital Insurance Trust Fund," 42 U.S.C. § 1395i, hospitals are not the beneficiaries of that trust.[8]

Baystate also attempts to shift the burden of proving its case to CMS by citing what it calls the agency's "withholding and destruction" of evidence. Pl. Brief at 21. As to "destruc-tion," Baystate points to certain files that had been retained "as late as 1997," but later were lost or discarded. Id. at 20 n.6. However, "as late as 1997," for that matter as late as 1999, Baystate had not yet raised any issue to which those records would have been relevant. See 2 AR 515 (Baystate Request for Board Hearing of March 18, 1999, identifying issues as of that date and not including any reference to the SSI fraction). The agency owed Baystate no obligation to guess what claims Baystate would make two or more years in the future and preserve documents that would turn out to be relevant to such claims.[9]

_____

[8] Instead of pointing to any substantive decision of Congress to create a fiduciary role for the Secretary or even to a trust created by Congress in favor of the hospitals, plaintiff asserts that the Secretary made himself a fiduciary when he "took it upon himself to calculate the DSH adjustment factor at issue here." Pl. Brief at 3. But, as a practical matter, there was no realistic choice except for the government to perform the calculation. Whether a person is or is not receiving SSI benefits is a matter that the Privacy Act rightly shields from direct release by SSA to hospitals. (In Count II of the Complaint, Baystate challenges that conclusion and argues that, if it treats a patient, it automatically becomes entitled to know his or her SSI status. However, the instant motions address only Count I of the Complaint. Pl. Brief at 4.) Recognition that the privacy interests of SSI beneficiaries require computation by the government does not constitute the creation by Congress of fiduciary duties.

[9] Baystate argues that the agency discarded documentation it had an obligation to keep under OMB Circular 130. Pl. Brief at 27-28 & n.18. Any such obligation, however, was not an obligation owed to Baystate. By its own terms, "[n]othing in this Circular shall be construed to confer a private right of action, on any person." OMB Circular 130 § 11, 61 FED. REG. 6428, 6435 (Feb. 20, 1996). Such circulars promulgating managerial policies within the executive

As to "withholding," while (as in most cases) not every discovery demand was meekly acceded to, the agency went to extraordinary lengths to accommodate Baystate requests. The record in this case covers 23 volumes and 8,773 pages, including several volumes of transcripts from nine days of hearings and more than 100 exhibits (albeit with some duplication of exhibits used more than once), and that does not even include documents omitted because they "contain patient identifiers" or because they were "voluminous," 1 AR 6. And those 8,733 pages do not even include the results of multiple data runs the agency produced for plaintiffs. So extensive were the demands placed by Baystate on the agency's limited programming resources that the agency found it necessary to pay an outside contractor to comply with those demands, see 5 AR 1654-58 (the agency shared with Baystate the detailed statement of the procedures the contractor used, see 2 AR 712-65, 3 AR 1169-82, 4 AR 1211-22, 1227-68). The agency produced a "run" of data for plaintiff. 2 AR 597. When plaintiff was dissatisfied, CMS produced a second run. Id. at 598. When plaintiff was still dissatisfied, CMS produced yet another run of the data. 4 AR 1278. Still later the agency produced four diskettes with electronic versions of data extracts, 7 AR 2685, and both electronic and paper copies of SSI eligibility information for Baystate patients, 7 AR 2102. The fiscal intermediary also sent Baystate diskettes of data. 5 AR 1973. In addition to data, CMS also provided plaintiff with computer code of programs used in com-

_____

branch do not create private rights of action. See AFGE v. Rumsfeld, 321 F.3d 139, 144-45 (D.C. Cir. 2003). Baystate similarly argues that a then-extant regulation, 41 C.F.R. § 201-20.303(b)(2)(i) (1995) (as well as the OMB circular) "required all Federal agencies to comply with the Federal Information Processing Standards ('FIPS')," and that the agency failed to comply with FIPS 101. Pl. Brief at 27-28 & n.16, citing FIPS 101, reprinted, 10 AR 3837, 3840. However, the cited regulation did not create a private right of action and merely defined FIPS without addressing under what circumstances their use was "required." FIPS 101 itself stated that "[i]ts use is encouraged but is not mandatory." 10 AR 3837.

puting the SSI fraction. 3 AR 1190, 4 AR 1310, 6 AR 2299-2315. And, of course, CMS

responded to numerous interrogatories, 7 AR 2465, 2510-68.[10]

To be sure, CMS did not also do hypothetical recalculations of the SSI fraction showing

how it would change if each of plaintiff's arguments were accepted. But since plaintiff makes

seven different arguments, there are 128 permutations of accepted argument/rejected argument

(even assuming that the possible resolutions of each argument are only binary) that would be

needed to measure the possible outcomes. The agency was not required to undertake the burden

of so many recalculations.

In sum, plaintiff has offered no legitimate basis for this Court to use some heightened or

ad hoc standard of review rather than the substantial evidence standard set forth in the APA.

III.    Individuals Whose Earned Income Disqualified Them From Receiving SSI
        Payments Were Properly Excluded From The Numerator Of The SSI Fraction

CMS properly excluded from the numerator of the SSI fraction those patient days

attributable to disabled Medicare beneficiaries whose income for periods of work was too high to

qualify them for SSI benefits. Patient days can be included in the numerator of the SSI fraction

only if the patient was "entitled to supplementary security income [SSI] benefits . . . under

subchapter XVI" of the Social Security Act, 42 U.S.C. §§ 1381-1385. 42 U.S.C.

§ 1395ww(d)(5)(F)(vi)(I). To be entitled to SSI benefits, an aged, blind, or disabled individual

must earn a monthly income below a certain amount. 42 U.S.C. § 1382. An individual whose

_____

[10] Atlanta Coll. of Med. & Dental Careers v. Riley, 987 F.2d 821, 830-31 (D.C. Cir.
1993), on which plaintiff heavily relies, does not shift the ultimate burden of proof to the
Secretary, 987 F.2d at 831, but merely a burden of production to produce some countervailing
evidence, a burden the Secretary sustained (assuming arguendo that the case applies at all in this
different, Medicare, context).

monthly earnings exceed the designated amount loses his eligibility.  42 U.S.C. § 1383(j).

Nothing in the Social Security Act suggests that a patient whose income level disqualifies him

for SSI benefits should nevertheless be counted as entitled to them for purposes of calculating

the SSI fraction.

Plaintiff's reliance (Pl. Brief at 33) on Section 1619(b) of the Social Security Act, 42

U.S.C. § 1382h(b), for the argument that such patients should be deemed entitled to SSI benefits

is misplaced.  Section 1619(b) provides that disabled individuals earning income that disqualifies

them for SSI cash benefits are "considered to be receiving" those benefits "for purposes of

subchapter XIX" of the Social Security Act.  42 U.S.C. § 1382h(b) (emphasis added).  That

"subchapter XIX of the Social Security Act," 42 U.S.C. §§ 1396-1396v, deals exclusively with

Medicaid, not supplemental security income, which is dealt with in subchapter XVI, and not

Medicare, which is dealt with in chapter XVIII.

That Section 1619(b) deemed entitlement is "for purposes of" Medicaid only is clear not

only from the statutory text, but also from its evident purpose.  Ordinarily, an individual

receiving SSI payments qualifies for Medicaid assistance.  42 U.S.C. § 1396a(10)(A)(i)(II).

Thus, section 1619(b) is intended to encourage individuals receiving SSI and Medicaid to

become employed with the assurance that, even if their income exceeds the SSI threshold and

they lose their SSI eligibility, they will not also lose their Medicaid assistance.  See, e.g., S. REP.

96-408 at 45-46, 1980 U.S.C.C.A.N. 1277, 1323 (bill addressed concern that SSI recipients with

increased earnings may face loss of Medicaid since eligibility for Medicaid is generally tied to

eligibility for SSI benefits); H. CONF. REP. 96-944 at 50, 1980 U.S.C.C.A.N. 1392, 1398 (same).

However, while these individuals are considered to be SSI recipients for Medicaid purposes, it is

-18-

clear they are <u>not actually</u> entitled to SSI benefits. <u>See</u> <u>id.</u> at 49 ("When a disabled SSI recipient's earnings rise to the point that <u>he no longer qualifies</u> for federal SSI benefits, . . . he would nevertheless continue to retain eligibility for Medicaid . . . <u>as though</u> he were an SSI recipient . . . .") (emphasis added).

The regulations reinforce the conclusion that the special SSI eligibility status established in Section 1619(b) applies only for purposes of ensuring Medicaid coverage. Specifically, the regulations state that "[t]he special eligibility status [described in Section 1619(b)] applies for the purposes of establishing or maintaining your eligibility for <u>Medicaid</u>." 20 C.F.R. § 416.264 (emphasis added). The regulations further provide that "[f]or these purposes we continue to consider you to be a blind or disabled individual receiving benefits even though you are in fact no longer receiving regular SSI benefits or special cash benefits." <u>Id.</u> (emphasis added). Moreover, this special eligibility status exclusively for purposes of Medicaid coverage can be conferred only when certain additional criteria have been met, and the determination that an individual meets these criteria is reevaluated every 12 months. 42 U.S.C. §§ 1382(h)(b)(1)-(3); 20 C.F.R. §§ 416.267-416.269.

Plaintiff argues that the special eligibility status conferred in Section 1619(b), 42 U.S.C. § 1382h(b), is a "non-cash" SSI benefit by which individuals otherwise ineligible for SSI cash benefits should nevertheless be deemed "entitled to [SSI] benefits" and therefore included in the numerator of the SSI fraction. Pl. Brief at 33-34. However, this does not follow. First, the only form of SSI benefit under the Social Security Act is monetary. 42 U.S.C. § 1381a ("Every aged, blind, or disabled individual who is determined . . . to be eligible on the basis of his income . . . shall . . . be <u>paid</u> benefits by the Commissioner of Social Security.") (emphasis added). Thus,

-19-

special eligibility status cannot properly be considered an SSI benefit for purposes of calculating the numerator of the SSI fraction pursuant to 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). Second, to the extent the statute is ambiguous on this point, the agency's decision not to include such patient days is permissible. Again, Congress intended the DSH fraction to be a proxy for low-income patients. It is not unreasonable for the agency to conclude that individuals whose income too high to qualify them for SSI benefits do not fit that description.

Moreover, the plain language of the regulation does not suggest that special SSI eligibility status is any form of SSI "benefit." See Pl. Brief at 34. The regulation states in relevant part: "Special SSI eligibility status also applies for purposes of reacquiring status as eligible for regular SSI benefits or special SSI cash benefits." 20 C.F.R. § 416.264. Obviously, eligibility for SSI benefits cannot be "reacquired" unless it has been lost, and this provision simply indicates that the special SSI eligibility status will facilitate the reacquisition of eligibility which was lost. Thus, for a disabled individual who lost his SSI eligibility due to increased earnings but later stopped working again, the regulations provide that the "special" SSI eligibility status he acquired by virtue of his previous eligibility will allow him to "reacquire" eligibility for SSI benefits without the burden of reapplying (provided he still otherwise meets the medical and other non-income-related eligibility requirements of the SSI program, see 42 U.S.C. §§ 1382, 1382h(a)). The regulation thereby facilitates the reestablishment of eligibility for SSI benefits by avoiding the most time-consuming aspect of that process, i.e., proving disability pursuant to 42 U.S.C. § 1382c. See 59 FED. REG. 41400 (Aug. 12, 1994) ("Work incentive provisions in the SSI program generally enable . . . disabled individuals to return to work or increase their level of work activity without losing SSI disability . . . status."); see id.

-20-

(noting that "[t]ransitions between the various statuses [resulting from intermittent periods of income earning] were complicated" and the complexity deterred people from working and risking the loss of SSI eligibility); see also S. REP. 96-408 at 4 (observing that prior to the creation of the special SSI eligibility status, an individual who lost his eligibility because of earned income but became unable to work would have to "reapply for benefits and go through the adjudication process again").

IV.    Defendant Properly Included "Covered" Days In The SSI Denominator
       And Excluded Exhausted And Secondary Payer Days As Not "Covered"

Plaintiff argues that the denominator of the SSI fraction should include only days for which the hospital was "paid" by the Medicare program and not days which are "covered or utilized," but for which the hospital may not have received payment.  Pl. Brief at 38.  Plaintiff further contends that even if covered or utilized days are the standard, Part A exhausted benefit days and Medicare secondary payer days are not covered or utilized and therefore should not be counted in the SSI denominator.  Pl. Brief at 39-40.

There is no basis for the argument that only days for which a hospital was paid should be included.  Plaintiff's argument confuses the question of whether a patient is entitled to benefits under Medicare part A with the conceptually distinct question of whether the provider is paid for the services it provides.  The statute speaks solely in terms of entitlement of the beneficiary, not payment to the provider.  In fact, the DSH statute does not mention payment to the provider at all.  Instead, the denominator of the SSI fraction consists of the number of hospital patient days "which were made up of patients who (for such days) were entitled to benefits under [Medicare] Part A."  42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).  This language indicates that Medicare entitlement

-21-

to benefits for particular days is the operative factor for inclusion in the denominator rather than actual payment to a provider.[11]

Payment to providers is conditional, and nothing in the Medicare statute suggests that a provider's failure to qualify for payment jeopardizes a beneficiary's entitlement to benefits.  The statute states that "payment for services furnished an individual may be made [to providers] . . . only if," inter alia, a written request is timely filed, 42 U.S.C. § 1395f(a)(1), and the services are medically necessary, id. § 1395f(a)(3).  However, the provider's failure to submit a timely claim for Medicare reimbursement or its rendering of services that are not medically necessary (and that therefore cannot be reimbursed by Medicare) does not affect the entitlement of the patient or the requirement that the days in question be included in the denominator of the SSI fraction.

In accordance with the statute, the regulations in effect during the period at issue required inclusion of "covered" or "furnished" days in the SSI fraction.  They state that a hospital's disproportionate patient percentage is based on "the number of covered patient days that . . . [a]re furnished to patients who during that month were entitled to both Medicare Part A and SSI . . . ."  42 C.F.R. § 412.106 (1993-1996).  Plaintiff's claim that in adopting the regulation the Secretary

---

[11] Plaintiff's assertion that during the years at issue, the SSI fraction included only Medicare days "paid" to the provider, Pl. Brief at 36, is entirely unsupported.  Plaintiff cites to paragraphs 218-219 of its Statement of Material Facts, which in turn cite to a discussion in the PRRB decision of the procedural background of the case, 1 AR 134; a letter from CMS counsel describing the MedPAR data used in calculating the SSI fraction as containing information "with respect to each covered individual," including the "number of covered Medicare days for such stay" (19 AR 6913) (emphasis added); letters from Baystate's counsel to the PRRB requesting the issuance of subpoenas (id. at 7239-54); and the PRRB's subpoenas for information related to the disproportionate share calculation (16 AR 5845-59).  The letter from CMS counsel supports the contrary view that CMS counted "covered" days in the SSI fraction.  The remaining documents not only fail to support plaintiff's assertion but also are irrelevant to the issue.

stated that the SSI fraction includes, in plaintiff's words, "only Medicare paid days," Pl. Brief at

37, citing 51 FED. REG. 31454, 31460-61 (Sept. 3, 1986), is wrong.  In fact, the Secretary

indicated that the Medicare fraction would count Medicare "covered" days:

> [O]ur interpretation that the Medicaid portion of the definition of the dispropor-
> tionate share percentage under section 1886(d)(5)(F)(vi)(II) of the Act refers only
> to Medicaid covered days is consistent with our interpretation of the Medicare
> portion under section 1886(d)(F)(vi)(I) of the Act, (which uses similar language)
> to refer only to Medicare covered days.  In the preamble to the interim final rule,
> we indicated that we would count "covered" Medicare days in determining the
> Medicare [SSI] portion of a hospital's disproportionate patient percentage.

51 FED. REG. at 31,460-61.[12]

Contrary to plaintiff's contention, Pl. Brief at 37, this interpretation of the statute as

requiring the inclusion of covered days in the SSI fraction is consistent with the rulings in Jewish

Hospital v. Secretary, 19 F.3d 270 (6th Cir. 1996), and Legacy Emanuel Hospital v. Shalala, 97

F.3d 1261 (9th Cir. 1996).  Those courts drew a distinction between a patient who is "eligible"

for Medicaid benefits, i.e., "capable of receiving federal medical assistance" (but not necessarily

the actual payment of benefits), Jewish Hospital, 19 F.3d at 274, and one who is "entitled" to

Medicare benefits, i.e., possessing "the absolute right to receive an independent and readily de-

fined payment," id. at 275.  See Legacy Emanuel, 97 F.3d at 1264.  However, payment to the

provider by CMS is not a prerequisite to the beneficiary's entitlement that his bill be covered,

and neither court held that it is.  Therefore, the Secretary's inclusion in the SSI fraction of days

for which the patient is entitled to benefits, i.e., "covered," under the Medicare program, but for

---

[12] Plaintiff similarly mischaracterizes the Secretary as stating in 51 FED. REG. 16772, 16777 (May 6, 1986), that the SSI fraction would "include only Medicare-paid days." Complaint ¶ 293(c).  In fact, the Secretary stated that "the covered Medicare Part A inpatient days of hospitalization in that month will be counted for the purpose of determining the hospital's disproportionate patient percentage."  51 FED. REG. at 16777 (emphasis added).

which the provider may have failed to qualify for payment, is consistent with the statutory

language, the operative regulations, and existing case law.[13]

Finally, plaintiff argues that exhausted benefit days are not "covered or utilized" days and

therefore should not be counted in the denominator of the SSI fraction. Pl. Brief at 39-40. In

fact, however, the Secretary did not include such days in the SSI fraction during the period in

question. See id. at 39. The Medicare program covers only 90 inpatient days per "spell of ill-

ness," plus 60 "lifetime reserve days," 42 U.S.C. § 1395d(a)(1); 42 C.F.R. § 409.61(a). There-

fore, an individual is entitled "to have payment made on his behalf" for up to 150 days of ser-

vices. 42 U.S.C. § 1395d(a). Services furnished during days in excess of this number are "not

covered." 42 U.S.C. § 1395d(b).[14]

---

[13] Contrary to plaintiff's allegation, Pl. Brief at 38 n.29, the inclusion of covered days is not inconsistent with the 1995 testimony of Anne Rudolph in a different case. See 3 AR 880 (Rudolph did not then know whether covered but unpaid days were included). Statements in the Secretary's prior briefs to the effect that the Medicare fraction counts only those patient days that "are actually paid by the Medicare program," Pl. Brief at 38, are, at most, ambiguous, and can be read consistently with the patient- rather than provider-centric view of whether a stay is covered.

[14] Similarly, where Medicare is a "secondary" payer and another payer (liability insur-ance, e.g.) has paid for all or part of a hospital bill, the extent to which a day is counted turns on the extent to which Medicare was called to make payments. Plaintiff chides the Administrator for agreeing with the PRRB on this point, Pl. Brief at 34-36, but it is no more clear from plain-tiff's current brief than it was to the PRRB (see 1 AR 168-69) that Baystate actually disagrees with what the agency does, or, if it does disagree, what exactly or even approximately Baystate thinks is wrong with the agency's practice of counting days as covered on a pro rated basis. See also 14 AR 5271-72 (statement of Baystate witness that based on then-recent interrogatory answers secondary payer days do not appear to be issue of disagreement).

V.    HMO Patients Entitled To Part A Medicare Benefits Were
Properly Included In The Denominator Of The SSI Fraction

Plaintiff argues that the denominator of the SSI fraction should not have included patient

stays paid for by a Medicare-contracting HMO.  Pl. Brief at 40.  (Of course, if the days are

properly included in the denominator, they are also properly included in the numerator if the

patients are SSI recipients.)  Plaintiff's argument is unsupported by the statute, which provides

that the denominator of the SSI fraction shall consist of "the number  of such hospital's patient

days for such fiscal year which were made up of patients who (for such days) were entitled to

benefits under part A of [the Medicare statute (42 U.S.C. subchapter XVIII, and Title VIII of the

Social Security Act)]."  42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).

Patients who have their hospital stay paid for under a Medicare HMO contract were

"entitled to benefits under Part A" of the Medicare statute.  During the years at issue in this case,

both the HMOs' obligation to cover services for individual patients and the HMOs' entitlement

to a Medicare payment under their contracts with CMS were defined in terms of individuals

"entitled to benefits under Part A."  A beneficiary could enroll for Medicare benefits through a

Medicare-contracting HMO only if the individual was "entitled to benefits under Part A and

enrolled under Part B, or enrolled under Part B only . . ."  42 U.S.C. § 1395mm(d).  For patients

who were enrolled only in Medicare Part B, Medicare HMOs were <u>only</u> required to cover Part B,

<u>i.e.</u>, <u>non-hospital</u>, services.  42 U.S.C. § 1395mm(c)(2)(A)(ii).  In the case of "those members

entitled to benefits under Part A and enrolled in Part B," Medicare-contracting HMOs were

required to pay for all "services covered under Parts A and B," including Medicare-covered

inpatient hospital services under Part A.  42 U.S.C. § 1395mm(c)(2)(A)(i).  Similarly, regarding

CMS's payments to HMOs for individuals enrolled in HMO plans, the statute expressly provided

for a Medicare payment to the HMOs to cover inpatient hospital services for individuals "who are entitled to benefits under Part A [of the Medicare statute]," 42 U.S.C. §§ 1395j-1395w-4. 42 U.S.C. § 1395mm(a)(1)(A)(i). Thus, contrary to plaintiff's claim, HMO patients who received hospital services were "entitled to Medicare Part A benefits," and it was certainly permissible to include their stays in the denominator of the SSI fraction (and the numerator as well if they were SSI recipients).

Plaintiff contends that CMS's policy of including Medicare HMO days in the SSI fraction is inconsistent with Medicare HMO days not being counted, during the years at issue here, in the calculation of the Medicare patient load for graduate medical education ("GME") purposes. Pl. Brief at 42. However, these policies are consistent, because Congress directed different results in these two situations through different statutory language. CMS did not count HMO days for purposes of GME payments because, unlike the statute governing the calculation of DSH payments, the GME statute excludes HMO days from the formula for calculating those payments.[15]

The amount CMS pays for direct GME costs is the product of a certain approved amount times the hospital's "medicare patient load." 42 U.S.C. § 1395ww(h)(3)(A); 42 C.F.R. § 413.76. The "medicare patient load" is defined as days attributable to patients "with respect to whom payment may be made under Part A" of the Medicare statute for the hospital stay. 42 U.S.C.

_____

[15] The prospective payment system under subsection 1886(d) of the Social Security Act, 42 U.S.C. § 1395ww(d), applies to the operating costs of inpatient hospital services. However, Congress excluded the "costs of approved educational activities" from the definition of "operating costs of inpatient hospital services." 42 U.S.C. § 1395ww(a)(4), (d)(1)(A). Thus, subsection (d) does not address the direct costs of medical educational activities; instead, these costs are paid under a separate mechanism set forth in subsection (h), 42 U.S.C. § 1395ww(h). Cf. 42 U.S.C. § 1395ww(d)(5)(B) (PPS add-on payment for indirect medical education costs).

§ 1395ww(h)(3)(C).  HMO patients do not fall into this category, because during the period at issue here, no Medicare payment was made, under Part A or otherwise, for a hospital stay by a Medicare beneficiary enrolled in an HMO.  Indeed, Medicare was expressly precluded from making any payments to a hospital for services furnished to HMO enrollees.  42 U.S.C. § 1395mm(a)(6).  Instead, the private HMO was obligated to make payment for Medicare-covered hospital stays by such individuals.[16]  42 U.S.C. § 1395mm(c)(2)(A)(i).

In contrast, payments under Part A (which would entitle a patient to be counted in the GME formula) are made on the patient's behalf directly to hospitals or similar health care providers.  42 U.S.C. §§ 1395d, 1395g; see Regions Hosp. v. Shalala, 522 U.S. 448, 452 (1998) (costs of GME programs are allowable costs "for which a hospital (a provider) may receive reimbursement") (emphasis added); Administrators of the Tulane Educ. Fund v. Shalala, 987 F.2d 790, 792 (D.C. Cir. 1993) ("Health care providers that participate in the Medicare program are eligible to be reimbursed" for GME costs).  Because there were no payments made under Part A with respect to HMO enrollees, CMS properly did not count them as part of the "medicare patient load" which factors into the amount paid to hospitals for GME costs.  42 U.S.C. § 1395ww(h)(1), (h)(3).

That HMO patients were not intended by Congress to be counted when calculating GME payments between 1993 and 1996 was confirmed by the fact that Congress enacted subsequent legislation that did require them to be counted.  Palmore v. United States, 411 U.S. 389, 395

---

[16] The HMO, in turn, was entitled to Medicare payment, but that payment represented the actuarial value of all Medicare-covered services, drawing from both Part A and Part B trust funds, in a fixed amount, without regard to whether specific services, including hospital services, were furnished to the beneficiary.  42 U.S.C. § 1395mm(a)(1)(D), (a)(6).

(1973) ("We are entitled to assume that in amending [a statute], Congress legislated with care.");
see also Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253 (1992) ("[C]ourts should disfavor
interpretations of statutes that render language superfluous").  The new provision required that,
beginning in 1998, CMS pay an additional amount to hospitals "for services furnished to indivi-
duals who are enrolled under a risk-sharing contract with an eligible organization under [42
U.S.C. §] 1395mm [ i.e., an HMO] and who are entitled to part A [Medicare benefits]."  42
U.S.C. § 1395ww(h)(3)(D)(i).  The GME payment under this new statutory provision equals a
certain approved amount multiplied by the number of days attributable to HMO enrollees.  Id.;
42 C.F.R. § 413.76(c).  Thus, the new formula parallels the earlier formula for GME payments
based on the "medicare patient load," but it specifically provides that the number of patient days
attributable to HMO enrollees will henceforth be factored into the calculation of GME payments.
42 U.S.C. § 1395ww(h)(3)(D)(i).  In any event, if Baystate were actually right that GME calcula-
tions and DSH calculations must follow the same rules for using or not using HMO days not-
withstanding the differences in statutory language and purpose, the fact that Congress stepped in
to change the GME rules to require HMO days to be counted would undermine Baystate's
argument that HMO days should not be counted.

     Plaintiff also argues that HMO days should not be included in the denominator of the SSI
fraction because, at the time at issue here, CMS allegedly rarely counted them in its MedPAR
file.  Pl. Brief at 44.  However, since 1987, the MedPAR file has contained a field that counts
HMO days.  55 FED. REG. 35994 (Sept. 4, 1990) ("[A]s of December 1, 1987, a field was
included on the Medicare Provider Analysis and Review (MedPAR) file that allows us to isolate

those HMO days that are associated with Medicare patients.  Therefore, since that time, we have been including HMO days in the SSI/Medicare percentage.").[17]

VI.    Baystate Did Not Demonstrate That Any Errors Of
Computer Programming Led To Understatement Of
Its SSI Fraction By An Unacceptably Large Percentage

**1.**  Baystate argues that because of the way the computers at SSA and CMS were pro-grammed, one can hypothesize circumstances in which some matches of SSI recipients and Medicare inpatients might have been missed.  The Administrator found that the effect of any such errors was moderate enough that the burden and disruption associated with retroactive calculation was simply not required.  1 AR 19-20, 40, 42, 44, 47-48, 54-55.

The Administrator's decision that the Medicare Act does not require a perfect standard of an "errorless match," 1 AR 41, is a construction of the Act entitled to Chevron deference.  See Cobell v. Norton, 428 F.3d 1070, 1074 (D.C. Cir. 2005) (agencies "enjoy a high degree of

---

[17] To the extent that Baystate is contending that, even if HMO days in theory should have been included in the MedPAR, in practice they were seldom included, Pl. Brief at 33-34, it is seeking in effect to take advantage of the hospitals' own failures to report the data.  It was the responsibility of the hospitals to report HMO utilization by Medicare beneficiaries so that utilization could be included in the MedPAR file.  CMS had directed hospitals to include services provided to HMO enrollees in the inpatient bills they submitted to intermediaries even though the HMO had responsibility for payment.  See Transmittal 534, "Medicare Hospital Manual" (March 1988) ("Section 450, Submitting Inpatient Bills in No-Payment Situations. – This has been updated to include services provided to HMO enrollees for which the HMO has jurisdiction for payment."); Transmittal 542, "Medicare Hospital Manual" (May 1988) ("Section 450, Submitting Inpatient Bills in No-Payment Situations. – This is further clarification of the part of this manual section concerning HMO enrollees.  The effective date has also been changed to August 1, 1988.").  A June 1989 Medicare Newsletter from Mutual of Omaha recognized this change, stating that "[e]ffective August 1, 1988, Section 450 of the Medicare Hospital Manual was amended to require hospitals to submit HMO-paid bills as no-pay bills to the intermediary." Mutual of Omaha "Medicare Newsletter," Hosp 89-5 (June 1989); see also Mutual of Omaha "Medicare Newsletter," Hosp 88-22 (Nov. 1988) ("We are still required to process no pay bills.  This information is used to update utilization records . . . .  You are required to send us no pay bills for admissions paid by the HMO").

deference" under <u>Chevron</u> to their "ideas on the trade-off between absolute accuracy and cost (in terms of time and money)"); <u>see also</u> <u>Methodist Hospital v. Shalala</u>, 38 F.3d 1225 (D.C. Cir. 1994) (sustaining Secretary's decision not to make retroactive corrections of concededly erroneous data that had been used in determining hospital reimbursement rates prospectively); <u>Mt. Diablo Hospital v. Shalala</u>, 3 F.3d 1226, 1233 (9th Cir. 1993) (Secretary's choice of "one imperfect database over another while seeking to develop data superior to either" was rational). And, of course, the mere "availability of appeal does not necessarily imply the availability of retroactive remedies." <u>Methodist Hospital v. Shalala</u>, 38 F.3d 1225, 1230 (D.C. Cir. 1994).

Baystate argues that since the SSI fraction is a "'number'" and "not an estimate" (Pl. Brief at 23), <u>any</u> departure, no matter how small, from perfect accuracy in calculating that number is intolerable and must be corrected by retroactive recalculations, even many years after the fact. The Administrator's decision rightly rejected the extreme notion that every error of calculation automatically requires a retroactive recalculation. 1 AR 24-28, 54-55.

While the Medicare Act indeed does refer to the number of "patient days" associated with patients who were entitled to both SSI and Medicare Part A, Congress did not describe precisely the method or manner by which to account for these days. Similarly, the Act is silent as to the level of precision which this accounting must achieve (other than directing that the ratio be expressed "as a percentage" in order to compare it to the various thresholds percentages – such as 15% – set forth in the statute). Furthermore, Congress provided no guidance in explaining what data should be used for this accounting or who should do the accounting.

Baystate's notion that absolute accuracy is required is especially misplaced in this context. The justification for DSH payments is that hospitals that serve a disproportionately

large share of low-income patients will have higher costs than are accounted for by standardized Medicare payments. Yet the DSH fraction does not even purport to measure directly the extra costs, if any, that Baystate or other hospitals actually incur.[18] Rather, Congress assumed that the percentage of low-income patients would bear some relationship to those costs. But it did not ask the Secretary to measure that proxy either. Rather, the statutory calculation is in turn a mere "proxy measure for low-income." H.R. REP. NO. 99-241, reprinted in 1986 U.S.C.C.A.N. 579, 594; S. REP. NO. 99-146, reprinted in 1986 U.S.C.C.A.N. 42, 258. There is little reason to suppose that Congress required absolute accuracy in computing a figure it recognized was already merely an approximation of an approximation of any extra underlying costs that justify the payments.

Moreover, although the PRRB had reasoned that performing recalculations for Baystate would not be unduly burdensome, the Administrator reasonably found that the more pertinent inquiry is the systemic burden of performing multiple recalculations for the many hospitals that have similar claims. 1 AR 55. In addition, the Secretary had already stated in issuing the final rule and in responding to comments on the interim final rule that routine, across-the-board recalculation of a hospital's SSI patient load on a monthly basis in order to derive the percentage of Medicare patients receiving SSI in every individual hospital's cost year would be unduly burdensome, particularly since it would not yield a significant difference in result from

---

[18] The Medicare Prospective Payment Commission (a legislative commission appointed by the Comptroller General rather than the President) recently advised Congress that DSH payments substantially exceed extra costs of serving low income patients. Medicare Prospective Payment Commission, *Hospital Inpatient and Outpatient Services,* Report to Congress, ch. 2A, at 70-87 (March 7, 2007), available at http://www.medpac.gov.

calculations based on a uniform federal fiscal year.  51 FED. REG. 16772, 16777 (May 6, 1986); 51 FED. REG. 31454, 31459 (Sep. 3, 1986).

Thus, with respect to the computer errors alleged by Baystate, the question is not whether the agency achieved perfection.  Rather the question is whether, given the "high degree of deference" to which the agency is entitled with respect to its "ideas on the trade-off between absolute accuracy and cost (in terms of time and money)," Cobell, 428 F.3d at 1074, the Administrator rationally concluded that the errors were not so significant that the costs and disruption of retroactive correction are required.

**2.**  One error alleged by Baystate was SSA's failure to look at  "stale" records in compiling the data on SSI-eligibility sent by SSA to CMS.  SSA uses its files on SSI eligibility for numerous purposes.  Understandably, for some purposes SSA need not look at inactive cases and the programs will run faster if inactive cases are periodically removed from the files, so SSA keeps both a set of full data that includes inactive cases and a leaner data set limited to active or recently active cases.  Until February 1996, SSA was sending to CMS data on SSI eligibility derived from the leaner set of data.  6 AR 2103-2114.  When CMS learned of this, it promptly asked SSA to send data on SSI eligibility derived from the full data set and CMS used those data to calculate the fractions for 1995 and later years.  6 AR 2103.  Plaintiff contends (Pl. Brief at 29) that CMS learned of the issue no later than 1993 and should also have corrected earlier years, but as we explain in more detail below (Argument, Part VII.2), substantial evidence supports the Administrator's finding that CMS did not learn of the problem until 1996, 6 AR 2103-2114.  Although the error sounds like it would have had a large effect, the Administrator found that it would have had only a relatively small effect on the number of matches.  1 AR 7-8, 44-48.  For

its internal housekeeping purposes, SSA could have removed cases from the leaner data set as soon as a year after they had become inactive, so that, in a <u>worst</u>-case scenario, if the removal occurred right before the tapes were sent to CMS six months after a given year's close, some data from the first six months of the year would have been missing.  But SSA did not in practice always delete inactive records the instant a year had passed, especially as increases in computer capacity made that housekeeping task less pressing.  13 AR 5106 (testimony of Baystate witness and former SSA employee).  And, while the measured nationwide average rate of the SSI fraction did go up from 1994 to 1995, which is consistent with a hypothesis that the change to using the fuller data set beginning in 1995 increased the matches, the trend of that rate was upward throughout most of the decade and the measured 1994-1995 increase was actually smaller than the measured 1993-1994 increase.  13 AR 4885, 4889, 4893, 4887, 4901, 4905, 4909, 4913.  Although it is impossible to be sure what the exact impact of this error was (SSA records available now will include information updated after the 1993 and 1994 years in question), the Administrator rationally concluded that in 1993, the average hospital "would have had about four stale records omitted from its calculation, some more, some less, some zero," and that the effects were even less (about three records per hospital) for 1994.  1 AR 47.

**3.**  Baystate contends that a second problem was that SSA reported to CMS that some individuals were not on SSI for a given month when in fact they were.  The situation could have arisen, Baystate argued, where an SSA field office needed to make a manual payment to a recipient and therefore needed to temporarily "fool" the automated system into not making what would be a duplicate payment.  In some such instances, Baystate argues, the program SSA designed to report SSI-eligibility status to CMS was also fooled into reporting non-eligibility.

13 AR 5110-11, 14 AR 5164-65 (testimony of Baystate witness and former SSA employee Alan Shafer). However, as the Administrator explained (1 AR 42), out of a sample of over 600 cases, Baystate pointed to only one instance where this seems to have occurred, even though, as the Administrator also explained (1 AR 38, 42), the sample was not random and was chosen from a population disproportionately likely to show the errors Baystate was hunting for. See 14 AR 5278 (Baystate witness statement that in choosing which records to request from SSA "we would have picked those records . . . where we thought there was an indication of SSI, and then filled that in with, I think, just some other ones").

**4.** Baystate also argues that the way CMS programmed its computer to match individuals listed in CMS files with individuals listed in SSA files might have missed some matches. CMS assigns beneficiaries a Health Insurance Claim Account Number ("HICAN"), which consists of the Social Security number (or railroad retirement account number) of the person whose earnings record generated Medicare entitlement and a suffix indicating the relationship between the bene-ficiary and that wage earner (e.g., self, spouse, widower), and those Medicare HICANs are re-flected in the hospitalization records CMS was trying to match with the SSI records. 14 AR 5388.[19] For persons entitled to benefits under title II of the Social Security Act, the SSA records sent to CMS contained a "title II" number, which is similarly the SSN of the relevant wage earner plus a suffix indicating the individual's relationship to the wage earner. 1 AR 141, 13 AR 5063, 5100. Since eligibility under title II is what generally triggers Medicare eligibility, 42

---

[19] The CMS claims records used in this match do not include the beneficiary's Social Security Number (although, of course, if eligibility is based on the beneficiary's own earnings record, the numeric portion of the HICAN will be the beneficiary's SSN). A different CMS database not used in these matches, the Enrollment Data Base, does contain SSNs. 2 AR 598.

U.S.C. § 1395c, the numerical portion of that number-plus-suffix will generally be the same as the numerical portion of the HICAN. 13 AR 5101. However, SSA's transmittal to CMS sent over only the earliest of the title II numbers found in SSA records during the preceding 42-month period, 13 AR 5063, so that if an individual's title II eligibility status or HICAN <u>changed</u> from one earnings record to another and the admission in question was under the later HICAN, some records could have been missed, 13 AR 5122.[20] The degree to which beneficiaries changing HICANs may have caused the numerator to be understated is uncertain. The Administrator found that, out of a non-random sample of over 600 cases likely to overstate any errors, Baystate pointed to one instance where this situation appears to have occurred. 1 AR 43.

   **5.** Finally, Baystate contends that CMS should have waited for later data from SSA before computing the fraction. CMS used SSA data that were current as of six months after the fiscal year for which CMS was computing the fraction, and plaintiff contends that had the agency waited for later data, additional beneficiaries would have been shown as entitled to benefits in SSA's records either because a suspension of benefits was removed[21] or because SSA retro

----

   [20] The records sent by SSA to CMS included each beneficiary's own Social Security number in addition to any title II number (which would not have been included on all records, since not all SSI recipients are eligible for title II benefits). The extent to which CMS, in addition to attempting to match the HICANs with the title II numbers, also attempted to match the numeric portion of the HICANs with the SSNs sent by SSA is unclear on the record. The computer program itself was not entered into the record (plaintiff's counsel argued that CMS programs were written in COBOL and would have required an "outside expert" to "decipher," 4 AR 1400-02), and the attempts of the parties' attorneys and an agency programmer to communicate about what the program did or did not do to match SSNs with HICANs seem confused or (Baystate's less charitable characterization, Pl. Brief at 27 n.15) contradictory. If resolution of this factual point were necessary to a decision, a remand would be required in light of the uncertainty of the record.

   [21] The typical reason why SSI benefits may be suspended is that the recipient is incompetent and SSA has not yet been able to find a suitable representative payee to receive payments

actively found someone eligible for SSI benefits.[22]  Baystate had a witness who used to work at

SSA testify that the SSI program is now "basically a disability program," that in many cases a

claimant is found disabled only after lengthy appeals, and that the eligibility of such persons will

only be reflected in the SSA records at some later time.  13 AR 5119-21.  However, as the

Administrator pointed out (1 AR 6, 41), for such individuals to be properly counted in the

numerator, they would have to have been eligible for both Medicare and SSI, and a person found

disabled by SSA will not have become entitled to Medicare as a result of that finding until 24

months after his disability entitlement begins.  42 U.S.C. § 1395c.[23]  Thus, while waiting for

further data to trickle into the SSA files to reflect SSA decisions on ongoing disability appeals

might allow listing of more individuals who will have been entitled to SSI, it is unlikely to find

more who were entitled to both SSI and Medicare at the same time, and it would delay the ability

of CMS to provide intermediaries and hospitals with the calculation of the SSI fraction they need

to make interim payments and to finalize payments.  Again, of the 627 patients non-randomly

sampled by the hospital, the Administrator found that only one additional match (a case where

benefits had been suspended) would have been added by using later data from SSA.  1 AR 40;

---

on his behalf.  13 AR 5114-15.  See 42 U.S.C. § 1383(a)(2)(B)(viii).

[22] Of course, as the Administrator pointed out, 1 AR 40, if some individuals lost SSI eligibility retroactively, that would also be reflected in later tapes and in that instance using the later data could lower Baystate's fraction.  See also 13 AR 5121 (Baystate witness noting that "there's some retroactive denials that would have some offsetting effect").

[23] The Medicare eligibility standard requires that a person under 65 have been receiving disability benefits for two years under title II, rather than under SSI.  The standards SSA uses to determine disability for SSI and title II purposes are essentially the same, see Sullivan v. Zebley, 493 U.S. 521 (1990), and, where an individual meets the non-disability provisions of both titles, disability is usually determined simultaneously for purposes of both titles, see, e.g., Bowen v. Yuckert, 482 U.S. 137 (1987).

see also 14 AR 5170 (Baystate witness acknowledges that "I don't believe I saw any cases that were retroactive SSI awards").[24]

The Medicare Act does not specifically address whether, or how long, the Secretary must delay determination of the DSH fraction waiting on retroactive changes in SSI entitlement. Just as the Secretary need not "make virtually continuous adjustments in the wage index to incorporate changing regional wage levels," but may instead use "reasonable approximations," Methodist Hospital, 38 F.3d at 1230, the Secretary is not required to hold open indefinitely the determination of the DSH fraction waiting for further SSA data. The agency already waits six months after the close of the fiscal year to gather the SSI data to match. Nothing in the statute specifies that seven months, or ten months, or eighteen months is required instead.

Accordingly, the Administrator correctly found that CMS is not required to postpone its calculation of the DSH fraction for any given year indefinitely in order to wait for possible changes in the SSI-entitlement data.

VII.    Baystate's Contentions That Agency Employees Repeatedly
        Lied About The DSH Calculations Are Without Merit

Baystate attempts to bolster its legal arguments with repeated statements or insinuations that agency employees tasked with making the complex DSH calculations are liars. If there is anything "slapdash" (Pl. Brief at 4) about this case, it is the way Baystate repeatedly slaps together snippets of testimony (or Baystate's mere characterization of testimony) and then dashes off a smug conclusion that an agency employee lied.

---

[24] The Administrator found that, in Baystate's non-random sample of 627 individuals, the total number of individuals that Baystate claimed were eligible for SSI but were not shown as such in the CMS calculation was ten (1.59% of 627), 1 AR 38, including some individuals for whom the reason for omission was not identifiable by Baystate's witness, see 13 AR 5136-38.

-37-

1.  The most serious accusation is the repeated assertion (Pl. Brief at 11-12, 15, 20 n.6) that Robyn Thomas submitted a declaration to this Court "under penalty of perjury" (Pl. Brief at 11), a "sworn statement" that was "later proven to be false," Pl. Brief at 20 n.6.  The allegedly "false" "under penalty of perjury" "sworn statement" is set out in full at 2 AR 596-600.  Plaintiff argues that Ms. Thomas stated that "the data files the agency used to calculate the Hospital's SSI fraction for 1995 *did not exist*."  Pl. Brief at 11 (emphasis plaintiff's).  Plaintiff then argues that two years later plaintiff  "proved" that the "data files that the Secretary used to compute the SSI fraction for the Hospital's fiscal year 1995 did exist."  Id. at 12.  Plaintiff does not say in the brief where it "proved" this alleged perjury, but its statement of material facts relies (¶ 226) on two short passages of the PRRB decision, 1 AR 135, 155 n.135, which in turn cite to 2003 testimony before the PRRB of Anthony Dean.

Thomas's 2001 declaration and Dean's 2003 testimony are consistent.  Thomas said in her declaration that CMS no longer had the files of data sent over to CMS by SSA that CMS used in making the calculations for fiscal year 1995.  Thomas Decl. ¶ 6, 2 AR 597.  Dean said the same thing in his testimony.  5 AR 1781-83.  Thomas also explained in her declaration that, though the <u>files</u> SSA sent over in 1996[25] were no longer available, the underlying <u>data</u> regarding eligibility could be re-requested from SSA, albeit with some data differences due to intervening updating of files by SSA.  Thomas Decl. ¶¶ 6-7, 2 AR 597.  Thomas further explained that CMS's original 1995 MedPAR Files, which her declaration did not deny CMS possessed, had

---

[25] The declaration is inaccurate in one immaterial respect in saying that the data <u>for</u> fiscal year 1995 were sent over from SSA <u>in</u> 1995.  2 AR 597.  As Baystate would surely have realized and the record consistently reflects, SSA always sent its data over in the April following a fiscal year, <u>i.e.</u>, in April 1996 with respect to fiscal 1995.  <u>E.g.</u>, Complaint ¶ 21.

captured information from the original SSA files (that were by then no longer in existence) and were indeed "based upon the" no longer available original "SSI eligibility files." Id. ¶ 8, 2 AR 597. Before the 2003 hearing, CMS provided these "existing, sorted versions of the SSI files." 4 AR 1544. Dean similarly indicated in 2003 that he had extracted the information from the then-no-longer-extant SSA files for 1995 into the still-available and already-produced CMS files. 5 AR 1782-83. But it is a surprising leap for Baystate to adopt the PRRB's offhand (or at least merely footnoted) observation that the extant and produced CMS's files for 1995 had "all the same information as in the SSA original tape," 1 AR 155 n. 135 (emphasis supplied), when it is the very point of Baystate's own arguments that the process by which CMS captures the SSA information for CMS files "drops" and "eliminates" records and information SSA's original tapes would have contained. Pl. Statement of Material Facts ¶¶ 76-90, 99, 154.[26]

    2. What plaintiff calls "[w]orse than all of" the alleged "complete lapses in quality control" is that CMS learned that SSA was not sending over "inactive" or "stale" records "not later than 1993," and, instead of fixing that problem, "embarked on a course of delay, disinformation

─────────────

    [26] About the Thomas declaration, plaintiff argues that "[a]pparently, the government's hope was that the sworn declaration to the Court was 'literally true' (CMS counsel's words), even if grossly misleading." Pl. Brief at 12. That sentence itself strings together phrases that plaintiff presumably hopes are literally true in a way that (hoped for or not) ends up misleading. The CMS counsel's expressed "hope" that the declaration was "literally true" was not expressed by the CMS counsel at the time the declaration was submitted, but by agency counsel nearly two years later when it was to him an historical event. The "even if grossly misleading" that immediately follows in unwarranted juxtaposition is not "the government's hope," but the plaintiff's unjust characterization of the declaration. There is nothing wrong with agency counsel hoping that a declaration submitted nearly two years before by an agency witness was accurate and double checking to make sure. As the very page plaintiff cites shows, Mr. Dean himself indicated in response to that agency counsel inquiry that the continued existence of the CMS files "does not at all contradict" the Thomas Declaration's explanation that the original SSA files were no longer available. 4 AR 1631.

and concealment." Pl. Brief at 29 (emphasis supplied). See id. at 15. The record instead shows that CMS learned of the "stale records" problem in February 1996. As the Administrator correctly found, CMS then promptly moved to correct that problem prospectively (i.e. beginning for fiscal 1995, for which the fraction had yet to be calculated). 1 AR 7.

Plaintiff's brief cites paragraphs 124 and 136 of its statement of material facts to support its argument that CMS had discovered the stale records problem in 1993 or earlier. Pl. Brief at 15, 29. Those paragraphs in turn cite the PRRB decision, 1 AR 155, and the testimony of David Pfeil and Daryl Rosenberg on which the PRRB relied. Pfeil is a paid consultant of Baystate, who offered what amounts to expert testimony while having an agreement that his firm would receive up to 35% of any recovery, 12 AR 4768. The Administrator rightly discounted his testimony for that reason. 1 AR 51-54. Even if Pfeil's testimony were credited, his statement that CMS "knew it had a problem" does not rest on any actual statement by CMS that it did know of the stale records problem or any other particular problem, but on Pfeil's opinion that by then CMS should have known. 14 AR 5429. The more critical testimony is thus that of Ms. Rosenberg, the sole CMS witness that Baystate cites as acknowledging that CMS "knew" of the stale records problem in 1993. Here is the testimony:

> Q [of PRRB Member Anjali Mulchandani-West]. Ms. Rosenberg, do you recall who discovered the stale records from [sic] and how it was discovered?
>
> A. I think that when we were doing recalculations, we noticed that we, a lot of times, the number would be smaller, and started looking at it, and Mr. Pfeil also called. And so it came to our attention, but we had been working on it.
>
> Q. So even if Mr. Pfeil hadn't called you, you think CMS would . . .
>
> A. Oh, no, we had been looking already. We knew the numbers, there was something wrong with the numbers.

. . . .

. . . . And we thought that we could see something wrong, but we couldn't – we didn't – there was no way we knew what SSA was sending at that point.  We never thought it was SSA.  We were looking at our own programs to see what was wrong.

15 AR 5582 (spellings of proper names corrected from transcribed version).

Nothing in the testimony suggests that CMS discovered that SSA was not sending over records of inactive cases <u>in 1993</u>.  Contemporaneous e-mail, handwritten notes, and memoranda clearly show the year, the month, the day, and very nearly the hour on which CMS in fact learned from SSA that SSA was not sending over stale records, February 15, <u>1996</u>.  6 AR 2103-2114.[27]  By the end of the month, CMS sent a formal request to SSA asking that SSA "please . . . not purge stale records from any future files you forward to us" and send data runs for prior periods that "restore[d] the stale data."  6 AR 2103.

**3**.  Plaintiff follows up its argument that CMS discovered the stale records problem in 1993 with an assertion that "[m]eanwhile" as part of its course of "delay, disinformation and concealment," CMS was "stating falsely" and "claiming falsely" in 1995 *Federal Register* publications that there were other problems with the DSH calculation.  Pl. Brief at 29.  Since CMS did not discover the problem with the SSA records until 1996, there is no "meanwhile" about the 1995 *Federal Register* publications.  What those publications actually do say about the problems with using hospital records did and does make sense, quite apart from the then-unrecognized

---

[27] <u>See</u> <u>also</u> 13 AR 5093 (testimony by SSA programmer that "when we had a meeting with CMS, all of a sudden I realized what the problem was"); 14 AR 5390 ("Q. [by Baystate's counsel] When you ran your test, Mr. Dean, in '95 did you discover the omission of stale records from SSA?  A. No."); 15 AR 5588 (Rosenberg testimony that when "they discovered the prob-lem, we immediately went to policy and told them the problem we had. . . . [I]n programming, you don't try to hide your mistakes because they're only going to blow up on you later").

problems with SSA data.  60 FED. REG. 45778, 45811-12 (Sept. 1, 1995); 60 FED. REG. 29202,

29233-24 (June 2, 1995).  Plaintiff also isolates one inaccurate noun phrase indicating that SSA

calculates the SSI fraction.  Pl. State. Mat. Facts ¶ 140.  However, the focus and intent of the

passage is on other points that are accurate.  Here is what CMS actually said:

> Because the SSI data used in the calculation are protected by the Privacy Act, we cannot
> provide an opportunity for hospitals to verify these data.  The data that the Social
> Security Administration uses to determine the Medicare Part A/SSI percentage are not
> released to HCFA and therefore we are unable to produce these data for hospitals.  We
> must accept the data that are officially collected and compiled by SSA on a monthly
> basis.  The SSA is responsible for administering the SSI program and keeps track, on a
> monthly basis, of those individuals who receive SSI benefits.

60 FED. REG. at 45812.  While this errs in saying that the fraction is actually computed by SSA,

the main points, the ones the writer was presumably focused on, are accurate: SSA data cannot

be released to the hospitals; it is SSA, not CMS, that decides who is or is not eligible for SSI;

and CMS is not able to second-guess those judgments.  If CMS actually had wanted to mislead

hospitals (or anyone else) by making the inherently implausible claim that SSA, rather than

CMS, was computing the Medicare Part A/SSI fraction, it did so in a singularly unlikely fashion,

for on the preceding page it had just restated that this very computation was among the "calcula-

tions done by HCFA and the fiscal intermediary."  60 FED. REG. at 45811; see also 4 AR 1628

(1995 HCFA letter to hospital stating that HCFA made this calculation).[28]

---

[28] Plaintiff's argument (Pl. Brief at 29) that another CMS employee had "testified falsely"
in 1995 that the data sent over by SSA were "verified and correct" is similarly misplaced
because in 1995 CMS had yet to discover the problems with the SSA data.  Moreover, the
agency witness disclosed the basis of her testimony and made no claim that CMS had
independently verified the data.  Here is the testimony after the "verified and correct" quoted by
plaintiff:

> Q.  By whom, verified by whom?
> A.  The data belongs to the Social Security Administration, and they are

**4.**   Plaintiff similarly yanks four words from the middle of one sentence in the 1986 *Federal Register* that was addressing one issue as if it were addressing another. Specifically, plaintiff says that CMS "did not use individuals' own Social Security records to match records, as the Secretary said he would in the preamble to the original, 1986, DSH rule." Pl. Brief at 13; see id. at 32 & n.21. Here is the full sentence from the preamble: "Although section 1886(d)(5)(F)(vi)(I) of the Act specifies that the match is done on a cost reporting basis, we believe that matching Social Security numbers on a federal fiscal year basis is the most feasible approach." 51 FED. REG. 16772, 16777 (May 6, 1986). As any fair reading of the sentence shows, it was not addressing what <u>records</u> the agency would match, but for what <u>periods</u> it would match. And if one were limited to four words to describe what records the agency was matching – the sentence was not trying to address that issue at all – the four words the agency actually used, "matching Social Security numbers," are about as good as any. The agency matches CMS's "HICANs," which <u>are</u> social security numbers with beneficiary codes added, with SSA's

---

responsible for verifying its correctness.
    Q.  So when you say "it is verified," does HCFA get some sort of a certification from SSA that it has verified the data before sending it to HCFA?
    A.  I don't know.
    Q.  And HCFA makes no independent, no attempt at independent verification of the SSA data it receives?
    A.  The data belongs to the Social Security Administration.
    Q.  And SSA sends the data over, or somehow we haven't established how HCFA gets the data, but HCFA makes no attempt to verify that data; it accepts what SSA sends?
    A.  Yes.

3 AR 976-77. There is no reason to call this testimony false. Nor does it in any way conceal the agency's position, as it makes essentially the same point that the agency made in the *Federal Register* passage quoted in the text, which is not that CMS independently verifies SSA's determinations of SSI eligibility, but that it is reasonable, indeed necessary, for CMS to rely on SSA's data in conducting the SSI-Medicare match.

title II numbers, which <u>are</u> social security numbers with beneficiary codes added.  14 AR 5384-86.  To be sure, the agency does not always match a beneficiary's "own" social security number, but "own" is not a word the cited *Federal Register* passage used, it is an extra word plaintiff adds to what the agency actually said.

<u>CONCLUSION</u>

The Administrator's Decision in this case should be sustained.  First, the SSI numerator is supposed to include only persons who are entitled to supplemental security benefits.  42 U.S.C. § 1395ww(d)(5)(F)(vi).  Under the plain language of that provision, persons who are merely deemed to be receiving such benefits for purposes of Medic<u>aid</u> are not entitled to such benefits for purposes of Medic<u>are</u>.  Even if the statutory text left any doubt, the agency's construction of the statute is at least rational and should be sustained under <u>Chevron</u>.  Similarly, the agency's view that the denominator should include all hospital stays covered by Medicare Part A, whether the coverage is provided through an HMO or regular fee-for service Medicare and whether or not the hospital is paid, is based on a straightforward reading of the statute that focuses on the beneficiary's entitlement, a reading that, at the very least, is a permissible view that should be sustained under <u>Chevron</u>.  Finally, the Administrator rationally and permissibly interpreted the Medicare Act not to require that calculations be perpetually revisited and reopened whenever it can be shown that in one respect or another they fall short of error-free perfection.

For the reasons stated above, plaintiff's motion for summary judgment should be denied and defendant Leavitt's cross-motion for summary judgment should be granted.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney

SHEILA M. LIEBER
Deputy Director

/s/ *Brian G. Kennedy*
BRIAN G. KENNEDY (D.C. Bar # 228726)
LISA A. OLSON (D.C. Bar #38266)
U.S. Department of Justice
 20 Mass. Ave., N.W., Room 7300
Washington, D.C. 20530
Telephone: (202) 514-3357
Telefacsimile: (202) 514-3357
E-mail: brian.kennedy@usdoj.gov

Dated: April 11, 2007                                    Counsel for Defendants

-45-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BAYSTATE MEDICAL CENTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06-cv-01263 |
| | ) | |
| MICHAEL O. LEAVITT, <u>et al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT LEAVITT'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, defendants hereby submit the following statement of material facts as to which there is no genuine issue.

STATUTORY BACKGROUND OF MEDICARE PART A

1. Part A of the Medicare Act provides for basic protection against the cost of hospital care to individuals over the age of 64 who are eligible for retirement benefits under title II of the Social Security Act or under the railroad retirement system, individuals under age 65 who have been entitled to disability benefits under title II for not less than 24 months, and certain individuals with end-stage renal disease. 42 U.S.C. § 1395c. Other residents of the United States over age 64 may pay premiums (or have premiums paid on their behalf) to enroll in Part A. 42 U.S.C. § 1395i-2. Persons under 65 who were found, and remain, disabled for title II purposes but are no longer entitled to such benefits because of excess income may also pay premiums to enroll in Part A. 42 U.S.C. § 1395i-2a.

2. Aspects of the Medicare Act are administered by the Secretary, who has delegated many functions to the Centers for Medicare &Medicaid Services ("CMS" or the agency),

formerly known as the Health Care Financing Administration ("HCFA").  CMS, in turn, uses

contractors known as "fiscal intermediaries" to process hospital claims.  42 U.S.C. § 1395h.

     3.  From the inception of Medicare until 1983, hospitals were paid based on the

"reasonable costs" they incurred.  See, e.g., County of Los Angeles v. Shalala, 192 F.3d 1005,

1008 (D.C. Cir. 1999), cert. denied, 530 U.S. 1204 (2000).  "To stem the program's escalating

costs and perceived inefficiency, Congress fundamentally overhauled the Medicare reimburse-

ment methodology in 1983," and payments are now made under a Prospective Payment System

("PPS"), that pays qualifying hospitals at prospectively fixed rates.  Id.  Some calculations used

in determining prospective payment amounts are made directly by Congress, most notably the

determination of the "applicable standard increase."  42 U.S.C. § 1395ww(b)( 3)(A).  Other

determinations, including the determination of the DSH fractions, are made by the Secretary

pursuant to statutory direction.

## DISPROPORTIONATE SHARE HOSPITAL ("DSH") PROVISIONS

     4.  The DSH adjustment provides for increased PPS payments to hospitals that serve a

"significantly disproportionate number of low-income patients."  42 U.S.C.

§ 1395ww(d)(5)(F)(i)(I).  Congress concluded that hospitals that serve a disproportionate

number of low-income patients may have greater than average expenses.  The DSH adjustment

does not attempt to calculate those extra expenses directly, nor does it attempt to identify all low-

income individuals who are treated at a hospital.   Rather, Congress intended the DSH fraction to

be merely a "proxy measure for low income."  H.R. REP. NO. 99-241, reprinted in 1986

U.S.C.CA.N. 579, 595.

5.  Whether a hospital qualifies for the DSH adjustment and the amount of the adjustment it receives depend on the hospital's "disproportionate patient percentage."  See 42 U.S.C. § 1395ww(d)(5)(F)(v).  In turn, the disproportionate patient percentage is the sum of two fractions, the "Medicare and Medicaid fractions."  42 U.S.C. § 1395ww(d)(5)(F)(vi).  This case involves the Medicare fraction, which is also referred to as the SSI fraction because it captures the percentage of Medicare patients who were also eligible for Supplemental Security Income ("SSI") benefits at the time of their hospital stays.

6.  The numerator of the SSI fraction consists of:

> the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of this sub-chapter and were entitled to supplemental security income benefits . . . under subchapter XVI of this chapter . . . .

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).

7.  The denominator of the SSI fraction consists of:

> the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under part A of this subchapter . . . .

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).

8.  The SSI program of title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq., provides a "guaranteed minimum income level" for financially needy individuals who are aged, blind, or disabled.  Sullivan v. Zebley, 493 U.S. 521, 524 (1990); see also 20 C.F.R. § 416.110. In order to qualify for SSI payments, an individual must have income and resources not in excess of statutorily specified amounts, 42 U.S.C. § 1382, and must be "aged, blind, or disabled" as defined in 42 U.S.C. § 1382c.  The SSI program is administered by the Social Security Administration ("SSA").

MATCHING SSA'S RECORDS ON SSI RECIPIENTS WITH CMS'S HOSPITAL CLAIM
RECORDS

9.  Calculation of the SSI fraction requires some matching of records from two different agencies' massive databases to find persons who were entitled to SSI benefits during the same month they had a Medicare-covered stay at a hospital.  Even as early as 1986, the necessary matching involved about 11 million Medicare hospital billing records per year, plus SSA's month-by-month records of SSI entitlement for over 5 million individuals.  51 FED. REG. 31454, 31459 (Sep. 3, 1986) (DSH final rule).

10.  The Secretary rejected a methodology that would have required hospitals to provide their own data for demonstrating the SSI eligibility of their Medicare inpatients, choosing instead to carry this burden for hospitals by conducting his own match of SSI eligibility data with Medicare inpatient discharge files of the thousands of subpart (d) hospitals.  *See* 51 FED. REG. at 31459.  The Secretary decided to determine the number of patient days in the SSI fraction numerator (i.e., patients who were entitled to both SSI and Medicare Part A), "by matching data from the Medicare Part A Tape Bill [PATBILL] file with the Social Security Administration's SSI file."  51 FED. REG. 16772, 16777 (May 6, 1986) (interim final rule with comment period).  The agency further explained that "this match will be done at least annually and will involve a match of the individuals who are SSI recipients for each month during the Federal fiscal year in which the hospital's cost reporting period begins with the Medicare Part A beneficiaries who received inpatient hospital services during the same month."  Id.  Also, consistent with the expectation of the House Committee Report, the Secretary determined that DSH payments would be made on an interim basis, subject to a final fiscal year-end settlement by the Medicare fiscal intermediary.  Id.

11.  The Secretary specifically advised providers that the match of Medicare PATBILL files with SSA's files for SSI recipients would be done on a Federal fiscal year basis, and not on a hospital cost reporting period basis, even though the Medicare statute suggests the latter approach.  Id.  A cost reporting period methodology would have required a monthly, rather than a yearly, match of Medicare and SSI files.  According to the Secretary, "[a] monthly match . . . would be administratively more cumbersome and costly and could not be accomplished in a timely manner."  Id.  The Secretary determined that there should not be "significant fluctuations" from one year to the next, and thus concluded that "the percentage for a hospital's own experience during the Federal fiscal year should be reasonably close to the percentage specific to the hospital's cost reporting period."  Id. (emphasis added).  However, the agency also allowed providers to request calculation of the SSI fraction on a cost reporting period basis, but the provider would have to furnish its own data on its Medicare patients for its cost reporting period, and bear the full cost of such calculation.  Id.

12.  Although the Secretary received various comments on the original SSI fraction methodology, no commenter expressed concern regarding the source of data (SSA's SSI records and Medicare's PATBILL records) or the time when the data match would be performed.  Other commenters did question, however, whether providers should have to bear the cost of recomputing their DSH calculations on a cost reporting basis since the statute suggested that the DSH percentages should be determined in this manner.  51 FED. REG. at 31459.  In response, the Secretary stated that the administrative burden of conducting a data match on a monthly basis, rather than once prior to the beginning of each new Federal fiscal year, outweighed any slight gain in accuracy.  51 FED. REG. at 31459-60.

PROCEDURAL BACKGROUND

13.  This case comes before the Court on judicial review of administrative action pursuant to 42 U.S.C. § 1395*oo*(f).  Plaintiff Baystate Medical Center's ("Baystate's") claims were initially heard, in part sustained, and in part denied, by the Provider Reimbursement Review Board ("PRRB").  Volume 1 Administrative Record ("1 AR") 131 (PRRB Decision).  The final agency action subject to review is the Administrator's Decision reversing in part (insofar as Baystate's claims had been sustained) the PRRB's decision.  1 AR 2.

14.  The Administrator's decision specifically discounts the testimony of two of the principal witnesses presented by Baystate and relied upon by the PRRB.  The Administrator found that those witnesses presented what amounts to expert testimony, 1 AR 51; 14 AR 5413-71; 14 AR 5263-90, despite having an agreement to receive up to 35% of any recovery.  Id. at 52; 12 AR 4768.  The Administrator also found that such contingency-fee expert-witness arrangements are contrary to public policy, 1 AR 52-54, citing, inter alia, Crowe v. Bolduc, 334 F.3d 124, 132 (1st Cir. 2003), and that the existence of such an agreement should be taken into account in evaluating their testimony.  Id. at 52.

15.  While the PRRB had reasoned that performing recalculations for Baystate would not be unduly burdensome, the Administrator found that the more pertinent inquiry is the systemic burden of performing multiple recalculations for the many hospitals that have similar claims. 1 AR 55.

MECHANICS OF THE MATCH PROCESS

SSA's SSI eligibility file

16.   SSA makes eligibility determinations for SSI and maintains the SSI eligibility files.

See 13 AR 5055.  Each year around early April, SSA prepares and sends CMS a cartridge or tape

containing a list of all individuals who were entitled to SSI benefits for any month during the

past 39 or 40-month period, and who are projected to be entitled to SSI for any of the next two or

three months.  13 AR 5057-58, 5070-71.  Thus, the 42-month period covers the 36 months in the

three prior calendar years and the first six months of the calendar year in which the tape is

prepared.  15 AR 5684-85.  The data included in the tape projects forward three months through

the end of June in the calendar year in which the tape is created.  Id.

17.   The SSA tapes for the period at issue include the following data for each SSI

recipient who was included on each tape:

   (1)     truncated last name and first initial
   (2)     Social Security number, which is referred to as the personal account number, or "PAN";
   (3)     date of birth;
   (4)     gender;
   (5)     the Social Security number or railroad retirement program identification number with a beneficiary identification code (altogether called a "title II number" or "CAN"), if the SSI recipient received monthly social security or railroad retirement benefits; and
   (6)     42 monthly indicators (ones and zeros) denoting the payment or non-payment of federal SSI benefits during the period covered by the SSA tape.

15 AR 5680-81, 5699-5700, 5736.

CMS's Medicare eligibility file

18.   CMS compiles Medicare beneficiary data in the MedPAR file.  15 AR 5559.  CMS's

MedPAR files contain data from claims for services provided to beneficiaries admitted to

Medicare certified inpatient hospitals.  15 AR 5723-24.  The accumulation of claims from a beneficiary's date of admission to an inpatient hospital until discharge represents one stay.  1 AR 17.  A stay record may represent one claim or multiple claims.  Id.

19.  Until 1995, the MedPAR records were drawn from the CMS Common Working File ("CWF").  15 AR 5727-28.  The CWF contains Medicare entitlement, utilization, Medicare Secondary Payor, HMO, and history data for each Medicare beneficiary.  1 AR 141.  Since 1995, the MedPAR files have been drawn from the National Claims History ("NCH") database.  15 AR 5722-23.  The NCH database is a national repository of all Medicare claims processed by fiscal intermediaries.  15 AR 5722.

20.  For each included Medicare inpatient stay, the MedPAR file contains the following data fields:

    (1)      the hospital's Medicare provider number;

    (2)      the patient's Medicare health insurance claim account number ("HIC" or "HICAN")[1];

    (3)      the dates of admission to, and discharge from, the hospital;

    (4)      the total length of the inpatient hospital stay;

    (5)      the number of days in the stay that were covered under Medicare Part A; and

    (6)      the number of days in the stay for which the patient was determined, through the match process described below, to be entitled to federal SSI benefits.

4 AR 1330, 1336-37, 1349; 1 AR 141-42.

CMS's use of the June MedPAR

21.  Each quarter, CMS creates several separate MedPAR files that collectively cover multiple calendar and fiscal years.  14 AR 5406-07; 15 AR 5724-26.  CMS matches its inpatient

---

[1] The HIC number assigned to each Medicare beneficiary is either a Social Security number or a railroad retirement number (but not necessarily the individual's own number) followed by an alpha-numeric beneficiary identification code.  14 AR 5384-85.

hospital stay records against the most recent annual SSA tape every time it creates one of these quarterly MedPAR runs. 15 AR 5725-26. CMS identifies the Medicare beneficiaries from among the individuals listed on the SSA file, and matches the resulting file of Medicare/SSI beneficiaries against its Medicare patient stay information for the previous fiscal year. 15 AR 5725-26. CMS then computes the Medicare fraction for all hospital cost reporting periods that began during the previous Federal fiscal year. 15 AR 5729.

22. Following its computation of the SSI fractions for a particular Federal fiscal year, generally in July or August, CMS transmits the results of the computations for each hospital (i.e., the hospital's total number of Medicare Part A covered days, its total number of Medicare/SSI days, and the resulting percentage) to the Medicare fiscal intermediaries. 15 AR 5773. Each intermediary is required by regulation to apply the SSI fraction computed by CMS in determining a hospital's entitlement to the DSH payment. 42 C.F.R. §§ 412.106(b)(2) and (b)(5); see also 51 Fed. Reg. 16772, 16777 (May 6, 1986) (interim final rule); 51 Fed. Reg. 31454, 31457-61 (Sept. 3, 1986) (final rule).

23. CMS used the MedPAR file based on the month of June following the end of the Federal fiscal year to compute the SSI fractions at issue for 1993-1996. 9 AR 3631-32; 15 AR 5559-60. For example, the June 1994 version of the MedPAR was used to calculate the DSH fraction for fiscal year 1993. Id.; 9 AR 3631-32. By each June MedPAR run, 98% of all claims for the prior fiscal years have been filed. 14 AR 5395, 5404; 15 AR 5750-51.

TYPES OF DAYS IN THE NUMERATOR

24. CMS properly excluded from the numerator of the SSI fraction those patient days attributable to disabled Medicare beneficiaries whose income for period of work was too high to qualify them for SSI benefits.

TYPES OF DAYS IN THE DENOMINATOR

25. CMS properly included in the denominator of the SSI fraction days for which the patient is entitled to benefits, i.e., "covered," under the Medicare program, but for which the provider may have failed to qualify for payment. CMS properly excluded exhausted and secondary payer days from the SSI denominator as not "covered."

26. CMS properly included in the SSI denominator patient stays paid for by a Medicare-contracting HMO.

ACCURACY OF METHODOLOGY FOR CALCULATING THE SSI FRACTION

The SSA identifier for SSI recipients: Title II numbers

27. To determine how many SSI recipients are among a hospital's inpatient population, the patient identifier in the SSA file must be matched with the patient identifier in the MedPAR file. SSA's annual tape contains all individuals receiving SSI benefits for any month during a 42-month period. The tape lists individuals according to their own Social Security numbers if they are receiving SSI benefits under title XVI of the Social Security Act for each month during a 42-month period. 13 AR 5070; 15 AR 5737. If they are also receiving retirement benefits under title II of the Social Security Act, it lists them under a title II number as well. 13 AR 5099-5100, 5124.

28. The title II number on SSA's tape consists of two elements: the Social Security number of the title II records holder (the person whose work history qualifies for title II benefits)

and an alpha-numeric suffix, called a beneficiary identification code or "BIC," that denotes the

relationship between the beneficiary and the title II record holder.  1 AR 141; 13 AR 5063, 5100.

For example, an individual, "A," may receive title II benefits only through his or her spouse,

"B," who has sufficient work history to be entitled to benefits on his or her own account.  In this

circumstance, "A" would be assigned a title II number that includes "B's" nine-digit Social

Security number with an alpha-numeric beneficiary identification code (such as B2) at the end.

See 13 AR 5100, 5124-25, 5126-27.

29.  An individual can have more than one title II number at the same time because an

individual may receive title II benefits simultaneously under or on account of more than one title

II number holder's account.  13 AR 5066, 5101; 9 AR 3640.  In addition, an individual's title II

number may change over the course of the 42-month range covered by an annual tape, for

example, with marriage, divorce, death of a spouse, or changes in work status.  See 13 AR 5124-

25, 5128.  However, SSA's annual tape includes a field for only one title II number per

individual.  13 AR 5063-64, 5122-25; 15 AR 5602, 5700.  The sole title II number that would be

placed on SSA's annual tape during the sorting process would ordinarily be the oldest title II

number within the 42-month range.  13 AR 5064.  Consequently, the SSA tape will supply only

one of those title II numbers (i.e., the earliest) to CMS for purposes of the match to determine the

number of days an individual was hospitalized while on SSI and Medicare.  13 AR 5101-02.

The CMS identifier for Medicare recipients: HIC or HICAN numbers

30.  In performing the match with SSA's title II numbers, CMS uses the HIC assigned to

each Medicare beneficiary in its MedPAR file.  9 AR 3643; 14 AR 5388.  Much like the title II

number, the HIC number, which CMS assigns to all Medicare beneficiaries, is a Social Security

number or railroad retirement number followed by a relationship-identifying suffix, called the beneficiary identification code.  See 1 AR 144; 10 AR 3696-99; CMS On-Line Manual, Medicare Pub. 100-1, Ch. 2, sections 50.2-50.4.  The Social Security or railroad retirement number is the number of the person on whose earnings account Medicare entitlement is based, and thus, it may or may not be the Medicare beneficiary's own Social Security (or railroad retirement) number.  See 10 AR 3696; CMS On-Line Manual, Medicare Pub. 100-1, Ch. 2, section 50.2.  For example, a married woman ("W") who is over the age of 65 may receive Medicare Part A benefits on the account of her husband ("H") if H has sufficient quarters of work to qualify for Social Security benefits.  In this example, W's HIC number would include H's nine-digit Social Security number followed by an alpha-numeric beneficiary identification code indicating W's spousal relationship with H, on whose account W may receive Social Security benefits (if any) under title II of the Act.  1 AR 145.

    31.  Since eligibility under title II is what generally triggers Medicare eligibility, 42 U.S.C. § 1395c, the numerical portion of that number-plus-suffix will generally be the same as the numerical portion of the HICAN.  13 AR 5101.  If the title II number and the HICAN are both based on the same earnings record (whether or not the earnings record of the beneficiary) and thus had the same root Social Security number, then CMS would be able to achieve a match.  13 AR 5101.  The match may not occur, however, where an individual's title II number has changed.  13 AR 5122.  Because SSA transmits only the oldest title II number, and an individual can have more than one title II number due to changes in status, CMS would fail to achieve a match based on the later title II numbers that are not provided.  9 AR 3641, 3643; 13 AR 5122.

-12-

However, out of a non-random sample of over 600 cases likely to overstate any errors, Baystate was able to point to only one instance where this situation appears to have occurred.  1 AR 43.

32.  Other individuals on the tape will only be listed according to their own Social Security number (i.e., the title II field is blank) because they are receiving SSI but not Social Security benefits.  14 AR 5384.  The extent to which CMS, in addition to attempting to match the HICANs with the title II numbers, also attempted to match the numeric portion of the HICANs with the SSNs sent by SSA is unclear on the record.

Inactive ("stale") records

33.  Until February 1996, SSA's annual tapes omitted all SSI records that had been terminated and were inactive prior to the time when SSA transmitted the tape to CMS.  1 AR 153; 6 AR 2103-2114.  During this time period, an "accounting page" of an individual's record could be terminated, even though the individual remained entitled to SSI benefits, and that record would become inactive immediately.  13 AR 5110.  This could occur either due to space limitations or the need to make payments manually.  13 AR 5081-82, 5110.  In addition, the records of deceased individuals and individuals in terminated status would usually be moved into inactive files after 12 months.  13 AR 5077-79, 5088, 5106; 14 AR 5201-02.  Records may also have been moved into inactive status sooner for terminations resulting from circumstances unrelated to income and resources.  14 AR 5203-04.  SSA did not always delete inactive records the instant a year had passed, especially as increases in computer capacity made that housekeeping task less pressing.  13 AR 5106 (testimony of Baystate witness and former SSA employee Alan Shafer).

-13-

34.  CMS had SSA prepare new tapes beginning with the 1996 fiscal year that corrected the situation by including the stale records; that is, the records that had previously been omitted because they had become inactive (due to death) were included on the data file prepared for CMS beginning with fiscal year 1995.  6 AR 2103; 15 AR 5561; 1 AR 154.  Consequently, the dispute as to the omission of stale records is applicable only to the 1993 and 1994 periods.  1 AR 154.  On February 15, 1996, CMS learned from SSA that SSA was not sending over stale records.  6 AR 2103-2114.; see also 13 AR 5093; 14 AR 5390; 15 AR 5588.  By the end of the month, CMS sent a formal request to SSA asking that SSA "please . . . not purge stale records from any future files you forward to us" and send data runs for prior periods that "restore[d] the stale data."  6 AR 2103.

35.  The only way to know the impact of including the inactive records that were omitted from original calculations of the Medicare fraction for fiscal years 1993 and 1994 would be to rerun the actual calculations.  14 AR 5224-25; 15 AR 5586.  However, no pre-1996 versions of the FY 1993 and 94 MedPAR files exist, making impossible the proof of a direct correlation between the alleged stale records situation and the alleged financial impact.  14 AR 5224-25; 9 AR 3609, 3647; 15 AR 5584.  There is no way, however, to know the source of the additional SSI days that appear in the later runs.  1 AR 155.  CMS did not recalculate the Medicare fractions prior to 1995 because information at the time suggested that the issue did not significantly affect individual hospitals' Medicare DSH adjustment amounts.  15 AR 5563.

36.  If a significant number of stale records had been omitted by SSA, one would expect to see a large jump between 1994 and 1995, and then a steady rise from 1995 on as the number of deaths, and stale records, for prior years increases.  12 AR 4528.  But the figures instead show

-14-

a continuous rise (with the exception of two small declines) for the plaintiff hospital, for

hospitals in Massachusetts, and for hospitals nationally, from each year to the next, including

from 1994 to 1995.[2]  Id.  This steady rise occurs even though the data is not edited to eliminate

stays that should not be included in the calculation, such as those for individuals who became

---

[2] The Medicare fractions for plaintiff for years 1993 through 2000 were as follows:

| 1993 | .07215 | 1997 | .10251 |
|------|--------|------|--------|
| 1994 | .08208 | 1998 | .10784 |
| 1995 | .08836 | 1999 | .10566 |
| 1996 | .09269 | 2000 | .11289 |

13 AR 4887, 4891, 4895, 4899, 4903, 4907, 4911, 4915.  The percentage rise each year for plaintiff is approximately 12.07% from 1993 to1994, 7.11% from 1994 to1995, 4.67% from 1995 to 1996, 9.58% from 1996 to 1997, 4.94% from 1997 to 1998, -2.02% from 1998 to 1999, and 6.40% from 1999 to 2000.

The Medicare fractions for all Massachusetts hospitals, and for hospitals nationally, show a similar pattern:

| | National | Massachusetts |
|------|----------|---------------|
| 1993 | .083746 | .066412 |
| 1994 | .087332 | .067787 |
| 1995 | .090322 | .072420 |
| 1996 | .091777 | .073438 |
| 1997 | .091551 | .076504 |
| 1998 | .092580 | .081392 |
| 1999 | .094241 | .085114 |
| 2000 | .094780 | .090037 |

13 AR 4885-4916.

The percentage rise each year in these categories nationally is approximately 4.11% from 1993 to 1994, 3.31% from 1994 to 1995, 1.59% from 1995 to 1996, -.25% from 1996 to 1997, 1.11% from 1997 to 1998, 1.76 % from 1998 to 1999, and .57% from 1999 to 2000.

The percentage rise each year in these categories for Massachusetts is approximately 2.03% from 1993 to 1994, 6.40% from 1994 to 1995, 1.39% from 1995 to 1996, 4.01% from 1996 to 1997, 6.01% from 1997 to 1998, 4.37% from 1998 to 1999, and 5.47% from 1999 to 2000.

ineligible during this time period.  15 AR 5562.  The steady rise also occurs despite the fact that

the later versions of MedPAR used in the calculation of the SSI fraction for prior years have a

decreased number of stays due to deaths that have occurred in the interim.  15 AR 5582-83; see

also 13 AR 5080-81.  In other words, the 1996 version of a MedPAR file for an earlier fiscal

year could be expected to have had more missing stale records than the version that was used to

perform the original calculations.  The steady rise does not reflect such a sudden increase.  12

AR 4528.

Forced pay cases

37.  SSA's system is designed to generate automated SSI payments.  13 AR 5110.

Sometimes, however, a field office needs to make a forced or manual payment on a temporary

basis.  Id.; 15 AR 5594, 5597.  In those instances, SSA will terminate the recipient's existing

record, start a new record that indicates no federal payment is due to the beneficiary (in order to

stop the system from making a duplicate payment), then terminate the second record and start a

third to resume system payments prospectively after the manual payment action is resolved.  13

AR 5110-11; 14 AR 5164-65; 15 AR 5594.  In these cases the earlier records, which would have

reflected some amount due the beneficiary, would have been terminated and would not have

been included in the annual tapes that SSA sent to CMS before 1996.  13 AR 5089-91.  The later

records would show that no amount had been paid for periods in which a forced payment was

made by the field office.  13 AR 5091; 11 AR 4029.

38.  As a result, individuals who received a forced payment during the period of their

inpatient hospital stays were not shown as having been entitled to SSI for such periods on SSA

annual tapes.  13 AR 5091; 11 AR 4029.  However, as the Administrator explained (1 AR 42),

-16-

out of a sample of over 600 cases, Baystate was able to point to only one instance where this seems to have occurred, even though, as the Administrator also pointed out (1 AR 38, 42), the sample was not random and was chosen from a population disproportionately likely to show the errors Baystate was hunting for.

<u>Retroactive awards</u>

39.  Not all retroactive grants – or denials – of SSI entitlement will be included in the SSA tape that is used to calculate a particular hospital's Medicare fraction for a particular period. 9 AR 3639.  However, SSI retroactive determinations can either establish entitlement or rescind a previous determination of entitlement for a particular month, so retroactive awards may be offset by retroactive denials.  13 AR 5121; 14 AR 5175.  Where the records show that more beneficiaries became eligible retroactively for SSI than had their eligibility terminated retroactively, 14 AR 5170, 5188, there is no way to determine how many records appearing to indicate new eligibility were actually just restored stale records.  14 AR 5445, 5256, 15 AR 5562.  Thus, there is no evidence as to how many retroactive SSI awards, if any, were made or how many were then omitted from the SSI fraction.  14 AR 5447.  Again, of the 627 patients non-randomly sampled by the hospital, the Administrator found that only 1 additional match (a case where benefits had been suspended) would have been added by using later data from SSA. 1 AR 40; <u>see also</u> 14 AR 5170 (Baystate witness acknowledges that "I don't believe I saw any cases that were retroactive SSI awards").

40.  Baystate had a witness who used to work at SSA testify that the SSI program is now "basically a disability program," that in many cases a claimant is found disabled only after lengthy appeals, and that the eligibility of such persons will only be reflected in the SSA records

-17-

at some later time.  13 AR 5119-21.  However, as the Administrator pointed out (1 AR 6, 41), for

such individuals to be properly counted in the numerator, they would have to have been eligible

for <u>both</u> Medicare and SSI, and a person found disabled by SSA will not have become entitled to

Medicare as a result of that finding until 24 months <u>after</u> his disability entitlement begins.  42

U.S.C. § 1395c.  Thus, while waiting for further data to trickle into the SSA files to reflect SSA

decisions on ongoing disability appeals might allow listing of more individuals who will have

been entitled to SSI, it is unlikely to find more who were entitled to both SSI and Medicare, and

it would delay the ability of the agency to provide intermediaries and hospitals with the

calculation of the SSI fraction they need to finalize payments.  Some of the SSI disability

appeals may not be resolved until several years in the future, and to account for all (or even

most) of such retroactive determinations would require the agency to check for continued

corrections over a period of many years.

     41.  Moreover, subsequent awards of SSI to Medicare beneficiaries are unlikely to occur

as a result of disability appeals.  <u>See generally</u> 12 AR 4511-13.  There are two reasons for this.

First, to be eligible for SSI benefits, an individual must be (1) aged 65 or older, blind, <u>or</u>

disabled; and (2) have limited resources.  42 U.S.C. § 1381a; 20 C.F.R. § 416.202(a), (d).  By

contrast, to receive Medicare an individual must (1) be aged 65 or older, <u>or</u> (2) have received

disability benefits for 25 months, <u>or</u> (3) have end-stage renal disease.  42 U.S.C. § 1395c; 42

C.F.R. § 406.5.  Approximately 87% of Medicare beneficiaries qualify for Medicare on the basis

of age.  11 AR 4107; <u>see</u> 14 AR 5168.  Therefore, at most, 13% of Medicare beneficiaries would

ever be in a position to challenge a disability determination for purposes of receiving SSI

benefits, because 87% would already have qualified for Medicare on the basis of age and

-18-

therefore would meet the age requirement for SSI benefits and would not need to prove disability in order to obtain SSI benefits.  12 AR 4512.

42.  As to the remaining 13% of Medicare beneficiaries who qualify on the alternative bases of disability or end-stage renal disease, the standards for establishing disability are essentially the same for Medicare and SSI purposes.  Cf. 42 U.S.C. § 423(d) with 42 U.S.C. § 1382c(a)(3)(A); cf. 20 C.F.R. § 404.1505 with 20 C.F.R. §§ 416.905, 416.906.  Therefore, an individual who qualifies for Medicare on the basis of disability would similarly qualify for SSI on that basis, and again, would not logically be in a position to pursue an appeal of a disability determination for purposes of receiving SSI benefits.  12 AR 4513.  Finally, it is possible that some of the individuals entitled to Medicare on the basis of end-stage renal disease could pursue appeals of SSI disability denials.  12 AR 4513.  However, beneficiaries who are entitled to Medicare on that basis constitute only .002 percent of all Medicare beneficiaries.  11 AR 4107.

DEFENDANT'S PRODUCTION OF RECORDS

43.  Defendant CMS paid an outside contractor to comply with plaintiff's demands for agency records.  See 5 AR 1654-58.  The agency shared with Baystate the detailed statement of the procedures the contractor used.  See 2 AR 712-65, 3 AR 1169-82, 4 AR 1211-22, 1227-68).  The agency produced a "run" of data for plaintiff.  2 AR 597.  When plaintiff was dissatisfied, the agency produced a second run.  Id. at 598.  When plaintiff was still dissatisfied, the agency produced yet another run of the data.  4 AR 1278.  Still later the agency produced four diskettes with electronic versions of the MedPAR extracts, 7 AR 2685, and both electronic and paper copies of SSI eligibility information for Baystate patients, 7 AR 2102.  The fiscal intermediary also sent Baystate diskettes of data.  5 AR 1973.  In addition to data, CMS also provided plaintiff

-19-

with computer code of programs used in computing the SSI fraction.  3 AR 1190, 4 AR 1310, 6

AR 2299-2315.  (SSA, a non-party below, also produced computer program codes in response to

a FOIA request, 7 AR 2465, 2510-68.)  And CMS responded to numerous interrogatories, 7 AR

2465, 2510-68, and made witnesses available for two multi-day evidentiary hearings.

<div style="margin-left: 40%;">

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney

SHEILA M. LIEBER
Deputy Director

/s/ *Brian G. Kennedy*
BRIAN G. KENNEDY (D.C. Bar # 228726)
LISA A. OLSON (D.C. Bar #38266)
U.S. Department of Justice
 20 Mass. Ave., N.W., Room 7300
Washington, D.C. 20530
Telephone: (202) 514-3357
Telefacsimile: (202) 514-3357
E-mail: brian.kennedy@usdoj.gov
Counsel for Defendants

</div>

Dated: April 11, 2007