## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BAYSTATE MEDICAL CENTER,            )
                                    )
            Plaintiff,              )
                                    )
    v.                              )        C.A. No. 06-1263 (JDB)
                                    )
MICHAEL O. LEAVITT, *et al.,*       )
                                    )
            Defendants.             )

## PLAINTIFF'S REPLY MEMORANDUM  IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN OPPOSITION TO DEFENDANT LEAVITT'S MOTION FOR SUMMARY JUDGMENT

Christopher L. Keough
  DC Bar No. 436567
John M. Faust
  DC Bar No. 433553
Stephanie A. Webster
  DC Bar No. 479524
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

May 18, 2007

# TABLE OF CONTENTS

I.    Defendant Raises No Genuine Issue Regarding Plaintiff's
      Statement Of Facts ...............................................................................5

II.   The Secretary's Decision Not To Correct Significant, Known
      Errors In His SSI Fraction Calculation Must Be Reversed ...............6

      A.    The Secretary Has No Statutory Or Regulatory
            Authority To Tolerate Known Errors In The Match
            Process ......................................................................................6

      B.    The Secretary Acted Arbitrarily And Capriciously,
            And Without Due Regard For His Fiduciary Obligations,
            When He Deemed His Agency's Errors "Acceptable"
            And Unworthy Of Correction.................................................9

            1.    The Secretary Owes An Obligation Of
                  Reasoned Decisionmaking Under The APA
                  As Well As Fiduciary Obligations As A
                  Result Of His Decision To Assume Sole
                  Responsibility For The SSI Calculation ......................9

            2.    The Secretary's Handling Of The Match
                  Process Has Been Neither Reasonable Nor
                  Consistent With His Fiduciary Obligations................12

            3.    The Record In This Case Contradicts The
                  Secretary's *Post Hoc* Rationalization Of
                  Prior Unlawful Conduct .............................................23

III.  The Secretary Unlawfully Excluded Patients Who Received
      Non-Cash Benefits From The Numerator Of The SSI Fraction ........33

IV.   The Secretary's Decision To Include Inpatient Days For
      Which No Medicare Payment May Be Made Is Invalid And
      Must Be Reversed ...............................................................................35

      A.    The Secretary Interpreted The DSH Statute To Include
            Only Medicare-Paid Days In The SSI Fraction When
            He Adopted The 1986 DSH Rule ............................................36

      B.    The SSI Fraction Should Not Include HMO Patient
            Days That Are Not, And Cannot Be, Paid For By
            Medicare Part A......................................................................38

CONCLUSION ...................................................................................43

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ............................................................... 5

*AT&T Co. v. FCC*, 974 F.2d 1351 (D.C. Cir. 1992) ................................................................ 13

*Atlanta College of Medical and Dental Careers,*
    *Inc. v. Riley,* 987 F.2d 821 (D.C. Cir. 1993) ............................................................. 25, 26

*Biloxi Reg'l Med. Ctr. v. Bowen,*
    835 F.2d 345 (D.C. Cir. 1987) ........................................................................................ 39

*Boivin v. U.S. Airways, Inc.,*
    297 F. Supp. 2d 110 (D.D.C. 2003) ........................................................................ 12, 23

*Bowen v. Georgetown Univ. Hosp.,*
    488 U.S. 204 (1988) .............................................................................. 9, 10, 23, 39

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156 (1962) ........................................................................................................ 39

*Campbell-EL v. District of Columbia,*
    874 F. Supp. 403 (D.D.C. 1994) ...................................................................................... 5

*City of Brookings Mun. Tel. Co. v. FCC,*
    822 F.2d 1153 (D.C. Cir. 1987) ............................................................... 9, 10, 21, 22

*Cobell v. Babbitt,* 91 F. Supp. 2d 1 (D.D.C. 1999) ................................................................. 12

*Cobell v. Kempthorne,* 455 F.3d 301 (D.C. Cir. 2006),
    *cert. denied,* 127 S. Ct. 1875 (2007) ...................................................................... 11, 12

*Cobell v. Norton,* 225 F.R.D. 41 (D.D.C. 2004) ................................................................... 12

*Cobell v. Norton,* 240 F.3d 1081 (D.C. Cir. 2001) ................................................................. 12

*Cobell v. Norton,* 428 F.3d 1070 (D.C. Cir. 2005) ................................................................. 13

*Continental Air Lines, Inc. v. Dep't of Transp.,*
    843 F.2d 1444 (D.C. Cir. 1988) ...................................................................................... 10

*County of Los Angeles v. Shalala,*
    192 F.3d 1005 (D.C. Cir. 1999) ................................................................................ 10, 30

*Dep't of Treasury v. FLRA,*
    837 F.2d 1163 (D.C. Cir. 1988) ...................................................................................... 34

*East Tennessee Natural Gas Co. v. FERC,*
    953 F.2d 675 (D.C. Cir. 1992) ..................................................................... 6

*Frito-Lay, Inc. v. Willoughby,*
    863 F.2d 1029 (D.C. Cir. 1988) ................................................................... 5

*Int'l Ladies' Garment Workers' Union v. Donovan,*
    722 F.2d 795 (D.C. Cir. 1983) ....................................................... 9, 10, 24

*Int'l Union, UAW v. NLRB,*
    459 F.2d 1329 (D.C. Cir. 1972) ................................................................ 29

*Jewish Hosp., Inc. v. Sec'y of HHS,*
    19 F.3d 270 (6th Cir. 1994) ...................................................................... 40

*Jicarilla Apache Tribe v. Supron Energy Corp.,*
    728 F.2d 1555 (10th Cir. 1984) ................................................................ 12

*Legacy Emanuel Hosp. & Health Ctr. v. Shalala,*
    97 F.3d 1261 (9th Cir. 1996) .................................................................... 40

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ................................................................................... 5

*Methodist Hospital v. Shalala,*
    38 F.3d 1225 (D.C. Cir. 1994) .................................................................. 20

*Monmouth Med. Ctr. v. Thompson,*
    257 F.3d 807 (D.C. Cir. 2001) ..................................................... 35, 38, 41

*Morall v. DEA,* 412 F.3d 165 (D.C. Cir. 2005) ........................................... 6, 14, 18

*Morton v. Ruiz,* 415 U.S. 199 (1974) .............................................................. 7, 38

*Motor Vehicle Mfrs. Ass'n of the United States,*
    *Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................... 10

*Mt. Diablo Hosp. v. Shalala,*
    3 F.3d 1226 (9th Cir. 1993) ...................................................... 10, 19, 20, 24

*Nat'l Commc'ns Ass'n, Inc. v. AT&T Corp.,*
    238 F.3d 124 (2d Cir. 2001) ..................................................................... 10

*Nat'l Family Planning & Reprod. Health Ass'n, Inc. v.*
    *Sullivan,* 979 F.2d 227 (D.C. Cir. 1992) ...................................... 35, 38, 41

*Nat'l Lime Ass'n v. EPA,*
    627 F.2d 416 (D.C. Cir. 1980) .................................................................. 24

*Nat'l Treasury Employees Union v. FLRA,*
　　399 F.3d 334 (D.C. Cir. 2005) ...................................................................43

*Navajo Tribe of Indians v. United States,*
　　624 F.2d 981 (Ct. Cl. 1980) .....................................................................11

*North Broward Hosp. Dist. v. Shalala,*
　　172 F.3d 90 (D.C. Cir. 1999) ...................................................................32

*Pillai v. CAB*, 485 F.2d 1018 (D.C. Cir. 1973) ............................................10

*PPG Indus., Inc. v. United States,*
　　52 F.3d 363 (D.C. Cir. 1995) .....................................................................6

*Rubin v. Estate of Warner,*
　　881 F. Supp. 23 (D.D.C. 1995) ..................................................................5

*Tendler v. Jaffe,* 203 F.2d 14 (D.C. Cir. 1953) ............................................11

*Thomas Jefferson Univ. v. Shalala,*
　　512 U.S. 504 (1994) ........................................................... 7, 35, 38, 41

*United States v. Chestman,*
　　947 F.2d 551 (2d Cir. 1991) (en banc) ......................................................11

*United States v. Margiotta,*
　　688 F.2d 108 (2d Cir. 1982) ....................................................................11

*United States v. Mitchell,*
　　463 U.S. 206 (1983) ...............................................................................11

*Wash. Metro. Area Transit Auth. v. Jeanty,*
　　718 A.2d 172 (D.C. 1998) .......................................................................25

*Williams v. United States,*
　　932 F. Supp. 354 (D.D.C. 1996) ................................................................5

## Statutes

5 U.S.C. § 706(2)(A).........................................................................................9
42 U.S.C. § 426(c)(1).....................................................................................40
42 U.S.C. § 1382h(b) ......................................................................................33
42 U.S.C. § 1395mm(a)(6)..............................................................................40
42 U.S.C. § 1395ww(h)(3)..............................................................................42
Employment Opportunities for Disabled Americans Act,
　　Pub. L. No. 99-643 ................................................................................34

## Rules

Fed. R. Civ. P. 56(e)......................................................................................5

## Regulations

20 C.F.R. § 416.264 ....................................................................................33

42 C.F.R. § 405.1875(c)(2) ...........................................................................6

42 C.F.R. § 412.106(b)(2)(i) ..........................................................................7

51 Fed. Reg. 16,772 (May 6, 1986) ...........................................................8, 36

51 Fed. Reg. 31,454 (Sept. 3, 1986.........................................7, 8, 36, 40, 41

55 Fed. Reg. 35,990 (Sept. 4, 1990).  ..........................................................41

59 Fed. Reg. 41,400 (Aug. 12, 1994)............................................................34

60 Fed. Reg. 45,778 (Sept. 1, 1995) .............................................................18

61 Fed. Reg. 31,022 (June 19, 1996) ...........................................................34

70 Fed. Reg. 57,132 (Sept. 30, 2005) ...........................................................33

## Legislative History

S. Rep. No. 99-146 (1985), *reprinted in* 1986 U.S.C.C.A.N. 42, 258.................................6, 20

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

BAYSTATE MEDICAL CENTER,            )
                                    )
                Plaintiff,          )
                                    )
        v.                          )        C.A. No. 06-1263 (JDB)
                                    )
MICHAEL O. LEAVITT, *et al.,*       )
                                    )
                Defendants.         )

### PLAINTIFF'S REPLY MEMORANDUM  IN SUPPORT OF ITS MOTION
### FOR SUMMARY JUDGMENT AND MEMORANDUM IN OPPOSITION
### TO DEFENDANT LEAVITT'S MOTION FOR SUMMARY JUDGMENT

The brief in support of Secretary's Leavitt's cross-motion and in opposition to Plaintiff's

motion for summary judgment ("Def. Br.") and his responses to Baystate's Statement of Material

Facts draw into clear focus the few genuine issues remaining for decision in this case.[1]

To begin, Secretary Leavitt now concedes – as the CMS Administrator for the most part

did – that errors occurred.  The Secretary tries to minimize and distance himself from these

deficiencies by blaming the "computer" and the Social Security Administration ("SSA") (Def.

Br. 32-33, 35-36), but he nonetheless concedes that his calculations failed to capture, from

available data, all days attributable to Medicare patients who were entitled to SSI during their

hospital stays.  This was not a close question at the administrative level.  Indeed, the Secretary's

Board held that there was "compelling evidence that [the Secretary's match process] did not, in

fact, produce accurate results."  Pl. Stmt. ¶ 104.  Days for SSI recipients who died or were

---

[1]    Plaintiff's Statement of Material Facts as to Which There Is No Genuine Dispute will be
referred to as "Plaintiff's Statement," or "Pl. Stmt."  Defendant Leavitt's response to Plaintiff's
Statement will be referred to as "Def. Resp."   His own Statement of Material Facts as to Which
There Is No Genuine Issue will be referred to as "Def. Leavitt Stmt." And Baystate's response to
that statement will be referred to as "Pl. Resp."

otherwise dropped from the active SSI rolls in the interval between their hospital stays and SSA's data production to CMS were not counted, although these "inactive" records were available.  Def. Leavitt Stmt. ¶ 33.  Neither were SSI recipients who received manual or "forced" payments, though records of these payments were available, too.  *Id.* ¶¶ 37-38.  Nor were those who received SSI benefits under a "Health Insurance Claim Account Number" that differed from the "Title II" number that CMS chose to use in the match process instead of individuals' own, unique Social Security numbers, which the Secretary had.  *Id.* ¶ 31.  Additionally, some SSI recipients were not captured because CMS decided not to use later and concededly more accurate data that was available to CMS before the agency issued its DSH payment determinations to Baystate for the years at issue.  Pl. Stmt. ¶¶ 38-44; Pl. Resp. ¶ 39.

There is no genuine dispute that these admitted errors tend to understate the payments due Baystate and all other DSH hospitals.  Pl. Stmt. ¶¶ 41, 91, 97, 104, 131, 151, 161.[2]  Despite quibbles about the significance of the errors for Baystate, none of them well-supported, even the error rates conceded by the Secretary translate to a potential nationwide impact running into the *hundreds of millions, if not billions,* of dollars just for the four fiscal years at issue.  *Id.* ¶ 186.  There is no genuine dispute that the Secretary refused discovery of the SSI records in the

---

[2]     The Secretary asserts that, as to just *one* of his many errors – the failure to use the latest available data for his match – it is possible that new SSI days appearing on later records for persons retroactively reinstated on the SSI rolls might be offset by persons later determined not to have been entitled to SSI during their hospital stays.  *See* Def. Br. 36 n.22.  The only evidence on that point suggests that new SSI additions overwhelm new SSI denials (*see* Pl. Stmt. ¶ 134, Pl. Resp. ¶¶ 39, 40, 41-42), but even if it were otherwise, Baystate's interest is in obtaining a *correct* count of its SSI days.  Although the Secretary should have the same interest, he admitted below that CMS "does not know whether, or to what extent" it omitted inpatient days for which the patient was entitled to SSI "due to a reversal of a determination of ineligibility" or due to a reversal, correction or resolution of a suspension of SSI benefits.  AR 3638-39 (CMS response to Provider Interrogatory 27).

government's sole possession that would have precisely quantified the impact of his errors. *Id.* ¶¶ 230-55.

The Secretary makes significant legal concessions as well. He is no longer arguing (as the Administrator did) either that Baystate was required to prove the precise economic impact of the agency's errors or that there was any legal or policy bar to retroactive correction of those errors for the years at issue. Nor does the Secretary's opposition to Baystate's motion take issue with the Hospital's proposed order to correct the errors in the Secretary's calculation, to obtain updated SSI data, and to reform the agency's flawed process for the calculation of the SSI fraction. That is, apart from arguing that Baystate's motion should not be granted at all, the Secretary's opposition, by it silence, concedes the propriety of the order should the Court reverse the Secretary's decision.

The sole remaining issue with respect to the data match process that the Secretary used is the validity of the Secretary's position – announced for the first time after the agency lost this case before the Provider Reimbursement Review Board – that the *record in this case* does not show that his systemic errors were *significant enough* to merit retroactive correction. Def. Br. 32. Neither the Medicare Act nor the Secretary's 20-year old regulation interpreting his responsibilities under that statute permits him to conclude that anything other than an accurate count of SSI days is permissible. *See* Part II-A below. The Secretary's established interpretation of the DSH statute and his implementing regulation do not allow for the imprecision that he now tries to excuse.

Even if the Secretary were correct (and he is not) that he has the authority to leave known errors intact so long as he views them as a "reasonably close" approximation of the hospital's SSI ratio, Def. Leavitt Stmt. ¶ 11, nothing about his agency's approach to the data match over the

years shows the "reasonableness" demanded of him under the Administrative Procedure Act. *See* Part II-B(1), (2) below. Nor does the agency's conduct display the care and good faith that the Secretary owed Baystate and all DSH hospitals, having chosen to assume sole responsibility for handling a calculation that determines, in part, those hospitals' DSH payments under the Medicare program. *See id.* In fact, the Secretary does not admit to having any hard numbers showing how close or far away the calculations are from an accurate determination, nor any recollection of the agency's rationale for not correcting known errors when they came to its attention long ago. That leaves the Secretary's impermissible *post hoc* rationalization of his errors and an "analysis" of the administrative burden of accuracy that (1) finds no support in the record and (2) is skewed to support the Secretary's foregone conclusion that he does not wish to revisit this matter. *See* Part II-B(3) below. The Secretary's refusal to correct his own known errors must be reversed as arbitrary and capricious, and as violative of the Secretary's fiduciary obligations.

Baystate's remaining claim is a straightforward challenge to the legality of the Secretary's *post-hoc* rationalizations for excluding certain categories of days from the numerator and denominator of the SSI fraction. In particular, contrary to prior SSA rules on entitlement to SSI benefits, the HHS Secretary maintains that inpatient days for individuals who receive special non-cash SSI benefits should be excluded from the SSI fraction. *See* Part III below. Moreover, while now conceding that two types of days unpaid by Medicare should be excluded from the fraction, the Secretary still contends that other days for which no Medicare payment is made should be counted as Medicare inpatient days for purposes of the SSI fraction. *See* Part IV below. The Secretary's positions on those issues are contrary to the Social Security Act, the

regulations implementing the Act, as well as prior agency policy and practice, and they must be rejected as a matter of law.

## I.    Defendant Raises No Genuine Issue Regarding Plaintiff's Statement Of Facts.

There is no genuine issue as to the material facts of this case. Baystate agrees with the Secretary's corrections to a few minor parts of Plaintiff's Statement.[3] The rest of the allegations in Plaintiff's Statement must be taken as true, as the Secretary either did not respond at all, or merely asserted immateriality.[4]  *See* Fed. R. Civ. P. 56(e). Those remaining allegations also must be taken as true because Defendant's response fails to "set forth specific facts showing that there is a genuine issue," *id.*, with appropriate references to record evidence such that more than a conclusory denial or "metaphysical doubt" is raised as to the material facts.[5]

Moreover, at several turns, the Secretary's response improperly attempts to relitigate the PRRB's fact findings that were not disturbed by the CMS Administrator in his decision below.[6] In his capacity as the Secretary's delegate, the CMS Administrator reviews and may reverse Board findings that the Administrator believes to be unsupported by substantial evidence in the

---

[3]    Def. Resp. ¶¶ 9, 11, 13, 15, 17, 19 and 61.

[4]    *See* Pl. Stmt. ¶¶ 1-3, 5-8, 10, 12, 14, 16, 18, 20, 25, 27-29, 31-39, 44, 46-48, 53-60, 62-67, 69-70, 76-87, 89-93, 95-96, 98, 101-03, 111, 125-30, 132-35, 138-39, 143, 145, 148, 150, 152-53, 158, 159, 163-64, 166, 178, 185, 188-91, 193-96, 198-202, 204-07, 210-13, 218-21, 223, 227, 232, 238, 240, 242, 245-46, 248, 252, 254.

[5]    *See generally Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256-57 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *Williams v. United States*, 932 F. Supp. 354, 355 (D.D.C. 1996); *Rubin v. Estate of Warner*, 881 F. Supp. 23, 25 (D.D.C. 1995); *Campbell-EL v. District of Columbia*, 874 F. Supp. 403, 406 (D.D.C. 1994); *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988).

[6]    *See* Pl. Stmt. and Def. Resp. ¶¶ 23, 42, 49, 50, 68, 71, 75, 94, 99, 100, 103-04, 107-09, 112, 123-24, 137, 140, 151, 154, 159, 161-62, 165, 167, 168, 175, 179, 180, 183, 184, 187, 215 and 216.

record.  42 C.F.R. § 405.1875(c)(2).  The Administrator has a significant burden in doing so.[7]  It

follows that, in this action for judicial review of his own final decision, the Secretary cannot

relitigate the factual findings that the Board reached if the Administrator failed to reverse them.

*PPG Indus., Inc. v. United States,* 52 F.3d 363, 365 (D.C. Cir. 1995) (the reviewing court "sits as

an appellate tribunal, not as a court authorized to determine in a trial-type proceeding whether

the [agency's decision] was factually flawed").

## II.    The Secretary's Decision Not To Correct Significant, Known Errors In His SSI Fraction Calculation Must Be Reversed.

### A.    The Secretary Has No Statutory Or Regulatory Authority To Tolerate Known Errors In The Match Process.

The parties agree that the Medicare Act requires the agency to calculate "*the number*" of

days attributable to patients who were entitled to both SSI and Medicare Part A.  Def. Br. 30.  To

be sure, Congress intended this calculation to form part of a "proxy measure for low-income,"

Def. Br. 31, but nowhere did it authorize the agency to do anything other than calculate this

statutory "proxy" accurately.   Neither the statute nor its legislative history authorizes an

approximation; on the contrary, Congress intended the Secretary "to develop *accurate* data" for

the SSI fraction used in the "final settlement" for each fiscal year.  S. Rep. No. 99-146, at 291

(1985), *reprinted in* 1986 U.S.C.C.A.N. 42, 258 (emphasis added).

Nonetheless, the Secretary insists on *Chevron* deference to what he calls his

"construction of the Act," which is really just the belated view he expressed in deciding this case

---

[7]      *See East Tennessee Natural Gas Co. v. FERC,* 953 F.2d 675, 681 (D.C. Cir. 1992) ("Because the ALJ relied on substantial evidence in the record, coupled with a well-reasoned and highly sensible analysis . . . , we can find no basis upon which to accept the Commission's unsupported and ill-reasoned conclusion to the contrary."); *Morall v. DEA*, 412 F.3d 165, 167, 180 (D.C. Cir. 2005) (an agency's findings of fact cannot be upheld if the final decision departs from the fact findings by the administrative tribunal that heard the evidence directly without considering contradictory evidence and the credibility findings of the tribunal that heard the evidence).

that known errors in the calculations at issue are permissible so long as they are, in the Secretary's assessment, "moderate enough." Def. Br. 29. But, we already know the Secretary's "construction of the Act." It is reflected in his only pre-litigation regulation on this topic, promulgated more than 20 years ago. Like the statute itself, the regulation permits no approximations. Rather, the rule states that the agency will "determin[e] for each hospital *the number* of patient days of those dually entitled to Medicare Part A and SSI." 51 Fed. Reg. 31,454, 31,459-60 (Sept. 3, 1986) (final rule) (emphasis added); 42 C.F.R. § 412.106(b)(2)(i). That regulatory construction binds the Secretary to accuracy today, even if he *now* believes he could have properly construed the Medicare Act to tolerate errors in his count of SSI days. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974) ("[I]t is incumbent upon agencies to follow their own procedures . . . even where the internal procedures are possibly more rigorous than otherwise would be required.").

Nor does the Secretary have the option of reinterpreting his own rule to provide the tolerance for error he now espouses. Deference to such a construction is impermissible when either the plain language of the regulation will not bear the agency's interpretation or the interpretation is inconsistent with "other indications of the Secretary's intent at the time of the regulation's promulgation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal quotation marks and citations omitted). Not only does the language of the Secretary's regulation require determination of "*the number*" (i.e., not an estimate or approximation), 42 C.F.R. § 412.106(b)(2)(i), but the Secretary's original interpretation of the statute and regulation requires accuracy. As CMS notes, Def. Br. 8, 31-32, the Secretary accompanied his 1986 interim final DSH rule with the observation that, despite language in the Medicare Act requiring the agency to calculate the SSI fraction on a hospital fiscal year basis, for ease of administration,

the agency planned to perform its calculations based on the *federal* fiscal year, believing that "the percentage for a hospital's own experience during the Federal fiscal year should be reasonably close to the percentage specific to the hospital's cost reporting period." 51 Fed. Reg. 16,772, 16,777 (May 6, 1986) (interim final rule). Later, in the final rule, the agency determined that SSI fractions calculated for a federal fiscal year and for hospital cost reporting periods were nearly perfectly correlated and that the variance between these calculations for nearly all hospitals was not more than 2.3 percentage points. 51 Fed. Reg. at 31,459-60. Nonetheless, the Secretary agreed to calculate the fraction on a hospital fiscal year basis upon request, and dropped the earlier proposed requirement that a hospital would have to pay the agency for the administrative expense and burden of performing a recalculation for the hospital's own cost-reporting period. *Id.* at 31,459. Given the chance early on to place administrative convenience over accuracy and faithfulness to the statute, the Secretary plainly rejected the "close enough is good enough" policy that he now advocates.[8] DSH hospitals like Baystate, who would never again be permitted any insight into the Secretary's data match process (until this litigation), were entitled to assume from the Secretary's public pronouncement that his agency would be producing accurate numbers, not approximate ones, for the federal fiscal year.

The Secretary now admits that he has never achieved accuracy in his calculation of the SSI fraction, even though the statute and the Secretary's implementing regulation require

---

[8]    The same preference for accuracy is apparent in the agency's other work on the DSH program. The Secretary does not permit estimates for the Medicaid fraction, for instance, Pl. Stmt. ¶¶ 5, 189, and his agency has required recalculation of SSI ratios when errors in the hospitals' favor were as small as 1.8 percent and the resulting dollar impact was as little as $2,247. *Id.* ¶ 190.

calculation of "the number" of SSI days.  That alone requires reversal of the Secretary's refusal to correct errors in Baystate's prior fiscal years.[9]

>    **B.    The Secretary Acted Arbitrarily And Capriciously, And Without Due Regard For His Fiduciary Obligations, When He Deemed His Agency's Errors "Acceptable" And Unworthy Of Correction.**

Even if the Secretary could properly construe his regulation to authorize him to refuse to correct errors he deems insignificant (and he cannot), the Administrator's decision still would have to be reversed because the Secretary's exercise of that authority was arbitrary and capricious, and it also violated the fiduciary obligations he assumed when he undertook to calculate the SSI fraction on the hospitals' behalf.

>    **1.    The Secretary Owes An Obligation Of Reasoned Decisionmaking Under The APA As Well As Fiduciary Obligations As A Result Of His Decision To Assume Sole Responsibility For The SSI Calculation.**

Whether in promulgating a rule or, as here, in implementing a prior rule, an agency has a "responsibility for exercising its expertise in a reasoned manner," consistent with the "arbitrary and capricious" standard of the APA, 5 U.S.C. § 706(2)(A).  *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1164, 1169 n.46 (D.C. Cir. 1987).  In evaluating agency action under this standard, courts must conduct a "searching and careful" inquiry, "the keystone of which is to ensure that the Secretary engaged in reasoned decisionmaking."  *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 815 (D.C. Cir. 1983) ("*ILGWU*").  This "reasonableness-checking" inquiry is guided by a "variety of well-known factors almost in the nature of a

---

[9]    Even if the Secretary properly changed course when he reversed the Board and pronounced his agency's data match errors "acceptable" (and he did not), a reinterpretation like that could have only prospective effect.  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208-09 (1988) (barring retroactive rule changes without Congressional authorization).  So, too, with respect to the agency's 2005 Federal Register comments advancing administrative "finality" as a reason not to correct "reasonably accurate but not perfect calculations."  *See* Pl. Stmt. ¶ 172.  If those belated comments have any effect at all, it is purely prospective.

checklist," including "consideration of meaningful alternatives," "a reasoned explication of the choice made," and "demonstrating a reasonable connection between the facts found and the option selected." *Continental Air Lines, Inc. v. Dep't of Transp.*, 843 F.2d 1444, 1451 (D.C. Cir. 1988). *See also Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Any "artificial narrowing of options" by the agency is "antithetical to reasoned decisionmaking," *ILGWU*, 722 F.2d at 817 (citation and internal quotes omitted). The agency also must be able to reproduce its analysis for the reviewing court so that a "rational connection between the facts found and the choice[s] made" can be discerned from the record. *Brookings*, 822 F.2d at 1165 (internal quotations and citation omitted).

Even when an agency expresses views on a matter for the first time in litigation (not the case here, given the 1986 regulations, *see* Part II-A above), those views merit deference only if they represent the agency's "fair and considered judgment on the matter." *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1016 (D.C. Cir. 1999) (internal quotations and citation omitted). Agency action "will not be upheld where the agency has intentionally omitted evidence from consideration . . . ." *Mt. Diablo Hosp. v. Shalala*, 3 F.3d 1226, 1232 (9th Cir. 1993) (citing *Pillai v. CAB*, 485 F.2d 1018, 1027 (D.C. Cir. 1973)). "*Post hoc* rationalizations advanced to remedy inadequacies in the agency's record or its explanation are bootless," *Brookings*, 822 F.2d at 1165, and "[d]eference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate." *Georgetown*, 488 U.S. at 213.

Finally, particularly in light of the undisputed fact that the Secretary's data, calculations, and reasoning are known only to his agency, the burden of demonstrating reasonableness is his, not Baystate's. *See Nat'l Commc'ns Ass'n, Inc. v. AT&T Corp.*, 238 F.3d 124, 130-31 (2d Cir.

2001) (applying "[t]he general rule . . . that the party that asserts the affirmative of an issue has the burden of proving the facts essential to its claim"); *Tendler v. Jaffee,* 203 F.2d 14, 18 (D.C. Cir. 1953) ("proof of a negative averment must be made by the one who has peculiar knowledge of its subject matter").

A second set of equally familiar principles must be applied here as well.  The Secretary concedes that APA standards and fiduciary standards "co-exist" in some cases. Def. Br. 14.  *See Cobell v. Kempthorne*, 455 F.3d 301, 304, 306-07 (D.C. Cir. 2006) (simultaneously applying both "administrative law and trust law"), *cert. denied,* 127 S. Ct. 1875 (2007).  This is one of them.  A fiduciary relationship is understood to arise when one party assumes "'de facto control and dominance'" over another, such that the second person must rely on the first to protect his interests.  *United States v. Chestman*, 947 F.2d 551, 568-69 (2d Cir. 1991) (en banc) (quoting *United States v. Margiotta,* 688 F.2d 108, 125 (2d Cir. 1982)).  *See United States v. Mitchell*, 463 U.S. 206, 225 (1983) ("'[W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists . . . even though nothing is said expressly in the authorizing or underlying statute . . . about . . . a trust or fiduciary connection.'") (quoting *Navajo Tribe of Indians v. United States*, 624 F.2d 981, 987 (Ct. Cl. 1980)).  In this instance, the Secretary took it upon his agency to calculate the SSI fraction, without input from the hospitals and without any opportunity in the ordinary course for hospitals to assure themselves of the process and the SSI data used by the Secretary to perform his calculations.  Pl. Stmt. ¶¶ 6-7, 12.  As a result, the hospitals necessarily were dependent on the competence, candor, and good faith of the public officials at HHS – all hallmarks of a classic fiduciary obligation.

In the administrative context, the existence of fiduciary duties "necessarily constrains" an agency's discretion. *Cobell v. Norton*, 240 F.3d 1081, 1099 (D.C. Cir. 2001).[10] "When faced with several policy choices, an administrator is generally allowed to select any *reasonable* option," but where fiduciary obligations are owed, "his actions must not merely meet the minimal requirements of administrative law, but also must pass scrutiny under the more stringent standards demanded of a fiduciary." *Id.* (emphasis added) (quoting *Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555, 1563 (10th Cir. 1984)). Fiduciaries must act on an informed and conscientious basis in their management and disposition of assets, *Cobell v. Norton*, 225 F.R.D. 41, 52 (D.D.C. 2004), and they must keep such records as are necessary to "render a complete and accurate historical accounting" of their actions. *Cobell*, 240 F.3d at 1104. Of particular importance here, a fiduciary may not knowingly make inaccurate disbursements. *See Cobell v. Babbitt*, 91 F. Supp. 2d 1, 6 (D.D.C. 1999) (government trustee issued payments to Indian beneficiaries "in erroneous amounts – from unreconciled accounts – some of which are known to have incorrect balances"). Moreover, the complexity of the regulatory scheme administered by the agency is no excuse for failing to discharge its fiduciary obligations. *Boivin v. U.S. Airways, Inc.,* 297 F. Supp. 2d 110, 117 (D.D.C. 2003) (a government fiduciary "cannot escape its fiduciary duties by claiming that its job is 'complex.'").

### 2.    The Secretary's Handling Of The Match Process Has Been Neither Reasonable Nor Consistent With His Fiduciary Obligations.

Especially telling in this case is the Secretary's concession that representatives of his agency cannot recount for the Court any contemporaneous decisions made by the agency when it discovered problems in the match process, which Baystate later identified in this case. Pl.

---

[10]    The presence of fiduciary duties also gives the Court substantial latitude to "fashion an equitable remedy" for an agency's unlawful conduct. *Cobell*, 455 F.3d at 305 (internal quotations and citation omitted).

Stmt. ¶ 140(f).  In other words, while he demands deference to his current litigation-orientated "'ideas on the trade-off between absolute accuracy and cost,'" Def. Br. 30 (quoting *Cobell v. Norton,* 428 F.3d 1070, 1074 (D.C. Cir. 2005)), the Secretary is unable to identify any such judgments at or around the time that these problems arose.[11]  The agency's acknowledged inability to articulate its contemporaneous reasoning is cause enough for reversal,[12] but it is hardly the only one.  Despite evident limitations in the agency's own understanding of what it did and why (and its admitted resistance to discovery on the question), we know enough about its management of the data match process during the time period at issue to conclude that CMS was making patently *unreasonable* decisions, stunningly devoid of care and good faith, that could not possibly be redeemed later.

    The Secretary's mismanagement of the match process began almost immediately.  Despite the Secretary's representation in the preamble to the 1986 DSH rule that CMS would use Social Security numbers to match records, and for reasons that CMS admits are unknown now (Pl. Stmt. ¶ 85), the agency instead proceeded to match records based on a Medicare identification number, the "HICAN," and a "title II" number on SSI records, which in some cases will not match for the same patient who was enrolled in Medicare and entitled to SSI benefits during an inpatient hospital stay.  *See* Pl. Stmt. ¶¶ 48-74, 91-115; Def. Leavitt Stmt. ¶ 31; Pl. Resp. ¶¶ 21, 31.  The agency admits that its use of these identifiers produces match results that are not as accurate, and are understated, as compared with the result that would

---

[11]     *See* Pl. Stmt. ¶ 148 (CMS Administrator never claimed that the agency based its decision not to correct known errors in 1996 on any assessment of the financial impact of those errors and, indeed, no CMS witness was able to articulate the agency's reasons for that decision); *see also* Pl. Resp. ¶ 35.

[12]     *See AT&T Co. v. FCC,* 974 F.2d 1351, 1354-55 (D.C. Cir. 1992) (noting that an agency must "articulate a satisfactory explanation for its action," and holding that the agency's "*Reconsideration Order* is arbitrary and capricious for want of an adequate explanation").

obtain from matches based on individuals' own Social Security numbers.[13]  *See* Pl. Stmt. ¶¶ 91, 113-15; Def. Leavitt Stmt. ¶ 31.  The Secretary does not use these same identifiers when he works with SSA on another match process, which is designed to match SSA records with CMS's data in order for SSA to monitor reduced payments to SSI recipients when they are residing in certain medical facilities for a month or more.  *See* Pl. Stmt. ¶ 51.  That process relies on Social Security numbers, not "HICANs" or some other numbers.[14]

In the face of that evidence, the Secretary's defense is glib – that he never actually promised to use the beneficiary's "own" Social Security number, only that he would use "a" Social Security number and that HICANs and Title II numbers usually (not always) consist of somebody's "social security number" (albeit not necessarily the beneficiary's *own* social security number) and additional alpha-numeric beneficiary identification codes that are later "equated" in CMS' match process.  Def. Br. 43-44.  This is double-speak, unaccompanied by any rational explanation for why these numbers were used when the preamble to the Secretary's DSH rule said that the agency would use *Social Security numbers* – which CMS processes.  The

---

[13]    The CMS employee who runs the agency's match program, Dean, contradicted himself when he testified on two occasions about how the identification numbers actually were used in the match program.  The Administrator based his decision on only one of Dean's differing accounts, without acknowledging or even accounting for the other.  Pl. Stmt. ¶ 90.  *See Morall*, 412 F.3d at 167, 180 (an agency's decision cannot stand when it fails to consider contradictory record evidence).

[14]    It is not insignificant that the more accurate matches performed with Social Security numbers in this context serve the government's interest, in that a missed "match" in this setting would result in the government paying more SSI cash benefits than it should.  In contrast, missed matches in CMS's calculation of SSI fraction, due to use of other identifiers like HICANs, *saves* the government money – fewer matches, the lower the SSI fraction, and the lower the hospitals' DSH payments.

Secretary's "explanation" certainly is not indicative of the candor reasonably expected of a public official, whether or not he is also a fiduciary.[15]

The pattern repeats itself when one examines other aspects of the setup of the data match. This multibillion dollar program is founded on a data match process concocted over the phone by one programmer at each of the relevant agencies after an exchange of letters. *See* Pl. Stmt. ¶ 51.[16] The Secretary ignored published federal data processing, management and verification standards, so there was never any organized process for determining the appropriate fields to use in the SSA data, for verifying that the results were accurate, or for assuring that the results were saved so that they could be replicated later if necessary. *Id.* ¶¶ 180-84. The Secretary's witnesses have admitted that there are aspects of this process that they simply cannot explain or even recall, particularly the reasons for setting it up in this way, and that the agency cannot

---

[15]    It is simply not credible for the Secretary to suggest (Def. Br. 43-44) that, by "Social Security number," he meant to refer to HICANs and Title II numbers rather than to each recipient's "own" unique Social Security number, or that any reasonable person would have interpreted his statement in the preamble to the 1986 DSH rule in that way. Nobody, not even the Secretary, calls a HICAN or a title II number a "social security number." *See* Def. Leavitt Stmt. ¶¶ 17, 20. Moreover, a HICAN does not always include a social security number – sometimes the HICAN assigned to a Medicare patient is a "railroad retirement number" followed by an alpha-numeric beneficiary identification code. *Id.* 8 n.1.

[16]    Though the Secretary insists that his agency did communicate with SSA (Def. Resp. ¶ 136), he cites to only *one* example of a meeting between CMS and SSA – one that took place in 1991 and in which the agencies concluded that "it appears, from the information gathered at the meeting, that the correct SSI data is being matched to the MEDPAR data and; therefore, all SSI percentages are correct." AR 1493-94. *One* meeting in 1991 does not amount to "adequate, reasonable communication and coordination." Moreover, the 1991 meeting was not a meaningful effort to test or validate the accuracy of the SSI data that CMS was receiving from SSA. The memorandum regarding the meeting, prepared by CMS' employee, Tayloe (AR 1493-94), confirms that she came away from it with a significant misunderstanding of the meaning of one of the two codes (M01) that SSA used to identify SSI recipients. Although the M01 code denotes a forced payment situation (AR 1493-94, 5087), Tayloe misunderstood the code to signify the payment of spousal benefits. If Tayloe had properly understood that the code signifies a forced pay situation, then, with the exercise of only minimal diligence, CMS and SSA almost certainly would have realized as early as 1991 that SSA was incorrectly omitting all forced pay cases from SSA's annual tapes.

replicate its calculations of the SSI fractions for the years in question.[17] *See id.* ¶¶ 42, 61, 75, 83, 85, 86, 91, 93-94, 109. Again, this is a far cry from the process employed for the match process performed to monitor proper payment of SSI benefits, which was the product of a coordinated effort between CMS and SSA to "identify the functional requirements for the match" and then to "test[] and validat[e] the match program." *Id.* ¶ 51. And again, the Secretary's response is glib and legalistic: Compliance with federal "FIPS" information processing standards was "not mandatory," he says, and violations of the standards give rise to no "private rights of action." Def. Br. 15-16 n.9. That is not the point. The issue is not whether anyone could sue the agency for damages caused by its sloppy records management, but whether the agency acted reasonably and competently so as to sustain the Secretary's after-the-fact judgment that the resulting errors required no correction. Processing important information in a haphazard manner is not reasonable, especially when the agency has shown in other contexts that it knows how to do the job correctly.

The timing of the data match also defies logic. Even though it takes little effort for SSA to produce its records (Pl. Stmt. ¶¶ 29, 43), and even though CMS admits that later data is more accurate than earlier data (*id.* ¶ 44), the Secretary uses an SSA data tape produced six months after the close of the federal fiscal year to perform a calculation that will take another two years or so to make its way into the agency's reimbursement decision for hospital fiscal years that began in the federal year. Pl. Resp. ¶ 39. In the intervening time, CMS matches its MEDPAR data against updated SSA records several more times before the issuance of a final DSH payment

---

[17]    There is no dispute that CMS possesses the data it used to calculate the SSI fractions that were applied to determine the Hospital's DSH payment for some of the years at issue, including fiscal year 1995. Pl. Stmt. ¶¶ 228-30. But, CMS cannot reconcile that data with the SSI fractions that were actually distributed by CMS and applied to determine the Hospital's payment. *Id.*

determinations to hospitals. Pl. Stmt. ¶¶ 38-40. Those later matches – already in hand and concededly more accurate (*id.* ¶ 44) – are nonetheless ignored for purposes of the DSH payment determination. The calculation used to determine payment employs only the results of the earlier match. This makes no sense, and indeed, CMS admits that the agency cannot explain the choice to proceed in this way. *Id.* ¶ 42.

As problems inevitably became apparent, the agency at the very least failed to address them, and worse, appears to have actively concealed them. The Secretary protests that CMS did not learn specifically about the omission of "stale records" from the SSI data until 1996, Def. Br. 39-41, but there is no dispute that CMS knew it had a serious problem with the SSI data by 1993 at the latest. Pl. Resp. ¶ 34 (3d sentence). Indeed, the CMS Administrator took no issue with the Board's finding that the "uncontroverted evidence shows that CMS knew, at least by 1993, that there was a problem with the SSI data that CMS had been receiving from SSA." PRRB Dec. at 25, AR 155.[18] CMS witness Rosenberg testified that the phenomenon that perhaps most clearly indicated the problem – SSI patient days were dropping out of the numerator of the SSI fraction with each successive recalculation of one hospital's SSI fraction for a given year (1989) – was

---

[18]    The Hospital's DSH consultant, Pfeil, testified that, from 1993 to 1995, he had been in contact with three CMS employees, Ann Tayloe, Daryl Rosenberg and Helen Nolt, about a problem with CMS' calculation of another hospital's SSI fraction for federal fiscal year 1989. AR 5419-29, 1583-1602. In that case, the SSI days kept falling out of the numerator of the hospital's SSI fraction for 1989 through three successive efforts by CMS to recalculate the 1989 SSI fraction for the hospital's two campuses. *Id.* Pfeil testified that by no later than February 1994, Tayloe had admitted to him that there must have been a problem with the SSA data, going back to 1990, AR 5419-20, and that statement is also reflected in a March 1995 letter from Pfeil to the hospital. AR 1591 ("HCFA believes that the problems . . . are not a product of the Medicare files . . . *The problem appears to be with the Social Security files that the Medicare data is matched against to identify SSI recipients*.") (emphasis added). In their testimony before the Board in this case, neither Tayloe nor Rosenberg denied that CMS knew by 1993 that there was a problem with the SSA data. On the contrary, Rosenberg testified that CMS knew that there was "something wrong with the numbers" even *before* 1993, when Pfeil began contacting them about his client's problem. AR 5582.

apparent from the agency's discussions with Baystate's witness, Pfeil,[19] and definitely raised a "red flag" that something was wrong with the data. AR 5586.

There is similarly no dispute that CMS never took any step to apprise hospitals of the fact that there appeared to be a problem with the data used in the calculations of the SSI fractions. Pl. Stmt. ¶ 140(e). To the contrary, in 1995, when CMS knew that there was a problem with that data, the agency and its principal DSH policy analyst, Tayloe, represented in 1995 (Tayloe under oath at a deposition and the agency in the Federal Register) that the SSI data was "verified" and "correct," inappropriately deflecting requests that the agency allow hospitals to verify the data themselves on the false representation that CMS did not have the SSI data used in its calculation of the SSI fractions. Pl. Stmt. ¶ 140[20]; *see also* 60 Fed. Reg. 45,778, 45,811-12 (Sept. 1, 1995) (final rule).

---

[19]    The Secretary's attack on Baystate's consultant, Pfeil, Def. Br. 40, is unfortunate, a baseless and defensive reaction to the fact that the Board found Baystate's witnesses credible and, by and large, found the agency's witnesses to be ill-informed, evasive, and even "disingenuous." *See Morall*, 412 F.3d at 167, 180 (agency's final decision cannot stand when it ignores the credibility findings of the administrative tribunal that heard the evidence directly). Even a cursory review of the Board's decision will confirm that the overwhelming evidence against the agency came out of the mouths of its current and former employees, and indeed, the Secretary's only quibble with Pfeil now relates to the single issue of the timing of the agency's knowledge of the stale records problem. *See* Def. Br. 40. In any event, Pfeil was not designated or accepted as an expert witness, did not deliver expert testimony, and the Hospital fully disclosed his financial interest in the case in written discovery responses provided to CMS long before he testified at the hearing in 2004. Pl. Resp. ¶ 14. His testimony drew no objection or motion to strike, and he was not cross-examined on the issue of any alleged bias. *Id.* Indeed, the Secretary's own counsel specifically requested the testimony of Provider's consultants at the evidentiary hearing in 2003. *Id.* In July 2004, the Secretary's counsel also informed the Hospital's counsel that he wanted Baystate to make witnesses from the Hospital's consulting firm available for examination at the hearing on the merits. *Id.*

[20]    On further questioning at her deposition, Tayloe admitted that what she meant when she said the data was "verified and correct" was only that she *assumed* it was, and that her agency had made no attempt whatsoever to assure its accuracy. Def. Br. 42-43 n.28. In other words, she had no basis for testifying as she did about the accuracy of the data. CMS just "accepts what SSA sends." *Id.* (citing AR 976-77). Having just negotiated a private settlement with one

To this day, the Secretary cannot recount his agency's reasoning for not correcting known errors or investigating and addressing others as they came to light over the course of several years in the administrative proceedings below. The CMS employee primarily responsible for the match process and for maintaining the program even testified that no one from CMS had *ever* asked him to look at the data and see if there appeared to be a problem. Pl. Stmt. ¶ 87. Agency decisionmakers do not remember what they did or did not do, let alone why. Pl. Resp. ¶ 34 (3d sentence). In particular, they cannot recall what they found when, having finally acknowledged their "stale records" problem, they tested their data in 1996 against corrected SSA records. *Id.* Nor can anyone explain – not even the agency "policy" people who all CMS witnesses agree made the decision – why the agency elected not to correct the erroneous reimbursement decisions that had issued as a result of admittedly tainted data. *Id.* The closest we come to an explanation is the testimony of one of those "policy" people, who admitted to recalling nothing about the matter (Pl. Stmt. ¶¶ 140(f), 141), but acknowledged that she might not have paid too much attention to an error in the range of a "few hundred million dollars," given the overall size of the Medicare Program. *Id.* ¶ 141.

The Secretary would like to excuse all of this by claiming administrative discretion to tolerate reasonable, unavoidable imperfections in the data used to make his calculations. Even setting aside the obvious point that no such excuse could possibly be available when agency employees conceal or simply ignore their mistakes, the cases he cites do not support the excuses offered here. In *Mt. Diablo Hospital v. Shalala*, 3 F.3d 1226 (9th Cir. 1993) (cited at Def. Br. 30), the Ninth Circuit rejected hospitals' challenge to the Secretary's decision not to factor the

---

hospital over apparent problems with the SSI data used in the calculation, however, Tayloe knew for a fact that the data was certainly not "verified and correct." Pl. Stmt. ¶ 140. *See supra*, n.18.

use of part-time workers into the wage index used for purposes of Medicare reimbursement. Unlike here, however, the legislative history for the statute at issue plainly stated that the data available to the agency was going to be "imprecise" and "less than perfectly reliable." 3 F.3d at 1233.[21]  The agency was required to choose between two "imperfect" databases, and made an informed, rational choice between them pending ongoing efforts to develop its own better data. *Id.*  The Secretary made no such informed choice in this case.  He set up the data match process on the fly, with no effort to verify its results.

Another wage index case, *Methodist Hospital v. Shalala*, 38 F.3d 1225 (D.C. Cir. 1994) (cited at Def. Br. 30) is also inapposite.  The plaintiff hospitals sued to compel the Secretary to retroactively adjust their Medicare reimbursement to address an error in the wage index caused by one non-party hospital's submission of erroneous wage information to the Bureau of Labor Statistics.  38 F.3d at 1228.  In rejecting that challenge, the Court noted that the wage index necessarily was only approximate (based as it was on wage data from past years), that there was no dispute that the agency had relied on the "most reliable data available" at the time, and that the agency had made a "concrete" showing that a retroactive corrections policy in these circumstances "would cause a significant, if not debilitating, disruption to the Secretary's administration of the already-complex Medicare program."  38 F.3d at 1230, 1233.  Here, in contrast, a patient's SSI entitlement is a matter of fact, not of estimation from past data.  Second, the Secretary did not use the best data that was available to CMS.[22]  And, finally, as discussed in greater detail below, the Secretary has made no credible showing of administrative burden.

---

[21]    *Compare* S. Rep. No. 99-146, at 291 (1985), *reprinted in* 1986 U.S.C.C.A.N. 42, 258 (Secretary required "to develop *accurate* data" for the SSI fraction used in the "final settlement" for each fiscal year) (emphasis added).

[22]    There is no dispute that inactive records were available at the time CMS calculated the SSI fractions, yet these records were omitted from CMS' calculations for 1993 and 1994.  Def.

The Court of Appeals' decision in *City of Brookings Municipal Telephone Company v. FCC*, 822 F.2d 1153 (D.C. Cir. 1987), is far more instructive. There, a number of local telephone companies challenged an FCC-approved change in the method of their reimbursement for providing local access to long distance service. The entity designated by the agency to produce the relevant cost schedules admitted that "'certain deliberative steps' were never reduced to writing and could not be documented," and that "'critical calculations' had not been preserved at the time they were performed" and therefore had to be reconstructed later. 822 F.2d at 1159. The plaintiffs complained that no reasonable connection was discernible in the data to the "average schedule costs or revenue requirements" they purported to measure, that the data contained "obvious mathematical errors," and that the underlying calculations were not disclosed. *Id.* at 1160, 1167. In response, the agency's designee acknowledged that "'improvements are possible in the studies, methodologies, and data'" it employed, but invoked its "expert judgment" to excuse the errors and chastised plaintiffs for holding it to an "'unrealistic' standard of statistical precision." *Id.* at 1160-61 (citation omitted). For the agency, it was sufficient – despite the errors – that the schedules appeared to mark an improvement over earlier iterations. *Id.* at 1161. In other words, like the Secretary here, the FCC in *Brookings* acknowledged serious error, but declined to do anything about it on grounds that its calculations were "close enough." *See id.* at 1167 ("[R]ather than reveal the path it took to reach this conclusion by explaining why the shortcomings pointed out with such scorching heat by

---

Leavitt Stmt. ¶ 34. Additionally, there is no dispute that the manual or forced pay records were available at the time CMS calculated the SSI fractions, yet these records were also omitted from CMS' calculations. *Id.* ¶¶ 37-38. Finally, there is no dispute that records reflecting individuals receiving non-cash benefits were available at the time CMS calculated the SSI fractions, yet these records were also omitted from CMS' calculations. Pl. Stmt. ¶¶ 174-76.

petitioners did not lead to seriously flawed results, the FCC directs the onlooker to comments in support of [the agency's] proposal.").

The D.C. Circuit's response was appropriately blunt: "This will not do as reasoned decisionmaking." *Id*. at 1168. Whatever the merit of the concepts advanced in the agency's new methodology, the Court held, "the undisputed omissions in data and methodology appear to have made it impossible to reproduce how [the agency] translated these concepts into hard figures." *Id*. Likewise, however "imperfect" the world in which the agency may operate, the Court held that it must explain why shortcomings in its approach were either unavoidable or remediable in the future. *Id*. "Lacking any indication of such a reasoned determination, however, we are forced to conclude that the FCC *acted irrationally in glossing over gaping holes*, especially in light of errors and anomalies in what [its designee] did submit." *Id*. (emphasis added). The Court also reversed the agency's decision on grounds that it had failed to consider alternatives to the flawed data and methodology it presented, choosing instead to offer "*post hoc rationalizations*" to the effect that the alternatives proffered by the plaintiffs were "impractical, expensive, and time-consuming." *Id*. at 1168-70.

The same result must follow here. The Secretary cannot simply announce that he is untroubled by acknowledged errors in the way his agency does business, without sharing the results of any contemporaneous assessment of those errors, without articulating his reasons for failing to correct them at the time, and without showing that he timely considered the feasibility of alternative methods that might have produced better results. Taking belated potshots at Baystate's evidence during litigation is no substitute for the rational, engaged decisionmaking that should have taken place years ago, and as in *Brookings*, amounts to little more than "glossing over gaping holes."

3.    **The Record In This Case Contradicts The Secretary's *Post Hoc* Rationalization Of Prior Unlawful Conduct.**

In the usual case, an agency would defend past decisions by reconstructing for the reviewing Court the facts found by the agency and the analysis it applied at the time. As shown, the Secretary cannot do that here, both because he admits ignorance about decisions made before administrative litigation ensued and because the prior record on its face is indefensible. That leaves the Secretary to excuse past errors by arguing for deference to his made-for-litigation judgment that the magnitude of those errors, as revealed in this case, is insufficient to justify the administrative burden of fixing them. Where fiduciary duties are involved, as they are here, the very idea of refusing for any reason to correct known errors in the handling of another's money is unthinkable. *See Boivin,* 297 F. Supp. 2d at 118 (finding likelihood of success on the merits of plaintiffs' claim that the Pension Benefit Guaranty Corporation breached its fiduciary duty by refusing "timely to correct mistakes after the mistakes have been brought to its attention"). Fiduciary duties aside, though, the Secretary's balancing of accuracy versus cost of error correction is a classic "*post hoc* rationalization" by an agency on the defensive about its acknowledged past failures, and the record will not support it. *See Georgetown*, 488 U.S. at 212 ("We have never applied [*Chevron* deference] to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice.").

The first step in the Secretary's belated "cost-benefit analysis" is to minimize Baystate's evidence of the impact of the agency's data match errors. There is no genuine dispute, however, that only the agency has access to the SSI data necessary to quantify those errors, that Baystate sought *all* of that data in discovery, and that the Secretary successfully resisted producing all but a narrow portion of it. Pl. Stmt. ¶¶ 144, 157, 218-56.    CMS did not proffer record evidence of

its own on the economic impact of its errors, but has confined itself to attacking Baystate's inferences from the relatively little data that the agency did agree to turn over.[23]

An agency does not act reasonably when it bases its decisions on a subset of data despite having access to more complete data. It is one thing to generalize from a limited sample when that sample is representative or the only one available; "[i]t is another thing altogether to generalize from an extremely limited sample when a broader sample . . . can be readily obtained and when no showing of the representativeness of the sample is made." *Nat'l Lime Ass'n v. EPA*, 627 F.2d 416, 434 n.52 (D.C. Cir. 1980). Nor is it permissible for an agency to excuse its policies by guessing that their impact will be small. *See ILGWU*, 722 F.2d at 823 n.59 (declining to credit Secretary of Labor's "general and wholly unverified conclusion that 'it appears'" the number of people affected by his decision to rescind a regulation "will be small"). *See* Def. Br. 33 (admitting "it is *impossible* to be sure what the exact impact of this error" was, but concluding nevertheless that the "average hospital" would have "'about four stale records omitted from its calculation, some more, some less, some zero'") (emphasis added) (quoting 1 AR 47).

But there is perhaps an even more fundamental problem here, and that is the basic unfairness and irrationality of an agency making decisions based on a record deliberately limited so as to support those decisions. *See Mt. Diablo*, 3 F.3d at 1232 ("[A]n action will not be upheld where the agency has intentionally omitted evidence from consideration . . . ."); *ILGWU*, 722 F.2d at 817 ("artificial narrowing of options" is "antithetical to reasoned decisionmaking"). In

---

[23] It is strange for the Secretary to claim that his decision not to correct errors was a reasonable one when his agency professes uncertainty about the prevalence of its errors, let alone their economic impact. *See, e.g.*, AR 3638-39 (CMS response to Provider Interrogatory 27) (CMS "does not know whether, or to what extent" it omitted inpatient days for which the patient was entitled to SSI "due to a reversal of a determination of ineligibility" or due to a reversal, correction or resolution of a suspension of SSI benefits); Pl. Stmt. ¶ 87 (agency's lead employee responsible for the data matching program testified that no one at CMS had yet asked him to look at the data and see if there appeared to be a problem).

*Atlanta College of Medical and Dental Careers, Inc. v. Riley*, 987 F.2d 821 (D.C. Cir. 1993), the

plaintiff colleges attempted to demonstrate to the Department of Education that its calculation of

the schools' student loan default rate was inaccurate, and therefore could not support the

agency's decision to terminate their eligibility under the federal student loan guaranty program.

Default rate information was solely in the possession of the agency and its subordinate agencies,

as is the case here with respect to SSI data. Nonetheless, the schools were able to identify from

their own records several categories of likely errors in the agency's calculation, just as Baystate

identified a series of errors in CMS' data match based on the relatively little information it had.

987 F.2d at 825. *See* Pl. Stmt. ¶ 235. As here, there was no question that the schools had done

all they could to present evidence that the agency's calculations were wrong. 987 F.2d at 831.

*See* Pl. Stmt. ¶¶ 218-56. In response, the agency and its guaranty agencies confirmed a few of

those errors (as CMS has here) and rejected the rest, largely without explanation. 987 F.2d at

825.

       The district court reversed the agency and the D.C. Circuit affirmed, holding that "the

Secretary could not deny a claim on the ground that the schools had not excluded possible

scenarios that could affect the accuracy of the schools' submissions *when those scenarios could*

*only be eliminated with information unavailable to the schools.*" *Id.* at 830 (emphasis added).

Under those circumstances, the Court held, the agency was required to produce "countervailing

evidence or a reason, not based on the insufficiency of the school's showing, that explains why

the school's allegations have not been accepted." *Id.* at 831.[24]

---

[24]    The holding of *Atlanta College* is but a specific application of the longstanding general rule that a litigant has no obligation to establish facts peculiarly within the knowledge of its adversary. *See, e.g., Wash. Metro. Area Transit Auth. v. Jeanty,* 718 A.2d 172, 176 (D.C. 1998).

In this case, the Secretary claims to have "sustained" his production burden under *Atlanta College*, Def. Br. 17 n.10, but he does not say how, and he has produced no countervailing evidence on economic impact. Instead, just as the Department of Education did in *Atlanta College*, the Secretary has merely come up with "possible scenarios" in which Baystate's numbers might be unreliable or insignificant. *See* Def. Br. 32-37. *Atlanta College* requires reversal.

In fact, the rule of *Atlanta College* has special force given the active measures the agency employed to limit the record available to the Board. The examples are many,[25] but one bears particular emphasis. In August 2000, the PRRB issued a subpoena requiring CMS to produce that data it used to compute the SSI fraction for the Hospital's fiscal year 1995. AR 5845-49. In 2001, after the Hospital sued in this Court to compel a response to the Board's subpoena, the agency moved to dismiss, submitting the supporting declaration of its employee, Robyn Thomas, who stated under penalty of perjury that the "files" that CMS used to calculate the Hospital's SSI fraction for fiscal year 1995 were no longer available, Pl. Stmt. ¶ 222, and that the Secretary had "answered the PRRB's subpoena as completely and accurately as possible." AR 599. Baystate responded to the declaration with skepticism, suggesting that, at the very least, CMS could use the MEDPAR records that would have existed as of 1996 to "reproduce the data for the specific patients and days that were included in the actual percentage computed by the agency in 1996."

---

[25] The degree to which CMS resisted discovery is really quite extraordinary. Before agency witnesses testified, CMS counsel "cautioned" the agency's Board (the Secretary objects to calling it a "warning," Def. Resp. ¶ 231) that it ought not accede to any more of what CMS viewed as invasive discovery demands by Baystate. Pl. Stmt. ¶ 231. Seeing this "caution" for what it was (a shot across the bow at fact finders employed by the defendant agency itself), the Board Chairman reminded agency counsel of the difficulty the Board and the hospital had in getting relevant information out of the agency, commented on the agency's possible "willful ignorance" in managing "federal health care funds," and assured counsel that, despite his "caution," the Board would indeed "get to the bottom of this and get the facts out." Pl. Stmt. 233.

AR 681.  In reply, the Secretary reaffirmed the Thomas Declaration, stating again that "the Secretary has answered the subpoena at issue as completely and as accurately as possible" and specifically that the Secretary had "released all of the data in his possession that is responsive to the subpoena at issue" after having "conducted an exhaustive search of its data banks."  AR 688.

Through later examination of agency witnesses, we now know that, when the Secretary's counsel submitted the Thomas Declaration to this Court, the Secretary had the June 1996 version of the MEDPAR file – the very same file that the Secretary now admits the agency used to calculate Baystate's SSI fraction for fiscal year 1995.  *See* Def. Leavitt Stmt. ¶¶ 20-23.  The Secretary now says that the Thomas Declaration did not expressly deny the existence of the June 1996 MEDPAR file, Def. Br. 38, but Thomas surely did not acknowledge the existence of that highly responsive data.  The subpoena did not ask for specific files; rather, it plainly and clearly required CMS to provide information (*e.g.*, patient names and identification numbers) for the patients and patient days that were included in the numerator and the denominator of the SSI fraction that *it calculated* for the Hospital's fiscal year 1995.  The Thomas Declaration indicated that this data was no longer available, seconded by the Secretary's own counsel, who represented that "the original data utilized by HCFA in calculating the [DSH] amounts for Baystate Medical Center, fiscal years 1993-1995 is no longer available."  AR 679.

That was false.  There is no question that CMS used the June 1996 version of the MEDPAR file to calculate the Hospital's SSI fraction for 1995, that CMS had that file when the Secretary's counsel submitted the Thomas Declaration to this Court, and that the Secretary only produced that file to the Hospital when its existence was revealed through examination of a CMS witness before the Board.   As the Board Chair summed it up during that 2003 discovery hearing:

> I would just comment that just based upon the records availability yesterday that there did seem to be a semantics war going on there.  It was very – it became very

clear after lengthy examination that even though Mr. Dean didn't have the original physical tape that SSA sent[,] you [CMS] had a problem. **You [CMS] had it all along. It was right there**.

AR 1838 (emphasis added); *see also* AR 1777-78, 1781-83, 1792-93.

In light of this kind of conduct – weakly defended as not *necessarily* perjury, *see* Def. Br. 38-39 – it borders on nonsense for the Secretary to ground his decision not to correct known errors on an alleged lack of demonstrated impact of those errors in the record of this case. His agency deliberately abridged that record in order to support a preordained conclusion.

Moreover, despite the Secretary's troubling manipulation of the evidence of impact, it is apparent that the likely dollar impact of his errors is massive. Indeed, after the smoke clears from the Secretary's unfounded attacks on Baystate's evidence,[26] we are left with conceded error rates by the Secretary that translate to hundreds of millions of dollars in DSH underpayments to the roughly 2,000 DSH hospitals nationwide, just for the four years at issue.[27] There was evidence before the Board of even more sizeable impacts in other years. Pl. Stmt. ¶ 145. Sizeable impact can be inferred, too, from the simple fact that the Secretary – while conceding

---

[26]    For example, Defendant alleges incorrectly (Def. Resp. ¶ 120) that there is no factual basis for the statement that Baystate's DSH payment would increase by an average $830 for each SSI day added to the numerator of the SSI fraction for the years at issue. The DSH calculation and formula at AR 4820 shows the effect of a 10 percent increase in the number of SSI days in the numerator of the SSI fraction. In 1993, for example, the addition of 475 SSI days increases the DSH payment by $307,123, or an average of $647 for each additional SSI day. The average additional DSH payment for each additional SSI days for all four fiscal years at issue is $830 per day.

[27]    Even the three to four hospital stays that the Secretary concedes were omitted per hospital in 1993 and 1994 due to the "stale records" problem would result in an $81.3 million impact for those years. Pl. Stmt. ¶ 146. Likewise, the .15% error the Secretary deems acceptable in his counting of manual or "forced pay" SSI days represents a $80 to $140 million impact nationwide per year. *Id.* ¶ 159-60. And, in the course of contesting Baystate's estimate of a .75% failure rate in the match process due to the Secretary's decision not to use Social Security numbers as promised, the Secretary concedes an even larger error rate of 1.59 percent, *id.* ¶¶ 104, 117, which more than doubles Baystate's estimate of a $400 to $700 million impact per year. *Id.* ¶¶ 119-22, 186.

that no accurate quantification of his errors is possible without access to records the government alone possesses – has either ignored or resisted efforts to use those records to do so. *See Int'l Union, UAW v. NLRB*, 459 F.2d 1329, 1336 (D.C. Cir. 1972) ("when a party has relevant evidence within his control which he fails to produce, that failure gives rise to an inference that the evidence is unfavorable to him").

In 1996, for example, the agency obtained corrected SSI records from SSA and created special MEDPAR files for the purpose of determining whether there was any material difference in the SSI calculation as between the old and new SSI records. Pl. Stmt. ¶ 129. The special MEDPAR files would have shown the impact of using corrected SSI records "by year, by hospital, and by stay." *Id.* ¶ 137. A summary of the results, prepared by CMS, shows 17 new SSI additions in the corrected records for every deletion of an SSI record that appeared in the old records. *Id.* ¶ 130. Otherwise, however, there is no trace of the outcome – CMS did not publish any disclosure of the results, agency witnesses profess to know nothing about why there was no correction to any previous SSI calculations, and the records reflecting this examination later disappeared from under the desk of CMS' lead programmer.[28] *Id.* ¶¶ 139-40, *see also* Pl. Resp. ¶¶ 34, 35. Years later, with the concurrence of the Board and SSA, Baystate proposed that SSA

---

[28]    The possibility that CMS would not have known at the time these records were lost or destroyed that they would be relevant to this later dispute with Baystate, *see* Def. Br. 15, is beside the point. The agency undertook to quantify the impact of its errors and then the outcome of that analysis largely disappeared from the face of the earth. A logical inference is that the impact was substantial; if it were insignificant, it stands to reason that the agency would have been at pains to make that fact known and to carefully preserve the proof that this was so. At a minimum, given the suspiciousness of this whole episode and all the other evidence of agency resistance to discovery of its errors, the Court should view with skepticism the agency's current assertions that its calculations produced an "acceptable" rate of error. An agency that cannot articulate the factual underpinning of its decisions acts arbitrarily and capriciously, and a fiduciary that does not maintain records sufficient to account for his actions has breached its fiduciary obligations.

release its SSI data for the years at issue to a third party contractor of CMS, who then – *at Baystate's expense* – would determine the correct number of the hospital's Medicare patients who were entitled to SSI during their stay. Pl. Stmt. ¶ 244. CMS refused. *Id.* ¶¶ 250, 253. That is not surprising. Previously, Ann Tayloe, CMS's lead policy analyst for DSH during the period at issue, had admitted that errors amounting to "a few hundred million dollars" might not have caught her attention. *Id.* ¶ 141.

Adding all of this together – and bearing in mind that the Secretary has articulated no standard for determining what degree of error is not "acceptable" to him, *see id.* ¶ 188, it is not possible to conclude that the Secretary reached any "fair and considered judgment" that the impact of his errors was trivial. *County of Los Angeles*, 192 F.3d at 1016 (internal quotations and citation omitted). On the contrary, the agency's admissions, its secrecy, and the very high dollar threshold it apparently sets for concern (in excess of "a few hundred million dollars") all suggest that the Secretary has greater insight into the magnitude of this problem than he admits to in this case, or that he allowed into the record in this case, and that the impact is substantial.

The Secretary's carefully worded brief suggests the same conclusion, more by silence than affirmation. The government's brief does not ever say, for instance, that the systemic impact of CMS errors is in fact known to the Secretary to be immaterial. Nor does the brief volunteer any information regarding whether this heated litigation – focused on serious, years-long, and systemic errors in his administration of a huge nationwide program – ever prompted the agency to undertake an assessment of the impact of its errors and its potential exposure to all DSH hospitals on these issues. It stands to reason that this must have occurred. If it did, and the answer was helpful to the Secretary, the assessment almost certainly would have found its way into these proceedings. Ignoring the elephant in the room, the Secretary is careful to comment

only on the Baystate record and to speculate over how that evidence might be flawed or distinguishable.

What, then, of the other aspect of the Secretary's "analysis," the burden on the agency to revisit and correct its erroneous calculations? The agency concedes that it faces no appreciable burden in recalculating Baystate's SSI fraction for the years in issue. Def. Br. 31.[29] The claimed problem instead is the "systemic burden of performing multiple recalculations for the many hospitals that have similar claims." *Id.* If the agency is going to invoke *systemic burdens*, however, it needs to have weighed those burdens against the *systemic impact* of its errors in order to produce a relevant, "apples to apples" comparison. Instead, the Secretary focuses on minimizing the evidence of impact on one hospital, Baystate, and then argues what amounts to a tautology – that the dollar impact on *one* hospital is substantially smaller than the agency's cost of fixing similar problems for *all* hospitals. That is arbitrary and capricious decisionmaking.

It is also the case that the record reflects no evidence at all of any systemic burden. Just as the Secretary has said, in effect, "trust me that the impact of my errors is small," he is also saying "trust me, this would be too expensive and time consuming to fix." The Secretary is obligated to articulate a rational factual and analytical basis for his decisions, and once again, he has failed to do so. In fact, the record on administrative burden weighs squarely against him. For example, SSA witnesses testified that SSA could easily produce their SSI data to CMS more

---

[29]    To the extent that Defendant suggests (Def. Resp. ¶ 43) that it would be a burden to distribute to intermediaries and hospitals the results of CMS' later data matches, Plaintiff notes that CMS distributes the results of its calculations of the SSI fractions by posting them on CMS' webpage. *See* http://www.cms.hhs.gov/AcuteInpatientPPS/05_dsh.asp. Similarly, the Court should disregard Defendant's protest that "some of the records needed to perform a recalculation are nonexistent." Def. Resp. ¶ 171. Not only does Defendant cite no record evidence to support this statement, but it is false. *See* Pl. Stmt. ¶¶ 219-29.

than once a year – producing the records is a matter of perhaps an hour of computer time. Pl. Stmt. ¶ 29. *See also id.* ¶ 155 (not difficult to correct the SSI records to reflect forced payments). Likewise, though CMS complains about the supposed burden of running a concededly more accurate later match, *it already does so* – several matches occur between the match that is used to calculate a hospital's SSI fraction and the date that the agency issues its final DSH payment determination to the hospital. *Id.* ¶ 39; Pl. Resp. ¶ 39. And CMS *actually did* a complete recalculation of all hospitals' SSI fraction in 1999, a recalculation that retroactively reduced Baystate's DSH payment for 1998. Pl. Stmt. ¶ 172(vi). What is evidently easy to do when there is money in it for the agency becomes unduly burdensome when the agency might owe money instead.

In the end, what is perhaps most significant on the question of burden is the Secretary's decision not to object to any aspect of Baystate's proposed order in this case. It is plain that the Secretary, having articulated neither the true impact of his errors nor the true burden of correcting them, is simply balking at the prospect of having to pay DSH hospitals more money.[30]

For these reasons, the record does not support the Secretary's assertion that the magnitude of his errors does not justify the burden on the agency to correct them. That decision must be reversed.

---

[30]     Although he insists that his documented historical aversion to the DSH payment is not relevant, Def. Br. 13-14 n.7, the Secretary takes the opportunity to remind the Court of his view that Baystate has already received a "substantial" DSH payment, Def. Resp. ¶ 132, and to cite a recent study for the proposition that DSH payments currently overcompensate hospitals for the cost of serving low-income patients, Def. Br. 31 n.18. The Secretary's unvarnished hostility to making payments mandated by Congress may not be relevant to the technical legal question of whether his construction of a statute is reasonable and therefore entitled to *Chevron* deference, *see North Broward Hosp. Dist. v. Shalala*, 172 F.3d 90, 94 (D.C. Cir. 1999), but there is no such issue in this case (*see* Part II-A above). The question instead is whether the Secretary has acted in a rational manner and with due regard for his fiduciary responsibilities. An assessment of the Secretary's intent is not necessary to answer "no" to that question, but it is certainly relevant.

**III.    The Secretary Unlawfully Excluded Patients Who Received Non-Cash Benefits From The Numerator Of The SSI Fraction.**

The government's brief assumes the conclusion to the CMS Administrator's argument (Def. Br. 19) that "the only form of SSI benefit under the Social Security Act is monetary."  Not true.

Title XVI of the Social Security Act (referred to as "subchapter XVI" in the U.S. Code) provides in section 1619(b) for non-monetary SSI disability benefits for individuals who return to work and are no longer receiving regular SSI benefits or special SSI cash benefits.  42 U.S.C. § 1382h(b).  As construed in SSA's regulation, section 1619(b) entitles such individuals to: (1) continuing eligibility for Medicaid; and (2) special SSI eligibility status.  20 C.F.R. § 416.264 (1995).

In its response to the Hospital's interrogatories in this case (AR 3591-3670), CMS conceded that it interprets the DSH statute to mean that an individual is "entitled to supplemental security income benefits" when "SSA considers the individual to be eligible for supplemental security income benefits."  AR 3636.  There can be no question that SSA considers individuals who qualify for special SSI and Medicaid eligibility status under section 1619(b) to be eligible for SSI benefits.

The SSA regulation relied upon by the PRRB (AR 159) states that "we [SSA] continue to consider you to be a blind or disabled individual receiving benefits even though you are in fact no longer receiving regular SSI benefits or special SSI cash benefits."  20 C.F.R. § 416.264 (quoted in PRRB Dec. at 29, AR 159).  Elsewhere, SSA also has said:  "For title XVI purposes, *we consider a benefit to be payable in a month when* ... we determine you are due a monthly payment, or *you are considered to be receiving SSI benefits in a month under section 1619(b) of the Act*."  70 Fed. Reg. 57,132, 57,133 (Sept. 30, 2005) (final rule) (emphasis added).  *See also*

61 Fed. Reg. 31,022, 31,024 (June 19, 1996) (final rule) (referring to "regular SSI benefits under section 1611 of the Act, special SSI cash benefits under section 1619(a) of the Act, [and] special SSI eligibility status under section 1619(b) of the Act . . . .").

In discussing its regulations implementing the version of section 1619(b) of the Act that was in effect during the periods at issue, and as amended by sections 2 and 4 of the Employment Opportunities for Disabled Americans Act, Pub. L. No. 99-643, SSA noted that Congress intended in section 1619(b) to afford disabled individuals the benefits of special eligibility status for Medicaid and SSI when they return to work:

> In enacting Pub. L. 99-643, *Congress recognized that disabled individuals who make work attempts may not be able to follow a steady progression from regular SSI status under section 1611 to special SSI cash benefit status under section 1619(a), to special SSI eligibility status under section 1619(b),* and then to a status of complete independence.  In reality, such individuals tend to have setbacks which may cause a drop in earnings and, therefore, a change in eligibility status.  According to the legislative history of Pub. L. 99-643, *it was Congress' intent to provide for easy transition, in either direction, between the various categories of benefits*.  Therefore, we revised § 416.1112(c)(6) to facilitate easier movement between different benefit statuses.  For periods prior to December 1, 1990, *an individual who remained continuously eligible for a benefit under section 1611, 1616 . . . , 1619(a), or 1619(b),* continued to qualify for the impairment-related work expense exclusion . . . .

59 Fed. Reg. 41,400, 41,402 (Aug. 12, 1994) (final rule) (emphasis added).

There is no question, then, that SSA interprets the SSI statute as affording non-monetary benefits to disabled individuals who are able to return to work.    That is the interpretation of the SSI statute that is pertinent here.   The CMS Administrator's interpretation of the SSI statute and regulations in his decision in this case, Adm'r Dec. at 49 (AR 50), is incorrect as a matter of law, and it is not entitled to deference, because the SSI statute and regulations are administered by SSA, not CMS.  *Dep't of Treasury v. FLRA*, 837 F.2d 1163, 1167 (D.C. Cir. 1988).

**IV.    The Secretary's Decision To Include Inpatient Days For Which No Medicare Payment May Be Made Is Invalid And Must Be Reversed.**

Although the Secretary has conceded, as he should, that the SSI fraction should not include Part A exhausted benefit days or Medicare secondary payer days that are not paid by Medicare Part A,[31] the Secretary maintains that the denominator of the fraction should include other days that are not, and cannot be, paid for by Medicare Part A.  Def. Br. 21-29.  At bottom, the Secretary argues that, for purposes of the DSH statute, the phrase "entitled to payments under Part A" includes days for which no payment of benefits may be made under Medicare Part A.

That interpretation of the statute is invalid, and it must be reversed.  As shown below, it is inconsistent with the Secretary's statements of intent when he adopted the DSH rule in 1986 and his subsequent interpretation of the same provision of the DSH statute in prior cases.  *See Thomas Jefferson Univ.*, 512 U.S. at 512; *see also Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 241 (D.C. Cir. 1992) ("[W]hen an agency [HHS] adopts a new construction of an old rule that repudiates or substantially amends the effect of the previous rule on the public, after the old interpretation of that rule has been advanced as a necessary interpretation of the statute and has been argued to and validated by the Supreme Court, the agency must adhere to the notice and comment rulemaking requirements of § 553 of the APA.").  The Secretary is bound by the interpretation of the DSH statute and regulation that he adopted in the preamble to the 1986 DSH rule unless and until he amends the DSH rule through the notice and comment rulemaking procedure prescribed by the Administrative Procedure Act.  *Nat'l Family Planning,* 979 F.2d at 240-41; *Monmouth Med. Ctr. v. Thompson,* 257 F.3d 807, 814 (D.C. Cir. 2001).  The Secretary did not invoke the notice and comment rulemaking procedure to amend his original interpretation of the DSH statute at any time before or during the periods at

---

[31]        *See* Def. Br. 24 & n.14; Def. Leavitt Stmt. ¶ 25.

issue. Accordingly, Medicare HMO days and other days that are not paid by Medicare Part A should not be included in the denominator of the SSI fraction for the period at issue.

A.    **The Secretary Interpreted The DSH Statute To Include Only Medicare-Paid Days In The SSI Fraction When He Adopted The 1986 DSH Rule.**

In the preamble to the Secretary's original rulemaking implementing the DSH statute, the final DSH rule promulgated on September 3, 1986, he explained that the Medicaid fraction and the Medicare/SSI fraction would include only Medicaid-covered days and Medicare-covered days, respectively. *See* 51 Fed. Reg. at 31,460-61. The Secretary further explained what days were considered to be Medicaid-covered days under his interpretation of the DSH statute: "that is, days that were *paid for* by the State's Medicaid program." *Id.* at 31,460 (third col.) (emphasis added). The Secretary added that this interpretation of the statutory provision defining the *Medicaid* fraction "is consistent with our interpretation of the *Medicare* portion of the DSH statute." *Id*. at 31,460-61 (emphasis added). By equating his interpretation of the Medicaid fraction to his view of the similar statutory language addressing the "Medicare portion" of the DSH statute, the Secretary established the SSI fraction would include only Medicare covered days that are "paid for by [Medicare]." *See id.* at 31,460 (stating that Medicaid covered days are days "that were paid for by the State's Medicaid program" and that the SSI fraction is interpreted in parallel fashion.)[32]

---

[32]    Consistent with that interpretation of the DSH statute, the Secretary's 1986 interim final rule stated that CMS would use the agency's Medicare Part A Tape Bill (PATBILL) file to calculate the Medicare/SSI fractions. 51 Fed. Reg. at 16,777. Unlike the MEDPAR file that was used to calculate the SSI fractions at issue in this case, the PATBILL file included a hospital's number of "Cost Report days," which consisted of "days credited to the provider's PS&R report as Medicare Days." Pl. Stmt. ¶ 207. The PS&R report "contains the details of the days for which a provider is paid by Medicare," *id.* ¶ 193 (undisputed), and "unlike the MEDPAR . . . the PS&R does not purport to contain days for which Medicare provided coverage and charged the beneficiary with 'utilization' of his/her available Medicare covered days but, for some technical reason, Medicare did not pay the hospital for the care." PRRB Dec. 35, AR 165; Pl. Stmt. ¶ 194 (undisputed). After the promulgation of the 1986 final DSH rule, CMS switched

As explained in Plaintiff's opening brief (7-8), after the Secretary adopted the final 1986 DSH rule, litigation ensued in several circuits concerning the agency's narrow construction of the Medicaid fraction to include only Medicaid-paid days.  In that litigation, the Secretary defended his interpretation of the Medicaid fraction based, in part, on his parallel construction of the DSH statute's definition of the SSI fraction as including only Medicare-paid days.  Excerpts of the briefs filed by the Secretary with the Fourth, Eighth and Ninth Circuits are included in the record.  AR 4120-4166; 4345-4361; 4363-4374.

For example, the Secretary's brief on appeal to the Eighth Circuit in the *Deaconess* case, AR 4126-4166, critiqued the district court's construction of the Medicaid fraction in that case on the ground that it "creates an illogical disparity between the Medicaid fraction, which supposedly counts 'unpaid' days, and the Medicare fraction, which concededly does not count 'unpaid' Medicare days."  AR 4138 (underscoring in original).  Similarly, the Secretary's brief on appeal to the Fourth Circuit in the *Cabell Huntington* case argued that "the Medicare fraction, 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I), counts only those 'patient days' that are actually paid by the Medicare program."  AR 4346.  Likewise, in his brief on appeal in the *Legacy Emanuel* case, the Secretary argued that his construction of the SSI fraction to "indicate paid Medicare days" supported his construction of the Medicaid fraction to "indicate paid Medicaid days."  AR 4361.

Although the Secretary's briefs in the prior litigation plainly represented that the Secretary construed the DSH statute to include only Medicare-paid days in the SSI fraction, the Secretary's brief in this case suggests that his prior representations to the courts "are, at most, ambiguous" on this point.  Def. Br. 24 n.13.  Apparently, the Secretary's current position is that he did not really mean what he plainly said to several federal courts before this one.  Perhaps not.

from using the PATBILL file to using the MEDPAR file for the calculation of the Medicare/SSI fractions, without advance notice or opportunity for public comment.  *See* Pl. Stmt. ¶ 207.

But, nevertheless, the Secretary is bound by his own rules, *Morton v. Ruiz*, 415 U.S. at 235, and

by his own contemporaneous statements of intent at the time he adopted the final 1986 DSH rule

that remained in effect during the periods at issue.  *See Thomas Jefferson Univ.*, 512 U.S. at 512;

*Monmouth Med. Ctr.,* 257 F.3d at 814.  This is especially so when the Secretary's statements of

intent at the time he adopted the 1986 DSH rule are consistent with the interpretation of the DSH

statute that the Secretary put forth to several federal courts in prior litigation.  *See Nat'l Family

Planning,* 979 F.2d at 241.  Whether the Secretary reasonably could have construed the DSH

statute in the first instance to include in the SSI fraction patient days that are not paid for by

Medicare Part A is beside the point.  The Secretary is bound by his contemporaneous statements

of intent at the time he adopted the final 1986 DSH rule and his subsequent, unambiguous

interpretation of the DSH statute in the prior litigation.

> **B.    The SSI Fraction Should Not Include HMO Patient Days That Are Not, And
> Cannot Be, Paid For By Medicare Part A.**

Albeit for different reasons than those offered by the CMS Administrator in the decision

below, the Secretary's brief maintains the untenable view that Medicare HMO days should be

included in the denominator of the SSI fraction.  Although the Secretary concedes that no

Medicare payment may be made for Medicare HMO patient days, Def. Br. 27, the Secretary

argues that HMO days should nevertheless be counted in the SSI fraction because these patients

are said to be entitled to benefits under Medicare Part A.  *See* Def. Br. 25-29.  That argument is

invalid, and Administrator's decision on this point should be reversed, for at least five reasons.

First, the argument presented in the Secretary's brief is not the basis for the

Administrator's decision in this case.  The Administrator concluded that HMO days should be

included in the SSI fraction because these days "are not paid to the provider by Medicare but are

covered days."  Adm'r Dec. at 34, AR 35 (emphasis in original).  Perhaps recognizing the fatal

and irreconcilable conflict between the Administrator's rationale for his decision in this case, the Secretary's prior statements of intent when he adopted the DSH rule in 1986, and the Secretary's proffered interpretation of the DSH statute when he previously appeared before the federal courts, the Secretary's counsel take a new tack here.  The government's brief now argues that even though Medicare may not pay for HMO patient days, these patients are nevertheless considered to be "entitled to benefits under Part A" for purposes of the DSH statute.  Def. Br. 25-26.  Courts must review agency action only on the basis of the rationale offered by the agency below, not on the different views the agency and its counsel may espouse later in litigation.  *See*, *e.g.*, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962); *Biloxi Reg'l Med. Ctr. v. Bowen*, 835 F.2d 345, 348 n.12, 351 n.18 (D.C. Cir. 1987).  The *post-hoc* rationalization offered by the Secretary's litigation counsel therefore is entitled to no deference, and the Administrator's decision in this case cannot be sustained on this basis.

Second, the Administrator's decision in this case and the arguments in the Secretary's brief are clearly contrary to the Secretary's established interpretation of the DSH statute and inconsistent with the language and design of the Medicare Act as a whole.  Again, the Secretary interpreted the DSH statute to include Medicare "covered" days (that is, Medicare *paid* days) when he promulgated the 1986 DSH rule (which remained in effect during the period at issue), and his current view that the SSI fraction may include days for which *no Medicare* payment may be made squarely conflicts with the narrower interpretation of the same provision of the DSH statute that the Secretary advocated in past cases.[33]  Moreover, the "benefit" provided under

---

[33]     *See Georgetown,* 488 U.S. at 212-13 ("Far from being a reasoned and consistent view of the scope of [the DSH statute], the Secretary's current interpretation of [the DSH statute] is contrary to the narrow view of that provision advocated in past cases . . . .  Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

Medicare Part A is the right to have payment made on one's behalf for inpatient hospital services, among other services.  *See* 42 U.S.C. § 426(c)(1) ("entitlement of an individual to hospital insurance benefits . . . shall consist of entitlement to have payment made . . . for inpatient hospital services.").  Having conceded that no Medicare payment may be made for HMO inpatient days, the Secretary cannot credibly maintain that an HMO enrollee is "entitled to benefits under Part A" for such days.  *Cf. Legacy Emanuel Hosp. & Health Ctr. v. Shalala*, 97 F.3d 1261, 1265 (9th Cir. 1996) (noting that entitlement to Medicare Part A for purposes of the DSH statute "means 'the absolute right to . . . payment.'") (quoting *Jewish Hosp., Inc. v. Sec'y of HHS*, 19 F.3d 270, 275 (6th Cir. 1994)).  The Secretary's own brief in the *Legacy Emanuel* case teaches that even if "the phrase 'entitled to benefits' . . . does not [necessarily] mean that Medicare will actually pay for specific days of care[,] . . .[t]he Medicare fraction then uses the phrase 'for such days' to indicate paid Medicare days."[34]  AR 4361 (emphasis added).

Third, having previously established his interpretation of the DSH statute as including only Medicare-paid days in the SSI fraction, the Secretary cannot include HMO days for which no Medicare payment may be made without first invoking the notice and comment rulemaking procedure mandated by section 553 of the APA.  In the 1986 DSH rule, the Secretary interpreted the DSH statute to include Medicare "covered" days in the SSI fraction.  51 Fed. Reg. at 31,460.  In the same rulemaking, the Secretary defined Medicaid "covered days" to mean "days that were paid for by the State's Medicaid program," and stressed that his policy on Medicaid "covered"

---

[34]    As the Secretary points out, individuals who are enrolled in Medicare HMOs "were" (past tense) entitled to Part A benefits.  Def. Br. 25.  This entitlement is a precondition to HMO enrollment, and ceases upon enrollment.  *See* 42 U.S.C. § 1395mm(a)(6) (only the HMO is entitled to receive payments from the Secretary under Part A for services furnished to a Medicare enrollee).  In any event, even if the Secretary considers HMO enrollees to be "entitled to benefits under Part A" for purposes of the Medicare HMO statute, the Secretary did not construe that phrase to have the same meaning for purposes of the DSH statute during the period at issue.

days in the Medicaid fraction was consistent with his policy on Medicare "covered" days in the SSI fraction. *Id.* at 31,460-61. In order to change his interpretation so as to include HMO days for which no payment may be made under Medicare Part A, the Secretary must first give hospitals the advance notice and opportunity to comment required by the APA and the Secretary did not invoke that procedure before or during the period at issue[35] *See Thomas Jefferson Univ.*, 512 U.S. at 512, 515 (no deference is owed to an agency's interpretation of a regulation that is inconsistent with indications of the agency's intent at the time of its adoption); *Nat'l Family Planning,* 979 F.2d at 240-41; *Monmouth,* 257 F.3d at 814.

Fourth, the Secretary's inconsistent treatment of HMO days as Medicare days only for purposes of the DSH calculation and not for any other Medicare payment purpose is arbitrary and capricious. There is no dispute that the Secretary treats Medicare HMO days as non-Medicare days for all other purposes, including for purposes of calculating the Medicare patient load fraction that used to determine Medicare payments to hospitals for graduate medical education ("GME") costs. Pl. Stmt. & Def. Resp. ¶ 215 As noted in the Board's decision (AR 170), and in Baystate's opening brief (at 40-41, 43-45), the Secretary has never provided a rational explanation for this inconsistent treatment of HMO days.

The government's opening brief offers nothing more in the way of a rational explanation for the Secretary's inconsistent treatment of HMO days. *See* Def. Br. 25-29. The Secretary's

---

[35] In response to a comment received on a proposed rule that had nothing to do with inclusion of Medicare HMO days in the SSI fraction, the Secretary stated in the preamble to a 1990 rule that the agency had been counting Medicare HMO days in the SSI fraction since December 1, 1987. 55 Fed. Reg. 35,990, 35,994 (Sept. 4, 1990). But the Secretary did not afford hospitals the advance notice or an opportunity comment on the inclusion of HMO days in the SSI fraction, as required by section 553 of the APA, either in 1987 or in 1990. Moreover, the record shows that the agency did not consistently count, and knew that it was not consistently counting, HMO days in the SSI fraction during the period at issue. *See* Pl. Stmt. ¶¶ 211-15; Pl. Resp. ¶¶ 19, 26. So, whatever else the Secretary may have said about HMO days, his practice was not to count these days in the SSI fraction.

brief suggests that Congress somehow blessed the Secretary's inconsistent treatment of Medicare HMO days through its 1997 establishment of a separate GME payment calculation for Medicare HMO days. *See* Def. Br. 27-28. To be sure, as pointed out in our opening brief (41-42), Congress' 1997 enactment of a separate GME payment calculation for HMO days affirmed that these days should not be counted under the pre-existing law as days "attributable to patients with respect to whom payment may be made under part A." *See* 42 U.S.C. § 1395ww(h)(3). Congress' expression of its intent that HMO days should not be counted for GME payment purposes as Medicare days for which "payment may be made under part A" does not save – but rather condemns – the Secretary's inconsistent treatment of HMO days in the DSH calculation. As discussed above, the Secretary cannot credibly maintain on the one hand that HMO patients are entitled to benefits under Part A while admitting on the other hand that these patients are not entitled to have payment made under Part A.

Fifth, and finally, the Secretary's position on Medicare HMO days cannot be squared with the Secretary's concession here (as now enunciated in the Secretary's brief) that Medicare Part A exhausted benefit days and Medicare secondary payer days should not be included in the SSI fraction. With respect to Medicare secondary payer days, the Secretary concedes that "the extent to which a day is counted turns on the extent to which Medicare was called to make *payments*." Def. Br. 24 n.14 (emphasis added). Likewise, the Secretary admits that exhausted benefit days are excluded from the SSI fraction because Medicare beneficiaries are only "entitled 'to have *payment* made'" on their behalf for a certain number of days per spell of illness. Def. Br. 24 (emphasis added). So, here again, the Secretary is treating similar situations differently without providing a rational explanation for the inconsistency. That is arbitrary and capricious.

*See Nat'l Treasury Employees Union v. FLRA*, 399 F.3d 334, 337 (D.C. Cir. 2005) (no deference is owed to an agency policy has been erratically and inconsistently applied).

## CONCLUSION

For the foregoing reasons, Baystate's Motion for Summary Judgment should be granted and the Secretary's cross-motion for summary judgment should be denied.

Respectfully submitted,


*/s/* Christopher L. Keough
Christopher L. Keough
  DC Bar No. 436567
John M. Faust
  DC Bar No. 433553
Stephanie A. Webster
  DC Bar No. 479524
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

May 18, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of May, 2007, I electronically filed the foregoing PLAINTIFF'S REPLY MEMORANDUM  IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN OPPOSITION TO DEFENDANT LEAVITT'S MOTION FOR SUMMARY JUDGMENT and PLAINTIFF'S RESPONSE TO DEFENDANT LEAVITT'S STATEMENT OF MATERIAL FACTS, with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record for the Defendants:

LISA A. OLSON
U.S. Department of Justice
20 Massachusetts Avenue, N.W.
Room 7300
Washington, D.C. 20530


/s/ Christopher L. Keough
Counsel for Plaintiff