**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BAYSTATE MEDICAL CENTER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    C.A. No. 06-1263 (JDB) |
| | ) |
| MICHAEL O. LEAVITT, *et al.,* | ) |
| | ) |
| Defendants. | ) |
| ―――――――――――――――――――― | ) |

**PLAINTIFF'S RESPONSE TO DEFENDANT**
**LEAVITT'S STATEMENT OF MATERIAL FACTS**

Pursuant to Local Civil Rule 7(h), Plaintiff submits the following response to

Defendant Leavitt's Statement of Material Facts As To Which There is No Genuine Issue

("Def. Leavitt's Stmt.").

Before addressing the factual allegations in the numbered paragraphs of the

Secretary's Statement, however, Plaintiff states that there appears to be a genuine issue as

to which of the defendants in the case has asserted the allegations made therein.  The title

of the document suggests that it is only Secretary Leavitt's statement, but the first

sentence of the document indicates that it was submitted by both "defendants."

Similarly, Defendants' Response to Plaintiff's Statement of Material Facts as to Which

There is No Genuine Issue ("Def. Response") indicates that it was submitted on behalf of

both "Defendant, Michael O. Leavitt, the Secretary of Health and Human Services (the

'Secretary'), and Defendant Jo Anne B. Barnhart, Commissioner of the Social Security

Administration."  But, Jo Anne B. Barnhart resigned as Commissioner effective January

19, 2007,[1]  and Michael J. Astrue was sworn as the Commissioner of the Social Security

Administration on February 12, 2007, well before that pleading was filed with the Court.

Further, no agency counsel for the Social Security Administration ("SSA") are listed on

Defendant Leavitt's Motion for Summary Judgment, or on Defendants' Memorandum of

Points of Authorities in Support of Defendant Leavitt's Motion for Summary Judgment

and in Opposition to Plaintiff's Motion for Summary Judgment ("Opp."), or on

Defendant Leavitt's Statement of Material Facts, or on Defendants' Response to

Plaintiff's Statement of Material Facts.  For these reasons, Plaintiff disputes that any of

those pleadings reflect the factual allegations, responses, legal arguments, or

interpretations of any statute or regulation by the Commissioner of the Social Security

Administration, as opposed to those of litigation counsel for Secretary Leavitt.

     4.    Plaintiff disputes the fourth sentence of this paragraph.  Specifically,

Plaintiff disputes that "Congress intended the DSH fraction to be merely a 'proxy

measure for low income.'"  The term "DSH fraction" is not used in the House Report

cited in support of this allegation.  *See* H.R. Rep. No. 99-241, 15-19, reprinted in 1986

U.S.C.A.A.N. 579, 593-97.  The portion of the House Report cited in Defendant Leavitt's

Statement addressed a particular provision of a House Bill (H.R. 3128, § 105) that would

have provided for a disproportionate share hospital ("DSH") payment adjustment only for

larger urban hospitals and based solely on a fraction representing "the percentage of a

hospital's total patient days attributable to medicaid patients (including medicaid-eligible

medicare beneficiaries—medicare/medicaid crossovers)."  H.R. Rep. No. 99-241 at 16,

reprinted in 1986 U.S.C.A.A.N. at 594. The House Report indicated that this Medicaid

fraction would serve as a "proxy measure for low-income" patients.  *Id.*  Recognizing that

---

[1] *See* Historical Information, Social Security Commissioners, posted at http://www.ssa.gov/history/commissioners.html.

this fraction alone may not be a perfect measure for low-income utilization, and that it could "substantially understate the presence of low-income patients," the House Report addressed the Committee's view that "any reasonable adjustment that could be implemented in FY 1986 would be better than none" in the face of the Secretary's continuing failure "to implement a disproportionate share adjustment in any meaningful way," despite "several mandates in the law."   H.R. Rep. No. 99-241 at 16, 18, reprinted in 1986 U.S.C.A.A.N. at 594, 596.

The House Report did not address the Medicare/SSI fraction, however, nor did it characterize the SSI fraction or the disproportionate patient percentage, which is the sum of the Medicaid and SSI fractions, as a proxy.  The Medicare/SSI fraction is addressed in a Senate Report (Senate Report 99-146) regarding a provision of a Senate bill (S. 1730) that proposed to establish a DSH payment based solely on "the percentage of a hospital's total Medicare patient days attributable to Medicare patients who are also enrolled in the federal Supplemental Security Income (SSI) program."  S. Rep. No. 99-146, 291-92, reprinted in 1986 U.S.C.A.A.N. 42, 258-59.  The Senate Report described that Medicare/SSI fraction as a "proxy measure for low-income Medicare patients" while clearly expressing the intent that the Secretary would be required to calculate this percentage accurately:  "[T]he Secretary would be required to pay hospitals interim rates based on historical data with final settlement based on actual data. . . .[T]he Secretary would be required to develop accurate data on Medicare patients who are also enrolled in SSI by October 1, 1986."  S. Rep. 99-146, at 291, reprinted in 1986 U.S.C.A.A.N. at 258.

10.    Plaintiff states that the second and third sentences of this paragraph are incomplete, and therefore disputed, insofar as it omit the following facts.

3

¶ 10, Second Sentence.  The Secretary used his MEDPAR file, not the Medicare

Part A Tape Bill (PATBILL) file that was mentioned in the preamble to the 1986 interim

final rule, 51 Fed. Reg. 16772, 16777 (May 6, 1986), to calculate the Medicare/SSI

fractions at issue in this case.  Def. Leavitt's Stmt. ¶ 23; Pl. Stmt. ¶ 40.  The PATBILL

file is not identical to the MEDPAR file that was used to calculate the Medicare/SSI

fractions for the years at issue in this case; among other things, the PATBILL file

included a hospital's number of "Cost report days," which consisted of "days credited to

the provider's PS&R report as Medicare Days."  Pl. Stmt. ¶ 207.  The PS&R report

"contains the details of the days for which a provider is paid by Medicare," Pl. Stmt. ¶

193, and "unlike the MEDPAR . . . the PS&R does not purport to contain days for which

Medicare provided coverage and charged the beneficiary with 'utilization' of his/her

available Medicare covered days but, for some technical reason, Medicare did not pay the

hospital for the care."  Pl. Stmt. ¶ 194.  After the promulgation of the 1986 final DSH

rule, CMS switched from using the PATBILL file to using the MEDPAR file for the

calculation of the Medicare/SSI fractions, without advance notice or opportunity for

public comment.  See Pl. Stmt. ¶ 207.

¶ 10, Third Sentence.  Plaintiff states that the third sentence of this paragraph is

incomplete, and therefore disputed, insofar as it omits that the May 6, 1986 interim final

rule also represented to hospitals that:  "[I]f a Medicare beneficiary is eligible for SSI

benefits (excluding State supplementation only) during a month in which the beneficiary

is a patient in the hospital, the covered Medicare Part A inpatient days of hospitalization

in that month will be counted for the purpose of determining the hospital's

disproportionate patient percentage."  51 Fed. Reg. at 16777 (emphasis added.)  The

above-quoted statement by the Secretary in the preamble to his 1986 DSH rule was unqualified; it admitted of no exception to the representation that if a Medicare beneficiary was eligible for Federal SSI benefits, the covered Medicare Part A inpatient days "will be counted" in the DSH calculation.

11.    Plaintiff states that this paragraph is incomplete, and therefore disputed, insofar as it omits the fact that, although the Secretary determined that the SSI fractions computed on a Federal fiscal year basis are "reasonably close" to the fractions computed for hospital cost reporting periods beginning in the federal year, the Secretary's <u>final</u> 1986 DSH rule allows hospitals to request to have their SSI fractions recalculated, without charge to the hospital, for their own hospital fiscal year.  51 Fed. Reg. 31454, 31459 (Sep. 3, 1986) (final rule); *see supra* ¶ 4.  Put differently, the final 1986 DSH rule effectively conceded that a "reasonably close" calculation of the SSI fraction is not good enough.  *Id.*

12.    Plaintiff disputes the first and third sentences of this paragraph for the following reasons:

¶ 12, First Sentence.  Plaintiff states that the first sentence of this paragraph is incomplete, and therefore disputed, insofar as it omits that the calculations at issue did not use the PATBILL file as a data source, but instead used the MEDPAR file.  *See supra* ¶ 10.  Further, while no commenter apparently expressed concern regarding "the time when the data match would be performed," the Secretary's 1986 DSH rule did not say when or how often the match would be performed and updated.  Moreover, the 1986 DSH rule did not advise hospitals that while the Secretary would perform 10 quarterly matches of CMS's inpatient hospital stay records and SSI data from SSA over the course

of approximately two and one-half years after the end of the subject Federal fiscal year,

Pl. Stmt. ¶ 38, the Secretary would only use one of the earliest of those matches to

calculate the SSI fractions that intermediaries would be required to apply in final DSH

payment determinations rendered 2-3 years after the end of the Federal fiscal year. Pl.

Stmt. ¶ 40.

¶ 12, Third Sentence.   The third sentence of this paragraph is incomplete, and

therefore disputed, insofar as it omits that the Secretary's final 1986 DSH rule allows a

hospital to request to have its SSI fraction recalculated, without charge to the hospital, for

the hospital's own fiscal year. 51 Fed. Reg. 31454, 31459 (Sep. 3, 1986) (final rule); *see*

*supra* ¶ 4 and 11.

14.    Plaintiff states that this paragraph is incomplete, and therefore disputed,

insofar as it omits the following facts.

The Administrator's challenge to the credibility of the two witnesses from

Baystate's DSH consulting firm rests on the fact, fully disclosed in Baystate's response to

CMS' discovery requests in this case (AR 3262), that Baystate pays its consulting firm on

a contingency-fee basis for the DSH consulting services which that firm provided to the

hospital for many fiscal years (not just the years at issue) and with respect to all aspects

of the DSH calculation (not just the SSI fraction). There was no agreement by Baystate

or its counsel, and there is no record evidence of such an agreement, to pay the witnesses

from the DSH consulting firm any fee whatsoever for their testimony in this case.

The Administrator acknowledges that the Hospital "did not proffer either witness

[from its consulting firm] as experts [*sic*]," Adm'r Dec. at 50 (AR 51), but nonetheless

faults the Board for crediting a few pieces of testimony that he characterized as "opinion"

testimony.  The Secretary's counsel, however, did not object to, or move to exclude or strike, the testimony that the Administrator's decision faults the Board for relying upon. Indeed, the Secretary's counsel specifically requested the testimony of Provider's consultants at the evidentiary hearing in 2003.  AR 7340.  In a telephone conference on July 14, 2004, the Secretary's counsel also informed Baystate's counsel that he wanted to examine witnesses from the consulting firm at the hearing on the merits, and these witnesses were later identified in an August 16, 2004 letter to the PRRB regarding the parties' joint agreement as to the witnesses that each had agreed to make available for examination at the hearing on the merits without need for subpoenas.  AR 7475-77.

15.    Plaintiff agrees that "the Administrator found that the more pertinent inquiry is the systemic burden of performing multiple recalculations for the many hospitals that have similar claims."  Plaintiff states that this statement is incomplete, however, and therefore is disputed, insofar as it omits that the Administrator's decision specifically referenced the "wider implications of [the Board's] decision in this case" in view of "the cases presently pending before [the Board] on this issue."  Adm'r Dec. at 54, AR at 55.

16.    Plaintiff disputes the statement in the second sentence of this paragraph that SSA sends CMS "a list of all individuals who are entitled to SSI benefits for any month during the past 39 or 40-month period."  As set forth in Plaintiff's statement of material facts, and in the decisions below, the uncontroverted evidence shows that the CMS did not use lists of "all individuals who are entitled to SSI benefits."  CMS instead used SSI data that was incomplete in several respects, including the omission of inactive SSI records for years prior to 1995, records of individuals who received manual payments

of SSI benefits during the inpatient hospital stays, records of individuals whose benefits were temporary on hold or in suspense, and records of individuals whose SSI benefits were retroactively granted or reinstated after CMS calculated the SSI fractions for a federal fiscal year.  Pl. Stmt. ¶¶ 123-176.

19.    Plaintiff agrees that the MEDPAR files have been drawn from the National Claims History ("NCH") database since 1995 and that the NCH "is a national repository of all Medicare claims processed by fiscal intermediaries."  *See* AR 5722-23. This paragraph is incomplete, however, and it is therefore disputed, insofar as it omits what the Secretary admits elsewhere:  Medicare (and its fiscal intermediaries) do not, and may not, make payment to hospitals for services furnished to Medicare HMO enrollees. Opp. at 27.   There is no evidence showing that Medicare Part A fiscal intermediaries process claims for services furnished to Medicare HMO patients.  *See id.*  Because the NCH is the repository of claims processed by fiscal intermediaries, there is no evidence in the record that Medicare HMO patient stays are included in the NCH, except as in this case, when HMO patient stays are billed in error to, and denied, for payment by the Medicare Part A intermediary.  Pl. Stmt. ¶ 211.  And, because the MEDPAR file has drawn from NCH since at least 1995, there is no evidence in the record that Medicare HMO days have been included in the MEDPAR since 1995 (except when billed in error to, and denied for payment by, the Part A intermediary).  CMS' principal MEDPAR programmer, Dean, testified that the HMO field on the MEDPAR file had not been used since at least 1995, which is when the MEDPAR files began to be drawn from the NCH. AR 5396.  Dean also testified in 2004 that "if these [HMO] records are in the national claims history data base they will be pulled into the MEDPAR system," AR 5396

(emphasis added), but Dean had readily admitted in prior testimony that he was "not real familiar" with the source of data in the NCH.  AR 5723.

21.    Plaintiff states that the third sentence of this paragraph is incomplete, and therefore is disputed, insofar as it relies on the 2003 testimony of CMS' principal MEDPAR programmer, Dean, for the statement that "CMS identifies the Medicare beneficiaries from among the individuals listed on the SSA file" and omits the following additional pertinent facts as to how CMS attempted to identify Medicare beneficiaries on the SSA file during the periods at issue.  Dean testified in 2003 that CMS' match program will drop any SSI records that do not display a Title II number:  "If there is no Title [II] number, which is all we are - you know, on our end, that is all we are really concerned about.  We are concerned with people who are on SSI and Medicare.  So this process would not write that record out.  So I wouldn't keep that record."  AR 5737. Dean further explained that his program assumes that only those records displaying a Title II number relate to Medicare beneficiaries:  "To me, that is the field that says they are eligible for Medicare."  AR 5737.  Regarding this process, the PRRB found:

> If the SSISORT program reformats the SSI data received from SSA to drop all SSI records that do not include a Title II number, as Dean testified in 2003, this creates a significant potential for error because, according to Shafer [the long-time SSA official], roughly half of the records on SSA's annual tapes would not have a Title II number.

Pl. Stmt. ¶ 99.

In his 2004 testimony, Dean contradicted the testimony he gave in the 2003 hearing.  Pl. Stmt. ¶¶ 81-82.  The PRRB found that Dean's inconsistent 2004 testimony was also discredited by its inconsistency with his testimony in a 1995 deposition and its inconsistency with CMS' own written discovery responses in this case.  Pl. Stmt. ¶¶ 83-87.  The Administrator's decision, however, credited Dean's 2004 testimony without

addressing or even acknowledging the Board's findings discrediting his testimony in 2004.  Pl. Stmt. ¶¶ 88-90.

23.    Plaintiff disputes the third sentence of this paragraph to the extent that it suggests that 98% of all SSI claims have been filed for the prior fiscal year by "each June MedPAR run."  The record evidence supports only that 98% of the Medicare claims for inpatient hospital stays have been filed by that time.  AR 5395, 5404, 5750-51.

24.    Plaintiff disputes the legal conclusion that CMS properly excluded from the numerator of the SSI fraction those patient days attributable to Medicare beneficiaries who qualified for SSI benefits under section 1619(b) of the Social Security Act, 42 U.S.C. § 1382h(b).

25.    Plaintiff disputes the first sentence of this paragraph for the following two reasons.  First, Plaintiff disputes the legal conclusion that CMS properly included days that were not paid for by Medicare Part A.  Second, the first sentence of this paragraph is incomplete, and therefore is disputed, insofar as it omits that the Board found "compelling evidence" showing that the "count of total Medicare days for the denominator [of the SSI fraction] is unreliable," that the Medicare days included in CMS' MEDPAR file did not include 61 Medicare inpatient hospital stays that were paid by Medicare Part A for two of the four years at issue, and that CMS could not explain or provide a reason for these discrepancies.  Pl. Stmt. ¶¶ 192-203.

26.    Plaintiff disputes this paragraph for the following two reasons.  First, Plaintiff disputes the legal conclusion that CMS properly included Medicare HMO patient days.  Second, this paragraph is incomplete, and therefore is disputed, insofar as it omits that the HMO days were only included in the Hospital's SSI fraction for the years

at issue when the HMO patient stays had been billed in error to, and denied for payment by, the Medicare Part A intermediary, and CMS has known for many years that it was not consistently counting Medicare HMO days in the denominator of SSI fraction.  *See supra* ¶ 19; Pl. Stmt. ¶¶ 211-16.

28.         Plaintiff disputes the second sentence of this paragraph where it states that "SSA's annual tape contains all individuals receiving SSI benefits."  It does not.  *See supra* ¶ 16.

29.         Plaintiff disputes the last sentence of this paragraph where it states that the SSA tape supplies a title II number to CMS "for purposes of the match."  The record evidence does not support the assertion that SSA intended for CMS to use that number for the match process instead of individuals' own social security numbers, which were also included on the SSA tape.  The former long-time SSA employee, Cribbs, who ran the program that created the annual SSA tapes for many years, testified that she was not aware that CMS was using the title II numbers for matching records on the SSA tape with CMS inpatient hospital stay records and if she had been aware, she would have suggested that CMS should use the social security numbers in the match process.  AR 5070.

31.         Plaintiff disputes the last sentence of this paragraph in the following respects.  First, the SSI records that were produced to Plaintiff in this case consisted of (i) records produced by SSA in a partial response to the Plaintiff's Freedom of Information Act request for the SSI records of all Medicare patients treated by the Hospital in any of the four fiscal years at issue and (ii) additional SSI records that Plaintiff was able to obtain on its own with the consent of still-living former patients.  Pl. Stmt. ¶¶ 237-255. Adm'r Dec. at 36-37 & nn. 64-65, AR 37-38 (citing Shafer's testimony, AR 5132-33,

5205). These records taken together did not make up a "sample" and the Secretary's Statement cites no record evidence supporting the Administrator's incorrect assertion that they were a "sample."

Second, those SSI records were not "likely to overstate any errors" and, again, the Secretary's Statement cites no record evidence supporting the Administrator's incorrect statement that they were likely to overstate errors. As indicated above, the only SSI records that were produced to Plaintiff in this case consisted of SSI records for now-deceased patients who were treated at the Hospital in 1994 and SSI records for other former patients who consented in 2002 to the release of their SSI records to the Hospital for the periods at issue. The SSI records for deceased patients treated in 1994 are the records that SSA agreed to produce in response to the Plaintiff's request for the SSI records of all Medicare patients who were treated by the Hospital in any of the four fiscal years at issue. Pl. Stmt. ¶¶ 238-240. The latter SSI records from the consent study are simply the SSI records of those former patients who consented to the release of their records. Pl. Stmt. ¶ 237. In neither case, did Baystate somehow skew the SSI records it received in order to overstate errors.

Third, the limited SSI records that were made available to Baystate in this case show that CMS failed to match SSI entitlement records with its inpatient hospital stay records for at least five, not just one, Medicare inpatient stays at the Plaintiff hospital during the period at issue. The undisputed facts relating to these five additional Medicare/SSI patient stays are as follows:

1)    CMS admitted in its discovery responses below that the patient stay identified as Master ID number 5676 involves an inpatient stay at the Plaintiff's hospital

in June 1993, that five Medicare days were counted in CMS' MEDPAR data, and that zero SSI days were counted in that MEDPAR data. AR 3616-17. According to CMS' witness from SSA, Walsh, SSI record for this same patient, AR 4041-49, shows that the patient was in continual SSI pay status from December 1992 through December 1995 and the SSI record for this patient would have been included on SSA's annual tape for fiscal year 1993, which was prepared in March 1994. AR 5598-99. Thus, the only remaining explanation for CMS' omission of the SSI days associated with this stay is that CMS failed to match to the SSI record.

2)     CMS admitted in its discovery responses below that the patient stay identified as Master ID number 17751 involves an inpatient stay at the Plaintiff's hospital in June 1994, that one or more Medicare days were counted in CMS' MEDPAR data, and that zero SSI days were counted in that MEDPAR data. AR 3623-24. The patient's SSI record, AR 4087-91, shows that this individual was entitled to SSI in June 1994 and there is no apparent reason why this SSI record would not have been on the SSI tape furnished to CMS by SSA. AR 3547-49 (Shafer Declaration, ¶¶ 8-10).

3)     CMS admitted in its discovery responses below that the patient stay identified as Master ID number 13607 involves an inpatient stay at the Plaintiff's hospital in June 1994, that one or more Medicare days were counted in CMS' MEDPAR data, and that zero SSI days were counted in that MEDPAR data. AR 3623-24. The SSI record for this individual, AR 4061-65, shows that the patient was entitled to SSI in June 1994 and there is no apparent reason why this SSI record would not have been on the SSI tape furnished to CMS by SSA. AR 3547-49.

4)      CMS admitted in its discovery responses below that the patient stay identified as Master ID number 10379 involves an inpatient stay at the Plaintiff's hospital in December 1993, that six Medicare days were counted in CMS' MEDPAR data, and that zero SSI days were counted in that MEDPAR data.  AR 3616-17.  According to CMS' witness from SSA, Walsh, the SSI record for this individual, AR 4041-49, shows that the patient was in continual SSI pay status from December 1992 through December 1995 and there is no reason why this SSI record would not have been included on the SSI tape that SSA furnished to CMS.  AR 5598-99.

5)      CMS admitted in its discovery responses below that the patient stay identified as Master ID number 9164 involves an inpatient stay at the Plaintiff's hospital in November 1993, that one or more Medicare days were counted in CMS' MEDPAR data, and that zero SSI days were counted in that MEDPAR data.  AR 3623-24.  The SSI record for this individual, AR 4061-65, shows that the patient was entitled to SSI during in November 1993 and there is no apparent reason why this SSI record would not have been on the SSI tape furnished to CMS by SSA.  AR 3547-49.

32.     Plaintiff disputes the second sentence of this paragraph.  Although the sworn testimony of CMS' principal MEDPAR programmer, Dean, at the 2004 hearing is inconsistent with his sworn testimony in the 2003 hearing, and with his sworn testimony in a 1995 deposition, and with CMS' written answers to interrogatories in this case, *see supra* ¶ 21, the record is not for that reason "unclear."  The Board found that Dean's inconsistent 2004 testimony was not credible.  Pl. Stmt. ¶¶ 81-87.  Defendant now says that the Board's findings on this point are not "material,"  Def. Response ¶¶ 82-87, but the Administrator, in crediting Dean's 2004 testimony, did not meet his burden to

acknowledge and to explain the reasons why the Administrator disregarded the Board's findings regarding the inconsistencies in Dean's 2004 testimony.  Pl. Stmt. ¶¶ 88-90.

34.    Plaintiff disputes the first and third sentences of this paragraph for the following reasons:

¶ 34, First Sentence.  Plaintiff disputes the first sentence of this paragraph insofar as it states that CMS had SSA prepare corrected SSI tapes "beginning with the 1996 fiscal year," and the previously omitted SSI records were included on data files prepared for CMS only beginning with fiscal year 1995.  In 1996, SSA furnished CMS with corrected SSI tapes that included the previously omitted inactive SSI records (whether the record became inactive due to death or for other reasons) for all fiscal years back to 1987. Pl. Stmt. ¶¶ 125-141; AR 2089-94, 2111.  CMS' original intent in requesting this corrected data was to determine the impact of the error and recalculate all of the prior years' SSI fractions if it was material.  Pl. Stmt. ¶ 129.  CMS then matched the corrected SSI data with its then-existing MEDPAR files of inpatient hospital stay records for prior years.  Pl. Stmt. ¶ 129.  But, for reasons that CMS cannot now explain, and that its employees do not admit to remembering, CMS did not use the corrected SSI data or the results of the matches of that data with MEDPAR records for prior years to correct hospitals' SSI fractions for prior years.  Pl. Stmt. ¶ 140(f).  According to the testimony of CMS employee, O'Leary, sometime in 1996, after CMS rematched its MEDPAR files with the corrected SSI records for prior years, CMS staff "got a different direction."  AR 5253-54.

¶ 34, Third Sentence.  Plaintiff disputes that "CMS learned from SSA that SSA was not sending over stale records" on February 15, 1996.  First, the PRRB found, and

the CMS Administrator did not dispute the Board's finding, that CMS knew about the omission of inactive SSI records at least by 1993. AR 155. The Administrator's carefully worded decision does not state when CMS learned of this problem. The Administrator's decision only addresses when CMS obtained corrected SSI records from SSA: "In 1996, upon learning that SSA had not been supplying it with stale records, CMS obtained updated SSI records from SSA." AR 45. The Administrator's decision does not necessarily address when CMS learned of the problem, and it cites no record evidence relied upon for the sentence quoted above. AR 45.

Second, handwritten notes of a meeting among CMS staff members on February 15, 1996 reflect that "Ann talked to SSA and found out that SSA has always left off dead people, when hospitals sent their own data in saw a drastic reduction in SSI." AR 2113. The same notes of the same meeting also state that "Ron talked to SSA programmer (Pat Cribbs) who said they always drop 'stale' people." *Id.* These notes do not state when "Ann" and "Ron" had these conversations with "SSA" and "Cribbs," and they do not show that these conversations were the first indication to anyone in CMS about the omission of the inactive SSI records. Cribbs testified before the Board that she discovered this problem during a meeting that she had with CMS staff sometime in 1996. AR 5093. However, every CMS employee who admitted to recalling anything about this problem testified that to the best of their recollection, someone working in their area in CMS (not SSA) discovered the problem. CMS' employee, Dean, testified in 2004 that he thought that another CMS employee, Janet O'Leary, discovered the problem, but Dean said he was not certain. AR 5398-99. O'Leary, on the other hand, testified in 2004 that she thought that Dean discovered the problem. AR 5213-14. Another CMS employee,

Rosenberg, testified in 2004 that CMS knew that there was "something wrong with the numbers" even *before* 1993, when Pfeil began contacting them about his client's problem with SSI records falling out of the numerator of the SSI fraction upon successive recalculations. AR 5582. In 2003, moreover, Rosenberg had testified that it was "my office that discovered what the problem was." AR 5774. When asked about how her office discovered the problem, she elaborated:

> I believe we actually started following the actual records that were disappearing. I mean, if they were disappearing, we went back and we discovered that they had died, and then we found out that SSI had not given us those what they call stale records. We were actually looking at it and trying to figure out what was wrong with it because of Dave Pfiel [sic]. He was the one who said the ratios were going down, and we were searching to find out why.

AR 5774.

The phenomenon alluded to in the notes of the February 15, 1996 meeting of CMS staff members – the "drastic" reductions in the SSI fractions when hospitals sent Medicare patient days data to CMS for recalculations of the hospital's SSI fraction for its own cost reporting period – was known to CMS as early as 1993, when Pfeil began communicating with three CMS employees, Tayloe, Rosenberg and Nolt, about SSI days that fell out of the numerator of a hospital's SSI fraction upon successive recalculations of that fraction by CMS for the same fiscal year. AR 5419-29, 1583-1602. Two CMS employees, Rosenberg and Phillips, testified that this phenomenon should have immediately raised a red flag. AR 5359-60, 5586.

35.     Plaintiff disputes this paragraph for the following reasons.

¶ 35, First-Third Sentences.  Plaintiff disputes the first three sentences of this paragraph because as the PRRB found, CMS' employee, O'Leary, admitted that the special MEDPAR files that CMS created by matching SSA's corrected SSI records to

CMS' inpatient hospital stay records for fiscal years prior to 1995 "would have shown the impact of the omission of stale records (as well as other updated SSI records) by year, by hospital, and by stay." Pl. Stmt. ¶ 137; *see also* AR 155, 5224-25. CMS employees testified, however, that CMS later "lost or destroyed" those special MEDPAR files, Pl. Stmt. ¶ 139, even though all MEDPAR files were supposed to be kept "permanently available." Pl. Stmt. ¶ 138.

¶ 35, Fourth Sentence. Plaintiff disputes the fourth sentence of this paragraph because no record evidence whatsoever supports it. *See* Pl. Stmt. ¶ 140(f). The Secretary's Statement cites Rosenberg's testimony on examination by the Secretary's counsel (AR 5563) for the statement that "CMS did not recalculate the Medicare fractions prior to 1995 because the information at the time suggested that the issue did not significantly affect individual hospitals' Medicare DSH adjustment amounts." The cited portion of Rosenberg's direct examination by the Secretary's counsel does not support that statement. In response to leading questioning by the Secretary's counsel, she testified that she did not know "what Ron Prahoda did with this information" and that she believed that Prahoda, O'Leary and Tayloe "discussed what to do with it, with the numbers. But I wasn't in on those discussions, so I really can't answer that." AR 5563.

36.     Plaintiff disputes this paragraph. No record evidence is cited for the allegations in the first, second, fifth or sixth sentences of this paragraph; the only cited support for the arguments made in those sentences are the arguments that were made in the post-hearing brief prepared by the Secretary's counsel (Romano and Soeffing). *See* AR 4528, 4555.

Further, the record evidence cited in this paragraph does not support the arguments asserted in this paragraph. *See* AR 5562, 5582-83, 5080-81. The cited testimony of CMS witnesses does not support the argument that if a significant number of SSI days were omitted from the calculations of the SSI ratios for years prior to 1995, then the percentage increase in the ratios from 1994 to 1995 would appear greater in relation to percentage increases between other years from 1993-2000. No CMS witness said that.

The statistics relied upon in support of the arguments asserted in paragraph 36 do not show what number of inactive SSI records and Medicare/SSI patient days were omitted from CMS' calculations of the SSI ratios for years prior to 1994. Defendant cites no record evidence on the many other variable factors (*e.g.*, local economic conditions, SSA outreach programs designed to educate low-income individuals about eligibility for SSI benefits) that would have impacted the percentage of Medicare patients who are low-income SSI recipients from hospital to hospital and from year to year from 1993 to 2000. There certainly is no record evidence showing, and Defendant cannot credibly maintain, that all other factors impacting the SSI ratios remained constant for each hospital and for all fiscal years from 1993-2000. In the absence of such evidence, no reasonable inference can be drawn from the statistics Secretary relies upon as to the impact of the Secretary's omission of inactive SSI records for years prior to 1995. For example, the statistics in footnote 2 to the Secretary's Statement neither prove nor disprove that Baystate's SSI ratios for 1994 and earlier years would have been greater, and other hospitals' SSI ratios for those years would have been greater, if CMS had included the inactive SSI records that in fact were omitted from its calculations of the SSI fractions for 1994 and prior fiscal years.

Finally, the arguments asserted in paragraph 36 of the Secretary's Statement are contrary to the uncontroverted record evidence. As the PRRB found, the record evidence shows that the omission of inactive SSI records would have a "major impact," although CMS' own witness admitted that the only way to know the impact for sure is to rerun the actual calculations. Pl. Stmt. ¶¶ 130-135. Further, as the PRRB also found, CMS previously obtained corrected SSI records from SSA with the original intent of recalculating hospitals' SSI fractions for all prior years before 1995. *See supra* ¶ 34. The agency then rematched the corrected records with CMS' inpatient hospital stay records for prior years to produce special MEDPAR files that showed "the impact of the omission of stale records (as well as other updated SSI records) by year, by hospital, and by stay." *See supra* ¶ 35. After that, CMS staff were given different marching orders, and the agency later "lost or destroyed" the special MEDPAR files, which showed the impact of the omission of stale SSI records by year, by hospital, and by stay. *Id.*

37. The third sentence of this paragraph is incomplete, and therefore disputed, insofar as it omits the fact that even after 1996, when SSA began sending "inactive" records reflecting manual payments of SSI benefits, CMS still would not have matched all Medicare/SSI beneficiaries who received manual payments of SSI benefits with CMS' inpatient hospital stay records in the MEDPAR file. Each of the three "records" sent to CMS by SSA in these situations, beginning in 1996, would be identified by the same title II number for the SSI recipient, if any title II number appeared at all. Pl. Stmt. ¶¶ 25-30, 53-65. CMS' program would treat the three records, therefore, as duplicate records and would eliminate two of the three accounting records for the SSI recipient. Pl. Stmt. ¶ 154. As a result, and as the PRRB found, there would be only a 1-in-3 chance even after

1996 that CMS would successfully match these record of an individual who received a manual payment of SSI benefits.  Pl. Stmt. ¶ 154.

38.    Plaintiff disputes the second sentence of this paragraph insofar as it suggests that there was a "sample" of cases and that a sample "was chosen from a population disproportionately likely to show the errors" committed by the Secretary.  *See supra* ¶ 31.

39.    Plaintiff disputes this paragraph in its entirety for the following reasons.

First, the Secretary's response to Plaintiff's Statement of Material Facts does not dispute the statement in paragraph 167 that "terminations of disability benefits are seldom made retroactively and most other denials are not made retroactively."   The Secretary's response to paragraph 130 of Plaintiff's Statement also does not dispute that CMS' summary of its special MEDPAR files, which were created with updated SSI records, indicated that the ratio of new SSI additions to old SSI deletions was greater than 17:1 for most years, including 1993 and 1994.  *See also, supra* ¶ 34.

Second, and for the same reasons set forth in the preceding paragraph, there is no genuine issue that the Secretary systematically understated the SSI fractions for the years at issue, as the PRRB found, by failing to apply the results of the subsequent data matches that CMS routinely performed against updated SSI tapes, long after CMS performed the original calculation of the SSI fraction for each Federal fiscal year and prior to the issuance of a final DSH payment determination for cost reporting periods that began in that Federal fiscal year.  Pl. Stmt. ¶¶ 38-45.  Under the DSH regulations, 42 C.F.R. § 412.106(b)(2)-(3), the SSI fraction computed for a particular federal fiscal year applies to cost reporting periods that begin in that year.  Pl. Stmt. ¶ 10.  According to the

Intermediary witness who testified in this case, Gouger, during the period at issue, the Medicare cost report settlement process was generally completed, as it was in this case, about two years after the close of a <u>hospital's cost reporting period</u>.  AR at 5504-05; *see* Def. Response ¶¶ 13, 15, 17.  Thus, for hospitals with a cost reporting period ending on September 30th (*i.e.* the federal fiscal year end), the cost report settlement process was usually completed and the DSH payment determination was issued approximately two years after the end of the Federal fiscal year; but, for hospitals with other cost reporting periods that began sometime during the Federal fiscal year, and ended after the September 30 end of the Federal fiscal year, the Medicare cost report settlement process was typically completed and a DSH payment determination was issued more than two years and up to three years after the end of the Federal fiscal year in which the cost reporting period began.  In all cases, CMS performed several additional matches of updated SSA records and inpatient hospital stay records in the time between CMS' original calculation of the SSI fractions for a Federal fiscal year and the later DSH payment determination that issued upon completion of the cost report settlement process. Pl. Stmt. ¶¶ 38, 40.

Third, the Secretary incorrectly states in the last sentence of paragraph 39 that the record shows "only 1" instance in which additional SSI days would have been added to the numerator of the SSI fraction if CMS had used the later data matches it performed against updated SSI records.  As set forth in paragraph 134 of Plaintiff's Statement, the Board compared the numbers of SSI and Medicare patient days included in CMS' June 1995 calculation of the Hospital's SSI fraction for the 1994 fiscal year with the numbers of SSI and Medicare patient days included in CMS' December 1996 calculation of the

Hospital's SSI fraction for 1994 and found that this comparison "showed that the Provider had 400 more SSI days while only 2600 more [Medicare] covered days which could be due to retroactive SSI eligibility determinations and/or restored [SSI] records." In other words, while the total number of Medicare days counted in the denominator of CMS' December 1996 calculation was 4.03% greater than the number of Medicare days counted in CMS's June 1995 calculation, the total number of Medicare/SSI days that were counted in the numerator of the SSI fraction numerator grew by an even greater percentage, 7.5%. Pl. Stmt. ¶ 134. Thus, the Board found that the "discrepancy between the earlier calculation and the 1996 run [for the Hospital's 1994 fiscal year] alone illustrates that the original data was inaccurate." PRRB Dec. at 25, AR 155. Thus, there is no genuine issue that retroactive determinations have the net effect of increasing the number of Medicare/SSI patient days counted in the numerator of the SSI fractions.

Fourth, Plaintiff disputes that "627 patients [were] randomly sampled by the hospital." *See supra* ¶ 31.

40.    Plaintiff disputes the argument in this paragraph that it would be "unlikely" that the Secretary would "find more [patients] who were entitled to both SSI and Medicare" if the agency used the later data matches it routinely performed with updated SSI data after CMS originally calculated the SSI fractions for the years at issue and before final DSH payment determinations were issued for cost reporting periods that began in those Federal fiscal years. *See supra* ¶ 39. For the same reasons, Plaintiff disputes that any "delay" would have been occasioned by the Secretary's use of the results of the later data matches that were performed before final DSH payment determinations were issued for the Federal fiscal years at issue. *See supra* ¶ 39. With

exception of the statement that the "SSI program is now 'basically a disability program,'" the factual predicates for the arguments asserted by the Secretary in paragraph 40 are unsupported by any evidence in the record.

41-42. Plaintiff disputes the arguments asserted in these paragraphs, based on the same argument asserted in the post-hearing brief prepared by the Secretary's counsel (AR 4511-13) in connection with the administrative proceedings below, that "subsequent awards of SSI to Medicare beneficiaries are unlikely to occur as a result of disability appeals." Even assuming *arguendo* that retroactive awards of SSI benefits are "unlikely" in the sense that less than 13% of a hospital's Medicare inpatient days could be impacted (and there is no direct evidence in the record showing that to be true), the evidence shows that the SSI ratios at issue were understated in material respects as a result of CMS' failure to consider or apply the results of later data matches that CMS routinely performed with updated SSI data for the Federal fiscal years at issue, after CMS originally calculated the SSI fractions for the years at issue and before final DSH payment determinations were issued for cost reporting periods that began in those Federal fiscal years,  *See supra* ¶ 39; *see also* Pl. Stmt. ¶¶ 116-122.

43. Plaintiff disputes this paragraph to the extent that the Secretary relies upon it to assert that the Secretary did not resist efforts by Plaintiff and the Board to obtain discovery of pertinent records, particularly the SSI records for all Baystate's Medicare inpatients during the periods at issue, as the PRRB's decision notes that he did. PRRB Dec. at 25 & n.135, AR 155; *see also* Pl. Stmt. ¶¶ 137, 144, 218-256. In particular, there is genuine dispute that CMS resisted the efforts to obtain the current SSI records needed

to measure the precise impact of the errors and omissions in the Secretary's calculations of the SSI fractions for the years at issue. Pl. Stmt. ¶¶ 238-255.

Further, the allegations in paragraph 43 of the Secretary's Statement are incomplete, and therefore disputed, insofar as most of the discovery produced by CMS was irrelevant or unresponsive to Plaintiff's discovery requests and the Board's discovery orders. The three data "run[s]" that CMS paid an outside contractor to produce were not responsive to the PRRB's subpoenas requiring CMS to produce information regarding the patient and patient days that were included in CMS' calculations of Plaintiff's SSI fractions for 1993-1996 because they did not reflect the patients and patient days that CMS actually counted in the calculations at issue, *see* Pl. Stmt. ¶¶ 219-23, and these runs were fraught with errors and inconsistencies. AR 6370, 6378-84. Further, when CMS produced those three, non-responsive data runs, CMS had in its possession the June 1996 version of the MEDPAR file that contained the inpatient hospital stay records and matched SSI days that were actually used, to calculate the SSI fraction at issue for fiscal year 1995. It took a court suit, stymied by CMS' false representation that the data files used to calculate the SSI fraction for 1995 no longer existed, and a subsequent discovery hearing before the PRRB to get that data out of CMS years later. *See* Pl. Stmt. ¶¶ 220-229.

Similarly, although the Secretary notes that CMS produced "computer code of programs used in computing the SSI fraction," the programs produced to the Plaintiff were not the programs that were used to calculate the SSI fractions at issue for fiscal years 1993-1996, as evidenced the year 2000 ("Y2K") edit corrections that were annotated in the programs. AR 2882, 2887.

Respectfully submitted,


*/s/* Christopher L. Keough
Christopher L. Keough
    DC Bar No. 436567
John M. Faust
    DC Bar No. 433553
Stephanie A. Webster
    DC Bar No. 479524
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

May 18, 2007