UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BAYSTATE MEDICAL CENTER,       )
                               )
        Plaintiff,             )
                               )
        v.                     )        Civil Action No. 1:06-cv-01263
                               )
MICHAEL O. LEAVITT, et al.,    )
                               )
        Defendants.            )
_____)

**REPLY IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

                                    Respectfully submitted,

                                    JEFFREY A. TAYLOR
                                    United States Attorney

OF COUNSEL:                         SHEILA M. LIEBER
                                    Deputy Director
DANIEL MERON
General Counsel                     **/s/ Lisa A. Olson**
                                    BRIAN G. KENNEDY
KATHLEEN H. McGUAN                  LISA A. OLSON (D.C. Bar #38266)
Associate General Counsel           U.S. Department of Justice
                                    20 Mass. Ave., N.W., Room 7300
MARK D. POLSTON                     Washington, D.C. 20530
Deputy Associate General            Telephone: (202) 514-5633
    Counsel for Litigation          Telefacsimile: (202) 616-8470
                                    E-mail: lisa.olson@usdoj.gov
PAUL E. SOEFFING
Attorney

United States Department of
    Health and Human Services

Dated: June 18, 2007               Counsel for Defendants

**TABLE OF CONTENTS**

PAGE(S)

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    1.    Neither The Language Of The DSH Statute Nor The Legislative
        History Suggests That SSI Eligibility Status Is A "Benefit" That
        Should Increase The Numerator Of The DSH Fraction . . . . . . . . . . . . . . . . . . 2

    2.    The Secretary Has Properly and Consistently Included In The
        Denominator Of The SSI Fraction "Covered" Days – Days For
        Which A Patient Was Entitled To Have Payments Made On His
        Behalf – Regardless of Whether or Not Payments Were Made To
        The Provider . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    3.    The Secretary Has Properly And Consistently Included HMO
        Days In The Medicare SSI Fraction As Days For Which A
        Beneficiary Is "Entitled To Benefits Under Part A" Of The
        Medicare Statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    4.    The Administrator Rationally Concluded That Any Error In The
        Calculation Of The Medicare Fraction Was Not So Large That
        Retroactive Recalculations Of The Fraction Were Required . . . . . . . . . . . . . . 12

        A.    Baystate Bears The Burden Of Showing That The
            Administrator's Decision Was Arbitrary Or Capricious . . . . . . . . . . . 13

        B.    The Agency Appropriately Used An Adjudicatory
            Process To Decide Issues Presented To It For Decision
            In That Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        C.    The Administrator's Decision Is Consistent With The
            Statute And Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        D.    Baystate's Reliance On Information Not In The Record
            Cannot Be Used To Support Its Claims . . . . . . . . . . . . . . . . . . . . . . . 21

        E.    Baystate's Attacks On The Veracity Of Agency Employees
            Are Unfounded . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

5.    The Administrator Reasonably Concluded That The Payment Of
Expert Witnesses On A Contingency Fee Basis Reduces The Weight
To Which Their Testimony Would Otherwise Be Entitled  . . . . . . . . . . . . . . . 25

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGES**

Alaska Dep't of Health & Social Servs. v. CMS, 424 F.3d 931 (9th Cir. 2005) ........................ 18

Bedroc Ltd. LLC v. United States, 541 U.S. 176 (2004) ............................................................. 2

Boivin v. U.S. Airways, Inc., 297 F. Supp. 2d 110 (D.D.C. 2003) ....................................... 14, 15

Boivin v. U.S. Airways, Inc., 2005 WL 713622 (D.D.C.), *vacated in part*
    *with directions to dismiss without prejudice in light of failure to*
    *exhaust administrative remedies*, 446 F.3d 148 (D.C. Cir. 2006) ................................... 15

Cabell Huntington Hosp. v. Shalala, 101 F.3d 984 (4th Cir. 1996) ........................................... 6

Camp v. Pitts, 411 U.S. 138 (1973) ......................................................................................... 21

City of Olmstead Falls v. FAA, 292 F.3d 261 (D.C. Cir. 2002) ................................................. 13

Cobell v. Norton, 240 F.3d 1081 (D.C. Cir. 2001) .................................................................... 14

Director, OWCP v. Greenwich Collieries, 512 U.S. 267 (1994) ................................................ 14

Fairfax Hosp. Ass'n v. Califano, 585 F.2d 602 (4th Cir. 1978) ................................................ 13

Fla. Power & Light Co. v. Lorion, 470 U.S. 729 (1985) ........................................................... 21

Granholm v. Heald, 544 U.S. 460 (2005) ................................................................................ 18

Greenleaf's Lessee v. Birth, 6 Pet. 302 (1832) ........................................................................ 15

ICORE, Inc. v. FCC, 985 F.2d 1075 (D.C. Cir. 1993) ............................................................... 20

Jewish Hosp. v. Secretary of Health & Human Servs.,
    19 F.3d 270 (6th Cir. 1994) .......................................................................................... 8, 9

Kennecott Greens Creek Min. Co. v. MSHA, 476 F.3d 946
    (D.C. Cir. 2007) ............................................................................................................. 19

Kronisch v. United States, 150 F.3d 112 (2d Cir. 1998) .......................................................... 22

Legacy Emanuel Hosp. & Health Ctr. v. Shalala, 97 F.3d 1261
    (9th Cir. 1996) ................................................................................................................. 8

Lomak Petroleum, Inc. v. FERC, 206 F.3d 1193 (D.C. Cir. 2000) ............................................. 13

Long Island Care at Home, Ltd. v. Coke, ___ S. Ct. ___,
        2007 WL 1661472 (2007) ........................................................................ 16

Millennium Pipeline Co., L.P. v. Gutierrez, 424 F. Supp. 2d 168
        (D.D.C. 2006) .............................................................................................. 13

Nat'l Commc'ns Ass'n v. AT&T Corp, 238 F.3d 124 (2d Cir. 2001) ......................................... 13

Norton v. S. Utah Wilderness Alliance, 542 U.S. 55 (2004) ..................................................... 18

San Luis Obispo Mothers For Peace v. NRC,
        789 F.2d 26 (D.C. Cir. 1986) ..................................................................... 13

Schaffer ex. rel Schaffer v. Weast, 546 U.S. 49, 126 S. Ct. 528 (2005) ......................................... 15

Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87 (1995) .............................................................. 17

Sutton v. United Air Lines, 527 U.S. 471 (1999) ....................................................................... 18

Tendler v. Jaffe, 203 F.2d 14 (D.C. Cir. 1953) ........................................................................... 13

United States v. Chestman, 947 F.2d 551 (2d Cir. 1991) ........................................................... 14

United States v. Mead Corp., 533 U.S. 218 (2001) .................................................................... 16

United States v. Mitchell, 463 U.S. 206 (1983) ........................................................................ 14

Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ., 127 S. Ct. 1534 (2007) ........................... 1, 12, 18

## STATUTES

5 U.S.C. § 556(d) ............................................................................................................... 14

5 U.S.C. § 706(2) ............................................................................................................... 13

42 U.S.C. § 426 ................................................................................................................... 9

42 U.S.C. § 426(c)(1) .......................................................................................................... 9

42 U.S.C. §§ 1381-1385 .................................................................................................... 2, 3

42 U.S.C. § 1381a ................................................................................................................ 3

42 U.S.C. § 1382(b) .................................................................................................... 4

42 U.S.C. § 1382c .................................................................................................... 5

42 U.S.C. § 1382h(a) .................................................................................................... 4

42 U.S.C. § 1382h(b) .................................................................................................... 1, 2, 4

42 U.S.C. § 1395d(b) .................................................................................................... 12

42 U.S.C. § 1395f .................................................................................................... 7

42 U.S.C. § 1395y (b)(2) .................................................................................................... 12

42 U.S.C. § 1395mm(a)(6) .................................................................................................... 9, 10

42 U.S.C. § 1395mm(d) .................................................................................................... 9

42 U.S.C. §  1395mm(c)(2)(A)(i) .................................................................................................... 9

42 U.S.C. §§ 1395mm(a)(1)(A)(i),(A) .................................................................................................... 10, 12

42 U.S.C. § 1395ww(d)(5)(F)(vi)(I) .................................................................................................... passim

42 U.S.C. §1395ww(h)(3)(C) .................................................................................................... 10, 11

42 U.S.C. § 1395ww(h)(3)(D)(i) .................................................................................................... 11

42 U.S.C. § 1396a(10)(II) .................................................................................................... 2

## RULES AND REGULATIONS

42 C.F.R. § 412.106(b) .................................................................................................... 8

51 Fed. Reg. 16,772, 16,777 (May 6, 1986) .................................................................................................... 24

51 Fed. Reg. 31,454, 31,459-60 (Sept. 3, 1986) .................................................................................................... 19

51 Fed. Reg. 31,460-61 (Sept. 3, 1986)(I) .................................................................................................... 6, 8, 10

52 Fed. Reg. 22,080, 22,085 (June 10, 1987) .................................................................................................... 7

52 Fed Reg. 33,034, 33,035 (Sept. 1, 1987) .................................................................................................... 7

52 Fed. Reg. 33,143, 33,144 (Sept. 1, 1987) .................................................................................................... 7

59 Fed. Reg. 41,400 (Aug. 12, 1994) ............................................................... 5

60 Fed. Reg. 45,811 (Sept. 1, 1995) ................................................................. 7

61 Fed. Reg. 31, 022 (June 19, 1996) ............................................................... 4

61 Fed. Reg. 31,024 (June 19, 1996) ............................................................ 4, 5

70 Fed. Reg. 47,278, 47,440 (Aug. 12, 2005) .............................................. 24

70 Fed. Reg. 57,132 (Sept. 20, 2005) ............................................................. 3

70 Fed. Reg. 57,133 (Sept. 20, 2005) .......................................................... 3, 4

## LEGISLATIVE MATERIALS

S. Rep. 96-408, 1980 U.S.C.C.A.N. 1277 ......................................................... 5

## INTRODUCTION

Baystate's arguments that special-SSI-eligibility-status days should be included in the numerator of the Medicare SSI fraction, and that covered-but-not-paid days and HMO days should be excluded from the denominator (and the numerator) overlooks the plain language of the statute in each of these instances. The numerator of the Medicare SSI fraction includes only days for which a patient was entitled to "benefits," not special SSI eligibility "status." The notion that special SSI eligibility status is a "non-cash benefit" under 42 U.S.C. § 1382h(b) of the Social Security Act ("Act") is simply one of Baystate's own creation. It similarly finds no support in the legislative history or in the two regulatory preambles Baystate cites, the latter of which concern unrelated statutory provisions and neither state nor imply that SSI special eligibility status is a benefit for purposes of the Medicare SSI fraction.

Baystate's argument that the denominator of the Medicare SSI fraction should only include days for which CMS pays the provider also clashes with the plain language of the statute, which speaks solely in terms of entitlement of the beneficiary, not payment to the provider. Both HMO days and "covered" days have properly and consistently been counted in the denominator of the Medicare SSI fraction since they are days for which a patient was entitled to have payments made on his or her behalf, regardless of whether the hospital received payment. The Secretary's position in prior litigation that uncovered days should count in the Medicaid fraction involved a separate issue that has no bearing on whether covered days should be counted here. His practice of including HMO days in the Medicare SSI fraction is also consistent with not counting Medicare HMO days for graduate medical education purposes, which are governed by very different statutory criteria and language.

Finally, the agency's method for calculating the Medicare SSI fraction is entitled to the Court's deference, *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 127 S. Ct. 1534, 1538 (2007), and the Administrator correctly concluded that any error was not so large that retroactive recalculations were required.

-1-

## ARGUMENT

1.    **Neither The Language Of The DSH Statute Nor The Legislative History Suggests That SSI Eligibility Status Is A "Benefit" That Should Increase The Numerator Of The DSH Fraction**

The notion that special SSI eligibility status is a "non-cash benefit" under the Social Security Act is one of Baystate's own creation, *see* Pl. Opp. Mem.[1] at 33 – and it is directly at odds with the plain language of the Act for purposes of the SSI fraction. *Bedroc Ltd. LLC v. United States*, 541 U.S. 176, 183 (2004) ("[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous."). Patient days can only be included in the numerator of the SSI fraction if the patient was "entitled to supplemental security income [SSI] benefits . . . under subchapter XVI" [42 U.S.C. §§ 1381-1385] of the Social Security Act. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). Nothing in the Social Security Act indicates that the special SSI eligibility status mentioned in Section 1619(b), 42 U.S.C. § 1382h(b), is a freestanding "benefit" that should increase the numerator. Baystate ignores the plain language of the statute in two fundamental respects.

First, the Social Security Act states that the special SSI eligibility status applies <u>only</u> "for purposes of subchapter XIX [Medicaid]." Specifically, blind or disabled individuals earning an income which would normally disqualify them for SSI cash benefits are "considered to be receiving" those benefits "<u>for purposes of subchapter XIX</u>" of the Social Security Act. 42 U.S.C. § 1382h(b). The purpose of this provision is to ensure that individuals who do not qualify for SSI benefits nevertheless continue to receive <u>Medicaid</u> benefits, which are ordinarily contingent on the receipt of SSI "pa[yments]." *See* 42 U.S.C. § 1396a(10)(A)(i)(II). But this exception to the general rule that earned income above a certain level causes a patient to be deemed ineligible for SSI benefits applies only for

---

[1] Plaintiff's Reply Memorandum in Support of Its Motion for Summary Judgment and Memorandum in Opposition to Defendant Leavitt's Motion for Summary Judgment is referred to herein as "Pl. Opp. Mem." Defendants' Memorandum of Points and Authorities in Support of Defendant Leavitt's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment is referred to herein as "Def. SJ Mem."

purposes related to the Medicaid statute. Assuming, *arguendo*, that special SSI eligibility status is a benefit, it clearly does not apply for purposes of subchapter XVI of the Social Security Act, 42 U.S.C. §§ 1381-1385. Special SSI eligibility status therefore could not under any circumstances properly be deemed a "benefit" that increases the patient days in the numerator of the SSI fraction under subchapter XVI.

Baystate ignores the plain language of the statute in a second respect. The term "benefit" is defined in the Social Security Act as the payment of cash. 42 U.S.C. § 1381a. Within the context of this litigation, there is no such thing as a "non-cash benefit," a term that was coined exclusively by Baystate. Thus, while special SSI eligibility status may confer an advantage that could lead to the payment of a benefit, nothing in the language of the statute suggests that the status itself constitutes a "benefit." Indeed, special SSI eligibility status is a fiction created by Congress only for purposes of continued Medicaid coverage so as to eliminate a disincentive for an individual to be gainfully employed.

The regulatory preambles to which Baystate cites are unavailing. The preamble to the 2005 regulations regarding the Ticket to Work and Work Incentives Improvement Act of 1999, 70 Fed. Reg. 57,132 (Sept. 20, 2005); *see* Pl. Reply at 33, are not remotely relevant to the question of whether special SSI eligibility status is a benefit for purposes of the SSI fraction. This Act expedites the reinstatement of eligibility for Social Security disability (Title II) and SSI (Title XVI) benefits terminated because of work activity. 70 Fed. Reg. 57,132. The regulations provide that an individual is entitled to a 24-month initial reinstatement period upon reinstatement of entitlement to Title II or Title XVI benefits. 70 Fed. Reg. 57,133. They explain that in order for benefits to be considered payable in a given month for Title II purposes, the beneficiary must not have engaged in substantial gainful activity. *Id.* Similarly, benefits will be considered payable in a given month for Title XVI purposes when a beneficiary is due a monthly payment or is considered to be receiving SSI benefits for that month under Section 1619(b) of the Social Security Act, 42 U.S.C. § 1382h(b). 70 Fed. Reg. 57,133. Therefore, the language Baystate cites ("For title

-3-

XVI purposes, we consider a benefit to be payable in a month when . . . we determine you are due a monthly payment, or you are considered to be receiving SSI benefits in a month under section 1619(b) of the Act") simply explains when SSI benefits will be considered payable to a reinstated beneficiary so as to count against the 24-month initial reinstatement period. The provision does not state or imply that special SSI eligibility status is an actual benefit for any purpose related to this case.

Similarly, the preamble to the regulations regarding payment for vocational rehabilitation (VR) services provides no support for the proposition that SSI eligibility status is a benefit. 61 Fed. Reg. 31, 022 (June 19, 1996); *see* Pl. Reply at 34. Baystate's unexplained quotation seems to suggest that special SSI eligibility status should be considered a "benefit" merely because it is mentioned in the same phrase as that term. *See* Pl. Reply at 34 ("regular SSI benefits under section 1611 of the Act, special SSI cash benefits under section 1619(a) of the Act, [and] special SSI eligibility status under section 1619(b) of the Act . . . ."). But an examination of this language in context dispels any such notion. The preamble states that the term "disability or blindness benefits" is defined "for the SSI VR payment regulations <u>only</u>" as referring to "regular SSI benefits under section 1611 of the Act, special SSI cash benefits under section 1619(a) of the Act, special SSI eligibility status under section 1619(b) of the Act, and/or a federally administered State supplementary payment under section 1616 of the Act . . . ." 61 Fed. Reg. 31024 (emphasis added). No stretch of logic leads to the conclusion that special SSI eligibility status is thereby defined as a "benefit."[2] Even if it were, the definition would apply only for purposes of the SSI VR payment regulations. Further confirmation that special SSI eligibility status is not a benefit appears in the very next sentence, which clearly distinguishes between a Social Security or SSI "benefit" and special SSI eligibility "status." It states as follows: "Thus, in these final VR payment regulations, when we use the terms

---

[2] Nor is special SSI eligibility status, or any other type of status, listed as a benefit in section 1611 of the Act, 42 U.S.C. §§ 1382(b), or 1619(a) of the Act, 42 U.S.C. § 1382h(a).

"disability or blindness benefits" with reference to the SSI program, we mean the <u>benefits,</u> <u>status, or payments</u> referred to in section 1615(e) of the Act." 61 Fed. Reg. 31,024 (emphasis added).

Finally, the legislative history on which Baystate relies, as cited in 59 Fed. Reg. 41,400 (Aug. 12, 1994); *see* Pl. Opp. Mem. at 34, neither expressly nor impliedly indicates that special SSI eligibility status is a benefit. Instead it merely reiterates the acknowledged fact that section 1619(b) was intended to facilitate the reestablishment of eligibility for SSI benefits by avoiding the most time-consuming aspect of that process, *i.e.*, proving disability pursuant to 42 U.S.C. § 1382c. *See* Def. SJ Mem. at 20-21 (citing 59 Fed. Reg. 41,400 ("Work incentive provisions in the SSI program generally enable . . . disabled individuals to return to work or increase their level of work activity without losing SSI disability . . . status."); *id.* (noting that "[t]ransitions between the various statuses [resulting from intermittent periods of income earning] were complicated" and the complexity deterred people from working and risking the loss of SSI eligibility); S. Rep. 96-408 at 4 (observing that prior to the creation of the special SSI eligibility status, an individual who lost his eligibility because of earned income but became unable to work would have to "reapply for benefits and go through the adjudication process again")). In citing to this legislative history and its discussion of the changes in eligibility status and transitions between various categories of benefits, Baystate does not – and cannot – point out where it says that a "status" is a "benefit." For that matter, Baystate utterly fails to explain either in legal or common-sense terms how special SSI eligibility "status" can amount to any sort of benefit in the absence of cash payments.

Therefore, defendants properly excluded from the numerator of the SSI fraction individuals whose earned income disqualified them from receiving SSI payments, even if those individuals were considered to be receiving such payments pursuant to Section 1619(b) only for purposes of retaining Medicaid assistance.

2.    **The Secretary Has Properly and Consistently Included In The Denominator Of The SSI Fraction "Covered" Days – Days For Which A Patient Was Entitled To Have Payments Made On His Behalf – Regardless of Whether or Not Payments Were Made To The Provider**

Baystate argues that the denominator of the SSI fraction should include only days for which the hospital was "paid" by the Medicare program. Pl. Opp. Mem. at 36. This position seems to arise from Baystate's misquotation of the DSH statute as requiring the inclusion of patient days for which patients were "entitled to payments under Part A" of the Medicare statute. Pl. Opp. Mem. at 35 (emphasis added). However, it collides with the actual language of the DSH statute, which provides that the denominator shall consist of patient days for which patients were "entitled to benefits under Part A." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). The statute is framed in terms of a patient's entitlement to benefits, not a hospital's receipt of payment. Hence, the Secretary's policy also focuses on whether patients were "entitled to benefits under Part A," 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I), not on whether the hospital properly billed Medicare and received payment. Nothing in the statute suggests that Congress intended to exclude days for which patients were "entitled to benefits under [Medicare] part A" simply because the hospital failed to properly submit a bill.

Contrary to Baystate's assertion that the Secretary took an inconsistent position in the original rulemaking, *see* Pl. Opp. Mem. at 36, the Secretary did originally interpret the Medicare SSI fraction of the DSH statute as counting Medicare "covered" days and not just "paid" days. 51 Fed. Reg. 31,460-61 (Sept. 3, 1986) (interpreting the Medicare portion under section 1886(d)(F)(vi)(I) of the Act "to refer only to Medicare covered days," and stating that "[i]n the preamble to the interim final rule, we indicated that we would count 'covered' Medicare days in determining the Medicare [SSI] portion of a hospital's disproportionate patient percentage"). 51 Fed. Reg. at 31,460-61; *see Cabell Huntington Hosp. v. Shalala*, 101 F.3d 984, 990 (4th Cir. 1996) ("If the statute is complex, the legislative history is more so. Drawing from it would necessarily be an exercise in

-6-

selectivity, which we decline to undertake.").[3]

Baystate's disagreement is actually focused on a very narrow category of patient days, specifically, those of beneficiaries who were entitled to Medicare part A benefits for those days but for which the hospital did not receive Medicare payment because of its failure to properly bill Medicare. See 42 U.S.C. § 1395f (providing that payment will be made only upon submission of a proper bill). Baystate's assertion that the Secretary counts days that "are not, and cannot be, paid for by Medicare part A," see Pl. Opp. Mem. at 35 (emphasis added), mischaracterizes the Secretary's position and the issue in this case. The days at issue here are not those that "cannot" be (or at least could not have been) paid for by Medicare part A; rather, the question is whether days should be counted that could have been paid for by Medicare part A – because the patient was "entitled to benefits under part A" for those days – but for which the hospital received no payment because of a failure to bill Medicare properly.

Baystate contends that the Secretary's exclusion of exhausted benefit days from the Medicaid fraction, and his assertion that the policies governing the Medicare and Medicaid fractions were consistent, show an intention to exclude covered but unpaid days from the Medicare fraction. Pl. Opp. Mem. at 36; 51 Fed. Reg. at 31,460-61. No such inference can be drawn. The Secretary did consistently exclude exhausted benefit days from both

---

[3] Baystate argues that the Secretary's alleged decision to use the PATBILL file rather than the MEDPAR file to calculate the Medicare/SSI fraction is proof that he intended only to count "paid" Medicare days in the denominator of the SSI fraction, since the PATBILL file purportedly includes only such "paid" days. Pl. Opp. Mem. at 36 n.32. In fact, however, the PATBILL file is the functional equivalent of the MEDPAR file. See 52 Fed. Reg. 33,143, 33,144 (Sept. 1, 1987) ("we use the two names [PATBILL and MEDPAR] interchangeably," and "[t]he MEDPAR file contains the same data as the PATBILL file but is in a simplified, reformatted record layout"); 52 Fed Reg. 33,034, 33,035 (Sept. 1, 1987) (same); 52 Fed. Reg. at 22,080, 22,085 (June 10, 1987) (same). Baystate provides no evidence to refute this fact.

Given that the two files are functionally equivalent, no advance notice and comment would be required for the use of the MEDPAR file instead of the PATBILL file. However, long before the time period at issue in this case, CMS's predecessor, HCFA, made clear that it was using the MEDPAR file. See 52 Fed. Reg. at 33,144 (stating that HCFA was "technically us[ing] the MEDPAR file"). In addition, the preambles to the September 4, 1990, and September 1, 1995 final rules on DSH identify the MEDPAR file as the source for the denominator of the Medicare fraction. See also 60 Fed. Reg. at 45,811 (Sept. 1, 1995).

fractions. However, the exclusion of exhausted benefit (i.e., uncovered and therefore unpaid) days from the Medicaid fraction does not show an intention to exclude covered but unpaid days from the Medicare fraction.[4]

Nor is Baystate correct that, in urging a parallel construction of the two fractions, i.e., that exhausted benefit days should not count in either, the Secretary represented to the courts that only paid Medicare days count. Pl. Opp. Mem. 37. The issue in the cited cases was whether uncovered (exhausted benefit) days should count in the Medicaid fraction, not whether covered but unpaid days should be counted in the Medicare fraction (due to the fault of the hospital). The Secretary's statements quoted by Baystate, see Pl. Opp. Mem. at 37, therefore pertained only to the issue of whether uncovered, exhausted Medicare benefit days should count in the Medicare fraction. The Secretary did not take the position, as Baystate does here, that Medicare covered days should be excluded if the hospital fails to bill Medicare appropriately.

Moreover, assuming, arguendo, that the Secretary had proposed that Medicare days should not be counted unless they were actually paid, that interpretation was rejected by the courts in those cases. For example, in Jewish Hospital, the Sixth Circuit explained the "entitled to" language in the following way: "To be entitled to some benefit means that one possesses the right or title to that benefit. Thus, the Medicare proxy fixes the calculation upon the absolute right to receive an independent and readily defined payment." Jewish Hosp. v. Secretary of Health & Human Servs., 19 F.3d 270, 275 (6th Cir. 1994); accord Legacy Emanuel Hosp. & Health Ctr. v. Shalala, 97 F.3d 1261, 1265 (9th Cir. 1996). This language fully supports the Secretary's interpretation. What matters is the patient's right to have payment made on his or her behalf. Jewish Hosp., 19 F.3d at 275. If a patient has such a right, then the day is properly includable, even if the hospital receives no payment

___

[4] After protracted litigation in which the Secretary attempted unsuccessfully to defend the policy of excluding exhausted benefit days in the Medicaid fraction, the agency decided to revise its policy so as to include exhausted benefit days in both the Medicaid and Medicare fractions. See 42 C.F.R. § 412.106(b).

for failure to properly submit a bill.

**3.    The Secretary Has Properly And Consistently Included HMO Days In The Medicare SSI Fraction As Days For Which A Beneficiary Is "Entitled To Benefits Under Part A" Of The Medicare Statute**

As the DSH statute requires, the Secretary has consistently counted in the Medicare SSI fraction inpatient hospital days for which a patient was "entitled to benefits under Part A" covering those days. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). Patients whose hospital stay is covered by a Medicare-contracting HMO were properly counted in the Medicare SSI fraction, because these beneficiaries were, by definition, "entitled to benefits under Part A," and had their hospital stay covered by these benefits, albeit through payments made by a private health plan rather than payments directly made to the hospital by the Secretary under Part A. *See* 42 U.S.C. §§ 1395mm(d), 1395mm(c)(2)(A)(i), (ii), 1395mm(a)(1)(A)(i).[5]

Altogether ignoring this plain language, Baystate instead argues that HMO days should be excluded because they are not patient days for which CMS "pays" the provider. However, the statute speaks solely in terms of entitlement of the beneficiary, not payment to the provider.[6] Accordingly, the Secretary has consistently included all days "covered" by Medicare in the Medicare SSI fraction, and not just days for which the hospital is "paid" by a fiscal intermediary. 51 Fed. Reg. at 31,460-61. Covered days are those for which the hospital receives compensation from the Medicare program, whether in the form of a

---

[5] For the completely unfounded and erroneous assertion that Part A entitlement to benefits ceases upon enrollment of a beneficiary with an HMO, Baystate cites 42 U.S.C. § 1395mm(a)(6), which says nothing of the kind. Pl. Opp. Mem. at 40 n.34. That provision merely states that if an individual is enrolled in an HMO, "only the [HMO] shall be entitled to receive payments from the Secretary" under the Medicare statute. 42 U.S.C. § 1395mm(a)(6). Entitlement is in fact governed by 42 U.S.C. § 426, which sets forth the conditions for entitlement – and does <u>not</u> provide that entitlement ceases upon enrollment in an HMO.

[6] The argument that 42 U.S.C. § 426(c)(1) defines entitlement to hospital insurance benefits under the Medicare statute as "entitlement to have payment made" for inpatient hospital services, Pl. Opp. Mem. at 40, omits critical statutory language. That provision actually states that "entitlement of an individual to hospital insurance benefits for a month shall consist of entitlement to have payment made under, and <u>subject to the limitations in</u>, part A of subchapter XVIII [the Medicare statute] of this chapter <u>on his behalf</u> for inpatient hospital services . . . ." 42 U.S.C. § 426(c)(1) (emphasis added). According to this provision as fully stated, then, payment is subject to the limitations in Part A but is not guaranteed, and the beneficiary is entitled to have payment made on his behalf, but not necessarily to the provider.

payment under Part A for hospital services or payment (whether on a fee-for-service, per diem, or even capitation basis) from a private HMO that is responsible for covering that Hospital stay under its obligation to provide Part A benefits to its Medicare enrollees.

Baystate fails to address the plain statutory language which shows that defendants' practice of including Medicare HMO days in the SSI fraction is fully consistent with Medicare HMO days not being counted, during the years at issue, in the calculation of the Medicare patient load for graduate medical education (GME) purposes. Def. SJ Mem. at 26. As defendants have explained, Def. SJ Mem. at 25, patient days should be counted in the Medicare SSI fraction if they are days for which the patients were "entitled to benefits under Part A" of the Medicare statute. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). Patients under a Medicare HMO contract clearly fall into this category, and indeed are receiving coverage of their hospital stay as a direct result of their entitlement to these Part A benefits.[7] 42 U.S.C. §§ 1395mm(a)(1)(A)(i), (c)(2)(A)(ii), (d). By contrast, patient days are counted in the calculation for direct GME costs if they are days for which "payment may be made under Part A" of the Medicare statute. 42 U.S.C. § 1395ww(h)(3)(C). HMO patients do not fall into this category, because no Medicare payments are made for hospital services furnished to HMO enrollees. 42 U.S.C. § 1395mm(a)(6). Baystate's bald allegation of inconsistency fails to take these very different statutory criteria into account.

Baystate alleges that the Secretary should not count HMO days in the Medicare SSI fraction because he "treats Medicare HMO days as non-Medicare days for all other purposes, including for purposes of calculating" Medicare payments to hospitals for GME costs. Pl. Opp. Mem. at 41. It is unclear what Baystate means by "non-Medicare days," a term not found in the statute. To the extent the term has any meaning, Baystates have

---

[7] Baystate claims that hospitals should have been afforded notice and comment on the inclusion of HMO days in the SSI fraction because the Secretary stated in a 1990 preamble to an unrelated proposed rule that the agency had been counting Medicare HMO days in the SSI fraction since December 1, 1987. See Pl. Opp. Mem. at 41 n.35. There is no evidence that this represented any change from the Secretary's consistent policy of counting HMO days, so no notice and comment would have been required.

offered no evidence that the Secretary treats these days as "non-Medicare days," since the Secretary would not deny they are days covered by Medicare. The Secretary is only acknowledging that they are not days for which "a payment may be made under Part A."[8] 42 U.S.C. § 1395ww(h)(3)(C).

Furthermore, as Baystate acknowledges, Pl. Opp. Mem. at 42, Congress effectively ratified the Secretary's interpretation of the GME statute by enacting a new provision requiring CMS to pay hospitals GME costs for services furnished to HMO enrollees, 42 U.S.C. § 1395ww(h)(3)(D)(i). In doing so, Congress did not alter the existing formula for calculating GME payments based on days for which "payment may be made under Part A," which the Secretary had correctly interpreted as not including days attributable to HMO enrollees. However, the new legislation did not address the meaning of the term "entitled to benefits under [Medicare] Part A," as used in the DSH statute, 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I), nor does it in any way undermine the valid distinction that must be made between entitlement of the beneficiary and payment to the provider.

Finally, the Secretary's inclusion of HMO days in the SSI fraction is consistent with the exclusion of exhausted benefit days and secondary payer days. *See* Pl. Opp. Mem. at 42. A patient day is included in the Medicare SSI fraction if the patient was "entitled to benefits under Part A" of the Medicare statute for that day. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). Neither secondary payer days nor exhausted benefit days meet this requirement, because both types of days are excluded from coverage under the Medicare program. 42 U.S.C. §§ 1395d(b), 1395y (b)(2). Therefore, it was reasonable for the Secretary to conclude that they are days for which the patient is not "entitled to benefits under Part A" of the Medicare statute. On the other hand, HMO beneficiaries are entitled to benefits under Part A and hence can properly be counted in the DSH fraction. *See* 42 U.S.C. §§ 1395mm(a)(1)(A)(i), (c)(2)(A)(i) and (ii), (d); Def. SJ Mem. at 25-26. This

---

[8] Baystate fails to identify any of the alleged "other purposes" besides the calculation of GME costs for which HMO days allegedly are treated as non-Medicare days by the Secretary.

distinction is straightforward and rational, and Baystate's twisting of the words in

defendants' legal brief does not make it less so. *See* Pl. Opp. Mem. at 42.

4.    **The Administrator Rationally Concluded That Any Error In The Calculation Of The Medicare Fraction Was Not So Large That Retroactive Recalculations Of The Fraction Were Required**

Even where a statute is phrased in mathematical terms and "sets out a formula," *Zuni*

*Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 127 S. Ct. at 1538, an agency retains discretion to

choose the details of a "calculation method," and receives *Chevron* deference to those

choices, *id.* at 1541. With respect to the statutory formula at issue in this case, 42 U.S.C. §

1395ww(d)(5)(F)(vi)(I), our opening brief explained why the Administrator correctly

concluded that some ideal standard of an "'errorless match'" is not required, Def. SJ Mem.

at 29, *quoting* 1 AR 41, and why the Administrator's conclusion that the effect of any

imprecision in calculation was modest enough that retroactive recalculation was not

required is both entitled to *Chevron* deference and reasonable. *Id.* at 29-37.

Baystate attempts to escape the force of those arguments any way it can: by asking

the Court to shift the burden of proof to the agency; by dismissing the Administrator's

decision as a mere litigation position rather than a resolution of issues placed before him for

decision; by arguing that the statute and regulation require error-free perfection; by

imagining that, even if the record does not support its claims, perhaps information outside

the record does; and by renewing its baseless accusations that agency employees lied. None

of these arguments has merit.

A.    **Baystate Bears The Burden Of Showing That The Administrator's Decision Was Arbitrary Or Capricious**

Under the Administrative Procedure Act (APA), agency action may be set aside if it

is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5

U.S.C. § 706(2)(A). Baystate argues that an agency argument that it was reasonable is an

"affirmative of an issue" asserted by the agency; that agency denial that it was unreasonable

is a "negative averment" by the agency; that, one way or the other, the burden of proof to

show that agency action was not arbitrary or capricious must therefore be on the agency. Pl. Opp. Mem. at 10-11.

That's 180 degrees wrong. The APA's arbitrary and capricious standard of review does not require an agency to prove as an affirmative defense that its action was reasonable. "Rather, the agency action under review is entitled to a presumption of regularity," and "[u]nder the arbitrary and capricious standard, the burden of proof is on the party challenging the decision." *Millennium Pipeline Co., L.P. v. Gutierrez*, 424 F. Supp. 2d 168, 171 (D.D.C. 2006) (citations omitted). As the Court of Appeals has repeatedly held, """[t]he party challenging an agency's action as arbitrary and capricious bears the burden of proof.""" *City of Olmstead Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002), *quoting Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193, 1198 (D.C. Cir. 2000), *quoting in turn San Luis Obispo Mothers For Peace v. NRC*, 789 F.2d 26, 37 (D.C. Cir. 1986) (*en banc*); *see also Fairfax Hosp. Ass'n v. Califano*, 585 F.2d 602, 611 (4th Cir. 1978) (applying principle in instance where Secretary reversed PRRB finding).[9]

Baystate also argues that the agency's role is sufficiently akin to that of a fiduciary that the agency should have borne the burden of proof. Pl. Opp. Mem. at 11-12, 23. However, Baystate, as "the proponent of a rule or order," here an order changing its Medicare fraction, "ha[d] the burden of proof," before the agency "[e]xcept as otherwise provided by statute." 5 U.S.C. § 556(d) (emphasis supplied); *see Director, OWCP v. Greenwich Collieries*, 512 U.S. 267 (1994). Thus, as we explained in our opening brief, in order to change the burden of proof to a fiduciary standard, it was incumbent on Baystate to

---

[9] Neither of the cases cited by *Baystate* on this issue addresses this point. The "negative averment" quotation in plaintiff's brief is from *Tendler v. Jaffe*, 203 F.2d 14, 18 (D.C. Cir. 1953), a jury trial between private parties rather than an APA case. The "affirmative of an issue" quotation from plaintiff's brief is from *Nat'l Commc'ns Ass'n v. AT&T Corp*, 238 F.3d 124, 130-31 (2d Cir. 2001), which likewise was not an APA case. There, the "burden of demonstrating reasonableness," Pl. Opp. Mem. at 10, was not assigned because of some overarching principle that anyone who asserts reasonableness always bears the burden of proving it. Rather, following the *amicus* views of a federal agency, the court held that where a specific statute made "unreasonable discrimination" actionable, once the private plaintiff had shown discrimination, it was up to the private defendant to show that the proven discrimination was nevertheless reasonable. 238 F.3d at 130-32.

show "a substantive decision of <u>Congress</u> to create a fiduciary role for the Secretary." Def. SJ Mem. at 15 n.8 (emphasis original).

Baystate fails to respond to that point. None of the three new cases cited in Baystate's memorandum (Pl. Opp. Mem. at 11-12) holds that the "[e]xcept as otherwise provided by statute" burden of proof in APA cases may be freelanced away by non-statutory, *ad hoc* analogies to fiduciary situations. *United States v. Chestman*, 947 F.2d 551 (2d Cir. 1991) (*en banc*), was a non-APA case in which the alleged fiduciary was a private party. *United States v. Mitchell*, 463 U.S. 206 (1983), like the decisions in *Cobell* fully discussed in our opening memorandum,[10] involved fiduciary obligations of the Government in the management of Indian resources that <u>are</u> established by statute. 463 U.S. at 226. In the third case, this Court concluded in *Boivin v. U.S. Airways, Inc.*, 297 F. Supp. 2d 110 (D.D.C. 2003), that a fiduciary obligation, on the Pension Benefit Guaranty Corporation wearing its non-agency hat as statutorily-authorized trustee of a terminated pension plan, had likewise been imposed by statute. *See* 297 F. Supp. 2d at 117.

*Boivin*, an instance in which a preliminary injunction against the alleged fiduciary was <u>denied</u>, also illustrates that even if a fiduciary's burden of proof were substituted for the one provided for by statute in the APA, it would not help Baystate. It is not enough, even where fiduciary standards are involved, to show merely that "mistaken calculations" were made; instead the "breach must be willful or involve bad faith conduct." 297 F. Supp. 2d at 117-18; *see Boivin v. U.S. Airways, Inc.*, 2005 WL 713622 (D.D.C.) (granting PBGC summary judgment in light of lack of bad faith), *vacated in part with directions to dismiss without prejudice in light of failure to exhaust administrative remedies*, 446 F.3d 148 (D.C. Cir. 2006). Even Baystate itself says that the fiduciary standard is that a fiduciary may not "knowingly make inaccurate reimbursements." Pl. Opp. Mem. at 12. That is not what the record here shows. For some of the issues in this case – whether to count persons deemed

---

[10] Def. SJ Mem. at 14-15, *discussing Cobell v. Kempthorne*, 455 F.3d 301 (D.C. Cir. 2006), *and Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001).

eligible for SSI for Medicaid purposes as also eligible for Medicare purposes, whether to count covered but not paid Medicare days, how long to wait for SSA updates before making the calculations – the parties disagree as a matter of law on what the correct calculation should be. That the agency disagrees with Baystate's legal view does not make the agency's view bad faith. The other issues likewise do not involve calculations that the agency knew were wrong when it made them. During the period at issue here, the agency did not know in real time that its data matches were not including "stale" records, or "forced pay" cases, or changed-HICAN cases. The stale records problem, the only one of those alleged miscues the agency discovered during the period at issue here, was corrected prospectively as soon as the agency did find out. 6 AR 2103-14. Those issues do not involve errors that the agency made "knowingly" or in "bad faith," but the kind of allegedly "mistaken calculations" that do not constitute violation of a fiduciary duty.

Baystate also argues (Pl. Opp. Mem. at 10) that the agency should bear the burden of proof because it has superior access to the underlying data. But, as we explained in our opening brief, Def. SJ Mem. at 16-17, the agency produced data for Baystate. And, in any event, the view that a party need not bear a burden of proving facts peculiarly within the knowledge of his adversary, is "'far from universal,'" *Schaffer ex. rel Schaffer v. Weast*, 546 U.S. 49, 126 S. Ct. 528, 536 (2005), *quoting Greenleaf's Lessee v. Birth*, 6 Pet. 302, 312 (1832), and does not override the congressional decision allocating the burden of proof in the APA itself.

Finally, Baystate seeks to lessen its burden of proof by blaming any inability to prove its claims on the Secretary's resistance to some of Baystate's discovery demands. Pl. Opp. Mem. at 23-24. However, as we explained in our opening brief, Def's SJ Mem. at 16-17, the Secretary made numerous discovery disclosures to Baystate, including no less than three data runs. Baystate says that it did not get "*all*" of the data it asked for, Pl. Opp. Mem. at 23 (emphasis Baystate's). But allowing a party to shift a burden of proof merely by posing enough discovery demands that an objection is eventually provoked would provide

an incentive to propose burdensome discovery. There are incentives enough already.[11]

**B.    The Agency Appropriately Used An Adjudicatory Process To Decide Issues Presented To It For Decision In That Process**

Baystate argues that the Administrator's decision is not entitled to deference and should be overturned because it represents a *post-hoc* judgment asserted for the first time in litigation rather than a contemporaneous decision. Pl. Opp. Mem. at 4, 7, 10, 13, 22-23. With one (wholly unconvincing) exception Baystate does not appear to mean by this that the position taken in this civil action is a new one that does not correspond to the Administrator's decision.[12] Rather, the "litigation" position Baystate refers to is the Administrator's decision below.

However, it is not just positions developed in rulemakings that are entitled to *Chevron* deference. Interpretations of a statute that an agency reaches for the first time in adjudications before the agency are likewise entitled to such deference. *E.g., United States v. Mead Corp.*, 533 U.S. 218, 230 & n.12 (2001); *see Long Island Care at Home, Ltd. v. Coke,* ___ S. Ct. ___, 2007 WL 1661472, *10 (2007) (deferring to memorandum written "in response to this litigation"). To the extent Baystate is contending that the Secretary had to decide these issues in rulemaking or not at all, the contention is squarely foreclosed by another Medicare hospital reimbursement case, *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87 (1995). The Court noted that although the Secretary had "issued regulations to address a wide range of reimbursement questions," they did not address every conceivable issue that might arise. 514 U.S. at 96. Referring specifically to the "adjudicative structure" also used

---

[11] Of the allegedly "many" examples of measures "the agency employed to limit the record," Baystate chooses one as "bear[ing] particular emphasis." Pl. Opp. Mem. at 28. We address the merits of that argument below, *infra* Part 4.E.

[12] The unconvincing exception is Baystate's contention that our opening brief is inconsistent with the Administrator's decision that HMO days are properly counted because they "'are not paid to the provider by Medicare but are <u>covered days</u>.'" Pl. Mem. at 38, *quoting* 1 AR 35 (emphasis original). The Administrator's view that covered days are properly included in the denominator is the same position our brief repeatedly stated. Def's SJ Mem. at 21, 22 & n.11, 23 & n.12, 24 & n.14, 25, 27, & 44.

in this case, the Court held that "[t]he APA does not require that all specific applications of a rule evolve by further, more precise rules rather than by adjudication." *Id.* Rather, "determining benefits both by rulemaking and adjudication is . . . a proper exercise" of the agency's statutory mandate. 514 U.S. at 97. In short, that the agency's position was reached in the process of litigation – the "litigation" before the agency, that is, not this civil action – in no way makes it undeserving of full *Chevron* deference.

The nature of the issues here makes it understandable that they would not have been addressed by the 1986 rulemaking. It would not necessarily have occurred to the Secretary, for example, that plaintiff would later make the novel claim that persons deemed receiving SSI benefits for purposes of Medicaid should also be deemed to be receiving them for purposes of this Medicare provision. Such questions as whether to count Medicaid-deemed days, HMO days, and otherwise covered but not paid days are not issues that one would necessarily expect to have been spotted in advance. Baystate does not contend that anyone actually did raise these issues in the rulemaking and ask the Secretary to decide them or that the Secretary did focus on and decide any of these specifics in the rulemaking. The first time they were formally raised before the agency was in the adjudication below, and there was nothing "*post hoc*" about the agency deciding those issues as and when they were first formally presented for decision. On the questions of computation, it is not as if the agency sat down and made a deliberate decision to not count, for example, people who had died, so there is, by definition, no "contemporaneous" rationale for deciding not to do so. The question the Administrator did decide, whether to make <u>recalculations</u> <u>retrospectively</u> once the issue had been recognized is again one that was presented formally through the means of the adjudication below.

### C.    The Administrator's Decision Is Consistent With The Statute And Regulation

Baystate attempts to bolster its contention that the Administrator's decision was reached for the first time in the adjudication below (an irrelevant point, as we have just

shown) by arguing that it was contrary to the decision the agency had already reached on the same issues in the regulation. Specifically, plaintiff says that the regulation required calculation of "'*the number*,'" Pl. Opp. Mem. at 7, *quoting* 42 C.F.R. § 412.106(b)(2)(i) (emphasis supplied by plaintiff) of hospital days of SSI-eligible patients, "(i.e., not an estimate or approximation)," Pl. Opp. Mem. at 7.

But we explained in our opening memorandum that the statute's similar reference to "the number" does not require a conclusion that there is only one single, non-estimated number that may permissibly be used. Def. SJ Mem. at 2, 7, 30. The two words "the number" are no less ambiguous in the regulation than they are in the statute. Baystate's notion that any reference to "the number" is "i.e., not an estimate or approximation," is inconsistent with frequent use of "the number" by educated native speakers of English to refer to an estimated number.[13] No more than in the statute itself does "the number" in the regulation unambiguously dictate that no estimation or approximation is acceptable. Since the regulation, like the statute, is ambiguous on this point, *Chevron* deference to the Administrator's decision remains appropriate. *See, e.g., Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 127 S. Ct. 1534 (2007) (deferring to agency construction of statute phrased in technical mathematical language); *Alaska Dep't of Health & Social Servs. v. CMS*, 424 F.3d 931, 938-39 (9th Cir. 2005) (deferring to Administrator's decision notwithstanding argument that it was contrary to regulation).

Indeed, as we pointed out in our opening brief (Def. SJ Mem. at 8-9, 31-32), the

---

[13] *E.g., Granholm v. Heald*, 544 U.S. 460, 467 (2005) ("the number of small wineries in the United States has significantly increased. By some estimates there are over 3,000 wineries in the country . . . ."); *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 60 (2004) ("According to the United States Forest Service's most recent estimates, some 42 million Americans participate in off-road travel each year, more than double the number two decades ago"); *Sutton v. United Air Lines*, 527 U.S. 471, 485 (1999) ("That report detailed the difficulty of estimating the number of disabled persons"). Such use of "the number" is the King James' English: "Yet the number of the children of Israel shall be as the sand of the sea, which cannot be measured nor numbered . . . ." *Hosea* 1:10 (King James).

regulation, far from undercutting the Administrator's decision, supports the conclusion that absolute accuracy is not required. The regulation provided for calculation on a federal fiscal year basis even though the statute seems to anticipate that calculations would be done on a hospital's cost-year basis. 51 Fed. Reg. 31,454, 31,459-60 (Sept. 3, 1986). Baystate claims that, because hospitals were allowed in the alternative to submit alternative data, at their own expense, 51 Fed. Reg. at 31,459, "the Secretary plainly rejected the 'close enough is good enough' policy that he now advocates." Pl. Opp. Mem. at 8 (source of inner quotation not stated). In fact, the Secretary recognized that it was acceptable to calculate "the number" of Medicare days that would be only "reasonably close" to the number of Medicare days in a hospital's own fiscal year, 51 Fed. Reg. at 31,459, by weighing competing considerations of "accuracy, timeliness, and cost efficiency," *id.* at 31,460. The Administrator's decision below, that total accuracy is not an absolute value to be pursued regardless of competing concerns of timeliness and efficiency, is thus consistent with the view stated when the DSH regulation was first promulgated.

Likewise, on judicial review of that decision, the "test is only reasonableness, not perfection." *Kennecott Greens Creek Min. Co. v. MSHA*, 476 F.3d 946, 954 (D.C. Cir. 2007). Of course, from the proposition that perfection is not required it does not follow that accuracy is wholly irrelevant or that high degrees of inaccuracy should be tolerated. But Baystate has not shown that the Administrator's judgment that that point has not been reached was unreasonable. The case Baystate finds particularly "instructive," Pl. Opp. Mem. at 21, *citing City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153 (D.C. Cir. 1987), actually is instructive, but it is by way of the stark contrast with this case. First, the Court of Appeals made a point no-estimates-allowed Baystate seems to forget: "We dare not overlook the realities and exigencies of regulatory life in an imperfect world and demand from our lofty perch that which could not reasonably be delivered." 822 F.2d at 1168. Second, the agency computations at issue in *City of Brookings* were far more flawed than

-19-

the calculations at issue here. The calculations in that case included such flagrant "gaping holes" *id.*, as "factors . . . grossly inaccurate or, at any rate, apparently drawn from the ether," *id.* at 1166, and even such fundamental arithmetic errors as "multipl[ying] non-zero numbers by a factor of zero to arrive at non-zero results," *id.* at 1160 (footnote omitted). By contrast, here the Administrator found that, even in a non-random sample likely to overstate the number of any errors, only 1.59% of the sample population appeared to be instances where SSI-eligibility stays were erroneously not counted. 1 AR 38.[14] That level of accuracy is a far cry from the errors in *City of Brookings*. Third, in contrast to the extensive consideration and analysis of the data undertaken by the Administrator in this case, in *City of Brookings* the agency offered nothing more than the scant, "unedifying remark" that "'there is little doubt that improvements are possible, in the studies, methodologies, and data . . . .'" 822 F.2d at 1167, *quoting MTS & WATS Mkt. Structure, Average Schedule Cos.*, 103 F.C.C. 2d 1017, 1023 (1986). Finally, the question in that case was what schedule to adopt going forward, not, as it is here, whether past calculations had to be revised. *Compare* 822 F.2d at 1161 (FCC contention that calculations were an improvement over prior calculations) *with ICORE, Inc. v. FCC*, 985 F.2d 1075 (D.C. Cir. 1993) (upholding rates remanded for further consideration in *City of Brookings* from the date of original FCC order forward).

### D.    Baystate's Reliance On Information Not In The Record Cannot Be Used To Support Its Claims

Baystate argues in two respects that information not in the record supports its claims. First, taking a hiatus from its arguments that the government is asserting mere litigation positions, Baystate accuses our opening brief of being "careful to comment only

---

[14] Even small percentage errors add up fast given the vast scope of the Medicare program, a circumstance Baystate is quick to seize upon. Pl. Opp. Mem. at 2, 19, 28, 30, 31. But Baystate is wrong in arguing (Pl. Opp. Mem. at 31) that the Administrator's invocation of the systemic burdens of correction resulted in an apples-to-oranges comparison to Baystate-only dollars. The Administrator's decision focused on the percentage of errors, not on any calculation, whether Baystate-specific or system-wide, of absolute dollar amounts. *See* 1 AR 38.

on the Baystate record" rather than "volunteer[ing]" additional "information" that with enough ingenuity from government counsel could have "found its way into these proceedings." Pl. Opp. Mem. at 30-31. Our opening brief's failure to talk about information not in the record is tantamount, according to Baystate, to "[i]gnoring the elephant in the room." *Id.* at 30. However, the "'focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.'" *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985), *quoting Camp v. Pitts*, 411 U.S. 138, 142 (1973). In some cases, one or both parties might in retrospect wish that more information were in the administrative record, but that does not justify after-the-fact efforts to help that information "f[ind] its way into" the proceedings. Our brief appropriately discussed the existing record, not some pink (or even grey) elephant.

Second, Baystate attempts to salvage its argument that the agency destroyed evidence. We explained in our opening brief that the alleged destruction occurred years before any issue to which those documents might have been relevant was raised in this case. Baystate now says that "the possibility that CMS would not have known at the time these records were lost or destroyed that they would be relevant to this later dispute with Baystate, *see* Def. Br. 15, is beside the point." Pl. Opp. Mem. at 29 n.28. In its opening brief, Baystate also argued that the agency was required to maintain documents by a Federal Information Processing Standard. Pl. SJ Mem. at 27-28 & n.16. We explained that the cited standard was <u>not</u> mandatory, Def. SJ Mem. at 15-16 & n.9, so Baystate now says that the mandatory-standard argument of its opening brief is also "not the point." Pl. Opp. Mem. at 16.

However, to justify the inferences Baystate asks this Court to draw from the non-existence of documents, at least one of those issues has to be "the point":

> In order for an adverse inference to arise from the destruction of evidence, the party having control over the evidence must have had an obligation to preserve it at the time it was destroyed. This obligation to preserve evidence arises when the

party has notice that the evidence is relevant to litigation–most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation.

*Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1998).  Since CMS would not have known at the time the documents were lost or destroyed that they would end up being relevant to an issue that would arise in litigation years later, and since CMS was under no other obligation to retain such records, no adverse inference from their loss or destruction is warranted.

### E.    Baystate's Attacks On The Veracity Of Agency Employees Are Unfounded

Baystate argues that of the supposedly "many" instances of agency misdeeds, one example "bears particular emphasis," the alleged inaccuracy of the 2001 Thomas Declaration.  Pl. Opp. Mem. at 26.  As we explained in our opening brief, Def's SJ Mem. at 38-39, Baystate's attack on the veracity of the declaration is unwarranted.

Baystate claims that Thomas denied that CMS had "'files,'" and argues that CMS did too have files.  Pl. Opp. Mem. at 26.  But the "files" Thomas said CMS did not have and the files it did have are different files.  The "files" that CMS does and did have, the "MEDPAR" files, are essentially the <u>result</u> files of the SSI-Medicare matching process. CMS takes the information from the SSA files on SSI eligibility and tries to match it with information from Medicare's own hospital claims files to create MEDPAR files that list patients, hospitals, and SSI eligibility.  At that point, calculation of the Medicare fraction is little more than counting the entries and long division.

As Baystate seems to have known, and certainly should have known, CMS had those results (*i.e.*, MEDPAR) files.  *See, e.g.*, 16 AR 5921-22, 5929-30, 5940.  Baystate's own brief in the 2001 subpoena enforcement proceeding expressly refers to the MEDPAR file as "HCFA's existing inpatient hospital utilization records (*i.e.*, the 'MEDPAR' file)."  2 AR 681.

Baystate's argument, focused on the 1995 MEDPAR file, was not that it didn't have

-22-

the MEDPAR file, but that the MEDPAR file was <u>wrong</u>. 5 AR 1650 ("What we have

found so far is the MEDPAR file, the MEDPAR data is wrong").[15]  To check whether the

MEDPAR results file was correct, Baystate wanted the original <u>source</u> files, including the

file created <u>by SSA</u> and transmitted to CMS in an as-of-1996 snapshot of SSA's 1995 SSI

eligibility data.[16]  Thomas explained – accurately – that <u>that file</u> no longer existed. 2 AR

597.  An obvious and necessary inference from her declaration is that in 2001 SSA still did

maintain <u>data</u> on SSI eligibility dating back at least as far as 1995.  *Id.*  Thomas explained –

accurately – that that database had been updated after the time the original file on 1995

eligibility had been sent to CMS, which incorporated data from that original file into the

MEDPAR.  *Id.*  She explained – accurately – that a new SSI-eligibility-in-1995 file created

in 2001 from the SSA database differed from the original file's snapshot of that database to

the extent of any changes to the data made in the interim.  *See id.*[17]

     With respect to the 1986 *Federal Register*, Baystate ignores the main point of our

response.  We explained that the attacked sentence in the regulatory preamble, "Although

section 1886(d)(5)(F)(vi)(I) of the Act specifies that the match is done on a cost reporting

basis, we believe that matching Social Security numbers on a federal fiscal year basis is the

most feasible approach," 51 Fed. Reg. 16,772, 16,777 (May 6, 1986), was not, as Baystate

---

[15] This statement is from 2003, rather than 2001.  However, it is from Baystate's <u>opening</u> argument at the very hearing at which Baystate now contends (Pl. Opp. Mem. at 27) "later examination of agency witnesses" first revealed the continuing existence of the MEDPAR file.

[16] Baystate apparently contends that at least CMS could have used the original MEPDAR results file to double check whether the MEDPAR results were correct. Pls' Opp. Mem. at 26-27.  That makes no sense.  If, as Baystate contends, the problem is that the MEDPAR file did not pick up all the SSI eligibles it should have (either because SSA never included them in the source file [*e.g.*, the forced pay issue] or because CMS didn't match them when it created the MEDPAR [*e.g.*, the HICAN-matching issue]) checking the MEDPAR results against the MEDPAR itself tells one nothing.  The parties thus seemed to understand in 2001 that the nub of the question was not the existence of the MEDPAR results file, but the availability of <u>source</u> data, and it was to that issue that the Thomas declaration was clearly addressed.

[17] Baystate's attack on the truthfulness of an agency employee's 1995 deposition fares no better.  We pointed out the fuller context of the three-word snippet plaintiff had quoted, and Baystate's reply acknowledges that context.  *Compare* Def. SJ Mem. at 42 n.28 *with* Pl. Opp. Mem. at 18 n.20.

continues to suppose, addressing the question of what numbers would be matched but the question of for what periods the match would be made. Four isolated mid-sentence words, "matching Social Security numbers," cannot reasonably be read in that context as specifically addressing what numbers would be matched or addressing any fine distinctions between SSNs and HICANs.[18] In retrospect, perhaps it would have been better if the 1986 rulemaking had attempted to address in more detail how (as opposed to when) the matching would be done or what a HICAN is (the agency had evidently not realized that what might then have seemed a relatively straightforward task of matching had difficulties or subtleties that the agency would only later discover[19]). But it is unreasonable for Baystate to read the actual rulemaking as having already done so.

5.    **The Administrator Reasonably Concluded That The Payment Of Expert Witnesses On A Contingency Fee Basis Reduces The Weight To Which Their Testimony Would Otherwise Be Entitled**

It is ironic that, while Baystate freely attacks agency employees as liars, it deplores as "unfortunate" (Pl. Opp. Mem. at 18 n.19) the Administrator's decision (1 AR 51-54) that Baystate's employment of expert witnesses on a contingency basis reduces the weight that should be given to their opinions. Baystate does not deny that there was such a financial interest, Pl. Opp. Mem. at 18 n.19, and it does not quarrel with the Administrator's legal conclusion that such an interest is properly considered in assessing the value of expert

---

[18] To our secondary point that the HICANs that actually are matched in any event ordinarily do contain Social Security numbers, Baystate responds that "[n]obody, not even the Secretary, calls a HICAN . . . a 'social security number.'" Pl. Opp. Mem. 15 n. 15. Almost no one calls a HICAN a HICAN either. A June 7, 2007, search in the Westlaw ALLFEDS directory for "HICAN or HICANS" revealed a grand total of one reference, and that was to a hydrofoil collision avoidance system. Even the same search in the *Federal Register* directory did not yield any use of HICAN or HICANS before (or after) 2005, when the Secretary addressed calculation of this fraction, 70 Fed. Reg. 47,278, 47,440 (Aug. 12, 2005).

[19] With respect to the time of those later discoveries, Baystate retreats from its original contention – thoroughly contradicted by the record, *see* Def. SJ Mem. at 39-41 – that CMS learned of the stale records problem by 1993, and now says merely that CMS knew or should have known by then that there was some unidentified problem or problems. *Compare* Pl. SJ Mem. at 15, 29 *with* Pl. Opp. Mem. at 17-18. Baystate does not, however, seem to contend that any of the other specific problems that it now alleges were identified even by the end of the 1993-1996 time frame at issue here.

-24-

witness testimony.  Instead, Baystate offers a series of arguments that are wrong, irrelevant, or both.  First Baystate argues that one of the consultants, Mr. Pfeil, did not deliver expert testimony.  Pl. Opp. Mem. at 18 n.19.  It is not clear why concluding that it was a fact witness Baystate was paying on a contingent-fee basis would make its position any better.  In any event, Pfeil clearly testified as an expert.  The testimony begins with credential burnishing relevant only to an expert's testimony, 14 AR 5413-15, and continues with Pfeil's experience matching beneficiaries with various state government databases, 14 AR 5415-19, before moving to Pfeil's assessment of the CMS program in light of his experience, 14 AR 5419 *et seq.*  Baystate also argues that Pfeil's testimony drew "no motion to strike."  Pl. Opp. Mem. at 18 n.19.  But the Administrator's point was not that the testimony should have been stricken, but that the weight to which it was entitled was affected by the contingency arrangement. 1 AR 52-54.  And on that point, Baystate's argument that Pfeil was "not cross-examined on the issue of any alleged bias," Pl. Opp. Mem. at 18 n. 19, is simply wrong.  14 AR 5468-69.

## CONCLUSION

For the foregoing reasons, in addition to those stated in defendants' motion for summary judgment, defendants' motion should be granted, and plaintiff's motion for summary judgment should be denied.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney

OF COUNSEL:

DANIEL MERON
General Counsel

KATHLEEN H. McGUAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General
    Counsel for Litigation

PAUL E. SOEFFING

SHEILA M. LIEBER
Deputy Director

**/s/ Lisa A. Olson**
BRIAN G. KENNEDY
LISA A. OLSON (D.C. Bar #38266)
U.S. Department of Justice
20 Mass. Ave., N.W., Room 7300
Washington, D.C. 20530
Telephone: (202) 514-5633
Telefacsimile: (202) 616-8470
E-mail: lisa.olson@usdoj.gov

-25-

Attorney

United States Department of
    Health and Human Services

Dated: June 18, 2007                         Counsel for Defendants