### CENTERS FOR MEDICARE AND MEDICAID SERVICES
*Decision of the Administrator*

| | |
|---|---|
| **In the case of:** | **Claim for:** |
| Saint Mary's Mercy Medical Center | Reimbursement Determination for Cost Reporting Periods ending: |
| Provider | 06/30/00 & 06/30/01 |
| vs. | |
| Blue Cross Blue Shield Association/ United Government Services, LLC (n/k/a National Government Services) | **Review of:** PRRB Dec. No. 2007-D63 Dated: August 24, 2007 |
| Intermediary | |

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the decision of the Provider Reimbursement Review Board (Board). The review is during the 60-day period in § 1878(f) (1) of the Social Security Act (Act), as amended (42 USC 1395oo (f)). The parties were notified of the Administrator's intention to review the Board's decision. The Intermediary and the CMS' Center for Medicare Management (CMM) commented, requesting reversal of the Board's decision. The Provider also commented, requesting that the Administrator affirm the Board's decision. Accordingly, this case is now before the Administrator for final agency review.

### ISSUE AND BOARD DECISION

The issue is whether CMS correctly calculated the Medicare fraction of the disproportionate patient percentage (DPP) for purposes of the DSH payment.

The Board, relying on its holdings in *Oakwood*[1] and *Baystate*[2] held that the additional SSI eligible days presented by the Provider should be included in the Provider's DSH calculation, subject to the Intermediary's review.

In reaching this determination the Board concluded that there was no statutory or regulatory impediment for recalculating the DSH percentage. The fact that CMS recalculated the Provider's SSI percentage for 2001 after the Intermediary identified an error with the percentage showed that CMS had the discretion to make changes after it initial issuance of the SSI percentage when there are known errors.

## COMMENTS

The Intermediary commented requesting that the Administrator reverse the Board's decision. The Intermediary disagreed with the Board's premise that there's a precise cost increment for each patient day counted in the calculation's proxies. In reaching this determination the Intermediary relied on the Administrator's Decision in *Baystate*.[3] In *Baystate*,[4] the Administrator held that a basic tenet of the prospective payment system is that rates are based on the best data available at the time. With respect to the Medicare DSH fraction, the Secretary has stated that the goal is to obtain reasonable accurate not necessarily perfect calculations. Therefore, the Board's directive to examine the SSI missing days asserted by the Provider and then have the Intermediary make its own determination as to the sufficiency of the evidence to alter the SSI percentage is not required by statute, regulation, policy or any pragmatic administrative or equity issues.

The Provider commented requesting that the Administrator uphold the Board's decision and direct the Intermediary to include upon audit the additional 218 SSI-eligible days for fiscal year ended June 30, 2000 and the additional 267 SSI-eligible days for fiscal year ended June 30, 2001 in the Provider's DSH calculation. To support this determination, the Provider relied on two Board decisions, *Oakwood, supra,* and *Baystate, supra*. In *Oakwood*, the Board held that the inclusion of additional SSI days "is purely a legal question" and "[t]here is nothing in the statute, regulation, or CMS rulings that would preclude CMS from recalculating a provider's DSH adjustment. In *Baystate*, the Board held that "an approximation of

---

[1] *Oakwood Hospital & Medical Center v Blue Cross blue Shield Ass'n/United Government Services, LLC (Wis.)*, PRRB Dec. No. 2006-D2 (Nov. 16, 2005) (Oakwood).
[2] *Baystate Medical Center v. Mutual of Omaha Insurance, Co.*, (CCH) ¶81,468; modified, CMS, Administrator(CCH) ¶81,506, (May 11, 2006); Civil Docket No. 1:06-cv-01263-JDB.
[3] Id.
[4] Id.

3

the DSH percentage is not permitted by statute or regulation" and the Medicare statute "requires the calculation to be accurate." Therefore, since the Provider presented undisputed evidence of the exact number of additional SSI-eligible days that CMS did not account for in the Provider's DSH calculation the Provider argued that the Administrator should uphold the Board's determination in this case.

CMM commented, requesting that the Administrator review the Board's decision. CMM argued that the Board erred in interpreting the regulations regarding recalculation of the Provider's DSH Disproportionate Patient Percentage (DPP). CMM noted that the regulation at issue permits a hospital to choose to have its DPP calculated based on the hospital's cost reporting period instead of the Federal fiscal year. However, if this request is made CMS will performed this calculation "once per hospital per cost reporting period"[5] and that the resulting DPP will "become the hospital's official [DPP] for that period."[6] Thus, the regulation only permits CMS to recalculate a hospital's DPP based upon a different time period, i.e., the hospital's cost reporting period rather than the Federal fiscal year in which its cost reporting period began. CMM argued that there is no provision for re-computing the DPP based on updated or corrected data as the Board determined.

With respect to the Board's determination that CMS has the discretion to make changes to a Provider's DPP due to the fact that the Provider's DPP was recalculated in this case, CMM explained that the additional recalculation of the Provider's DPP was only performed because CMS inadvertently used the wrong file to calculate the original request. Therefore, CMS does not have the discretion to revise a provider's SSI percentage as stated by the Board. CMM also pointed out that CMS has applied a similar policy in the context of outlier payment determinations, and that this policy has been upheld in several court cases.[7]

Finally, CMM explained that the DSH Medicare/SSI fraction does not contemplate the inclusion of days for which a patient is entitled to benefits under Medicare Part B. Therefore, CMM questioned the accuracy of the data submitted by the Provider because the database relied on by the Provider included patient eligibility for both Medicare Part A and Part B on a date of service.

---

[5] 42 C.F.R. § 412.106(b) (3) (2000).
[6] Id.
[7] County of Los Angeles v. Shalala, 192 f.3d 1005 (D.C. Cir. 1999); Rush-Presbyterian-St. Luke's Med. Ctr. v. Thompson, No. 03-5375, 2003 WL 22019351 (N.D. Ill. Aug. 25, 2003).

## DISCUSSION

The entire record, which was furnished by the Board, has been examined, including all correspondence, position papers, and exhibits. The Administrator has reviewed the Board's decision. All comments received timely are included in the record and have been considered.

The Social Security Amendments of 1965[8] established Title XVIII of the Act, which authorized the establishment of the Medicare program to pay part of the costs of the health care services furnished to entitled beneficiaries. The Medicare program primarily provides medical services to aged and disabled persons and consists of two Parts: Part A, which provides reimbursement for inpatient hospital and related post-hospital, home health, and hospice care,[9] and Part B, which is supplemental voluntary insurance program for hospital outpatient services, physician services and other services not covered under Part A.[10] At its inception in 1965, Medicare paid for the reasonable cost of furnishing covered services to beneficiaries.[11] However, concerned with increasing costs, Congress enacted Title VI of the Social Security Amendments of 1983.[12] This provision added § 1886(d) of the Act and established the inpatient prospective payment system (IPPS) for reimbursement of inpatient hospital operating costs for all items and services provided to Medicare beneficiaries, other than physician's services, associated with each discharge. The purpose of IPPS was to reform the financial incentives hospitals face, promoting efficiency by rewarding cost effective hospital practices.[13]

These amendments changed the method of payment for inpatient hospital services for most hospitals under Medicare. Under IPPS, hospitals and other health care providers are reimbursed their inpatient operating costs on the basis of prospectively determined national and regional rates for each discharge rather than reasonable operating costs. Thus, hospitals are paid based on a predetermined amount depending on the patient's diagnosis at the time of discharge. Hospitals are paid a fixed amount for each patient based on one of almost 500 diagnosis related groups (DRG) subject to certain payment adjustments.

---

[8] Pub. Law No. 89-97.
[9] Section 1811-1821 of the Act.
[10] Section 1831-1848(j) of the Act.
[11] Under Medicare, Part A services are furnished by providers of services.
[12] Pub. Law No. 98-21.
[13] H.R. Rep. No. 25, 98th Cong., 1st Sess. 132 (1983).

Concerned with possible payment inequities for IPPS hospitals that treat a disproportionate share of low-income patients, pursuant to Section 1886(d) (5) (F) (i) of the Act, Congress directed the Secretary to provide, for discharges occurring after May 1, 1986, "for hospitals serving a significantly disproportionate number of low-income patients...."[14]

There are two methods to determine eligibility for a Medicare DSH adjustment: the "proxy method" and the "Pickle method."[15] To be eligible for the DSH payment under the proxy method, an IPPS hospital must meet certain criteria concerning, inter alia, its disproportionate patient percentage or DPP. Relevant to this case, with respect to the proxy method, Section 1886 (d)(5)(F)(vi) of the Act states that the terms "disproportionate patient percentage" means the sum of two fractions which is expressed as a percentage for a hospital's cost reporting period. The fractions are often referred to as the "Medicare low-income proxy" or "Medicare fraction" and the Medicaid low-income proxy", respectively, and are defined as follows:

> (I) the fraction (expressed as a percentage) the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under Part A of this title and were entitled to supplemental security income benefits (excluding any State supplementation) under title XVI of this Act and the denominator of which is the number of such hospital's patients day for such fiscal year which were made up of patients who (for such days) were entitled to benefits under Part A of this title.

> (II) the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consists of patients who (for such days) were eligible for medical assistance under a State Plan approved under title XIX, but who were not entitled to benefits under Part A of this title, and the denominator of which is the total number of the hospital patient days for such period.

CMS implemented the statutory provisions at 42 C.F.R. § 412.106 (2000) and explains that the hospital's disproportionate patient percentage is determined by adding the results of two computations and expressing that sum as a percentage. Relevant to this case, the first computation, the "Medicare fraction" is set forth at 42 C.F.R. § 412.106(b) (2) (2000). The regulation at 42 C.F.R. § 412.106(b) provides that:

---

[14] Section 9105 of the Consolidated Omnibus Budget Reconciliation Act of 1985 (Pub. L. No. 99-272). See also 51 Fed. Reg. 16772, 16773-16776 (1986).
[15] The Pickle method is set forth at section 1886(d) (F) (i) (II) of the Act.

> (b) *Determination of a hospital's disproportionate patient percentage.* (1) *General rule.* A hospital's disproportionate patient percentage is determined by adding the results of two computations and expressing that sum as a percentage.
> (2) *First computation: Federal fiscal year.* For each month of the Federal fiscal year in which the hospital's cost reporting period begins, CMS-
> (i) Determines the number of covered patient days that-
> (A) Are associated with discharges occurring during each month; and
> (B) Are furnished to patients who during that month were entitled to both Medicare Part A and SSI, excluding those patients who received only State supplementation;
> (ii) Adds the results for the whole period: and
> (iii) Divides the number determined under paragraph (b) (2) (ii) of this section by the total number of patient days that-
> (3) *First computation: Cost reporting period.* If a hospital prefers that CMS use its cost reporting period instead of the Federal fiscal year, it must furnish to CMS, through its intermediary, a written request including the hospital's name provider number, and cost reporting period end date. This exception will be performed once per hospital per cost reporting period, and the resulting percentage becomes the hospital's official Medicare Part A/SSI percentage for that period.
> (4) *Second computation.* The fiscal intermediary determines, for the same cost reporting period used for the first computation, the number of the hospital's patient days of service for which patients were eligible for Medicaid but not entitled to Medicare Part A, and divides that number by the total number of patient days in the same period.....

In this case, the Provider challenged the calculation of its Medicare fraction in determining its DSH adjustment payment.[16] The Board concluded that the regulation did not preclude the recalculation of the Medicare fraction.

---

[16] Under the Administrative Procedure Act, the proponent of the rule has the burden of proof. 5 USC 556(d). Thus, a provider has the burden to establish its claim for reimbursement before the Board. In this instance, the Provider has the burden of proof to support its claim for additional DSH payments by a preponderance of the evidence. (*Fairfax Hospital Association v. Califano*, 585 F. 2d 602 (4th Cir. 1978) CMS/HCFA Ruling 79-60c.)

The Administrator does not agree. The Administrator finds that the regulation does not provide for a recalculation of the SSI ratio based upon updated, or later data, once it is completed by CMS. A review of the applicable law and regulations show that the Secretary did not intend for the DSH calculations to be recomputed, or recalculated, based upon later data.

On its face, the regulation does not allow for further recalculations of a provider's SSI ratio beyond that explicitly prescribed in the regulation. As the regulation shows, only a limited exception for recalculation of the Medicare fraction based upon a provider's cost reporting period is allowed. Notably, this limited exception was based on the explicit time period (a provider's cost reporting period) which was set forth in the statute. In contrast, no such explicit provision for recalculation of the Medicare fraction based on later, or corrected data, is set forth in the statute, nor in the regulation.

The Secretary has consistently recognized the administrative burdens involved in calculating the Medicare fraction and has made policy decisions balancing the need to reduce administrative burdens and the need for timely, accurate data. The policy holding that the CMS calculated Medicare fraction is not subject to updating is consistent with the competing interests of finality, timeliness, efficiency and accuracy in the administration of a large Federal program.

In arriving at this policy, the Secretary considered the administrative burdens associated with the calculation of the Medicare fraction. The Secretary necessarily examined these problems within the context of administering the entire Medicare program and not within the singular context of calculating a single hospital's DSH Medicare fraction. In implementing DSH provisions in 1986, the Secretary found that to match SSI eligibility records to Medicare bills on a Federal fiscal year on an annual basis was the most efficient approach given the scope of the program. Noting the 11 million billing records and 5 million SSI records, the Secretary specifically limited any calculations to a *yearly basis* stating that:

> The data source for computation of the SSI/Medicare percentage include the Medicare inpatient discharge file which is compiled on a Federal fiscal year basis and includes approximately 11 million billing records (this compilation is done about three or four months after the close of the Federal fiscal year and is then updated periodically as additional discharge data are received) and the SSI file that lists all SSI recipients for a 3 year period denotes the month during the period in which the recipient was eligible for SSI benefits (the SSI file includes over 5 million records.) In order to compute the SSI /Medicare percentage, the 11 million records from the discharge file must be individually matched by beneficiary number and month

of hospitalization with the SSI recipient records. On a Federal fiscal year basis, this match would be performed <u>on a yearly basis.</u> (Emphasis added.) [17]

In balancing administrative efficiency and accuracy, the Secretary noted that:

> We do not believe that there are likely to be significant fluctuations from one year to the next in the percentage of patients served by hospitals that are dually entitled to Medicare Part A and SSI. Consequently, the percentage for a hospital's own experience during the Federal fiscal year should be reasonably close to the percentage specific to the hospital's cost reporting period.[18]

The Secretary, subsequently, compared the Medicare fraction based on a provider's cost reporting period and the Federal fiscal year and concluded, as predicted, that these two periods resulted in reasonably close percentages. The Secretary subsequently determined that he would afford hospitals the option to determine the number of patient days of those dually entitled to Medicare Part A and SSI for their own cost reporting periods. The Secretary concluded that:

> We do not believe Congress intended to impose cumbersome and costly administrative burden as that described above in implementing this provision. The Secretary has general rulemaking authority under section 1102 and 1871 of the Act to deal with problems of implementing and administering the Act in an efficient manner. Based on the above discussion, we believe that using the Federal fiscal year instead of a hospital's own cost reporting period is the most feasible approach to implementing provision terms of accuracy, timeliness and cost efficiency. In addition, we believe we have complied with the law by affording hospitals the option of having their SSI/Medicare percentages computed based on … the cost reporting period.[19]

---

[17] 51 Fed. Reg. 31454, 31459-60 (Sept 1986). (The 2002 MEDPAR file contains over 12 million records. http://www.cms.gov/IdentifiableDataFiles/05_MedicareProviderAnalysisandReviewFile.asp .)

[18] 51 Fed. Reg. 16777.

[19] 51 Fed Reg. 31459-60. (*See also* "[I]n the interim final rule we proposed matching SSI eligibility records to the Medicare bills on a Federal fiscal year basis because we believe this is the most efficient approach." 51 Fed. Reg. 31454 (Sept. 3, 1986))

In allowing for this provision, the Secretary noted that:

> [I]f a hospital has its SSI/Medicare percentage recomputed based on its own cost reporting period, this percentage will be used for purpose of it disproportionate share adjustment <u>whether the result is higher or lower than the percentage computed based on the Federal fiscal year</u>." (Emphasis added.) [20]

That is, a provider cannot request such a recalculation and chose the higher Medicare fraction. The regulatory language plainly does not incorporate any procedures for revising the Medicare fraction based upon later data. Rather, the regulation provides for a provider's Medicare fraction to be final, once calculated by CMS, except in the instance where a provider has requested the computation be based on its cost reporting period.

In response to the specific commenters, the Secretary had the opportunity to specifically address this issue in the final rule to the FFY 2006 final rates.[21] The Secretary specifically rejected the use of updated SSI eligibility information (which the commenter argued may include retroactive approvals, etc.), for use by CMS to revise calculations of hospital DSH Medicare fractions. Consequently the Secretary clearly had a policy of calculating the SSI fraction based upon specific data, within certain timeframes, and not subject to later revision.

Moreover, the Administrator finds that this policy is consistent with IPPS. Notably, where the Secretary has allowed for corrections of data underlying inpatient prospective payments or IPPS, the Secretary has set forth specific procedures and timeframes for doing so consistent with the aims of IPPS (e.g., wage index). In contrast, no process was implemented in the regulations at 42 C.F.R. § 412.106 for the recalculation of the CMS Medicare fraction.

Likewise, the Secretary has determined that the refusal to recalculate underlying IPPS data is also rational and consistent with the aims of the inpatient PPS. Specifically, the regulation for determining eligibility for the rural referral center status required the use of a provider's published 1981 case mix index (CMI). The Secretary refused to recalculate a provider's 1981 CMI for purposes of determining its eligibility for rural referral center status under IPPS. [22] The court in *Board of*

---

[20] 51 Fed Reg. 31459-60.
[21] 70 Fed. Reg. 47278, 47439-47440.
[22] In reference to a specific objection raised by a commenter regarding the CMI, the Secretary announced: "We do not believe that hospitals should be allowed to substitute other criteria for the one we published in the NPRM (notice of proposed

10

*Trustees of Knox County Hospital v.Shalala*, 135 F 2d 493 (7th Cir. 1998), specifically addressed the provider's challenge to the Secretary's use of a published 1981 case mix index (CMI). The provider argued that CMS ought to accept a recalculated CMI because its study conducted by a nationally recognized consulting firm, was based on 100 percent of the provider's 1981 Medicare discharges. In contrast, the Secretary's calculation was based in large part on the MEDPAR file, which included information concerning only 20 percent of the Provider's 1981 discharges. However, the Court accepted that the Secretary's policy serves the interests of accuracy, uniformity and administrative convenience and concluded that the Secretary's policy of relying solely on her own calculation of a provider's 1981 CMI was not arbitrary and capricious.

The Secretary, as a matter of policy, also declined to recalculate the outlier payments to account for the difference between the estimated and actual outlier payments. See e.g., 49 Fed. Reg. 234, 265-66. In response to commenters, the Secretary pointed out that this policy applied regardless of whether the aggregate outlier payments resulted in more or less than the statutory five- six percent of the total projected DRG prospective payment. Such a policy promoted finality, efficiency and certainty in the process. The court in *County of Los Angeles v. Shalala*, 192 F. 2d 1005 (1999), upheld this policy observing that: "while we have recognized that retroactive corrections may not ultimately undermine PPS, we have emphasized that that 'does not establish that a prospective–only policy is unreasonable.' *Methodist*, 38 F. 3d at 1232." *County of Los Angeles v. Shalala*, 192 F. 2d 1005, 1020 (1999).

Similarly, the Secretary's policy in this instance promotes administrative finality and certainty in the process. The Secretary's policy is neutral in that the SSI ratio remains the same regardless of whether a later recalculation would result in a higher or lower Medicare fraction. This neutrality ensures predictability in the process by preventing unexpected shifts in the payment rates based on later data.

The Administrator also disagrees with the Board's determination that CMS has the discretion to make changes to a Provider's DPP due to the fact that the Provider's DPP was recalculated in this case. In this case, the record shows that CMS

---

rulemaking. We selected the 1981 case-mix index for this criterion because it represents the most current published data available at the time. The basic tenet of the prospective payment system is that the rates paid to hospitals are determined prospectively and are based on the best data available at the time. Thus, a hospital knows in advance what its payment amounts will be." See 49 Fed. Reg. 34728 34743-44 No commenters raised the issue of recalculating the SSI ratio in the initial rule implementing the DSH SSI calculation and thus the issue was not explicitly addressed in the final rule.

recalculated the Provider's DPP because it inadvertently used the wrong file to calculate the initial DPP. Based on this fact, the Administrator finds that the CMS action does not negate the foregoing policy set forth by the Secretary regarding the discretion to revise a provider's SSI percentage.

Finally, the Administrator notes that the Board erred in finding that the Provider presented undisputed evidence of the exact number of additional SSI eligible days that CMS did not account for in the DSH calculation. The Administrator first notes that the data at issue has not been audited by CMS. In addition, CMS calculates the SSI percentage based upon CMS' Medicare Part A claims data and SSA's SSI eligibility data. In contrast, the data used by the Provider was from the Michigan Medicaid database, which involves secondary SSI data for patients eligible for Medicare Part A and Part B on the date of service. Notably, the DSH calculation does not include days for which a patient is entitled to Part B. Further, the Provider's data involves only Medicare patients for which no SSI eligibility was indicated which were compared to the Michigan Medicaid Data. The Provider was not seeking to identify erroneously included days (i.e., individuals that lost SSI eligibility retroactive to the month of discharge.) Thus, with respect to the Provider's data, not only is the data from a secondary source for individuals for which there was no SSI eligibility indicated, but on its face, it would include days for which a patient is entitled to benefits under Medicare Part B. Therefore, the record does not demonstrate that the Provider presented evidence of the exact number of additional SSI eligible days that CMS did not account for in the DSH calculation.

Thus, in conclusion, the Administrator finds that the regulation precludes the recalculation of the Medicare fraction based on updated or corrected data. Further, as the Board is bound by the regulations, it is not authorize to order any recalculation of the SSI ratio based on updated or corrected data.[23]

---

[23] The Administrator also hereby incorporates by reference his decision in *Baystate Medical Center v. Mutual of Omaha Ins. Co.*, Administrator Decision 2006-D20 (May 11, 2006).

## DECISION

The decision of the Board is reversed in accordance with the foregoing opinion

**THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE SECRETARY OF THE HEALTH AND HUMAN SERVICES**

Date: 10/23/07

Herb B. Kuhn
Deputy Administrator
Centers for Medicare & Medicaid Services