UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BAYSTATE MEDICAL CENTER, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHAEL O. LEAVITT, *et al.*, )<br>)<br>Defendants. )<br>_____ ) | C.A. No. 06-1263 (JDB) |

**PLAINTIFF'S RESPONSE TO *AMICUS* BRIEF**

Plaintiff Baystate Medical Center submits the following response to the two issues addressed in the *Amicus Curiae* brief filed in this case by the plaintiff hospitals in *Auburn Regional Medical Center v. Leavitt*, Civil Action No. 07-2075.

**I.   RIGHT TO RELIEF FROM UNDERPAYMENTS STEMMING FROM ERRORS IN THE SECRETARY'S PAYMENT DETERMINATION**

The *Auburn* plaintiffs correctly point out that the Government's briefs do not attempt to defend the argument, asserted in the Secretary Leavitt's final decision below, that his calculation of the SSI ratio is fixed when performed and cannot be revised to reflect later or corrected data.[1] *See* Def. Mem. at 29-37; Pl. Reply Br. at 3; Def. Reply Br. at 12.  Instead, the Government now argues that Baystate is not entitled to relief from errors in Secretary Leavitt's calculation

---

[1]   For ease of reference, the opening brief in support of Baystate's motion for summary judgment is referred to herein as "Pl. Br."  The opening brief in support of Secretary Leavitt's cross-motion and in opposition to Baystate's motion for summary judgment is referred to as "Def. Br."  Baystate's memorandum in opposition to Secretary Leavitt's motion and reply in support of its motion is referred to as "Pl. Reply Br.," and the reply memorandum in support of Defendant Leavitt's motion is referred to as "Def. Reply Br."

because, it says, the Hospital failed to show that those errors were large enough to mandate retrospective relief.[2]  Def. Reply Br. at 12.

But, as the *Auburn* plaintiffs correctly state, there is no materiality threshold to relief in an appeal in which a provider, like Baystate, has met the jurisdictional requirements, including the $10,000 amount in controversy requirement, established in 42 U.S.C. § 1395oo(a).  Indeed, when Congress enacted the prospective payment system ("PPS") in 1983, it amended section 1395oo(a) specifically for the purpose of granting hospitals the right to appeal and obtain relief from a determination of the Secretary as to the amount of payment under the prospective system established in section 1395ww(d) (which includes the DSH payment adjustment and provides for the calculation of the Medicare/SSI ratio at issue).  *See* Social Security Amendments of 1983, § 602(h)(1); *see also Washington Hosp. Ctr., v. Bowen*, 795 F.2d 139, 142, 144-48 (D.C. Cir. 1986).  Accordingly, when the Secretary promulgated the initial rules implementing the DSH provisions of the PPS statute, he unequivocally assured hospitals that they would have the same right to appeal DSH payment determinations as they have to appeal other Medicare payment determinations pursuant to section 1395oo and the pre-existing appeal regulations "set forth in 42 CFR., Part 405, Subpart R, Provider Reimbursement Determinations and Appeals (§§ 405.1801 through 405.1890)."  51 Fed. Reg. 31454, 31458 (Sept. 3, 1986) (final rule).  And, the only materiality threshold established in section 1395oo and the Secretary's appeal regulations is the $10,000 amount in controversy requirement.

Moreover, the agency's ever-shifting positions on this issue – as evidenced in part by the Secretary's recent decision in the *Saint Mary* case discussed in the *Auburn* plaintiffs' brief –

---

[2]  It is entirely unclear who is responsible for the Government's various pleadings in this case.  *Compare* <u>Defendant Leavitt's</u> Motion for Summary Judgment *with* Reply in Support of <u>Defendants'</u> Motion for Summary Judgment.  *See also* Plaintiff's Response to Defendant Leavitt's Statement of Material Facts 1-2.

further underscore why no deference is owed to the Secretary's litigation position here. *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 211-13 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate"); *see also* Pl. Reply Br. at 10. As the *Auburn* plaintiffs point out, the Secretary's final decision in *Saint Mary Mercy Medical Center v. United Government Services* does not purport even to consider, let alone dispute, the materiality of the alleged errors in the Secretary's calculation of that hospital's SSI ratios.[3] Amicus Brief, Exhibit A. In that case, the Secretary refused to grant relief not because the Secretary determined that this number of additional days failed to meet some sort of secret materiality threshold, but for the very reason the Secretary has declined to defend here – that "the [DSH] regulation precludes the recalculation of the Medicare fraction based upon updated or corrected data." *Id*. at 11.

So, the Secretary's final decisions in other more recent cases do not stand on materiality; the Secretary has resorted instead back to a statement of "policy" that he has not attempted to defend in this case. Of course, there never was, and is not now, any genuine "policy" prohibiting revision of the SSI ratios to reflect correct or later data. Indeed, contrary to any such "policy," the Secretary's final decision in *Saint Mary* states that CMS actually *did* revise the hospital's SSI ratio for its 2001 cost reporting period to reflect corrected data after the agency determined that it had originally "used the wrong file" to calculate the ratio for that period. *See* Amicus Brief, Exhibit A at 2-3. And that is not the only time that the Secretary has revised the SSI ratios to reflect corrected data. In 1999, the agency revised all hospitals' SSI ratios for 1998, which

---

[3]  The Secretary adopted the same position again in another recent decision discussed below. *Saint Mary's Hospital – Milwaukee v. Blue Cross Blue Shield Ass'n / National Government Servs., LLC*-WI ("*Saint Mary's – Milwaukee*"), Decision of the Administrator (Jan. 5, 2008) (Pl. Exhibit 1). There again, CMS refused to grant relief from an allegedly erroneous calculation of the SSI fraction because "the Secretary did not intend for the DSH calculations to be recomputed or recalculated based upon later, or corrected, data." *Id* at 7.

3

resulted in a $35,000 downward adjustment to Baystate's DSH payment for 1998. *See* Pl. Br. at 31. Even now, the agency has been telling hospitals and fiscal intermediaries for the past several months that it is going to revise the SSI ratios for 2005 to reflect corrected data, but it has not yet done so. *Id.*

There is no question that the impact of the Secretary's errors is substantial. The undisputed evidence in this case shows that the impact of the Secretary's admitted errors is substantial, more than enough to satisfy any materiality threshold if it existed. *See, e.g.,* Pl. Stmt. ¶¶ 116-20, 145-46, 159-60, 173, 186. Indeed, while Baystate proved an even greater impact, the Secretary concedes "a 1.59 percent failure rate in the match." Defendant's Response to Plaintiff's Statement of Material Facts as to Which There Is No Genuine Dispute ¶ 24 (citing AR 38); Def Br. at 37 n.34  In the decision below, the Administrator of CMS calculated this "failure rate" by dividing (i) a small subset of 627 of Baystate's Medicare patients, none of whom had been identified by the Secretary as having been entitled to SSI benefits during their hospital stays, into (ii) the number of patients from that subset who in fact *were* entitled to SSI. *See* AR 38. The application of the Secretary's match "failure rate" to Baystate's total number of all Medicare patient days that were not previously counted as SSI days for the years at issue results in a **17% increase in Baystate's SSI ratios** and additional DSH payment of approximately **$3.0 million** for the four years at issue. This percentage increase in the SSI ratios and the related payment increase in the DSH adjustment are based on the following **undisputed** facts:

i) The Secretary initially determined that Baystate had 20,913 Medicare/SSI days for the four years at issue. Plaintiff's Statement of Material Facts As to Which There Is No Genuine Issue ("Pl Stmt.") ¶¶ 14, 16, 18, 20, 119.

4

ii) The Secretary also determined that Baystate had a total of 250,494 Medicare days for those years. *Id*.

iii) Subtracting the number of SSI days identified by the Secretary (20,913) from the total number of Medicare days counted by the Secretary (250,494) leaves 229,581 Medicare days not previously identified as SSI days. *Id*. ¶ 119. The remaining 229,581 Medicare days comprise the universe of Baystate's total number of Medicare days that were not previously identified as, but may have been, Medicare/SSI days. That is the total number of patient days that is comparable to the 627 patients considered in the Secretary's calculation of the 1.59% match "failure rate" for a small subset of Baystate's Medicare patients.

iv) The application of the Secretary's 1.59% "failure rate" to those 229,581 remaining Medicare days would result in an additional 3,650 Medicare/SSI days, which is a 17% increase over the number of SSI days that the Secretary identified (24,563 versus 20,913).

v) Because the average effect of adding one SSI day to the numerator of Baystate's SSI fraction is $830, *id*. ¶ 120, the admitted 1.59% match failure rate would result in additional DSH payment of $3,029,500 to Baystate due to the addition of 3,650 Medicare/SSI days to the SSI fractions for the four years at issue.

In sum, the internal inconsistencies in the positions taken by the Secretary in his briefs in this case, in his more recent decisions in other cases, and in his actions reveal that the only consistent aspect of the Secretary's "policy" statements are their inconsistency. In truth, the Secretary's "policy" in any given instance is whatever best fits the agency's litigation position at any particular moment: Far from reflecting the sort of reasoned, consistent decision making that warrants deference, *United States v. Mead Corp.*, 533 U.S. 218, 227-31 (2001), the Secretary's inconsistent litigating positions in this and other cases merit no deference whatsoever. *Bowen v.*

*Georgetown Univ. Hosp.*, 488 U.S. at 213; *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ("The weight of [an agency's] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier pronouncements, and all those factors which give it power to persuade, if lacking power to control.")

## II.   MEDICARE HMO DAYS SHOULD NOT BE INCLUDED IN THE DENOMINATOR OF THE MEDICARE/SSI FRACTION.

The *Auburn* plaintiffs appropriately comment that Congress' 1997 amendments to the Medicare statute confirmed that Medicare HMO enrollees are not "entitled to benefits under [Medicare] part A," and those patient days, therefore, should not be included in the Medicare/SSI fraction as defined in 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). This alone is enough to reject Secretary's Leavitt's convoluted theory that a Medicare HMO enrollee is somehow "entitled to benefits under part A" even though the Secretary admits that "no Medicare payments are made for hospital services furnished to HMO enrollees," Def. Reply Br. at 10, because "Medicare was expressly precluded from making any payments to a hospital for services furnished to HMO enrollees." Def. Br. at 27. Here again, the Secretary is conflating the two different terms used in the DSH statute – "eligible" and "entitled" – just as he previously did when four consecutive federal Courts of Appeals ruled that such a construction of the statute violates its plain meaning and is invalid. *See Cabell Huntington Hospital* v. *Shalala*, 101 F.3d 984 (4th Cir. 1996); *Legacy Emanuel Hospital & Health Center* v. *Shalala*, 97 F.3d 1261 (9th Cir. 1996); *Deaconness Health Servs. Corp.* v. *Shalala*, 83 F.3d 1041 (8th Cir. 1996) (per curiam); *Jewish Hospital, Inc.* v. *Secretary of Health & Human Servs.*, 19 F.3d 270 (6th Cir. 1994).

Further, the inclusion of Medicare HMO days in the Medicare SSI fraction creates a logical disconnect between the days that are included in that ratio, which is used to calculate the

6

DSH adjustment to the standard PPS payment rates per discharge, and the PPS payments to which that adjustment is applied. *See* Pl. Br. at 6-9. The payments to which the DSH adjustment applies include only the standard PPS rates per discharge that are paid by the Medicare fiscal intermediaries under Part A of the Medicare Act; they do not include amounts paid by the Medicare HMOs. *See* 42 C.F.R. § 412.106(a)(2); Pl. Reply Br. at 40 n.34

But, even if the Secretary's position otherwise would be a permissible interpretation of the statute (and the 1997 amendments confirm that it is not), the Secretary is not writing on a blank slate in this case. The Secretary's current litigation position is also invalid because it conflicts with his original statements of intent at the time when the agency adopted the DSH regulation, which remained in effect, unchanged, during the periods at issue here. In addition, the Secretary's position in this case conflicts with an agency ruling in another case that was decided after the Government filed its briefs in this case. For both of these reasons as well, the Secretary's position in this case is entitled to no deference whatsoever and cannot be sustained.

1.   The Government's briefs argue that (i) the Secretary has always interpreted the DSH statute to include Medicare "covered" days in the Medicare/SSI fraction (Def. Br. at 22), and (ii) such "covered" days may include days, like Medicare HMO patient days, for which Medicare is "expressly precluded from" making payment under Part A (Def. Br. at 25, 27) . It is true that the Secretary has always construed the statute to include Medicare "covered" days. But, the second part of the Secretary's argument is clearly contrary to the Secretary's statement of intent and its actual practice when it originally adopted the DSH regulation. In the preamble to his 1986 final rule implementing the DSH statute, in his discussion of his interpretation of the DSH statute in litigation before four federal Courts of Appeals during the period at issue, and in actual practice during the same period, the Secretary included only "days actually paid by

7

Medicare"[4] in the Medicare/SSI fraction. See Pl. Br. at 37-38, 43-45; Pl. Reply Br. at 36-37 & n.32, 40-41.[5] Because the Secretary never amended the DSH regulation to change that interpretation at any time before or during the period at issue,[6] his contrary position in this case is invalid. *See, e.g., Monmouth Med. Ctr. v. Thompson,* 257 F.2d 807, 814 (D.C. Cir. 2001); Pl. Reply Br. at 35, 38.

2.  The glaring inconsistencies in the Secretary's varying positions concerning the patient days attributable to patients who are considered to be "entitled to benefits under [Medicare] part A" continue even now. For example, the Secretary's opening brief in this case conceded (as it should) that days occurring after a Medicare beneficiary has exhausted benefits for inpatient hospital services should not be considered to be days for which the patient is entitled to benefits under Medicare Part A. Def. Br. at 24. The Secretary's opening brief says this is so because these days "are 'not covered.'" *Id*. Yet, in a 2008 decision in another case, the Secretary ruled that a Medicare patient is entitled to benefits under Medicare Part A even after exhaustion of benefits, and, therefore, the days occurring after exhaustion of benefits may not be included in the Medicaid fraction even if the patient is eligible for Medicaid. *Saint Mary's –*

---

[4] This quotation is from the brief that the Secretary filed with the Fourth Circuit in *Cabell Huntington Hosp. v. Shalala,* 101 F.3d 984 (1996). See Pl. Br. at 38; AR 4345, 4346.

[5] The evidence in this case shows, as the PRRB found, that the Secretary counted only a very small number of Medicare HMO patient days in the SSI fraction and only when the Hospital had mistakenly billed and received a payment denial from the Medicare Part A fiscal intermediary. Pl. Stmt. ¶ 211; Pl. Br. at 44.

[6] In 2003, the Secretary clarified that once a Medicare beneficiary elects to enroll in a Medicare+Choice HMO, "those patient days attributable to the beneficiary should not be included in the Medicare [SSI] fraction of the DSH patient calculation," and the Secretary proposed a rule to include such days in the Medicaid fraction. 68 Fed. Reg. 27154, 27208 (May 19, 2003). In 2004, however, the Secretary reversed course. In the 2004 rule, the Secretary "adopt[ed] a policy" and revised the DSH regulation to include these days in the Medicare SSI fraction. 69 Fed. Reg. 48916, 49099 (Aug. 11, 2004).

*Milwaukee*, Decision of the Administrator at 11-12 (Pl. Exhibit 1).  This is not the only example of the Secretary's internally inconsistent statements as to which days should be included considered to be "entitled to benefits under [Medicare] part A."  *See* Pl. Br. at 36 n.23; *see also* Pl. Stmt. ¶¶ 198-200, 206, 210-17.  But, it is enough to say that the Secretary's interpretation of the DSH statute and regulations is erratic and inconsistent, and that it is, therefore, invalid.  *See National Treasury Employees Union v. FLRA*, 399 F.3d 334, 337, 340-42 (D.C. Cir. 2005); *Michigan Public Power Agency v. FERC*, 405 F.3d 8, 12-14 (D.C. Cir. 2005).

       Respectfully submitted,

       */s/* Christopher L. Keough
       Christopher L. Keough
        DC Bar No. 436567
       John M. Faust
        DC Bar No. 433553
       Stephanie A. Webster
        DC Bar No. 479524
       VINSON & ELKINS L.L.P.
       1455 Pennsylvania Avenue, N.W.
       Suite 600
       Washington, D.C.  20004-1008
       (202) 639-6500 (phone)
       (202) 639-6604 (fax)

       Counsel for Plaintiff

February 6, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of February, 2008, I electronically filed the foregoing Plaintiff's Response to Amicus Brief using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record for the Defendants:

> BRIAN G. KENNEDY
> LISA A. OLSON
> U.S. Department of Justice
> 20 Massachusetts Avenue, N.W.
> Room 7300
> Washington, D.C. 20530

A copy of the foregoing Plaintiff's Response to Amicus Brief was served on this date on counsel for the plaintiffs in *Auburn Regional Medical Center v. Leavitt*, Case No. 07-2075, by email and U.S. mail at the following address:

> ROBERT L. ROTH
> Crowell & Moring, LLP
> 1001 Pennsylvania Avenue, N.W.
> Washington, DC  20004-2595
> rroth@crowell.com

/s/ Christopher L. Keough
Christopher L. Keough