# CENTERS FOR MEDICARE AND MEDICAID SERVICES
## Decision of the Administrator

| In the case of: | Claim for: |
|---|---|
| Saint Mary's Hospital - Milwaukee | Reimbursement Determination for Cost Reporting Periods ending: 06/30/00 |
| Provider | |
| vs. | |
| Blue Cross Blue Shield Association/ National Government Services, LLC-WI | Review of: PRRB Dec. No. 2008-D7 Dated: November 16, 2007 |
| Intermediary | |

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the decision of the Provider Reimbursement Review Board (Board). The review is during the 60-day period in § 1878(f) (1) of the Social Security Act (Act), as amended (42 USC 1395oo (f)). The Administrator notified the parties of his intent to review the Board's decision as to Issue Nos. 1 and 2. CMS' Center for Medicare Management (CMM) commented, requesting reversal of the Board's decision on Issue Nos. 1 and 2. The Provider also commented, requesting that the Administrator affirm the Board's decision on Issue Nos. 1 and 2. Accordingly, this case is now before the Administrator for final agency review.

## ISSUES AND BOARD DECISION

### Issue No. 1 – Recalculation of the SSI Ratio

Whether CMS properly calculated the Provider's Medicare disproportionate share hospital (DSH) adjustment by not including 52 patient days from the Supplemental Security Income (SSI) fraction.

Exhibit 1

The Board, relying on its holdings in *Oakwood*[1] and *Baystate*[2] held that the additional 52 SSI days identified by the Provider should be included in the Provider's DSH calculation.

In reaching this determination the Board concluded that there was no statutory or regulatory impediment for recalculating the DSH percentage. Furthermore, the Medicare law required that the DSH calculation be accurate. Therefore, since the Board determined that the SSI file is a more accurate data source than the Medicare Provider Analysis and Review (MEDPAR) file, the additional 52 SSI days should be included in the calculation.

**Issue No. 2 – Medicaid Proxy and Dual-Eligible Inpatient Days.**

Whether the Intermediary improperly calculated the Provider's Medicare DSH adjustment by excluding 366 Long Term Respiratory Unit (LTRU) patient days from the Medicaid proxy of the DSH calculation.

The Board relying on its decision in *Alhambra Hospital*[3] held that the Intermediary improperly eliminated from the DSH calculation patient days for patients who otherwise were entitled to both Medicare and Medicaid benefits, but who had exhausted their benefits.

## COMMENTS

**Issue No. 1 - Recalculation of the SSI Ratio**

CMM commented, requesting that the Administrator reverse the Board's decision. CMM argued that the Board erred in interpreting the regulations regarding recalculation of the Provider's DSH Disproportionate Patient Percentage (DPP). CMM noted that the regulation at issue permits a hospital to choose to have its DPP calculated based on the hospital's cost reporting period instead of the Federal fiscal year (FFY). However, if this request is made, CMS will perform this calculation

---

[1] *Oakwood Hospital & Medical Center v Blue Cross Blue Shield Ass'n/United Government Services, LLC (Wis.)*, PRRB Dec. No. 2006-D2 (Nov. 16, 2005) (Oakwood).
[2] *Baystate Medical Center v. Mutual of Omaha Insurance, Co.*, (CCH) ¶81,468; modified, CMS, Administrator(CCH) ¶81,506, (May 11, 2006); Civil Docket No. 1:06-cv-01263-JDB.
[3] *Alhambra Hospital Center v Blue Cross Blue Shield Ass'n/United Government Services, LLC (CA)*, PRRB Dec. No 2005-D47 (July 29, 2005), rev'd CMS Admr. (9/30/05).

"once per hospital per cost reporting period"[4] and that the resulting DPP will "become the hospital's official [DPP] for that period."[5] Thus, the regulation only permits CMS to recalculate a hospital's DPP based upon a different time period, i.e., the hospital's cost reporting period rather than the FFY in which its cost reporting period began. CMM argued that there is no provision for re-computing the DPP based on updated or corrected data as the Board determined.

CMM noted that this policy of not performing redeterminations has also been applied in the context of outlier payment determinations. In fact, CMS's refusal to make redeterminations of outlier payments has been upheld in court. *Count of Los Angeles v. Shalala*, 192 F.3d 1005 (D.C. Cir. 1999) and *Rush-Presbyterian-St. Luke's Med. Ctr. v. Thompson*, No. 03-5375, 2003 WL 22019351 (N.D. Ill. Aug. 25, 2003).

The Provider commented requesting that the Administrator affirm the Board's determination. The Provider argued that all SSI days must be included as long as the patient was entitled to both SSI and Medicare Part A. The statute does not afford the Secretary the discretion as to which SSI days should be included in the numerator of the SSI fraction. Accordingly, since the 52 SSI patients in this case were also entitled to Medicare Part A the additional 52 SSI days should be included in the numerator of the SSI fraction.

Finally, there is no regulation that includes such a limitation on SSI appeals as CMM argued with regard to outlier payment redeterminations. CMM's argument that those regulations also provide a limit on the right to appeal the SSI fraction is entirely unsupported.

**Issue No. 2 - Medicaid Proxy and Dual-Eligible Inpatient Days**

CMM commented, requesting that the Administrator reverse the Board's decision. CMM contended that entitlement to Medicare Part A benefits precludes dual-eligible inpatient days from being included in the Medicaid proxy of the Medicare DSH calculation. For example, when a Medicare beneficiary exhausts their inpatient hospital benefits, those benefits will be renewed when the beneficiary has not been in a hospital or Skilled Nursing Facility (SNF) for 60 days. Therefore, under CMS' interpretation of the statute and the regulations, the days at issue are not included in the numerator of the Medicaid fraction.

---

[4] 42 C.F.R. § 412.106(b) (3) (2000).
[5] Id.

The Provider commented requesting that the Administrator uphold the Board's decision. The Provider argued that the 366 days should be included in the Medicaid proxy calculation on the basis that the Provider was not "entitled" to payments for such days as the patient exhausted its coverage for such days. Relying on *Jewish Hospital, Inc. v. Secretary of Health and Human Services*, 19 F.3d 270, 275 (6th Cir. 1994), the Provider contended that once a "dually eligible" i.e., crossover patient's Part A benefit are exhausted, the patient is no longer "entitled" to Medicare Part A benefits. Therefore, the remaining days of the patient's stay should be included in the Medicaid proxy of the DSH adjustment.

## DISCUSSION

The entire record, which was furnished by the Board, has been examined, including all correspondence, position papers, and exhibits. The Administrator has reviewed the Board's decision. All comments received timely are included in the record and have been considered.

### Issue No. 1 - Recalculation of the SSI Fraction

The Social Security Amendments of 1965[6] established Title XVIII of the Act, which authorized the establishment of the Medicare program to pay part of the costs of the health care services furnished to entitled beneficiaries. The Medicare program primarily provides medical services to aged and disabled persons and consists of two Parts: Part A, which provides reimbursement for inpatient hospital and related post-hospital, home health, and hospice care,[7] and Part B, which is supplemental voluntary insurance program for hospital outpatient services, physician services and other services not covered under Part A.[8] At its inception in 1965, Medicare paid for the reasonable cost of furnishing covered services to beneficiaries.[9] However, concerned with increasing costs, Congress enacted Title VI of the Social Security Amendments of 1983.[10] This provision added § 1886(d) of the Act and established the inpatient prospective payment system (IPPS) for reimbursement of inpatient hospital operating costs for all items and services provided to Medicare beneficiaries, other than physician's services, associated with each discharge. The purpose of IPPS was to reform the financial incentives hospitals face, promoting efficiency by rewarding cost effective hospital practices.[11]

---

[6] Pub. Law No. 89-97.
[7] Section 1811-1821 of the Act.
[8] Section 1831-1848(j) of the Act.
[9] Under Medicare, Part A services are furnished by providers of services.
[10] Pub. Law No. 98.21.
[11] H.R. Rep. No. 25, 98th Cong., 1st Sess. 132 (1983).

These amendments changed the method of payment for inpatient hospital services for most hospitals under Medicare. Under IPPS, hospitals and other health care providers are reimbursed their inpatient operating costs on the basis of prospectively determined national and regional rates for each discharge rather than reasonable operating costs. Thus, hospitals are paid based on a predetermined amount depending on the patient's diagnosis at the time of discharge. Hospitals are paid a fixed amount for each patient based on one of almost 500 diagnosis related groups (DRG) subject to certain payment adjustments.

Concerned with possible payment inequities for IPPS hospitals that treat a disproportionate share of low-income patients, pursuant to Section 1886(d) (5) (F) (i) of the Act, Congress directed the Secretary to provide, for discharges occurring after May 1, 1986, "for hospitals serving a significantly disproportionate number of low-income patients...."[12]

There are two methods to determine eligibility for a Medicare DSH adjustment: the "proxy method" and the "Pickle method."[13] To be eligible for the DSH payment under the proxy method, an IPPS hospital must meet certain criteria concerning, inter alia, its disproportionate patient percentage or DPP. Relevant to this case, with respect to the proxy method, § 1886 (d)(5)(F)(vi) of the Act states that the terms "disproportionate patient percentage" means the sum of two fractions which is expressed as a percentage for a hospital's cost reporting period. The fractions are often referred to as the "Medicare low-income proxy" or "Medicare fraction" and the Medicaid low-income proxy", respectively, and are defined as follows:

> (I) the fraction (expressed as a percentage) the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under Part A of this title and were entitled to supplemental security income benefits (excluding any State supplementation) under title XVI of this Act and the denominator of which is the number of such hospital's patients day for such fiscal year which were made up of patients who (for such days) were entitled to benefits under Part A of this title.

> (II) the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consists of patients who (for such days) were eligible for medical assistance under a State Plan approved under title XIX, but who were not entitled to benefits under Part A of this title, and the denominator of which is the

---

[12] Section 9105 of the Consolidated Omnibus Budget Reconciliation Act of 1985 (Pub. L. No. 99-272). See also 51 Fed. Reg. 16772, 16773-16776 (1986).
[13] The Pickle method is set forth at section 1886(d) (F) (i) (II) of the Act.

total number of the hospital patient days for such period. (Emphasis added.)

The Secretary implemented the statutory provisions at 42 C.F.R. § 412.106 (2000) and explains that the hospital's DPP is determined by adding the results of two computations and expressing that sum as a percentage.

Relevant to Issue No. 1, the first computation, the "Medicare fraction" is set forth at 42 C.F.R. § 412.106(b) (2) (2000). The regulation at 42 C.F.R. § 412.106(b) provides that:

> (b) *Determination of a hospital's disproportionate patient percentage. (1) General rule.* A hospital's disproportionate patient percentage is determined by adding the results of two computations and expressing that sum as a percentage.
> (2) *First computation: Federal fiscal year.* For each month of the Federal fiscal year in which the hospital's cost reporting period begins, CMS-
> (i) Determines the number of covered patient days that-
> (A) Are associated with discharges occurring during each month; and
> (B) Are furnished to patients who during that month were entitled to both Medicare Part A and SSI, excluding those patients who received only State supplementation;
> (ii) Adds the results for the whole period: and
> (iii) Divides the number determined under paragraph (b) (2) (ii) of this section by the total number of patient days that-
> (3) *First computation: Cost reporting period.* If a hospital prefers that CMS use its cost reporting period instead of the Federal fiscal year, it must furnish to CMS, through its intermediary, a written request including the hospital's name provider number, and cost reporting period end date. This exception will be performed once per hospital per cost reporting period, and the resulting percentage becomes the hospital's official Medicare Part A/SSI percentage for that period.
> (4) *Second computation.* The fiscal intermediary determines, for the same cost reporting period used for the first computation, the number of the hospital's patient days of service for which patients were eligible for Medicaid but not entitled to Medicare Part A, and divides that number by the total number of patient days in the same period.....

In this case, the Provider challenged the calculation of its Medicare fraction in determining its DSH adjustment payment.[14] The Board concluded that the regulation did not preclude the recalculation of the Medicare fraction.

The Administrator does not agree. The Administrator finds that the regulation does not provide for a recalculation of the SSI ratio based upon updated or later data once it is completed by CMS. A review of the applicable law and regulations show that the Secretary did not intend for the DSH calculations to be recomputed or recalculated based upon later, or corrected, data.

On its face, the regulation does not allow for further recalculations of a provider's SSI ratio beyond that explicitly prescribed in the regulation. As the regulation shows, only a limited exception for recalculation of the Medicare fraction based upon a provider's cost reporting period is allowed. Notably, this limited exception was based on the explicit time period (a provider's cost reporting period) which was set forth in the statute. In contrast, no such explicit provision for recalculation of the Medicare fraction based on later, or corrected data, is set forth in the statute, nor in the regulation.

The Secretary has consistently recognized the administrative burdens involved in calculating the Medicare fraction and has made policy decisions balancing the need to reduce administrative burdens and the need for timely, accurate data. The policy to consider the CMS calculated Medicare fraction not subject to updating is consistent with the sometimes competing interests of finality, timeliness, efficiency and accuracy in the administration of a large Federal program.

In arriving at this policy, the Secretary considered the administrative burdens associated with the calculation of the Medicare fraction. The Secretary necessarily examined these problems within the context of administering the entire Medicare program and not within the singular context of calculating a single hospital's DSH Medicare fraction. In implementing DSH provisions in 1986, the Secretary found that to match SSI eligibility records to Medicare bills on a Federal fiscal year on an annual basis was the most efficient approach given the scope of the program. Noting the 11 million billing records and 5 million SSI records, the Secretary specifically limited any calculations to a *yearly basis* stating that:

---

[14] Under the Administrative Procedure Act, the proponent of the rule has the burden of proof. 5 USC 556(d). Thus, a provider has the burden to establish its claim for reimbursement before the Board. In this instance, the Provider has the burden of proof to support its claim for additional DSH payments by a preponderance of the evidence. (*Fairfax Hospital Association v. Califano*, 585 F. 2d 602 (4th Cir. 1978) CMS/HCFA Ruling 79-60c.)

> The data source for computation of the SSI/Medicare percentage include the Medicare inpatient discharge file which is compiled on a Federal fiscal year basis and includes approximately 11 million billing records (this compilation is done about three or four months after the close of the Federal fiscal year and is then updated periodically as additional discharge data are received) and the SSI file that lists all SSI recipients for a 3 year period denotes the month during the period in which the recipient was eligible for SSI benefits (the SSI file includes over 5 million records.) In order to compute the SSI/Medicare percentage, the 11 million records from the discharge file must be individually matched by beneficiary number and month of hospitalization with the SSI recipient records. On a Federal fiscal year basis, this match would be performed <u>on a yearly basis</u>. (Emphasis added.) [15]

In balancing administrative efficiency and accuracy, the Secretary noted that:

> We do not believe that there are likely to be significant fluctuations from one year to the next in the percentage of patients served by hospitals that are dually entitled to Medicare Part A and SSI. Consequently, the percentage for a hospital's own experience during the Federal fiscal year should be reasonably close to the percentage specific to the hospital's cost reporting period.[16]

The Secretary, subsequently, compared the Medicare fraction based on a provider's cost reporting period and the Federal fiscal year and concluded, as predicted, that these two periods resulted in reasonably close percentages. The Secretary subsequently determined that he would afford hospitals the option to determine the number of patient days of those dually entitled to Medicare Part A and SSI for their own cost reporting periods. The Secretary concluded that:

> We do not believe Congress intended to impose cumbersome and costly administrative burden as that described above in implementing this provision. The Secretary has general rulemaking authority under section 1102 and 1871 of the Act to deal with problems of implementing and administering the Act in an efficient manner. Based on the above discussion, we believe that using the Federal

---

[15] 51 Fed. Reg. 31454, 31459-60 (Sept 1986).
(The 2002 MEDPAR file contains over 12 million records. See, e.g., http://www.cms.gov/IdentifiableDataFiles/05_MedicareProviderAnalysisandReviewFile.asp .)
[16] 51 Fed. Reg. 16777.

01/25/2008 14:24 4107860043
CMS

fiscal year instead of a hospital's own cost reporting period is the most feasible approach to implementing provision terms of accuracy, timeliness and cost efficiency. In addition, we believe we have complied with the law by affording hospitals the option of having their SSI/Medicare percentages computed based on ... the cost reporting period.[17]

In allowing for this provision, the Secretary noted that:

[I]f a hospital has its SSI/Medicare percentage recomputed based on its own cost reporting period, this percentage will be used for purpose of it disproportionate share adjustment whether the result is higher or lower than the percentage computed based on the Federal fiscal year." (Emphasis added.) [18]

That is, a provider cannot request such a recalculation and chose the higher Medicare fraction. The regulatory language plainly does not incorporate any procedures for revising the Medicare fraction based upon later data. Rather, the regulation provides for a provider's Medicare fraction to be final, once calculated by CMS, except in the instance where a provider has requested the computation be based on its cost reporting period.

Finally, in response to the specific commenters, the Secretary had the opportunity to specifically address this issue in the final rule to the FFY 2006 final rates.[19] The Secretary specifically rejected the use of updated SSI eligibility information (which the commenter argued may include retroactive approvals, etc.), for use by CMS to revise calculations of hospital DSH Medicare fractions. Consequently, the Secretary clearly had a policy of calculating the SSI fraction based upon specific data, within certain timeframes, and not subject to later revision.

Moreover, the Administrator finds that this policy is consistent with IPPS. Notably, where the Secretary has allowed for corrections of data underlying inpatient prospective payments or IPPS, the Secretary has set forth specific procedures and timeframes for doing so consistent with the aims of IPPS (e.g., wage index). In contrast, no process was implemented in the regulations at 42 C.F.R. § 412.106 for the recalculation of the CMS Medicare fraction.

---

[17] 51 Fed Reg. 31459-60. (See also "[I]n the interim final rule we proposed matching SSI eligibility records to the Medicare bills on a Federal fiscal year basis because we believe this is the most efficient approach." 51 Fed. Reg. 31454 (Sept. 3, 1986)).
[18] 51 Fed Reg. 31459-60.
[19] 70 Fed. Reg. 47278, 47439-47440.

Likewise, the Secretary has determined that the refusal to recalculate underlying IPPS data is also rational and consistent with the aims of the inpatient PPS. Specifically, the regulation for determining eligibility for the rural referral center status required the use of a provider's published 1981 case mix index (CMI). The Secretary refused to recalculate a provider's 1981 CMI for purposes of determining its eligibility for rural referral center status under IPPS.[20] The court in *Board of Trustees of Knox County Hospital v.Shalala*, 135 F 2d 493 (7th Cir. 1998), specifically addressed the provider's challenge to the Secretary's use of a published 1981 case mix index (CMI). The provider argued that CMS ought to accept a recalculated CMI because its study conducted by a nationally recognized consulting firm, was based on 100 percent of the provider's 1981 Medicare discharges. In contrast, the Secretary's calculation was based in large part on the MEDPAR file, which included information concerning only 20 percent of the Provider's 1981 discharges. However, the Court accepted that the Secretary's policy serves the interests of accuracy, uniformity and administrative convenience and concluded that the Secretary's policy of relying solely on her own calculation of a provider's 1981 CMI was not arbitrary and capricious.

The Secretary, as a matter of policy, also declined to recalculate the outlier payments to account for the difference between the estimated and actual outlier payments. See e.g., 49 Fed. Reg. 234, 265-66. In response to commenters, the Secretary pointed out that this policy applied regardless of whether the aggregate outlier payments resulted in more or less than the statutory five- six percent of the total projected DRG prospective payment. Such a policy promoted finality, efficiency and certainty in the process. The court in *County of Los Angeles v. Shalala*, 192 F. 2d 1005 (1999), upheld this policy observing that: "while we have recognized that retroactive corrections may not ultimately undermine PPS, we have emphasized that that 'does not establish that a prospective–only policy is unreasonable.' *Methodist*, 38 F. 3d at 1232." *County of Los Angeles v. Shalala*, 192 F. 2d 1005, 1020 (1999).

---

[20] In reference to a specific objection raised by a commenter regarding the CMI, the Secretary announced: "We do not believe that hospitals should be allowed to substitute other criteria for the one we published in the NPRM (notice of proposed rulemaking. We selected the 1981 case-mix index for this criterion because it represents the most current published data available at the time. The basic tenet of the prospective payment system is that the rates paid to hospitals are determined prospectively and are based on the best data available at the time. Thus, a hospital knows in advance what its payment amounts will be." See 49 Fed. Reg. 34728 34743-44 No commenters raised the issue of recalculating the SSI ratio in the initial rule implementing the DSH SSI calculation and thus the issue was not explicitly addressed in the final rule.

Similarly, the Secretary's policy in this instance promotes administrative finality and certainty in the process. The Secretary's policy is neutral in that the SSI ratio remains the same regardless of whether a later recalculation would result in a higher or lower Medicare fraction. This neutrality ensures predictability in the process by preventing unexpected shifts in the payment rates based on later data. Thus, the Administrator finds that the regulation precludes the recalculation of the Medicare fraction based on updated or corrected data. Further, as the Board is bound by the regulations, it is not authorize to order any recalculation of the SSI ratio based on updated or corrected data.

**Issue No. 2 - Medicaid Proxy and Dual-Eligible Inpatient Days.**

As stated above, to be eligible for the additional DSH payment, a hospital must meet certain criteria concerning, inter alia, its DDP. Section 1886(d)(5)(F)(vi) of the Act states that the term DPP means the sum of two fractions which is expressed as a percentage for a hospital's cost reporting period. Relevant to Issue No. 2 is the Medicaid portion of this fraction which is defined at § 1886(d)(5)(F)(vi)(II) as:

> the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) <u>were eligible for medical assistance under a State plan approved under title XIX, but who were not entitled to benefits under part A of this title</u>, and the denominator of which is the total number of the hospital's patient days for such period. (Emphasis added).

Consistent with the statute the regulation at 42 C.F.R. § 412.106(b)(4)(2000) describes the numerator of the Medicaid fraction as "the number of the hospital's patient days of service for which patients were eligible for Medicaid but not entitled to Medicare Part A...."

In this case, the Provider argued that the Intermediary improperly excluded 366 LTRU patient days from the numerator of the Medicaid fraction of the Medicare DSH calculation. These were patient days for a Medicare beneficiary at the Provider who was both eligible for Medicaid and entitled to Medicare Part A benefits but had exhausted Medicare Part A benefits. The Provider argued that, since the beneficiary had exhausted his Medicare Part A benefits, that the beneficiary was no longer entitled to Medicare. Therefore, the days should be included in the Medicaid proxy of the Medicare DSH calculation. The Board relying on its decision in *Alhambra Hospital*[21] agreed.

---

[21] <u>Supra</u>, n. 3.

The Administrator does not agree. The Administrator finds that the statutory phrase in the Medicaid proxy "but who were not entitled to benefits under Medicare Part A of this title" forecloses the inclusion of the days at issue in this case in the numerator of the Medicaid proxy. A review of the plain language of the statute reflects that the Medicare low-income proxy is intended to capture distinct patient populations. The Medicare low-income proxy, because it uses SSI as the income indicator, includes Medicare/Medicaid dual eligible patients. The Medicaid low-income proxy specifically excludes from its calculations patients entitled to Medicare Part A and limits its proxy to Medicaid-only eligible patients. The relevant language of the Medicaid proxy indicates that it is the status of the patients, as opposed to the payment of the day, which determines whether a patient day is included in the numerator of the Medicaid proxy.

Accordingly, based on the plain language of the statute the Administrator finds that the statutory phrase in the Medicaid proxy "but who were not entitled to benefits under Medicare Part A of this title" forecloses the inclusion of the days at issue in this case in the numerator of the Medicaid proxy.[22] Thus, the Intermediary's calculation of the Provider's DSH adjustment was proper.[23]

---

[22] As noted by CMM, even when a Medicare beneficiary exhaust their inpatient hospital benefits, these benefits will be renewed when the beneficiary has not been in a hospital or SNF for 60 days. Thus, while a Medicare beneficiary's benefit period may exhaust or expire, the entitlement for Medicare does not expire.

[23] The Secretary addressed this policy of including dual-eligible patient days in the Medicare fraction at 68 Fed. Reg. 27207 (May 19, 2003) and 69 Fed. Reg. 48916, 49098 (Aug 11, 2004).

## DECISION

Issue No. 1

The Administrator reverses the Board's decision on Issue No. 1.

Issue No. 2

The Administrator reverses the Board's decision on Issue No. 2.

**THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE SECRETARY OF THE HEALTH AND HUMAN SERVICES**

Date: 1/15/08

Herb B. Kuhn
Deputy Administrator
Centers for Medicare & Medicaid Services